# Exhibit 37 –

## Supplemental Expert Report of David Kalat

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| ROBERT BRAVER, for himself and all<br>Individuals similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:17-cv-00383-F |
| | ) | |
| NORTHSTAR ALARM SERVICES, LLC, a<br>Utah Limited Liability Company,<br>YODEL TECHNOLOGIES, and<br>DOES 2-10, UNKNOWN INDIVIDUALS | ) | |

**SUPPLEMENTAL EXPERT REPORT OF DAVID KALAT**

I.   INTRODUCTION ................................................................................................ 3

II.  QUALIFICATIONS ........................................................................................... 4

III. DOCUMENTS AND DATA SOURCES CONSIDERED ............................... 6

IV.  FACTUAL BACKGROUND ............................................................................ 8

V.   ANALYSIS AND CONCLUSIONS ............................................................... 12

   A Significant Number of Proposed Class Members Were Called On Documented Business Telephone Lines ................................................................................................. 12

   Many of the Telephone Numbers Identified as Proposed Class Members Cannot Be Reliably Matched to a Called Party ................................................................................. 13

   Mr. Biggerstaff's Proposed Class Includes Calls That Were Requested by the Recipients ..... 15

   Soundboard Avatar Technology Predates Its Application to Telemarketing ............................ 16

**Prefatory comment:**

On March 29, 2018 I submitted an expert report that included research from four online landline telephone number directories (LexisNexis, TLO, 411.com/WhitePagesPro, and Google) relating to selected telephone numbers. As I testified at my deposition on April 20, 2018, this work was conducted at my direction by professional researchers employed by my firm, Berkeley Research Group Investigatory Services of Illinois, LLC. At my deposition I testified that I understood the research methodology used would count any reference to the name in the Lead List within the results returned by the database search as a match.

During my deposition I was presented with examples that indicated this methodology had not been consistently followed. I subsequently confirmed that some of the research results were interpreted by my researchers using a less strict methodology for assigning matches to leads. While I consider the alternate methodology they followed to be valid, in order to conform my report and its associated exhibits to the methodology that I intended, I am submitting this updated version. The only changes are in section V under the heading "*Many of the Telephone Numbers Identified as Proposed Class Members Cannot Be Reliably Matched to a Called Party*." Both methodologies are described therein and both sets of results are presented. Using the stricter approach to assigning matches to leads resulted only in slight changes to the overall counts I reported and does not materially change any of my conclusions.

## I.     INTRODUCTION

1.  Ten percent of the telephone numbers identified in Mr. Biggerstaff's proposed class list are documented as being used by businesses. An individualized analysis of each telephone number would be required to establish which specific ones were associated with businesses.

2.  Depending on the methodology used to evaluate a match, between nine and twelve percent of the telephone numbers identified in Mr. Biggerstaff's proposed class list return a different name from the name identified in the Leads when searched in an online directory of landline

telephone numbers (LexisNexis, TLO, 411.com/WhitePagesPro, and Google). In some cases, a single number returned different names from three or more resources. For example, does the telephone number ██████2050 belong to Jean ████ (the lead identified in the Leads), Yvonne ████ (the name returned by LexisNexis), Chimere ████ (the name returned by 411.com), or Jean ████ (the name returned by Google)?

3. In many of the call recordings produced by Yodel, the call recipients said they were not the person that the soundboard operator had intended to call. To quantify this discrepancy, I selected a random sample of the call recordings using a 95% level of confidence and a margin of error of 5% or less. Each randomly selected sample recording was played in order to identify in which recordings the called party self-identified themselves as someone other than the person listed in the Leads. This analysis identified that in thirty percent of the calls, the called party was someone other than the person listed in the Leads. An individualized analysis of each number is necessary to identify which telephone numbers are affected, and who the actual called party was.

4. The "status" codes recorded in the lead lists and call logs indicate that approximately twenty-six percent of the calls in the total proposed class list prepared by Mr. Biggerstaff, made to approximately three percent of the leads, were placed to call recipients who apparently requested the calls.

5. Soundboard technology significantly predates its relatively recent use for telemarketing and other telecommunications purposes. In fact, soundboards have been in use for decades to help assist individuals with speech disabilities.


## II.    QUALIFICATIONS

6. I am a Director at Berkeley Research Group, LLC ("BRG"), a leading global strategic advisory and expert services firm that provides independent expert testimony, litigation support, data analytics and other services to major law firms, Fortune 500 corporations, government agencies, and regulatory bodies around the world. I am a member of the firm's Global

Investigations + Strategic Intelligence practice group. I lead investigations involving data analytics and forensic computer examinations. I joined BRG in April 2015. My Curriculum Vitae is set forth as Exhibit A, and lists my publications in the last ten years and my prior testimony in the last four years.

7. I received my Bachelor of Arts from the University of Michigan as a James B. Angell Scholar. I received my Masters Degree in Library and Information Science from the University of Illinois at Urbana-Champaign.

8. I am a licensed Private Detective in the state of Illinois (license number 115.002487). I am a Certified Fraud Examiner (license number 621469). I am certified by the International Society of Forensic Computer Examiners (ISFCE) as a Certified Computer Examiner (license number 1666). I am also licensed by the International Information System Security Certification Consortium ((ISC)$^2$) as a Certified Information Systems Security Professional (license number 593527).

9. I am a non-fiction author with a focus on the history of information technology. My blog "Nervous System" at Legal Tech News, for example, approaches issues of data privacy and cybersecurity from a historical context.

10. I have been retained as a consulting and/or testifying expert in several pending TCPA actions for which I have not yet been disclosed nor provided any written testimony. I have direct experience analyzing the types of call log data, lead list data, and other data types at issue in this matter. During the course of my work at BRG I have performed a variety of data analysis on numerous putative TCPA class actions and cases filed under the California Invasion of Privacy Act. My work has included but is not limited to reverse engineering the data schema and design of autodialers; forensic examination of web server logs to compare to the URLs and IP addresses in lead lists; analysis in SQL and PostgreSQL of dialer database records, call detail records; and Customer Relationship Management ("CRM") database records; analyzing records produced by the Interactive Marketing Solutions ("IMS") to distinguish wireless telephone numbers from landline telephone numbers; and conducting telephone number

reverse lookups using data brokers such as LexisNexis. I have analyzed the use of dialers from Asteria, Noble Systems, Interactive Intelligence, Genesys, and other vendors. I have examined the use of soundboard avatar technology.

11. I have also provided prior expert testimony in my capacity as a technology and investigative expert in the following matters:

- C.J. Drilling, Inc. v. Welsh, No. 17 CH 001095 (Kane Cnty. Cir. Ct.)
- Western Union v. Kula, 1:17cv00280 (N.D. Ill.)
- Segerdahl Corp. v. Ferruzza, et al., 1:17cv03015 (E.D. Ill.)
- L&W Supply Corp. v. Banks et al., CV16-00816 (Washoe Cnty. Dist. Ct.)
- Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores, 1:15cv1104 (W.D. Texas); also In Re: Frank Miranda Dores and Mary Anne Souza Dores, No. 16-10169-B-13 (Bankr. E.D. Calif.)
- Pro Sapiens LLC v. Indeck Power Equipment Co., 14L5730 (Cook Cnty. Cir. Ct.)
- Geophysical Service Inc. v. Anadarko Petroleum Corp. et al., 1201-15228 (Ct. of Queen's Bench of Alberta)

12. I have been retained by counsel for NorthStar Alarm Services, LLC ("NorthStar"). I am being compensated at an hourly rate of $420.

13. My understanding of the factual matters at issue is based on my review of the documents and data described in section III below. I understand that additional information relevant to my opinions may be disclosed in subsequent productions and depositions. Accordingly, I reserve the right to amend my findings based upon such additional disclosures.

## III.    DOCUMENTS AND DATA SOURCES CONSIDERED

14. My report is based on my review and examination of the following documents and data sources.

- BRAVER-0020 -Yodel Demo.mp4
- NorthStar00000139

- NorthStar_transfers_and_audio CONFIDENTIAL.xlsx
- NorthStar_outbound_lead_logs.csv
- NorthStar_outbound_leads.csv
- 2017.12.19 - Wood, Kyle - Indiv., Vol. I
- 2017.12.19 - Wood, Kyle - Indiv., Vol. II
- 2017.12.20 - Wood, Kyle - Yodel 30(b)(6)
- 2018.01.04 - Braver, Robert H.
- Exhibit 1 to 2017.12.19 - Wood, Kyle
- Exhibit 32 to 2017.12.19 - Wood, Kyle
- Exhibit 4 to 2017.12.19 - Wood, Kyle
- Exhibit 48 to 2017.12.19 - Wood, Kyle
- Exhibit 5 to 2017.12.19 - Wood, Kyle
- Exhibit 52 to 2017.12.19 - Wood, Kyle
- Exhibit 53 to 2017.12.19 - Wood, Kyle
- Exhibit 55 to 2017.12.20 - Wood, Kyle - Yodel 30(b)(6)
- Exhibit 56 to 2017.12.20 - Wood, Kyle - Yodel 30(b)(6)
- Exhibit 57 to 2017.12.20 - Wood, Kyle - Yodel 30(b)(6)
- Exhibit 6 to 2017.12.19 - Wood, Kyle
- 2017.09.27 - Yodel's Initial Disclosures
- 2017.11.14 - Yodel's Resps. to Plaintiffs_ 1st ROGS and RFP (CONFIDENTIAL)
- 2017.11.30 - Yodel's Suppl. Discovery Responses (CONFIDENTIAL)
- 2017.12.18 - Yodel's Supplemental Discovery Responses (CONFIDENTIAL)
- 2017.12.22 - Braver's Response to NorthStar Discovery
- 2017.12.31 - Yodel 2nd discovery responses (CONFIDENTIAL) (2).PDF
- 2018.01.05 - NorthStar's Responses to Plaintiff's [2nd] Discovery Requests
- 2018.1.05 - Yodel's 3rd Discovery Responses (CONFIDENTIAL)

- Letter from Lois Greisman, Associate Director, Director of Marketing Practices, FTC, to Michael Bills, CEO, Call Assistant, LLC (Sept. 11, 2009)
- Letter from Lois Greisman, Associate Director, Director of Marketing Practices, FTC, to Michael Bills, CEO, Call Assistant, LLC (Nov. 10, 2016)

## IV.    FACTUAL BACKGROUND

15. NorthStar Alarm Services, LLC ("NorthStar") is a provider of home security services with corporate offices in Orem, Utah.[1]

16. Between February 2016 and October 2016, NorthStar engaged Yodel Technologies, LLC ("Yodel") to generate home-security related sales leads.[2]

17. Yodel is a provider of telecommunication and call center services, with corporate offices in Palm Harbor, Florida.[3] Among the services offered by Yodel is soundboard technology, also known as avatar technology.[4]

18. Use of a soundboard avatar system like the one offered by Yodel entails the drafting and recording of a script to be followed by the call center agents. The script consists of a series of pre-recorded statements for call center agents to use while communicating with customers. Certain parts of the script are designed to be used in every call while others may be optional responses to be used depending upon how the conversation with the customer unfolds. The scripts are recorded by actors and are stored as "prompts" in the soundboard software. When a call center agent connects live to a customer in an actual call, the agent selects from the available prompts to carry on a conversation.[5] Which prompts are played and in what order depends entirely on the manual actions and decisions of the call center agent—the soundboard

---

[1] https://www.NorthStarhome.com/about.php
[2] Deposition of Adam Bailey, December 29, 2017 at 26:18-21.
[3] https://www.yodelvoice.com/about-us/
[4] Deposition of Kyle Wood, December 19, 2017 at 16:8-17.
[5] BRAVER-0020 -Yodel Demo.mp4; also Deposition of Kyle Wood, December 19, 2017 at 16:8-17:13; 20:7-13; and 97:14-23.

itself never "automatically" plays anything, and if the agent never presses a key then no voice will be heard. Additionally, the agent has the ability to join the call at any time with their own voice, instead of or in addition to the playback of the prerecorded prompts.[6]

19. I understand that the FTC issued an informal staff opinion on September 11, 2009 specifically exempting the use of soundboard avatars from the 2008 amendments to the Telemarketing Sales Rule ("TSR"), which prohibited "telemarketing calls that deliver prerecorded messages without a consumer's express written agreement to receive such calls."[7] According to the FTC's September 11, 2009 letter, the use of soundboard avatars allowed for enough conversational interaction with call recipients to be distinguishable from "prerecorded messages" as defined by the TSR.[8] I understand that on November 10, 2016, the FTC issued a new staff opinion that reversed its previous 2009 opinion. According to the new letter, the FTC concluded that outbound telemarketing calls using soundboard technology are now subject to the TSR's prerecorded call provisions. The letter also stated that "[i]n order to give industry sufficient time to make any necessary changes to bring themselves into compliance, the revocation of the September 2009 letter will be effective six months from today, on May 12, 2017."[9] Neither the 2009 nor the 2016 FTC letters directly address the Telephone Consumer Protection Act (47 U.S.C. § 227, "TCPA").

20. All of the calls reflected in Yodel's logs occurred between February 2016 and October 2016. These calls therefore occurred after the September 11, 2009 FTC letter and before the November 10, 2016 FTC letter and concluded more than five months prior to the May 12, 2017 deadline for compliance.

---

[6] 2017.11.14 – Yodel's Resps. to Plaintiffs_ 1st ROGS and RFP (CONFIDENTIAL), p. 4.
[7] 16 CFR Part 310.
[8] Letter from Lois Greisman, Associate Director, Director of Marketing Practices, FTC, to Michael Bills, CEO, Call Assistant, LLC (Sept. 11, 2009), attached as Exhibit B.
[9] Letter from Lois Greisman, Associate Director, Director of Marketing Practices, FTC, to Michael Bills, CEO, Call Assistant, LLC (Nov. 10, 2016), attached as Exhibit C, p. 3-4.

21. I understand that Yodel obtained lists of prospects from third-party data providers Flex Marketing and Red Dot Data.[10] The lists of prospects provided by Red Dot Data consisted of names, addresses, and landline telephone numbers.[11] Some of the leads provided by Red Dot Data included the website URL and IP addresses that document the customer's provision of consent to be called, however.[12] The absence of this data from other Red Dot Data leads does not necessarily mean no consent was originally provided by those prospects, only that any such consent if it existed was not contained in the documentation available.

22. Call center agents called the Red Dot leads using the recorded script prompts. The call center agents then determined if the call recipient wanted to communicate further with NorthStar. At first Yodel sent to NorthStar the leads qualified by the soundboard agents and NorthStar later contacted these persons as requested. Later the campaign was adjusted so that qualified leads were immediately transferred from the soundboard agents to NorthStar's during the initial call.[13]

23. According to NorthStar's disclosures in this case, I understand that Yodel transferred 9,196 live calls over the course of the campaign.[14]

24. I understand that in the ordinary course of business, Yodel's system recorded calls as they occurred, but that calls under 30 seconds were not saved.[15]

25. I am informed that copies of all available recordings of the calls were produced through Yodel's counsel in a production titled "NorthStar_transfers_and_audio."[16] This production includes 5,309 rows of data containing links to 5,119 unique call recordings.

---

[10] Deposition of Kyle Wood, December 19, 2017 at 17:21-18:17.
[11] Ibid at 25:2-3 and 19:14-16.
[12] Ibid at 25:2-12. See also Defendant Yodel Technologies LLC's Supplemental Responses to Plaintiff Robert Braver's Discovery Requests, p. 6.
[13] Defendant Yodel Technologies LLC's Supplemental Responses to Plaintiff Robert Braver's Discovery Requests, p. 4; Deposition of Adam Bailey, December 29, 2017 at 48:11-49:9.
[14] NorthStar Alarm Services, LLC's Responses to Plaintiff's Written Discovery Requests, p. 3.
[15] Deposition of Kyle Wood, December 19, 2017 at 90:11-91:3.
[16] Ibid at 88:11-21.

26. According to "Defendant Yodel Technologies LLC's Supplemental Responses To Plaintiff Robert Braver's Discovery Requests," the spreadsheet "NorthStar_outbound_lead_logs.csv" ("Call Logs") contains all identifying information in Yodel's possession, custody or control, regarding the phone calls made as part of the NorthStar calling campaign, and the spreadsheet "NorthStar_outbound_leads.csv" ("Leads") contains all identifying information in Yodel's possession, custody or control, regarding the individual leads called during the NorthStar calling campaign.[17]

27. Plaintiff's expert Robert Biggerstaff ("Mr. Biggerstaff") conducted an analysis of the Call Logs and Leads data. According to his Expert Report, Mr. Biggerstaff filtered the Call Logs according to the following criteria:

    a. Include only records where the value of "outbound_lead_group_id" is 597, to identify leads obtained from Red Dot Data;

    b. Include only records where the value of "status_final" is either 20 (indicating the call recipient requested to be put on a Do Not Call list) or 50 (indicating that the soundboard agent had progressed to the point of the sixth prompt in the script);

    c. Exclude any records where the value of "campaign_id" is 92, which would indicate the campaign was used for testing purposes;

    d. Include only records where the value of "cc_agent" is populated with some data, indicating that a Yodel agent was involved in the call;

    e. Include only records where the value of "hangup_cause" is "NORMAL CLEARING," indicating the call concluded with one of the parties hanging up normally;

---

[17] Defendant Yodel Technologies LLC's Supplemental Responses to Plaintiff Robert Braver's Discovery Requests, p. 2-3.

f.  Include only records where the value of "ip_address" and "url" on the corresponding record in the Leads Log was empty, in order to exclude leads for which some form of consent had been documented;

g.  Include only records with a total call duration longer than 30 seconds; and

h.  Include only records that could be matched to a corresponding lead in Leads through the reference value of "outbound_lead_id."

Mr. Biggerstaff reported that the above criteria identified a set of 252,765 calls made to 239,630 unique leads.[18]

## V.     ANALYSIS AND CONCLUSIONS

### A Significant Number of Proposed Class Members Were Called On Documented Business Telephone Lines

28. I conducted my own analysis of the Call Logs and Leads data and determined that 10% of the calls identified in Mr. Biggerstaff's proposed class list were made to telephone numbers that are documented as being used by businesses.

29. In order to conduct this analysis, I selected a statistically sound random sample of telephone numbers from the population of the 239,630 leads identified by Mr. Biggerstaff.[19] Using a 95% confidence level and a margin of error of no more than 5%, a random sample of 384 telephone numbers from the pool of 239,630 leads was selected for review. The telephone numbers were selected using statistical software package Rat-Stats, which was developed by Office of Inspector General and is the primary statistical tool for OIG's Office of Audit Services. BRG applied the uniformly distributed random number generator in Rat-Stats to select 384 unique telephone numbers. The application of a uniformly distributed random number generator

---

[18] Expert Report of Robert Biggerstaff, January 26, 2018, p. 7-11.
[19] Mr. Biggerstaff did not include the list of calls in his expert report, however data analysts working at my direction replicated his analysis as described in his report to produce the same set of 252,765 calls made to 239,630 unique leads.

guarantees that each number within the sampling frame had an equal chance of being selected, which is the requirement for a statistically valid simple random sample.

30. At my direction, professional researchers then searched these 384 telephone numbers in LexisNexis, TLO, 411.com/WhitePagesPro, and Google to identify the person or party associated with that telephone number. As set forth in Exhibit D, 38 of the 384 numbers were found to be associated with a business, at a rate of 9.9%. Given the statistical relationship between the sample and the proposed class as a whole, there is a 95% level of confidence and a margin of error of 5% or less that 9.9% of the class as a whole represents telephone numbers used for business.

31. I observed no pattern to which telephone numbers were associated with businesses. Although the analysis above indicates that 10% of the numbers listed in Mr. Biggerstaff's proposed class are business telephone numbers, an individualized analysis of each telephone number would be required to establish which specific ones were associated with businesses.

### Many of the Telephone Numbers Identified as Proposed Class Members Cannot Be Reliably Matched to a Called Party

32. Researching the person or party associated with each telephone number in the random sample of 384 also identified substantial discrepancies between the names listed in the Leads and the results returned by database records.

33. There are different approaches to evaluating discrepancies between the names listed in the Leads and the results returned by database searches. When these database providers return multiple names for individuals associated with a given telephone number, the different results are ranked by priority or confidence level. In the course of conducting similar analysis on other matters I have often relied on the top-level or highest ranked result as the primary or principal "hit" for a given database record. Although I consider this a reliable and appropriate methodology for identifying discrepant names, it was my intention to use a stricter methodology in this case. According to the standard that I described in my deposition, if a

database result returned a discrepant name as the top-ranked "hit" but also included a lower-ranked version of the name in the Leads, this would be counted as a match. In the discussion below I report both figures, but the difference between them is minimal and my conclusions are based on the stricter methodology that considered any reference to a name in the Lead as a match.

34. When the 384 sample telephone numbers were searched in the online database records of LexisNexis, TLO, 411.com/WhitePagesPro, and Google, different types of discrepancies were observed.

    a. The database might return no name at all for the phone number—for example, this occurred twelve percent of the time (42 records out of 384) when searching in LexisNexis (11%).

    b. The database might return a completely different name associated with the phone number—this also occurred ten percent of the time when searching in LexisNexis (38 records out of 384 using the strict match methodology, or 47 records out of 384 when matched on top-ranked hit alone).

In other words, searching the database records of an established and reputable data vendor such as LexisNexis failed to return the same name as the Lead in twenty-one percent of instances. Although synthesizing the results of all of the database resources to one another resolved some of these discrepancies, this also introduced different ones. In all, I found that two or more databases returned discrepant results from the last name listed in the Leads in 36 records out of the 384 (9%) using the strict match methodology, or 46 records out of the 384 (12%) when matched on top-ranked hit alone. Exhibit E sets forth the full results of this analysis.

35. As shown in the Exhibit, the names returned by different databases can differ from one another. For example, does the telephone number ███-2050 belong to Jean ███ (the lead identified in the Leads), Yvonne ███ (the name returned by LexisNexis), Chimere ███ (411.com), or Jean ███ (the name returned by Google)?

36. As an additional data point in determining the owner of any given telephone number, I observed that many of the call recordings produced in the "NorthStar_transfers_and_audio" spreadsheet contained recordings of call recipients who said they were not the person that the soundboard operator had intended to call.

37. To quantify this discrepancy, I selected a random sample of the call recordings using the same methodology used to select the random sample of telephone numbers. Three-hundred-fifty-seven call recordings were selected, representing a 95% level of confidence and a margin of error of 5% or less. Each recording was played in order to identify in which recordings the called party self-identified themselves as someone other than the person listed in the Leads.

38. As set forth in Exhibit F, this analysis identified that in 108 of the sample recordings (30%), the called party was someone other than the person listed in the Leads.

39. Based on these findings, it is reasonable to conclude that as many as 30% of the telephone numbers listed in Mr. Biggerstaff's proposed class list do not belong to the person listed in the Leads, but that an individualized analysis of each number is necessary to identify which telephone numbers are affected, and who the actual called party was.

## Mr. Biggerstaff's Proposed Class List Includes Calls That Were Requested by the Recipients

40. My analysis of the Call Logs also identified that three percent of the calls in the total proposed class list prepared by Mr. Biggerstaff were placed to call recipients who apparently requested the calls.

41. According to testimony, the "status" field in the Leads data indicates the overall disposition of the lead in Yodel's records.[20] A total of 3,496 distinct leads show a status code of 13, and another 3,879 show a status code of 30. According to the explanation of the disposition codes that was produced[21], a status of 13 means the call recipient requested a same-day call back,

---

[20] Deposition of Kyle Wood, December 19, 2017 at 29:19-23.
[21] See Exhibit 56 to the 30(b)(6) Deposition of Kyle Wood, December 20, 2017.

and a status of 30 means the call recipient requested a call back within a few days.[22] Together these account for 7,375 records out of the set of 239,630 unique leads, or approximately 3%.[23] Examining the Call Log data shows that 34,330 calls are listed with a "status_original" of 13 and 31,181 are listed with a "status_original" of 30.[24] Together these calls account for 65,511 calls out of the 252,765 identified by Mr. Biggerstaff, or 26% of the total.

42. The same Call Logs data for the call involving plaintiff Robert Braver's telephone number (405) 360-7462 shows a "status_final" of 50, and the corresponding record in the Leads data also shows Mr. Braver's lead with a status of 50.[25] According to the explanation of the disposition codes and the testimony of the 30(b)(6) witness, this status designation merely reflects that the soundboard agent had progressed to the point of the sixth prompt in the script.[26] The records pertaining to Mr. Braver in the Leads and Call Logs data do not show him associated with a status of 13, 30, or 20.

### Soundboard Avatar Technology Predates Its Application to Telemarketing

43. Soundboard technology significantly predates its relatively recent use for telemarketing and other telecommunications purposes. In fact, soundboards have been in use for decades to help assist patients with speech disabilities.

44. Augmentative and Alternative Communication ("AAC") describes a variety of tools used to support and supplement the communication of people whose verbal abilities are impaired. AAC tools have been used by people with Alzheimer's disease, Parkinson's disease, autism spectrum disorder, learning difficulties, stroke, cerebral palsy, head/brain injury, profound and multiple learning disabilities, and motor neuron disease/amyotrophic lateral sclerosis.[27]

---

[22] 30(b)(6) Deposition of Kyle Wood, December 20, 2017 at 33:23-34:1.
[23] NorthStar_outbound_leads.csv, A/K/A "Leads."
[24] NorthStar_outbound_lead_logs.csv, A/K/A "Call Logs."
[25] NorthStar_outbound_lead_logs.csv, A/K/A "Call Logs," and NorthStar_outbound_leads.csv, A/K/A "Leads."
[26] 30(b)(6) Deposition of Kyle Wood, December 20, 2017 at 35:5-15, and exhibit 56 to same.
[27] Sally Millar and Janet Scott, "What Is Augmentative and Alternative Communication? An Introduction," *Augmentative Communication in Practice: An Introduction* (1998), p. 3-6, attached as Exhibit G.

45. Technology-based AAC tools include "soundboards" that provide either synthesized or prerecorded/digitized voice output. The individual using an AAC soundboard selects components of a message from the device's display. Depending upon the language abilities of the user, this display may provide some combination of a keyboard to spell words letter-by-letter, icons or symbols to select words and phrases, and full or partial pre-programmed messages.[28]

46. An example of an AAC soundboard display, taken from a free AAC app available for iPhones[29], is shown below:



---

[28] David Mahmarian, "A History of Autism and AAC," www.medium.com (February 3, 2016), available from https://medium.com/@dmahmarian/a-history-of-autism-and-aac-9a2b321b01f0 and attached as Exhibit H Deborah Jans and Sue Clark, "High Technology Aids to Communication," *Augmentative Communication in Practice: An Introduction* (1998), p. 37-39; attached as Exhibit I; National Academies of Sciences, Engineering, and Medicine; Health and Medicine Division; Board on Health Care Services; Committee on the Use of Selected Assistive Products and Technologies in Eliminating or Reducing the Effects of Impairments; Flaubert JL, Spicer CM, Jette AM, editors. "Augmentative and Alternative Communication and Voice Products and Technologies," *The Promise of Assistive Technology to Enhance Activity and Work Participation*. (May 9, 2017), p. 209-309, available from: https://www.ncbi.nlm.nih.gov/books/NBK453284/ and attached as Exhibit J.
[29] Alexicom AAC, available from https://itunes.apple.com/us/app/alexicom-aac/id395122088

47. For comparison, below is a sample display of a soundboard used by Yodel as depicted in marketing materials:



48. AAC technologies developed over many years. Therapists working with persons with speech disabilities first began implementing "communication boards" in the 1920s, to provide an easily portable tool for patients to indicate or generate forms of communication.[30] Advances in computer technology eventually allowed various forms of speech-generation (including synthetic and pre-recorded voices) to be incorporated into the communication boards. The Prentke Romich Company was one of the first manufacturers of an AAC soundboard with synthesized speech capabilities—their "Express 3" device in 1982 incorporated synthesized speech generation, and in 1984 their "Touch Talker" was a portable soundboard device.[31] Depicted below is the Prentke Romich "Vanguard II" portable soundboard from 2003, which included both synthesized and digitized speech.[32]



---

[30] Exhibit H.
[31] https://www.prentrom.com/our-history, attached as Exhibit J.
[32] https://www.prentrom.com/50/, attached as Exhibit K.

Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on April 26, 2018.

_____

David Kalat

**List of Exhibits**

A    Curriculum Vitae of David Kalat

B    Letter from Lois Greisman, Associate Director, Director of Marketing Practices, FTC, to Michael Bills, CEO, Call Assistant, LLC (Sept. 11, 2009)

C    Letter from Lois Greisman, Associate Director, Director of Marketing Practices, FTC, to Michael Bills, CEO, Call Assistant, LLC (Nov. 10, 2016)

D    Analysis of 384 telephone numbers (1)

E    Analysis of 384 telephone numbers (2)

F    Analysis of 357 call recordings

G    Sally Millar and Janet Scott, "What Is Augmentative and Alternative Communication? An Introduction," Augmentative Communication in Practice: An Introduction (1998)

H    David Mahmarian, "A History of Autism and AAC," www.medium.com (February 3, 2016)

I    Deborah Jans and Sue Clark, "High Technology Aids to Communication," Augmentative Communication in Practice: An Introduction (1998)

J    National Academies of Sciences, Engineering, and Medicine; Health and Medicine Division; Board on Health Care Services; Committee on the Use of Selected Assistive Products and Technologies in Eliminating or Reducing the Effects of Impairments; Flaubert JL, Spicer CM, Jette AM, editors. The Promise of Assistive Technology to Enhance Activity and Work Participation. (May 9, 2017), Augmentative and Alternative Communication and Voice Products and Technologies

K    https://www.prentrom.com/our-history

L    https://www.prentrom.com/50

# EXHIBIT A

## Curriculum Vitae



**David Kalat**
BERKELEY RESEARCH GROUP, LLC
70 West. Madison Suite 5000 | Chicago, IL 60602
Direct: 312.429.7907
dkalat@thinkbrg.com

## EDUCATION

M.L.I.S          University of Illinois at Urbana-Champaign, 2011
B.A.             University of Michigan, 1992, *James B. Angell Scholar*

## EMPLOYMENT

Director, Berkeley Research Group (BRG), 2015–present
Director, Disputes and Investigations, Duff & Phelps, 2011-2015

Mr. Kalat is testifying expert in digital forensic investigations and an eDiscovery specialist. He leads the Chicago digital forensics lab for BRG's Global Investigations and Strategic Intelligence practice group. Prior to joining BRG, Mr. Kalat was with Duff & Phelps' Disputes and Investigations practice, where he managed an international team of forensic examiners and eDiscovery support specialists. Mr. Kalat has over 20 years of experience in digital video, and has applied this knowledge to the forensic examination of video evidence in a variety of contexts including investigations into alleged police misconduct.

## PROFESSIONAL CERTIFICATIONS AND AFFILIATIONS

- Licensed Private Detective (License No. 115.002487), State of Illinois
- Certified Fraud Examiner (CFE), Association of Certified Fraud Examiners (License No. 621469)
- Certified Computer Examiner (CCE), International Society of Forensic Computer Examiners (ISFCE) (License No. 1666)
- Certified Information Systems Security Professional (CISSP), International Information System Security Certification Consortium (ISC)2 (License No. 593527)
- Access Data Certified Examiner (ACE)
- Member, Association of Certified Fraud Examiners Greater Chicago Chapter
- Member, Forensic Expert Witness Association (FEWA)
- Member, Chicago Area Litigation Support Managers (CALSM)



**REPRESENTATIVE CASEWORK**

*Digital Forensics*

- Conducted a forensic investigation of a laptop and user's webmail in an investigation of theft of trade secrets, and provided trial testimony in Bankruptcy Court that the defendant had taken steps to erase and conceal the evidence that he had misappropriated company documents.
  - Based in part on Mr. Kalat's testimony, the Court found the debtor acted in bad faith and dismissed his bankruptcy case.
- Conducted a forensic investigation of a user's laptop and webmail in a breach of contract case on behalf of the defendant to determine whether key evidence in the matter had been fraudulently doctored, and provided deposition testimony regarding data deletion from multiple webmail accounts.
  - Relying on Mr. Kalat's testimony, the Court granted the defendant's motion for sanctions and dismissed the plaintiff's cause of action with prejudice.

*Video Analysis*

- In a confidential engagement, examined surveillance CCTV and law enforcement dashcam footage in an investigation into a disputed police shooting.
- Examined surveillance footage for prosecutors investigating an alleged assault on a school bus.
  - Mr. Kalat's analysis was instrumental in the prosecution's decision not to press charges.

*Electronic Discovery*

- Managed the data collection and review hosting on behalf of a governmental agency involved in litigation over a failed IT implementation. Supervised the preservation of data stored on networked resources and proprietary database systems, and managed hosting of over 1 Tb of data for review.
  - The agency reached a settlement with the IT vendor for $59 million.
- Managed the attorney review and deposition coding on behalf of the testifying expert for Irving Picard, the Trustee in the Bernie L. Madoff Investment Securities liquidation investigation. Responsibilities included selecting and supervising a team of contract attorneys to review a database of over 20 million documents hosted in Relativity.
  - As of September 2017, the Trustee had recovered approximately $12.7 billion, or more than 72% of the principal he said Madoff defrauded from his customers.
- Supervised the on-site collection of digital forensic evidence from a pharmaceutical company ordered to remediate its computer network. Collected almost 500 forensic images from over 300 computers and 90 servers, totaling over 138 TB of data.
  - The data collection and remediation was completed within 10 months and the injunction was lifted.

*Data Analytics*

- On behalf of a marketing company accused of violating the TCPA, analyzed the dialer's PostgreSQL database to determine exactly what records existed for the hundreds of millions of predictive and robocalls in question.
  - Thanks in large part to this analytical work, the case settled for a fraction of the sums other cases with similar fact patterns did.
- Analyzed dialer database records for a TCPA matter on behalf of defendants to determine if the database could identify which calls were successfully connected, and how an automated "opt-out" mechanism functioned.

**TESTIMONIAL EXPERIENCE**

- <u>C.J. Drilling, Inc. v. Welsh</u>, No. 17 CH 001095 (Kane Cnty. Cir. Ct., 2017)
- <u>Western Union v. Kula</u>, 1:17cv00280 (N.D. Ill., 2017)
- <u>Segerdahl Corp. v. Ferruzza, *et al.*</u>, 1:17cv03015 (E.D. Ill., 2017)
- <u>L&W Supply Corp. v. Banks *et al*.</u>, CV16-00816 (Washoe Cnty. Dist. Ct., 2016)



- <u>Bunnet & Co., Inc. and Energy Feeds International, LLC v. Dores</u>, 1:15cv1104 (W.D. Texas, 2016); also <u>In Re: Frank Miranda Dores and Mary Anne Souza Dores</u>, No. 16-10169-B-13 (Bankr. E.D. Calif.)
- <u>Pro Sapiens LLC v. Indeck Power Equipment Co.</u>, 14L5730 (Cook Cnty. Cir. Ct., 2015)
- <u>Geophysical Service Inc. v. Anadarko Petroleum Corp. *et al.*</u>, 1201-15228 (Ct. of Queen's Bench of Alberta, 2014)

## BOOKS AND MONOGRAPHS

- *Day One: The Origin Story of Computer Forensics,* [1] Pratt's Privacy & Cybersecurity Law Report [4] (LexisNexis A.S. Pratt).
- *The Trouble With Mobile Forensics*, ThinkBRGTech.com (October 15, 2015)
- *Anti-Forensics Gets An Upgrade: The Hidden Traps In Today's Latest Technology*, ThinkBRGTech.com (June 27, 2016)
- *Dyn and Dash*, SC Media (December 19, 2016)
- *Understanding the Challenges of Strong Encryption*, Law360 (April 10 & 11, 2017)
- *Outrunning the Lion: Advice for Fighting on the Front Lines of Today's Data Breach Attacks,* (Legal Tech News, December 20, 2017)
- *Fighting on Today's Front Lines*, (InfoSecurity Magazine, Jan. 3. 2018)
- *Nervous System: The Story of the First White Hat Hacker* (Legal Tech News, February 5, 2018)
- *Nervous System: Evaluating TCPA Liability in the Actual Wild West* (Legal Tech News, March 1, 2018)

## CLE and OTHER LECTURE PRESENTATIONS

- ThinkCLE - *The Art of Settling TCPA Lawsuits* (CLE, Feb. 7, 2018)
- *2017 Lessons Learned - Data Breaches, and Preventing Access Failure Attack* (Presenter on Infosecurity Magazine's Webinar, Dec. 21, 2017)
- P&I DC West Conference – Panelist on *Cybersecurity Track* panel (Oct. 9, 2017)
- ThinkCLE - *Is the Party Over for Professional TCPA Plaintiffs? Challenging the Adequacy & Typicality of Class Representatives* (CLE, Oct. 3, 2017)
- National Business Institute – *How to Get Your Social Media, Email and Text Evidence Admitted (and Keep Theirs Out)* (CLE, June 28, 2017)
- Worldwide Employee Benefits Network Chicago - *What Employee Benefit Plan Professionals Need to Know about Cybersecurity* (May 24, 2017)
- ACFE Chicago - *Digital Forensics is Dead, Long Live Digital Forensics* (CLE, October 23, 2015)
- ThinkCLE - *How to Realize ROI from your Preservation Efforts* (CLE, October 22, 2015; July 23, 2015)
- E-Discovery – Issues and Developments (CLE, June 24, 2014)
- National Business Institute – *Find It Fast and Free on the Net: Strategies for Legal Research on the Web* (CLE, June 25, 2015; April 10, 2014; June 6, 2013; May 23, 2012)

# EXHIBIT B



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Federal Trade Commission
Division of Marketing Practices

September 11, 2009

Mr. Michael Bills, CEO
Call Assistant, LLC
1925 West Indiana Avenue
Salt Lake City, Utah 84104

Dear Mr. Bills:

You have requested an informal staff opinion as to the applicability to 2008 amendments to the Telemarketing Sales Rule ("TSR") to a particular technology used by CallAssistant, L.C. ("CallAssistant"). The amendments at issue impose new restrictions on the use of prerecorded messages in telemarketing. 16 C.F.R. § 310.4(b)(1)(v); 73 Fed. Reg. 15204 (Aug. 29, 2008). Specifically, these amendments require, as of December 1, 2008, that any outbound telemarketing call that delivers a prerecorded message include: (1) if the call could be answered in person by a consumer, an automated interactive voice and/or keypress-activated opt-out mechanism that the call recipient can use at any time during the message to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A); and (2) if the call could be answered by an answering machine or voicemail service, a toll-free telephone number that the call recipient can use to assert a Do Not Call request pursuant to § 310.4(b)(1)(iii)(A). Additionally, as of September 1, 2009, the amendments prohibit any outbound telemarketing call that delivers a prerecorded message unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of that seller and includes such person's telephone number and signature.

As described in your letter, CallAssistant uses technology that enables its calling agents to interact with the recipient of a call using his or her own voice or by substituting appropriate audio recording of a response. According to your letter, when used to place outbound telemarketing calls, this technology works as follows:

A live agent using the System places a call to a consumer and hears the consumer greeting. In response to the greeting, the agent may elect to speak to the call recipient using his or her voice, or may press a button to play an appropriate recorded script segment. After the agent's response, the agent listens to the consumer customer's reply. After listening to the consumer's reply, the live agent again chooses whether to speak to the call recipient in his or her own voice, or another recording. At all times, even during the playing of any recorded segment, the agent retains the power to interrupt any recorded message to listen to the consumer and respond appropriately.

Mr. Michael Bills
Page 2 of 3 Pages

Furthermore, according to your description, "live agents hear every word spoken by the call recipient, and determine what is said" in response. A single agent always stays with a call from beginning to end.

You seek an opinion as to whether the amended TSR provisions on the use of prerecorded messages in telemarketing apply to CallAssistant's calls that employ the technology summarized above. Based on the description of the technology included in your letter, the staff of the Federal Trade Commission has concluded that the 2008 TSR amendments cited above do not prohibit telemarketing calls using this technology if the calls that otherwise comply with the TSR and other applicable law. The 2008 amendments at 16 C.F.R. § 310.4(b)(1)(v) prohibit calls that deliver a prerecorded message and do not allow interaction with call recipients in a manner virtually indistinguishable from calls conducted by live operators. Unlike the technology that you describe, the delivery of prerecorded messages in such calls does not involve a live agent who controls the content and continuity of what is said to respond to concerns, questions, comments – or demands – of the call recipient.

In adopting the 2008 TSR amendments, the Commission noted that the intrusion of a telemarketing call on a consumer's right to privacy "may be exacerbated immeasurably when there is no human being on the other end of the line." 73 Fed. Reg. at 51180. The Commission observed that special restrictions on prerecorded telemarketing messages were warranted because they "convert the telephone from an instrument for two-way conversations into a one-way device for transmitting advertisements." *Id.*[1] Consequently, in Staff's view, the concerns about prerecorded messages addressed in the 2008 TSR amendments do not apply to the calls described above, in which a live human being continuously interacts with the recipient of a call in a two-way conversation, but is permitted to respond by selecting recorded statements.

Nevertheless, the use of such technology in a campaign to induce the sales of goods or services, or charitable donations is "telemarketing" under the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6106(4), and therefore must comply with the Rule's other requirements and prohibitions. In particular, the technology must connect an outbound telephone call to a live agent within two seconds of the call recipient's completed greeting. 16 C.F.R. § 310.4(b)(1)(iv). The agents making calls using this technology must

---

[1] In adopting the 2008 amendments, the Commission recognized that in the future prerecorded message might eliminate the objections that prompted the adoption of the these rules and justify exemptions permitting interactive prerecorded messages:

> [T]he Commission notes that it is aware that the technology used in making prerecorded messages interactive is rapidly evolving, and that affordable technological advances may eventually permit the widespread use of interactive messages that are essentially indistinguishable from conversing with a human being. Accordingly, nothing in this notice should be interpreted to foreclose the possibility of petitions seeking further amendment of the TSR or exemption from the provisions adopted here.

73 Fed. Reg. 51180 (Aug. 29, 2008).

Mr. Michael Bills
Page 3 of 3 Pages

disclose the purpose of the call, the identity of the seller, make other required disclosures, and comply with other TSR provisions preventing deceptive and abusive conduct. *Id.* §§ 310.3 and 310.4.

Please be advised that this opinion is based exclusively on all the information furnished in your request. This opinion applies only to the extent that actual company practices conform to the material submitted for review. Please be advised further that the views expressed in this letter are those of the FTC staff. They have not been reviewed, approved, or adopted by the Commission, and they are not binding upon the Commission. However, they do reflect the opinions of the staff members charged with enforcement of the TSR.

Sincerely,

Lois Greisman
Associate Director
Division of Marketing Practices

# EXHIBIT C



UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, D.C. 20580

Lois C. Greisman
Associate Director
Division of Marketing Practices

November 10, 2016

Michael Bills
132 S 600 East, Suite 204
Salt Lake City, UT 84102

**Re:    September 11, 2009 Staff Opinion Letter on Soundboard Technology**

Dear Mr. Bills:

We are writing to you regarding the informal staff opinion letter we provided to your former company, Call Assistant, LLC, on September 11, 2009. [1] Our September 2009 letter responded to Call Assistant's inquiry regarding whether the Telemarketing Sales Rule's ("TSR") provisions governing outbound telemarketing calls that deliver prerecorded messages[2] apply to calls utilizing soundboard technology, which is technology that allows a live agent to communicate with a call recipient by playing recorded audio snippets instead of using his or her own live voice. In the September 2009 letter, staff stated its opinion that the technology, as described by Call Assistant, would not be subject to the prerecorded message provisions of the TSR. Staff's opinion was based on important features that Call Assistant highlighted about its technology – i.e., that for the entire duration of a call made using the technology, a single live agent stays with the call from beginning to end, listens to every word spoken by the call recipient, determines what is heard by the call recipient, and has the ability to interrupt recordings and use his or her own voice to communicate with the call recipient if needed. In our view at that time, these features made the calls "virtually indistinguishable" from normal two-way conversations with live operators and placed them outside the scope of the TSR's prerecorded message provisions.

Since the issuance of our September 2009 letter, staff has received a steadily increasing volume of formal and informal complaints from consumers about telemarketing calls utilizing soundboard technology. Consumers complain that during these calls they are not receiving appropriate recorded responses to their questions or comments. Consumers further complain that often no live telemarketer intervenes to provide a human response when requested to do so, the recorded audio snippets that are played do not adequately address consumer questions, or the call

---

[1] A copy of the September 11, 2009 staff opinion letter can be found at
http://www.ftc.gov/sites/default/files/documents/advisory_opinions/opinion-09-1/opinion0901_1.pdf. Call Assistant, LLC, filed for Chapter 7 bankruptcy on August 13, 2015. *In re Call Assistant LLC*, Case No. 15-11708 (KJC) (Bankr. D. Del. Aug. 13, 2015).

[2] 16 C.F.R. § 310.4(b)(1)(v).

Michael Bills
Page 2 of 6

is terminated in response to consumers questions.  Indeed, media reports also have taken note of this phenomenon, which some in the press have dubbed telemarketing "robot" calls.[3]  Simply put, since we issued the letter in 2009, staff has seen evidence of the widespread use of soundboard technology in a manner that does not represent a normal, continuous, two-way conversation between the call recipient and a live person.  This is inconsistent with the principles we laid out in our September 2009 letter as well as our understanding of the technology at the time we issued the letter.[4]  Moreover, this type of use does not provide the consumer benefits upon which we based our September 2009 opinion.

In response to rising complaints and concerns, staff reached out to the Professional Association for Customer Engagement ("PACE"), which is a trade association representing call centers, and the Soundboard Association, a trade organization representing manufacturers and users of soundboard technology.  During the last few months, we have had multiple productive discussions and meetings with PACE and the Soundboard Association to learn more about soundboard technology and obtain industry input regarding the regulatory status of that technology.  Both PACE and the Soundboard Association were responsive to requests, provided meaningful input to assist staff in its review of this technology, and highlighted the potential benefits of responsible soundboard use.  Staff carefully considered the input of PACE and the Soundboard Association.

A fundamental premise of our September 2009 letter was that soundboard technology was a surrogate for the live agent's actual voice.  A human being cannot conduct separate conversations with multiple consumers at the same time using his or her own voice.  Nonetheless, some companies are routinely using soundboard technology in precisely this manner, and these companies are improperly using our September 2009 letter to justify their actions in court proceedings[5] and in investigations.  Indeed, Call Assistant noted publicly that

---

[3] *See, e.g.*., Sean Gallagher, *The New Spam: Interactive Robo-Calls From the Cloud as Cheap as E-Mail*, ARS TECHNICA, (Apr. 15, 2015), http://arstechnica.com/information-technology/2015/04/the-new-spam-interactive-robo-calls-from-the-cloud-as-cheap-as-e-mail; Alexis C. Madrigal, *Almost Human:  The Surreal, Cyborg Future of Telemarketing*, THE ATLANTIC, (Dec. 20, 2013), http://www.theatlantic.com/technology/archive/2013/12/almost-human-the-surreal-cyborg-future-of-telemarketing/282537/; Alexis C. Madrigal, *The Only Thing Weirder Than a Telemarketing Robot*, THE ATLANTIC, (Dec. 13, 2013), http://www.theatlantic.com/technology/archive/2013/12/the-only-thing-weirder-than-a-telemarketing-robot/282282/; Zeke Miller & Denver Nicks, *Meet the Robot Telemarketer Who Denies She's a Robot*, TIME, (Dec. 10, 2013), http://newsfeed.time.com/2013/12/10/meet-the-robot-telemarketer-who-denies-shes-a-robot/; Kris Hundley, *These Telemarketers Never Stray From Script*, TAMPA BAY TIMES, (Nov. 14, 2013), http://www.tampabay.com/news/these-telemarketers-never-stray-from-the-script/2152303.

[4] For example, Call Assistant highlighted the ability of its agents to use their own voices during calls using its soundboard technology:  "Our technology merely substitutes sound files for the agent's voice (*although the agent can interject with his or her voice at any time*) . . . ."  (emphasis supplied).  *See also* September 2009 Letter at 1 ("In response to the greeting, the agent may elect to speak to the call recipient *using his or her voice*, or may press a button to play an appropriate recorded script segment. . . .  At all times, even during the playing of a recorded segment, *the agent retains the power to interrupt any recorded message to listen to the consumer and respond appropriately*.") (emphasis supplied).

[5] *See, e.g., Fitzhenry v. ADT Corp.*, No. 9:14-CV-80180 (S.D. Fla.); *Barrett v. ADT Corp.,* No. 12:15-CV-1348 (S.D. Ohio).

Michael Bills
Page 3 of 6

one of the advantages of its technology is that "an agent can conduct multiple calls simultaneously."[6]  Staff also has seen evidence that call centers are using soundboard technology to increase the number of outbound calls they can make.  In addition, in our discussions and meetings, industry representatives acknowledged that call centers routinely use soundboard technology to allow a single live agent to handle more than one call at the same time.

The plain language of the TSR provision governing prerecorded calls imposes restrictions on "any outbound telephone call that delivers a prerecorded message."[7]  It is indisputable that calls made using soundboard technology deliver prerecorded messages.  As such, under the plain meaning of the words in the TSR's prerecorded call provision, outbound telemarketing calls using soundboard technology are covered because such calls "deliver a prerecorded message."[8]

Given the actual language used in the TSR, the increasing volume of consumer complaints, and all the abuses we have seen since we issued the September 2009 letter, we have decided to revoke the September 2009 letter.  It is now staff's opinion that outbound telemarketing calls that utilize soundboard technology are subject to the TSR's prerecorded call provisions because such calls do, in fact, "deliver a prerecorded message" as set forth in the plain language of the rule.[9]  Accordingly, outbound telemarketing calls made using soundboard technology are subject to the provisions of 16 C.F.R. § 310.4(b)(1)(v), and can only be made legally if they comply with the requirements set forth in Section 310.4(b)(1)(v)(A) (for calls selling goods or services), Section 310.4(b)(1)(v)(B) (for calls seeking charitable contributions from members or prior donors), or Section 310.4(b)(1)(v)(D) (healthcare messages by a covered entity or its business associate under HIPAA).

In reaching this conclusion, staff did consider whether an express requirement that live agents using soundboard technology only handle one call at a time would change the analysis.  Staff has concluded that it would not.  First, even with a 1-to-1 limitation in place, such calls would still "deliver a prerecorded message" and therefore would fall within the plain language of 16 C.F.R. 310.4(b)(1)(v).  Moreover, in staff's view, a 1-to-1 limitation would not stop abusive use of the technology.  Based on preliminary information provided by industry representatives, a significant percentage of the total number of call center seats utilizing soundboard technology are used to make telemarketing or lead generation calls.  A 1-to-1 limitation would allow a lead generation operation to use soundboard technology in which live operators simply press a button to play a prerecorded message offering a good or service that asks the consumer to say "yes" or press 1 on their phone if they are interested.  If the consumer says yes or presses 1, the live agent would then transfer the call to the seller who makes a telemarketing pitch.  Such calls are indistinguishable from standard lead generation robocalls that are governed by the TSR and are the subject of a large volume of consumer complaints and significant telemarketing abuse.  The

---

[6] *Nougar, L.C., et al. v. Revocalize, LLC, et al.*, No. 2:11-cv-127, DE 41 (D. Utah, Oct. 18, 2011).

[7] 16 C.F.R. § 310.4(b)(1)(v).

[8] *Id.*

[9] *Id.*  Staff notes that representatives of both PACE and the Soundboard Association disagree with this conclusion.

Michael Bills
Page 4 of 6

fact that a live operator, instead of a computer, "delivers" the prerecorded message and transfers interested consumers to sellers makes little difference from the call recipient's perspective. Thus, even a 1-to-1 limitation would permit soundboard technology to be used to deliver calls that are indistinguishable from the telemarketing robocalls that consumers consider to be abusive and that are illegal under the TSR.

Finally, staff does recognize that when the Commission adopted the TSR's robocall provisions TSR in 2008, it foresaw that technology could evolve to allow the use of interactive prerecorded messages in telemarketing calls in a manner "essentially indistinguishable from conversing with a human being."[10]  Indeed, soundboard technology, when used properly, may one day approach that level of proficiency.  If and when such advances occur, the Commission noted that parties could seek further amendment of the TSR or exemptions from the prerecorded message provisions.[11]

In order to give industry sufficient time to make any necessary changes to bring themselves into compliance, the revocation of the September 2009 letter will be effective six months from today, on May 12, 2017.  As of that date, the September 11, 2009 letter will no longer represent the opinions of FTC staff and cannot be used, relied upon, or cited for any purpose.

In closing, staff notes that revocation of the September 2009 opinion letter does not mean that the TSR prohibits all calls made using soundboard technology.  To the contrary, call centers can still use soundboard technology for in-bound calls and to place a wide variety of outbound calls, such as non-telemarketing calls (e.g., political calls, survey calls, and pure informational calls), telemarketing calls that fall within the exemptions set forth in Section 310.4(B)(1)(v)(A), (B), or (D), certain types of charitable donation calls, and calls that are expressly exempt from the TSR under Section 310.6 (e.g., business-to-business calls).  In fact, the preliminary data provided indicates that a significant percentage of call center seats that utilize soundboard technology are used for in-bound calls or to place non-telemarketing calls, such as political or charitable calls.  As long as those calls remain outside the scope of the TSR, companies can continue to use soundboard technology for those types of calls without violating the TSR.  Please note, however, that we do not opine on whether the use of such technology complies with state or other federal laws, including the Telephone Consumer Protection Act, 47 U.S.C. § 227, or its corresponding regulations implemented by the Federal Communications Commission, 47 C.F.R. § 64.1200.

Please be advised that the views expressed in this letter are those of the FTC staff, subject to the limitations in 16 C.F.R. § 1.3.  They have not been approved or adopted by the Commission, and they are not binding upon the Commission.  However, they do reflect the views of staff members charged with enforcement of the TSR.

---

[10] *Telemarketing Sales Rule*, 73 Fed. Reg. 51,164, 51,1180 (Aug. 29, 2008).

[11] *Id.* ("Accordingly, nothing in this notice should be interpreted to foreclose the possibility of petitions seeking further amendment of the TSR or exemptions from the provisions adopted here.")

Michael Bills
Page 5 of 6

Sincerely,

Lois C. Greisman
Associate Director
Division of Marketing Practices

Cc:     Michele A. Shuster, Esq.
        General Counsel, PACE
        6530 W. Campus Oval, Suite 210
        New Albany, OH 43054

        The Soundboard Association
        c/o Peter B. Miller, Esq.
        Crowell & Moring LLP
        1001 Pennsylvania Ave., NW
        Washington, DC 20004

        Call Assistant, LLC
        78-00 3rd Street N., Suite 900
        St. Paul, MN 55128

        Ronald S. Gellert
        Gellert Scali Busenkell & Brown, LLC
        1201 N. Orange Street, Suite 300
        Wilmington, DE 19801
        *Counsel for Debtor, Call Assistant, LLC*

        David Carickhoff
        Jennifer L. Dering
        Archer & Greiner, P.C.
        300 Delaware Ave., Suite 1100
        Wilmington, DE 19801
        *Bankruptcy Trustee for Call Assistant, LLC*

        Noguar
        5286 S 320 West
        Murray, UT 84107

        Avatar Technologies, Inc.
        138 Columbus Ave., 2nd Floor
        Mount Vernon, NY  10553

Michael Bills
Page 6 of 6

Robby H. Birnbaum
Greenspoon Marder
One Boca Place, 2255 Glades Road, Suite 400-E
Boca Raton, FL 33431
*Counsel for Avatar Technologies, Inc.*

# EXHIBIT D

Berkeley Research Group

| **Exhibit D** |
| :---: |
| **Lead List Phone Numbers Registered with One or More Businesses** |

| | |
| :--- | :---: |
| Total Phone Numbers in Lead List | 384 |
| Number of Lead List Phone Numbers with at least one business-related search result | 38 |
| **Percentage of Lead List Phone Numbers with at least one bisiness-related result** | **9.9%** |

*Notes*

[1] Lead numbers associated with businesses averaged at least 1.58 results as a business number (out of four).

[2] Supporting data can be found in Exhibit D2.

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| **Total Lead List Phone Numbers** | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 267583593 | | | | | See Exhibit D | |
| 272001522 | | | | | See Exhibit D | |
| 291005207 | | | | | | |
| 239881296 | | | | | | |
| 239724015 | | | | | | |
| 239719437 | | | | | | |
| 240904535 | | | | | | |
| 290808088 | | | | | | |
| 239877771 | | | | | | |
| 336509485 | | | | | | |
| 271534990 | | | | | | |
| 312831157 | | | | | | |
| 271535645 | | | | | | |
| 360954188 | | | Mary's Fish Camp | Deluca | Mary's Fish Camp | 2 |
| 336146898 | | | | | | |
| 329984178 | | | | | | |
| 336587050 | | | | | | |
| 251719839 | | | | | | |
| 329281058 | | | | | | |
| 290601226 | | | | Onita | | |
| 239887917 | | | | | | |
| 239727089 | | | | | | |
| 239727488 | | | | | | |
| 291455088 | Wind River Ready Mix | | Wind River Ready Mix | | Wind River Ready Mix | 3 |
| 239731209 | VGA LINDLEY ANI | | | | | 1 |
| 239731662 | | | | | | |
| 290602332 | | | Milanos Pizza Overton | | | 1 |
| 328942613 | | | | | | |
| 360954355 | | | Mike's Handyman Services | | Mikes Handyman Services | 2 |
| 263131583 | | | | | | |
| 291377661 | | | | | | |
| 360939494 | | | Timothy Cox Tree Services | | | 1 |
| 361081020 | | | | | | |
| 263133401 | | | | | | |
| 291013007 | | | Mt. Zion Baptist Church | | Mt. Zion Baptist Church | 2 |
| 250651512 | | | | | | |
| 290815862 | | | | | | |
| 239894251 | | | | | | |
| 361059446 | | | | | | |
| 239739606 | | | | | | |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count | |
|---|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 | See Exhibit D |
| Lead List Phone Numbers without a reported a corresponding Business Name | 38 | See Exhibit D |
| Total Lead List Phone Numbers | **384** | |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 336150310 | | | | | | |
| 267595489 | | | | | | |
| 328946018 | | | | | | |
| 291375984 | | | | | | |
| 290608190 | | | | | | |
| 291110183 | EZ Money Corporation | | | | | 1 |
| 271897814 | | | | | | |
| 275254952 | | | | | | |
| 291376864 | | | | | | |
| 289741981 | | | | | | |
| 263138130 | | | | | | |
| 291202487 | | | | | | |
| 271898600 | | | | | | |
| 361185237 | | | | | | |
| 290717504 | | | | | | |
| 330002554 | | | | | | |
| 291620815 | | | | | | |
| 290821330 | | | | | | |
| 263140904 | | | | | | |
| 250659756 | | | | | | |
| 263141857 | | | | | | |
| 271901473 | | | | | | |
| 363710412 | | | | | | |
| 363640017 | | | UAW Community Services Department | | | |
| 363046760 | | | Prodigy Controls | | | 1 |
| 290612652 | | | | | | 1 |
| 290715569 | | | | | | |
| 291622895 | | | | | | |
| 336206402 | | | | | | |
| 360908906 | | | | | | |
| 239746394 | | | | | | |
| 271904669 | | | | | | |
| 271905268 | | | Hall Drywall LLC | | Hall Drywall LLC | 2 |
| 250665839 | | | | | | |
| 291296884 | | | | | | |
| 291624579 | | | | | | |
| 290826767 | | | | | | |
| 250525425 | | | | | | |
| 250525447 | | | | | | |
| 250525603 | | | | | | |

Berkeley Research Group

## Exhibit D2
## Lead List Phone Numbers: Business Names Identified

### DETAIL SUMMARY

| Description | Total Count |
| --- | --- |
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| Total Lead List Phone Numbers | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | See Exhibit D | See Exhibit D | |
| 268457679 | | | | | | |
| 250525787 | | | | | | |
| 239911594 | | | | | | |
| 312843130 | | | | | | |
| 363606688 | | | | | | |
| 336730772 | | | | | | |
| 268458532 | | | | | | |
| 252219000 | | | | | | |
| 239756981 | | | | | | |
| 333715069 | | | | | | |
| 361012410 | | | | | | |
| 328954509 | | | | | | |
| 250528159 | | | | | | |
| 290829376 | | | | | | |
| 250671526 | | | | | | |
| 252221454 | | | | | | |
| 336593958 | | | | | | |
| 336258331 | | | | | | |
| 290621721 | | | | | | |
| 290728508 | | | | | | |
| 271912713 | | | | | | |
| 272029631 | | | | | | |
| 250673392 | | | | | | |
| 240939455 | | | | | | |
| 250532098 | | | | | | |
| 272030106 | | | | | | |
| 271913340 | | | | | | |
| 328957910 | | | Schloss & Associates | Foust | | 1 |
| 239915456 | | | | | | |
| 291388719 | | | | | | |
| 250303673 | | | | | | |
| 281179798 | | | | | | |
| 263157150 | | | | | | |
| 329832109 | | | | | | |
| 312848258 | | | | | | |
| 329321682 | | | | | | |
| 263158554 | | | | | | |
| 336211810 | | | | | | |
| 271917578 | | | | | | |
| 250539249 | | | | | | |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| Total Lead List Phone Numbers | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 239770134 | | | | | See Exhibit D | |
| 239921794 | | | | | See Exhibit D | |
| 281183625 | | | | | | |
| 361139917 | | | | | | |
| 291475482 | | | | | | |
| 290937595 | | | | | | |
| 290838520 | | | | | | |
| 273144660 | | | | | | |
| 239768666 | | | | | | |
| 290736855 | | | | | | |
| 240951793 | | | | | | |
| 336440522 | | | | | | |
| 290631601 | | | | | | |
| 290840689 | | | | | | |
| 266902372 | | | | | | |
| 250545471 | | | | | | |
| 336560640 | Rock Your World, Inc. | | | Rock Your World Inc. | | 2 |
| 271924065 | | | | | | |
| 250686895 | | | | | | |
| 329847974 | | | | | | |
| 312853545 | | | | | | |
| 240954846 | | | | | | |
| 291636680 | | | | | | |
| 291396457 | J S Auto Sales | | | J S Auto Sales | | 2 |
| 268476596 | | | | | | |
| 326140638 | Hy & Mikes Bai | | | Hy & Mike's Bail Bonds | | 2 |
| 328966359 | | | | | | |
| 239932710 | | | | | | |
| 290844409 | | | | | | |
| 290844472 | | | | | | |
| 361225369 | | | | | | |
| 250551704 | | | | | | |
| 266908413 | | | | | | |
| 281193555 | | | | | | |
| 239940165 | Coral Bay Cdd Clubhouse Pool | | | Coral Bay CDD Clubhouse Pool | | 2 |
| 290637808 | | | | | | |
| 361148783 | | | | | | |
| 361193834 | | | | | | |
| 239785157 | | | Catcin, Martins, Jaktreemongton, Roth Case Sabatini and Co | | | 1 |
| 239785811 | | | | | | |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| **Total Lead List Phone Numbers** | **384** |

See Exhibit D
See Exhibit D

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 281195445 | | | | | | |
| 273638528 | | | | | | |
| 336636120 | | | | | | |
| 290640430 | | | | | | |
| 250556035 | | | | | | |
| 268484850 | | | | | | |
| 329863106 | | | | | | |
| 273639277 | | | | | | |
| 239791240 | Galaxy Smoothie | | Galaxy Smoothie | | Galaxy Smoothie | 3 |
| 360988415 | | | | | | |
| 281198368 | | | | | | |
| 336169590 | | | | | | |
| 273639727 | | | | | | |
| 290647786 | | | | | | |
| 268486810 | | | | | | |
| 399948070 | | | | | | |
| 328972603 | | | | | | |
| 336314665 | | | | | | |
| 240969550 | | | | | | |
| 290852110 | | | | | | |
| 336170345 | | | | | | |
| 281200257 | | | Electrolysis Centre of Va Beach | | | 1 |
| 290644154 | | | | | | |
| 360652305 | | | | | | |
| 360652396 | | | | | | |
| 240970106 | | | | | | |
| 273642122 | | | | | | |
| 290951842 | | | | | | |
| 256924024 | | | | | | |
| 273643103 | Johnny's Navajoh | | | | | 1 |
| 281202212 | A Waske James Attorney At Law | | Waske & Payne | | Hogan Johnny's Navajo | 2 |
| 329353603 | | | | | | |
| 360913715 | | | | | | |
| 281203094 | | | | | | |
| 271939991 | | | | | | |
| 336707010 | | | | | | |
| 266920623 | | | | | | |
| 291143581 | | | | | | |
| 250565726 | | | | | | |
| 240974812 | | | | | | |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| Total Lead List Phone Numbers | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 336404979 | | | | | See Exhibit D | |
| 336707190 | | | | | See Exhibit D | |
| 271942238 | | | | | | |
| 290857215 | | | | | | |
| 239952557 | | | | | | |
| 256930442 | | | | | | |
| 250569547 | | | | | | |
| 290858539 | | | | | | |
| 239953929 | | | | | | |
| 239799834 | | | | | | |
| 336740829 | | | | | | |
| 266925361 | | | Kvl Audio Visual Service | | | 1 |
| 256933072 | | | | | | |
| 291572981 | | | | | | |
| 293966549 | | | | | | |
| 336708963 | | | | | | |
| 361095987 | | | | | | |
| 336175099 | | | | | | |
| 269184021 | | | Lavanh Khaysone | | | 1 |
| 250431149 | | | Blinds America | | | 1 |
| 291495425 | | | | | | |
| 239810467 | | | | | | |
| 290862962 | | | | | | |
| 361124564 | | | | | | |
| 239811059 | | | | | | |
| 336605686 | | | | | | |
| 361041711 | | | | | | |
| 329375308 | | | | | | |
| 266931860 | | | | | | |
| 336274049 | | | | | | |
| 329893716 | | | Alondra Home | | | 1 |
| 329011224 | | | | | | |
| 361214455 | | | | | | |
| 363641852 | | Orange Blade Consultants | Orange Blade Consultants | | Orange Blade Consultants | 3 |
| 361064695 | | | | | | |
| 329378796 | | | | | | |
| 273657303 | | | | | | |
| 256941844 | | | | | | |
| 271482723 | | | | | | |
| 239972482 | | | | | | |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| **Total Lead List Phone Numbers** | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 336493020 | | | | | | |
| 271484240 | | | | | | |
| 267533389 | | | | | | |
| 271955733 | | | | | | |
| 290661463 | | | | | | |
| 250584498 | | | | | | |
| 271956201 | | | | | | |
| 291063284 | | | | | | |
| 336711504 | | | | | | |
| 281219011 | | | | | | |
| 271485483 | | | | | | |
| 250586016 | | | | | | |
| 256945925 | | | | | | |
| 290768293 | | | | | | |
| 399976759 | | | | | | |
| 336678522 | | | | | | |
| 273662531 | | | | | | |
| 290870596 | | | | | | |
| 239972473 | | | | | | |
| 336644674 | | | | | | |
| 291337012 | | | | | | |
| 336674559 | | | | | | |
| 250590403 | | | | | | |
| 291503932 | | | | | | |
| 290873038 | | | | | | |
| 336230330 | | | | | | |
| 291067861 | | | | | | |
| 361086886 | | | | | | |
| 239983185 | | | | Olin Miller Ins Inc. | | 1 |
| 267541235 | | | | | | |
| 239983455 | | | | | | |
| 336495611 | | | | | | |
| 329221585 | | | | | | |
| 329034884 | | | | McElven Ranks | | |
| 256953401 | | | | | | |
| 271964658 | | | | | | |
| 239985566 | | | Norman Heath Logging Co | | | 1 |
| 361076966 | | | Post Oxford House | | Post Oxford House | 2 |
| 361159382 | | | | | | |
| 290876703 | | | | | | |

See Exhibit D
See Exhibit D

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| Total Lead List Phone Numbers | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| | | | | See Exhibit D | | |
| | | | | See Exhibit D | | |
| 271966140 | | | | | | |
| 336456080 | | | | | | |
| 290975974 | | | | | | |
| 250454283 | | | | | | |
| 239830046 | | | | | | |
| 239835489 | | | | | | |
| 291342318 | | | | | | |
| 291342362 | | | | | | |
| 336233072 | | | | | | |
| 291165695 | | | | | | |
| 271498209 | | | | | | |
| 271498099 | | | | | | |
| 336497476 | | | | | | |
| 250456606 | | | | | | |
| 336575004 | | | | | | |
| 250458296 | | | | | | |
| 250602678 | | | | | | |
| 271500477 | | | | | | |
| 267550687 | | | | | | |
| 271972063 | | | | | | |
| 360992723 | | | | | | |
| 256961947 | | | | | | |
| 267550825 | | | | | | |
| 239842062 | | | | | | |
| 290781823 | | | | | | |
| 239839416 | | | | | | |
| 290802653 | | | | | | |
| 250464060 | | | | | | |
| 239995796 | | | | | | |
| 271976754 | | | | | | |
| 290785615 | | | | | | |
| 239848692 | | | | | | |
| 336539815 | | | | | | |
| 336188329 | | | | | | |
| 271979121 | | | | | | |
| 290786907 | | | | | | |
| 290787294 | | | | | | |
| 329246807 | | | | | | |
| 286104804 | | | | | | |
| 239847616 | | | | | | |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | | Total Count |
|---|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | | 38 |
| Total Lead List Phone Numbers | | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| 239852925 | | | | | See Exhibit D | |
| 336285754 | | | | | See Exhibit D | |
| 291083141 | | | | | | |
| 271981996 | Inglot Realty | | | | | 1 |
| 286106660 | | | | | | |
| 271982603 | | | | | | |
| 275223515 | | | | | | |
| 290790903 | | | Ignition Consulting Group | | | 1 |
| 271983382 | | | | | | |
| 239851984 | | | | | | |
| 251694040 | | | Bradley Family Day Care | | | 1 |
| 291354347 | | | | | | |
| 291354683 | | | | | | |
| 271514707 | | | | | | |
| 290991425 | | | | | | |
| 271986013 | | | | | | |
| 291269406 | | | | | | |
| 291088500 | | | | | | |
| 336192158 | | | | | | |
| 336752698 | | | | | | |
| 267568840 | | Vallie's Place | Vallie's Place | | | 2 |
| 263109238 | | | | | | |
| 291271635 | | | | | | |
| 328929677 | | | | | | |
| 290797631 | | | | | | |
| 289867163 | | | | | | |
| 271521903 | | | | | | |
| 329081945 | | | | | | |
| 361021744 | | | | | Nel Main Interiors Inc. | 2 |
| 271199607 | | | Nel Main Interiors Inc. | | | |
| 239864396 | | | | | | |
| 329267071 | | | | | | |
| 336194678 | | | | | | |
| 290696568 | | | | | | |
| 312824406 | | | | | | |
| 250631179 | | | | | | |
| 250488324 | | | | | | |
| 290697154 | | | | | | |
| 361021850 | | | | | | |
| 361161529 | WELLS FARGO BNK | | | | | 1 |

Berkeley Research Group

**Exhibit D2**
**Lead List Phone Numbers: Business Names Identified**

*DETAIL SUMMARY*

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with a Business Name Reported in one or more Search Engine Results | 346 |
| Lead List Phone Numbers without reported a corresponding Business Name | 38 |
| **Total Lead List Phone Numbers** | **384** |

| phone_id | Lexis - Business | TLO - Business | Google - Business | Google - Additional Names | 411.com - Business | Count of Search Engines Returning Business Names |
|---|---|---|---|---|---|---|
| | | | | | See Exhibit D | |
| | | | | | See Exhibit D | |
| 271526308 | | | | | | |
| 267577681 | | | | | | |
| 360921819 | | | | | | |
| 336584066 | CLE CRED REPAIR | | | | | 1 |
| 291364092 | | | | | | |
| 329274115 | | | | | | |
| 321584740 | FARMACIA SUNRAY | | | | | |
| 291002315 | | | Am Tax Services LLC | | | 2 |
| 290700117 | | | | | | |
| 329275420 | | | | | | |
| 250493151 | | | | | | |
| 290905361 | | | | | | |
| 321585419 | | | | | | |
| 239877387 | | | | | | |
| 271529306 | | | Rick Fink Painting | | | 1 |
| 240900662 | | | | | | |
| 240900832 | | | | | | |
| 312827885 | | | | | | |
| 363775455 | | | | | | |
| 363798581 | | | | | | |
| 363820663 | | | Peterson Properties LLC | | | 1 |
| 363983375 | | | | | | |
| 363983039 | | | | | | |
| 363838031 | | | | | | |

# EXHIBIT E

Berkeley Research Group

| **Exhibit E** |
|---|
| **Lead List Phone Numbers: Last Name Matches to Search Results** |

|  | **Total Phone Numbers** | **As a Percentage all List Numbers** |
|---|---|---|
| **Total Phone Numbers in Lead List** | **384** | |
| Number of Lead List Phone Numbers with no reported "Last Name" in Lexis Nexis [1] | 42 | 11% |
| Number of Lead List Phone Numbers with discrepant "Last Name" from what is reported in Lexis Nexis [1] | 38 | 10% |
| **Total Lead List Phone Numbers not matched to a "Last Name" in Lexis Nexis** | **80** | 21% |
| **Lead List Phone Numbers with more than than 1 discrepant "Last Name" from those reported by 4 Search Engines: 411.com, Google, LexisNexis and TLO [2]** | **40** | 10% |

*Notes*

[1]  Supporting data can be found in Exhibit E2.

[2]  Supporting data can be found in Exhibit E3.

**Exhibit E2**
**Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results**

| COLOR KEY | | |
|---|---|---|
| **Description** | **Total Count** | |
| Match on Last Name Reported in Lexis Nexis | 297 | |
| No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| No Match between Reported Last Names | 38 | See Exhibit E |
| BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | See Exhibit E |
| **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
|---|---|---|---|---|---|
| 0188 | Connie | | | Jeffrey, Lisa | FALSE |
| 3311 | Beverly | | | Dean | FALSE |
| 3088 | Alvin | | | Tina | FALSE |
| 5411 | James | | | Barbara, Timothy | FALSE |
| 7406 | Christina | | | Armando | FALSE |
| 0596 | Teri | | | Craig | FALSE |
| 3338 | James | | | Nancie | FALSE |
| 0422 | Wenday | | | Clement | FALSE |
| 4148 | David | | | Janice | FALSE |
| 2424 | Gino | | | Tamika | FALSE |
| 2125 | Donald | | | Loyce | FALSE |
| 7547 | Billy | | | | FALSE |
| 1107 | Mitchell | | | Christina | FALSE |
| 5660 | Eugene | | | Emma | FALSE |
| 5251 | Nozella | | | E B | FALSE |
| 1630 | Clara | | | Daniel, Kathryn | FALSE |
| 2796 | Vicki | | | Vicki | TRUE |
| 7946 | Fred | | | Beverly | TRUE |
| 2050 | Marie | | | Yvonne | FALSE |
| 1167 | Carolyn | | | Miranda | TRUE |
| 6970 | Glenford | | | Therese | FALSE |
| 1088 | Johnnie | | | Johnnie | FALSE |
| 1473 | Steve | | | Mary; Monica | FALSE |
| 6343 | Raymond | | | Edward; Sylvia | FALSE |
| 3121 | Anita | | | A | FALSE |
| 9957 | Michael | | | Michael | FALSE |
| 1952 | Betty | | | Brian; Margie; Margot | FALSE |
| 0780 | Pattie | | | Pattie | FALSE |
| 9904 | John | | | Lester | FALSE |
| 8126 | Lynn | | | Gretchen | TRUE |
| 1721 | Barbara | | | Glorian | FALSE |
| 5678 | Nikki | | | Clifford; Thelma | FALSE |
| 4598 | Camey | | | Ethelyn; Lynn; William | FALSE |
| 4013 | Susan | | | Susan | FALSE |
| 5737 | Janet | | | Pamela | FALSE |
| 3487 | Lonnie | | | Silva | FALSE |
| 4590 | James | | | Cindy | FALSE |
| 4841 | Rodney | | | Heidi; John | FALSE |
| 5432 | Robert | | | Mary | FALSE |
| 1496 | John | | | Ciara; Matthew | FALSE |
| 4813 | Curtis | | | Richard | FALSE |
| 1494 | Leroy | | | Joyce | FALSE |
| 3314 | Donald | | | Marta, Donald | TRUE |
| 1852 | Forrest | | | Kathryn, Forrest | TRUE |
| 0185 | Margaret | | | M | TRUE |
| 2311 | Juanita | | | Juanita | TRUE |
| 0752 | Patricia | | | Patricia | TRUE |
| 1402 | Brad | | | Brad, Kimberly | TRUE |
| 3458 | Bradford | | | Janey | TRUE |
| 2398 | Madlyne | | | Madlyne | TRUE |
| 0620 | Myra | | | Myra, Mark | TRUE |
| 4828 | Shirley | | | S | TRUE |
| 6113 | Robbie | | | Donald | TRUE |
| 6926 | Pamela | | | Martin, Pamela | TRUE |
| 3474 | Thomas | | | Thomas | TRUE |
| 0527 | Marilyn | | | Marilyn | TRUE |
| 6269 | Magdalena | | | Conrad | TRUE |
| 3912 | Gregory | | | Gregory, Jean | TRUE |
| 0894 | Alejandro | | | Alejandro | TRUE |
| 4989 | Rosemary | | | Rosemary, Kelly | TRUE |
| 6990 | Phyllis | | | Freda, Phyllis | TRUE |
| 8990 | Mary | | | Charles, Mary, Donald | TRUE |
| 2608 | Clayton | | | C | TRUE |

| | | |
|---|---|---|
| **Exhibit E2** | | |
| **Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results** | | |

| COLOR KEY | | |
|---|---|---|
| **Description** | **Total Count** | |
| Match on Last Name Reported in Lexis Nexis | 297 | |
| No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| No Match between Reported Last Names | 38 | See Exhibit E |
| BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | |
| **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
|---|---|---|---|---|---|
| 6818 | Tracey | | | Stefanie | TRUE |
| 7409 | Joe | | | Ani | TRUE |
| 4923 | Willa | | | Hubert | TRUE |
| 6772 | Gwendolyn | | | Charles | TRUE |
| 8021 | Michael | | | Brian, Jennie, Michael | TRUE |
| 6389 | Diana | | | Diana | TRUE |
| 8597 | Kathleen | | | Kathleen | TRUE |
| 2889 | Brent | | | B | TRUE |
| 7959 | Thomas | | | | FALSE |
| 2832 | Larry | | | Larry | TRUE |
| 6348 | Barbara | | | Barbara, Dest, Laona | TRUE |
| 238 | Patricia | | | Patricia | TRUE |
| 352 | Pamela | | | Frank, Pamela | TRUE |
| 0802 | Jackie | | | Jacqueline | TRUE |
| 7451 | Barbara | | | Barbara | TRUE |
| 0367 | Todd | | | Todd, Jacqueline | BRG OK |
| 0959 | Oscar | | | Oscar, Thelma | TRUE |
| 2496 | Ingrid | | | | FALSE |
| 4015 | Anna | | | Anna | TRUE |
| 9470 | Phyllis | | | David | TRUE |
| 5082 | Virginia | | | Virginia | TRUE |
| 6037 | Leo | | | Leo, Marjorie | TRUE |
| 8285 | Morris | | | Debbie | TRUE |
| 7033 | Loyce | | | Loyce | TRUE |
| 4173 | Patricia | | | Patricia | TRUE |
| 8664 | Antonia | | | Antonia | TRUE |
| 0023 | James | | | Todd Jamel, James | TRUE |
| 2353 | Margaret | | | Frank | TRUE |
| 5339 | Mark | | | Donna | TRUE |
| 9769 | Patricia | | | Patricia | TRUE |
| 8513 | Sergey | | | Olga | TRUE |
| 6101 | Charles | | | Charles, Rosa | TRUE |
| 8918 | Frank | | | Edwina, Frankie | TRUE |
| 8048 | Dantedean | | | Carolyn, Dantedean | TRUE |
| 6513 | Ann | | | Catherine, Scott | TRUE |
| 2644 | Tran | | | | FALSE |
| 8914 | Suresh | | | Suresh | TRUE |
| 4733 | Kathleen | | | Kathleen | TRUE |
| 8552 | Dorothy | | | Dorothy | TRUE |
| 8337 | Jeannett | | | Roy | TRUE |
| 9947 | Bjorn | | | Bjorn, Suzanne | TRUE |
| 2048 | Allan | | | Allan | TRUE |
| 977 | Mary | | | Edward | TRUE |
| 6650 | Terry | | | Terry | TRUE |
| 7667 | Roman | | | Alice, Roman | TRUE |
| 5705 | Corinne | | | Cheryl, Denis | TRUE |
| 4079 | Ronald | | | Ronald | TRUE |
| 2880 | Suzanne | | | Suzanne | TRUE |
| 8851 | Luis | | | Luis | TRUE |
| 6714 | Linda | | | Linda | TRUE |
| 0834 | Sally | | | Sally | TRUE |
| 8149 | Leroy | | | Leroy | TRUE |
| 582 | Cheryl | | | Cheryl, John | TRUE |
| 5559 | Stewart | | | Stewart | TRUE |
| 8494 | Marshall | | | Marshall | TRUE |
| 6120 | Thomas | | | Elaine | TRUE |
| 2815 | Rick | | | Clara | TRUE |
| 2476 | Maria | | | Josefina, Jose, Juan | TRUE |
| 0102 | Franceletha | | | Barry | TRUE |
| 9953 | Barbara | | | Barbara | TRUE |
| 6985 | Juan | | | Juan, Linda | TRUE |
| 4429 | Denise | | | James | TRUE |
| 7854 | Marjorie | | | Marjorie | TRUE |

| Exhibit E2 |
| --- |
| Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results |

| COLOR KEY | | |
| --- | --- | --- |
| **Description** | **Total Count** | |
| Match on Last Name Reported in Lexis Nexis | 297 | |
| No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| No Match between Reported Last Names | 38 | See Exhibit E |
| BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | |
| **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
| --- | --- | --- | --- | --- | --- |
| 6653 | Velma | | | Velma, Vern | TRUE |
| 8354 | Dora | | | Katherine | TRUE |
| 4527 | Quentin | | | Quentin | TRUE |
| 8313 | Bobby | | | Bobby, Maria | TRUE |
| 9545 | Barbara | | | Barbara | TRUE |
| 2115 | Leitha | | | R | TRUE |
| 2139 | Carrie | | | | FALSE |
| 031 | Michael | | | Kimberly, Michael | TRUE |
| 7651 | Sharon | | | Sharon | TRUE |
| 7730 | Jean | | | Gary, Jean | TRUE |
| 277 | Lina | | | Cayo | TRUE |
| 2356 | Cynthia | | | Cynthia | TRUE |
| 3143 | Linda | | | | FALSE |
| 9363 | Matilda | | | Matilda | TRUE |
| 8160 | David | | | David, Henrietta | TRUE |
| 0563 | Marilyn | | | Marilyn | TRUE |
| 0907 | Carolina | | | Carrie | TRUE |
| 4757 | Marsha | | | David | TRUE |
| 2722 | Sophie | | | | FALSE |
| 5841 | Bruce | | | Bruce | TRUE |
| 696 | Thelma | | | Thelma | TRUE |
| 5741 | William | | | William | TRUE |
| 0207 | Betty | | | Betty | TRUE |
| 5822 | Michael | | | Michael | TRUE |
| 7194 | Frank | | | | FALSE |
| 7458 | James | | | | FALSE |
| 4558 | Billy | | | William | TRUE |
| 4453 | Marie | | | Marie | BRG OK |
| 7899 | Julio | | | Amalio | TRUE |
| 2775 | Savannah | | | Ashley, James | TRUE |
| 5189 | Emma | | | Emma | TRUE |
| 165 | John | | | Johnny, Murrel | TRUE |
| 6547 | Sammy | | | Hedrine, Sammy | TRUE |
| 8659 | Bhogilal | | | Bhogilal | TRUE |
| 424 | Caster | | | Caster | TRUE |
| 0955 | Allard | | | Allard | TRUE |
| 7868 | Donna | | | Donna | TRUE |
| 0760 | Mary | | | Barry, Mary | TRUE |
| 6789 | Susan | | | | FALSE |
| 2198 | Raymond | | | Joan, Raymond | TRUE |
| 2526 | Valdemar | | | Valdemar | TRUE |
| 8457 | Richard | | | | FALSE |
| 0689 | Vickie | | | Richard | TRUE |
| 4192 | Monica | | | Monica | TRUE |
| 7906 | Johnny | | | | FALSE |
| 2428 | Virginia | | | Alan, Virginia | TRUE |
| 6918 | Bonnie | | | | FALSE |
| 0962 | Gus | | | Gus | TRUE |
| 8211 | Howard | | | Howard | TRUE |
| 0979 | Leola | | | Leola | TRUE |
| 8015 | Eddie | | | | FALSE |
| 2836 | Garland | | | Barbara | TRUE |
| 0659 | Mary | | | Mary | TRUE |
| 2485 | Helen | | | | FALSE |
| 2444 | Darrell | | | Connie | TRUE |
| 102 | Virginia | | | | FALSE |
| 4441 | Lynn | | | Lynn | TRUE |
| 4105 | Robert | | | Robert | TRUE |
| 5843 | Gaye | | | Alexander; Gaye | TRUE |
| 2482 | Mary | | | Mary; Maryelle | TRUE |
| 262 | Gary | | | | FALSE |
| 2997 | Shirley | | | Freddie; Shirley | TRUE |
| 393 | Marilyn | | | Marilyn | TRUE |

**Exhibit E2**
**Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results**

| COLOR KEY | | |
|---|---|---|
| **Description** | **Total Count** | |
| Match on Last Name Reported in Lexis Nexis | 297 | |
| No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| No Match between Reported Last Names | 38 | See Exhibit E |
| BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | |
| **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
|---|---|---|---|---|---|
| 4379 | Dewey | | | Hazel | TRUE |
| 8141 | Crystal | | | Crystal; David | TRUE |
| 2026 | Melba | | | Richard | TRUE |
| 8905 | Gary | | | | FALSE |
| 8294 | Gloria | | | Gloria | TRUE |
| 6574 | Timothy | | | A | TRUE |
| 5168 | Sharon | | | John; Sharon | TRUE |
| 0230 | Masker | | | Masker; Doris; Michael | TRUE |
| 9022 | Arpatsy | | | Arpatsy | TRUE |
| 5552 | Rita | | | Michael; Rita | TRUE |
| 3174 | Kathy | | | David; Kathy | TRUE |
| 4664 | Robert | | | | FALSE |
| 5295 | Gwendolyn | | | Gwendolyn; Tyaira; Willie | TRUE |
| 2083 | Virgilio | | | Josephine; Virgilio | TRUE |
| 6899 | Alfred | | | Alfred; Patricia | TRUE |
| 5230 | Lois | | | Lois; Todd | TRUE |
| 0322 | Margaret | | | Margaret | TRUE |
| 1918 | Kimberly | | | Kim; Kimberly | TRUE |
| 1862 | Carl | | | Carl; Frances | TRUE |
| 9129 | Manjulaben | | | Manjulaben | TRUE |
| 9628 | James | | | | FALSE |
| 6686 | James | | | James | TRUE |
| 2379 | Jay | | | Barbara; Jay | TRUE |
| 6972 | Maria | | | Joseph | TRUE |
| 6260 | John | | | John | TRUE |
| 8700 | Mackie | | | | FALSE |
| 6589 | Leroy | | | Leona; Leonae; Leroy | TRUE |
| 6188 | Charles | | | Charles | TRUE |
| 8400 | Richard | | | Sheila | TRUE |
| 2671 | Virgie | | | Amber | TRUE |
| 5545 | Debra-lynn | | | Nancy | TRUE |
| 8320 | Lawrence | | | Lawrence | TRUE |
| 7050 | Marjorie | | | Marjorie | BRG OK |
| 4443 | Peter | | | Gail; Peter | TRUE |
| 7777 | Glenna | | | Glenna | TRUE |
| 0164 | Enid | | | Enid; Kenneth | TRUE |
| 1540 | Daniel | | | Daniel; Wendy | TRUE |
| 4139 | Frances | | | | FALSE |
| 7202 | Patricia | | | Patricia | TRUE |
| 0645 | Joseph | | | Cleta; Joseph | TRUE |
| 2481 | Jerome | | | Jerome | BRG OK |
| 8450 | Michael | | | Michael | TRUE |
| 0166 | Linda | | | Linda | TRUE |
| 3097 | Alla | | | Alla | TRUE |
| 2971 | Daniel | | | Barbara; Jennifer | TRUE |
| 0556 | Kenneth | | | Gloria; Kenneth | TRUE |
| 3197 | Willie | | | Bertha; Willie | TRUE |
| 7664 | Carol | | | Carol | TRUE |
| 7160 | Gary | | | Gary | TRUE |
| 5756 | Khaysone | | | Khaysone | TRUE |
| 3512 | Tommy | | | William; Julie; Katherine; Tom... | TRUE |
| 5252 | Lonnie | | | Alice; Loni; Lonnie | TRUE |
| 2983 | William | | | Dennis; Lizabelle | TRUE |
| 3344 | Mikel | | | | FALSE |
| 3090 | Marian | | | Marian | TRUE |
| 2377 | Philp | | | | FALSE |
| 0447 | Patti | | | | FALSE |
| 1371 | Diane | | | Diane; Savana | TRUE |
| 0351 | Elitania | | | | FALSE |
| 4225 | Herbert | | | Herbert | TRUE |
| 3650 | James | | | James | TRUE |
| 8670 | John | | | | FALSE |
| 7232 | Esther | | | Esther; Scott | TRUE |

**Exhibit E2**
**Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results**

| COLOR KEY | | |
|---|---|---|
| **Description** | **Total Count** | |
| Match on Last Name Reported in Lexis Nexis | 297 | |
| No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| No Match between Reported Last Names | 38 | See Exhibit E |
| BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | |
| **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
|---|---|---|---|---|---|
| 9234 | Wesley | | | Loretta | TRUE |
| 9545 | David | | | Constance; David | TRUE |
| 2671 | Sheila | | | H; K; Kaele | TRUE |
| 3556 | Mary | | | | FALSE |
| 7391 | Laura | | | Calvin; Laura | TRUE |
| 4630 | Vasil | | | L | TRUE |
| 1147 | Ronnie | | | Jennifer | TRUE |
| 2414 | Kay | | | Kay | TRUE |
| 5862 | Genie | | | Genie; Olin | TRUE |
| 5417 | Linda | | | Eric; Linda; Wesley | TRUE |
| 9852 | Ronald | | | Kathleen | BRG OK |
| 2455 | Lisa | | | | FALSE |
| 5065 | Pamela | | | Jacquelyn; Mattie; Torrey | TRUE |
| 4430 | Lee | | | | FALSE |
| 5249 | Darnell | | | Lizzie; Michael | TRUE |
| 5175 | Carlin | | | Carlin; Dorothy | TRUE |
| 3447 | Joyce | | | Joyce; Vincent | TRUE |
| 7125 | Manuela | | | Isamael; Manuela; Maria | TRUE |
| 4611 | Valerie | | | Valerie | TRUE |
| 0805 | Cathie | | | Cathie | TRUE |
| 1455 | Patrick | | | Owen | TRUE |
| 5593 | William | | | Joan; Sherrill; William | TRUE |
| 0680 | Thelma | | | Ronald | TRUE |
| 7348 | Laurie | | | Kedric; Laurie | TRUE |
| 8028 | Somsanuk | | | Savivanh; Somsanuk | TRUE |
| 2484 | James | | | James; Patricia; Wing; Althga; | TRUE |
| 9427 | Clarita | | | Clarita; Emil; Emmauel | TRUE |
| 1401 | Norman | | | Norman | TRUE |
| 1577 | Marion | | | Lloyd; Marion; Nancy; Sarah | TRUE |
| 1857 | Phillip | | | Phillip | TRUE |
| 2505 | Negash | | | Negash | TRUE |
| 1283 | Julius | | | Cody; Bernice; Julius; Latoya | TRUE |
| 2234 | Carl | | | Kristy | TRUE |
| 5752 | Becky | | | Becky | TRUE |
| 6001 | Doris | | | Doris | TRUE |
| 9195 | Gerald | | | Jerry | TRUE |
| 0192 | Kenneth | | | Jayne; Kenneth | TRUE |
| 2362 | Macie | | | Macie | TRUE |
| 1285 | Diana | | | Willi; Michael | TRUE |
| 9261 | Donna | | | Donna | TRUE |
| 0276 | Bruce | | | Gloria | TRUE |
| 8355 | Bessie | | | N | TRUE |
| 8336 | Marvin | | | Marvin | TRUE |
| 4841 | Shirley | | | R & S | TRUE |
| 2462 | Karen | | | William | TRUE |
| 4096 | Osman | | | Osman | TRUE |
| 8798 | Daniel | | | Daniel; Gerard | TRUE |
| 3464 | Alicia | | | Alicia | TRUE |
| 5704 | Joyce | | | Bobby; Joyce | TRUE |
| 4091 | Robbie | | | Reginald | TRUE |
| 9717 | Maralyn | | | Terry | TRUE |
| 2702 | Velma | | | L; V; Velma; Willie | TRUE |
| 0923 | Kenneth | | | Ken | TRUE |
| 9576 | Emily | | | Emily; Jimmy | TRUE |
| 8131 | Enaya | | | Enaya | TRUE |
| 9966 | Teresa | | | Teresa | TRUE |
| 2881 | Lynn | | | Lynn; Shannon | TRUE |
| 1871 | George | | | George | TRUE |
| 9290 | Micaela | | | Belinda; Lisa; Micaela | TRUE |
| 0346 | William | | | WB | TRUE |
| 8628 | Robert | | | Donna; Robert | TRUE |
| 8279 | Noreen | | | Noreen; Tommy | TRUE |
| 0451 | Margie | | | Ronnie | TRUE |

**Exhibit E2**
**Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results**

| COLOR KEY | | |
|---|---|---|

| Description | Total Count | |
|---|---|---|
| Match on Last Name Reported in Lexis Nexis | 297 | |
| No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| No Match between Reported Last Names | 38 | See Exhibit E |
| BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | |
| **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
|---|---|---|---|---|---|
| 6301 | Charles | | | Charles | TRUE |
| 562 | Jan | | | Cheryl; Jan | TRUE |
| 8219 | Joan | | | | FALSE |
| 6964 | Inez | | | Inez | TRUE |
| 6825 | Andrew | | | Sarah | TRUE |
| 2654 | Brian | | | Brian | TRUE |
| 2963 | Paula | | | | FALSE |
| 2344 | Fred | | | | FALSE |
| 4725 | Joe | | | Joe | TRUE |
| 6607 | Mary | | | Mary | TRUE |
| 9222 | Rima | | | R | TRUE |
| 2253 | R | | | Robert | TRUE |
| 6220 | Mary | | | | FALSE |
| 8815 | Billy | | | William; Beverly; Billy; Emily | TRUE |
| 6525 | Amando | | | Amand | TRUE |
| 6837 | Celia | | | Celia; Nicole; Richard | TRUE |
| 067 | Janice | | | Janice; Kenneth | TRUE |
| 2147 | John | | | Carol; John | TRUE |
| 4684 | Elizabeth | | | Elizabeth | TRUE |
| 5139 | Walter | | | Sherry; Walter | TRUE |
| 0743 | Birtha | | | Bertha | TRUE |
| 0884 | Mary | | | Austin; Mary | TRUE |
| 7675 | Donald | | | Ashleigh; Deborah; Donald | BRG OK |
| 8621 | Joann | | | Iecha; Joann; Veronika | TRUE |
| 9612 | Sabrina | | | Jermaine; Sabrina | TRUE |
| 5331 | Mignon | | | Cecille; John; Mignon | TRUE |
| 6040 | Helen | | | Helen | TRUE |
| 6257 | Jamie | | | Jamie | TRUE |
| 9648 | Vallie | | | | FALSE |
| 6105 | Ryle | | | Ryle | TRUE |
| 9570 | Cesar | | | Cesar; Rosa | TRUE |
| 204 | Bonnie | | | Bonnie | TRUE |
| 2112 | Chester | | | | FALSE |
| 2716 | Kattie | | | Kattie | TRUE |
| 4441 | Orell | | | Columbus; Orell | TRUE |
| 6288 | Nels | | | | FALSE |
| 9669 | Mary | | | Mary | TRUE |
| 080 | A | | | Audrey | TRUE |
| 0873 | Jean | | | J | TRUE |
| 0837 | Larry | | | L | TRUE |
| 893 | Olen | | | Kathleen; Kahson; Ogn | TRUE |
| 6369 | Patricia | | | James; Jason | TRUE |
| 7604 | Scott | | | Scott | BRG OK |
| 0121 | Debra | | | Debra | TRUE |
| 4130 | Edith | | | Edith | TRUE |
| 6507 | David | | | Caron; David; Kimberly; Kristi | TRUE |
| 0489 | Edward | | | | FALSE |
| 9280 | Susan | | | | FALSE |
| 8985 | Ludmila | | | Fred; Ludmila | TRUE |
| 6437 | Ralph | | | Ralph | TRUE |
| 6563 | Nell | | | Gertie; Gina | TRUE |
| 605 | Marguerite | | | | FALSE |
| 7886 | Terry | | | Irene; Terry | TRUE |
| 0275 | Roger | | | Roger | TRUE |
| 0587 | Gertrud | | | Richard | TRUE |
| 4616 | Sharon | | | Sharon | TRUE |
| 6502 | Rhonda | | | Rhonda | TRUE |
| 8854 | Patricia | | | Patricia; Patrick; Roy | TRUE |
| 6501 | Phillip | | | Mary; Philip | TRUE |
| 6052 | Rick | | | Nancy; Rick | TRUE |
| 6069 | Darnell | | | Darnell | TRUE |
| 7840 | Martin | | | | FALSE |
| 6716 | Gerald | | | Gerald; Natalie; Nina; Rose | TRUE |

Berkeley Research Group

**Exhibit E2**
**Lead List Phone Numbers: Last Name Matches to LexisNexis Search Results**

| COLOR KEY | | |
|---|---|---|

| | Description | Total Count | |
|---|---|---|---|
| | Match on Last Name Reported in Lexis Nexis | 297 | |
| | No Last Name Reported in Lexis Nexis | 42 | See Exhibit E |
| | No Match between Reported Last Names | 38 | See Exhibit E |
| | BRG Manually Matched on Last Name Reported in Lexis Nexis | 7 | |
| | **Total Lead List Phone Numbers** | **384** | See Exhibit E |

| phone number | first_name | last_name | Lexis - Last_name | Lexis - First_Name | BRG Match Code: LexisNexis |
|---|---|---|---|---|---|
| 4831 | Richard | | | Richard | TRUE |
| 0193 | Samantha | | | | FALSE |
| 2076 | Brian | | | Brian; Eugene | TRUE |
| 6322 | Michael | | | | FALSE |
| 8386 | Lindra | | | Lindra | TRUE |
| 2794 | George | | | Barbara | TRUE |
| 384 | | | | | |

**Exhibit E3**
**Lead List Phone Numbers: Last Name Matches to Search Engine Results**

### DETAIL SUMMARY

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | LexisNexis Result | TLO Results | Google Results | 411.com Results | Match on Last Name | | | | Count of Search Engines Returning Discrepant Last Name Matches |
|---|---|---|---|---|---|---|---|---|---|---|
| phone_id | last_name | Last Name | Last Name | Last Name | Last Name | LexisNexis | TLO | Google | 411.com | |
| 3314 | Stewart | Stewart | Stewart | Stewart | Stewart | TRUE | TRUE | TRUE | TRUE | 0 |
| 1852 | Fletcher | Fletcher | Fletcher | Fletcher | Fletcher | TRUE | TRUE | TRUE | TRUE | 0 |
| 0185 | Surratt | Surratt | Surratt | Surratt | Morrison | TRUE | FALSE | TRUE | FALSE | 2 |
| 2311 | King | King | King | King | King | TRUE | TRUE | TRUE | TRUE | 0 |
| 0752 | Smith | Smith | Smith | Smith | Smith | TRUE | TRUE | TRUE | TRUE | 0 |
| 0188 | Rieken | Frerichs | Rieken | Rieken | Frerichs | FALSE | TRUE | TRUE | FALSE | 2 |
| 1402 | Beaudine | Beaudine | Beaudine | Beaudine | Beaudine | TRUE | TRUE | TRUE | TRUE | 0 |
| 3458 | Lester | Lester | Lester | Lester | Lester | TRUE | TRUE | TRUE | TRUE | 0 |
| 2398 | Dansby | Dansby | Dansby | Dansby | Gatsby | TRUE | TRUE | TRUE | FALSE | 1 |
| 0620 | Martin | Martin | Martin | Martin | Martin | TRUE | TRUE | TRUE | TRUE | 0 |
| 4828 | Jump | Jump | Jump | Jump | Young | TRUE | TRUE | TRUE | FALSE | 1 |
| 6113 | Hutton | Hutton | Hutton | Hutton | Hutton | TRUE | TRUE | TRUE | TRUE | 0 |
| 6926 | Price | Price | Price | Price | Price | TRUE | TRUE | TRUE | TRUE | 0 |
| 3474 | Mcdermott | McDermott | McDermott | | Mcdermott | TRUE | TRUE | FALSE | TRUE | 1 |
| 0527 | Katz | Katz | Katz | Katz | Katz | TRUE | TRUE | TRUE | TRUE | 0 |
| 6269 | Sagnip | Sagnip | Sagnip | Sagnip | Sagnip | TRUE | TRUE | TRUE | TRUE | 0 |
| 3912 | Foster | Foster | Foster | Foster | Foster | TRUE | TRUE | TRUE | TRUE | 0 |
| 0894 | Cardenas | Cardenas | Cardenas | Cardenas | Cardenas | FALSE | TRUE | TRUE | TRUE | 1 |
| 4989 | Bencik | Bencik | Bencik | Bencik | Bencik | TRUE | TRUE | TRUE | TRUE | 0 |
| 3311 | Knouff | Takahata | Knouff | Kanouff | Knouff | FALSE | TRUE | FALSE | TRUE | 2 |
| 6990 | Linker | Linker | Linker | Linker | Linker | TRUE | TRUE | TRUE | TRUE | 0 |
| 8990 | Russell | Russell | Russell | Russell | Russell | TRUE | TRUE | TRUE | TRUE | 0 |
| 2608 | Mitchell | Mitchell | Mitchell | Mitchell | Mitchell | TRUE | TRUE | TRUE | TRUE | 0 |
| 5818 | Gustavson | Gustavson | Gustavson | | Gustavson | TRUE | TRUE | FALSE | TRUE | 1 |
| 7409 | Lindley | Lindley | Lindley | Lindley | | TRUE | TRUE | TRUE | FALSE | 1 |
| 4923 | Evans | Evans | Evans | Evans | Evans | TRUE | TRUE | TRUE | TRUE | 0 |
| 3088 | Strong | Staples | Strong | | Strong | FALSE | TRUE | FALSE | TRUE | 2 |
| 6772 | Wood | Wood | Wood | Wood | Wood | TRUE | TRUE | TRUE | TRUE | 0 |
| 3021 | Tromblee | Tromblee | Tromblee | | Tromblee | TRUE | TRUE | FALSE | TRUE | 1 |
| 5389 | Sutton | Sutton | Sutton | Sutton | Sutton | TRUE | TRUE | TRUE | TRUE | 0 |

Berkeley Research Group

## Exhibit E3
## Lead List Phone Numbers: Last Name Matches to Search Engine Results

| DETAIL SUMMARY |
| --- |

| Description | Total Count |
| --- | --- |
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 3597 | Garvin | Garvin | Garvin | Covington | Garvin | TRUE | TRUE | FALSE | TRUE | 1 |
| 5411 | Quick | Cox | Quick | Quick | Quick | FALSE | TRUE | TRUE | TRUE | 1 |
| 2889 | Davis | Davis | Davis | Davis | Davis | TRUE | TRUE | TRUE | TRUE | 0 |
| 7959 | Jones | | Jones | Jones | Jones | FALSE | TRUE | TRUE | TRUE | 1 |
| 2832 | Johnson | Johnson | Johnson | | Johnson | TRUE | TRUE | FALSE | TRUE | 1 |
| 6348 | Ayles | Ayles | Ayles | Ayles | Ayles | TRUE | TRUE | TRUE | TRUE | 0 |
| 7406 | Anderson | Vega | Anderson | Vega | Anderson | FALSE | TRUE | FALSE | TRUE | 2 |
| 1238 | Hacker | Hacker | Hacker | Hacker | Hacker | TRUE | TRUE | TRUE | TRUE | 0 |
| 1352 | Frankino | Frankino | Frankino | Frankino | Frankino | TRUE | TRUE | TRUE | TRUE | 0 |
| 0596 | Jones | Huffman | Jones | Jones | Jones | FALSE | TRUE | TRUE | TRUE | 1 |
| 0802 | Woods | Woods | Woods | Woods | Woods | TRUE | TRUE | TRUE | TRUE | 0 |
| 7451 | Hospodar | Hospodar | Hospodar | Hospodar | Hospodar | TRUE | TRUE | TRUE | TRUE | 0 |
| 0367 | Sternberg | Sternburg | Sternberg | Sternberg | | BRG OK | TRUE | TRUE | FALSE | 1 |
| 0959 | Davis | Davis | Davis | Davis | Davis | TRUE | TRUE | TRUE | TRUE | 0 |
| 2496 | Oas | | Oas | Oas | Oas | FALSE | TRUE | TRUE | TRUE | 1 |
| 4015 | Warren | Warren | Warren | Warren | Warren | TRUE | TRUE | TRUE | TRUE | 0 |
| 9470 | Carroll | Carroll | Carroll | Carroll | Carroll | TRUE | TRUE | TRUE | TRUE | 0 |
| 6082 | Watson | Watson | Watson | Watson | Watson | TRUE | TRUE | TRUE | TRUE | 0 |
| 3338 | Mitchell | Carroll | Mitchell | Mitchell | Mitchell | FALSE | TRUE | TRUE | TRUE | 1 |
| 3037 | Peloquin | Peloquin | Peloquin | Peloquin | Peloquin | TRUE | TRUE | TRUE | TRUE | 0 |
| 8285 | Lovell | Lovell | Lovell | Lovell | Lovell | TRUE | TRUE | TRUE | TRUE | 0 |
| 7033 | Mckinney | Mckinney | McKinney | McKinney | McKinney | TRUE | TRUE | TRUE | TRUE | 0 |
| 4173 | Jordan | Jordan | Jordan | Jordan | Jordan | TRUE | TRUE | TRUE | TRUE | 0 |
| 8664 | Hamilton | Hamilton | Hamilton | Hamilton | Hamilton | TRUE | TRUE | TRUE | TRUE | 0 |
| 0023 | Irby | Irby | Irby | Irby | Irby | TRUE | TRUE | TRUE | TRUE | 0 |
| 2353 | Dahl | Dahl | Dahl | Dahl | Dahl | TRUE | TRUE | TRUE | TRUE | 0 |
| 6339 | Reece | Reece | Reece | Reece | Reece | TRUE | TRUE | TRUE | TRUE | 0 |
| 9769 | Newkirk | NewKirk | Newkirk | | Newkirk | TRUE | TRUE | FALSE | TRUE | 1 |
| 3513 | Petrenko | Petrenko | Petrenko | Petrenko | Petrenko | TRUE | TRUE | TRUE | TRUE | 0 |
| 6101 | Johnson | Johnson | Johnson | Johnson | Johnson | TRUE | TRUE | TRUE | TRUE | 0 |
| 3918 | Smith | Smith | Smith | Smith | Smith | TRUE | TRUE | TRUE | TRUE | 0 |
| 0422 | Olson | Opusunju | Olson | Olson | Olson | FALSE | TRUE | TRUE | TRUE | 1 |
| 8048 | Reyes | Reyes | Reyes | Reyes | Reyes | TRUE | TRUE | TRUE | TRUE | 0 |
| 5513 | Birdsall | Birdsall | Birdsall | | | TRUE | TRUE | FALSE | FALSE | 2 |

| Exhibit E3 |
| --- |
| Lead List Phone Numbers: Last Name Matches to Search Engine Results |

| DETAIL SUMMARY |
| --- |

| Description | Total Count |
| --- | --- |
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 2644 | Thanh | | Thanh | | Thanh | FALSE | TRUE | FALSE | TRUE | 2 |
| 8914 | Joshi | Joshi | Joshi | Joshi | Joshi | TRUE | TRUE | TRUE | TRUE | 0 |
| 4148 | Millsop | Yonkers | Yonkers | Yonkers | Yonkers | FALSE | FALSE | FALSE | FALSE | 4 |
| 4733 | Kerlin | | Kerlin | Kerlin | | TRUE | TRUE | TRUE | FALSE | 1 |
| 3552 | Wilson | Wilson | Wilson | Wilson | Wilson | TRUE | TRUE | TRUE | TRUE | 0 |
| 3337 | Greathouse | Greathouse | Greathouse | Greathouse | Greathouse | FALSE | TRUE | TRUE | TRUE | 1 |
| 9947 | Undseth | Undseth | Undseth | Undseth | Undseth | TRUE | TRUE | TRUE | TRUE | 0 |
| 2048 | Hall | Hall | Hall | Hall | Hall | TRUE | TRUE | TRUE | TRUE | 0 |
| 1977 | Jones | Jones | Jones | Jones | Jones | TRUE | TRUE | TRUE | TRUE | 0 |
| 6650 | Patton | Patton | Patton | Godlewski | Patton | TRUE | TRUE | FALSE | TRUE | 1 |
| 2424 | Danelli | Brazier | Danelli | Brazier | Brazier | FALSE | TRUE | FALSE | FALSE | 3 |
| 7667 | Zytek | Zytek | Zytek | Zytek | Zytek | TRUE | TRUE | TRUE | TRUE | 0 |
| 6705 | Widlock | Widlock | Widlock | Widlock | Widlock | TRUE | TRUE | TRUE | TRUE | 0 |
| 4079 | Smith | Smith | Smith | Smith | Smith | TRUE | TRUE | TRUE | TRUE | 0 |
| 2880 | Becht | Becht | Becht | Becht | Becht | TRUE | TRUE | TRUE | TRUE | 0 |
| 8851 | Alvarado | Alvarado | Alvarado | Alvarado | Alvarado | TRUE | TRUE | TRUE | TRUE | 0 |
| 5714 | Mccurry | McCurry | Mccurry | Mccurry | Mccurry | TRUE | TRUE | TRUE | TRUE | 0 |
| 0834 | Bell | Bell | Bell | Bell | Bell | TRUE | TRUE | TRUE | TRUE | 0 |
| 3149 | Walker | Walker | Walker | Walker | Walker | TRUE | TRUE | TRUE | TRUE | 0 |
| 1582 | Kloos | Kloos | Kloos | Kloos | Kloos | TRUE | TRUE | TRUE | TRUE | 0 |
| 5559 | Chaney | Chaney | Chaney | Chaney | | TRUE | TRUE | TRUE | FALSE | 1 |
| 3494 | Mason | Mason | Mason | Mason | Mason | TRUE | TRUE | TRUE | TRUE | 0 |
| 6120 | Lawson | Lawson | Lawson | Lawson | Lawson | TRUE | TRUE | TRUE | TRUE | 0 |
| 2125 | Reinhart | Holt | Reinhart | Reinhart | Reinhart | FALSE | TRUE | TRUE | TRUE | 1 |
| 7547 | Harris | null | Harris | Harris | Harris | FALSE | TRUE | TRUE | TRUE | 1 |
| 2815 | Taylor | Taylor | Taylor | Taylor | Taylor | TRUE | TRUE | TRUE | TRUE | 0 |
| 2476 | Romero | Romero | Romero | Romero | Romero | TRUE | TRUE | TRUE | TRUE | 0 |
| 0102 | Burgains | Burgains | Burgains | Burgains | Burgains | TRUE | TRUE | TRUE | TRUE | 0 |
| 9953 | Spaulding | Spaulding | Spaulding | Spaulding | Spaulding | TRUE | TRUE | TRUE | TRUE | 0 |
| 5985 | Oviedo | Oviedo | Oviedo | Oviedo | Oviedo | TRUE | TRUE | TRUE | TRUE | 0 |
| 4429 | Renfrow | Renfrow | Renfrow | Renfrow | Renfrow | TRUE | TRUE | TRUE | TRUE | 0 |
| 7854 | Hall | Hall | Hall | Hall | Hall | TRUE | TRUE | TRUE | TRUE | 0 |
| 5653 | Alexander | Alexander | Alexander | Alexander | Alexander | TRUE | TRUE | TRUE | TRUE | 0 |
| 8354 | Brown | Brown | Brown | Brown | Brown | TRUE | TRUE | TRUE | TRUE | 0 |

Berkeley Research Group

| | |
|---|---|
| **Exhibit E3** | |
| **Lead List Phone Numbers: Last Name Matches to Search Engine Results** | |

| *DETAIL SUMMARY* |
|---|

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 4527 | Starkes | Starkes | Starkes | Starkes | Starkes | TRUE | TRUE | TRUE | TRUE | 0 |
| 8313 | Willis | Willis | Willis | Willis | Willis | TRUE | TRUE | TRUE | TRUE | 0 |
| 9545 | Chinelo | Chinelo | Chinelo | Chinelo | Chinelo | TRUE | TRUE | TRUE | TRUE | 0 |
| 2115 | Hamilton | Hamilton | Hamilton | Hamilton | Hamilton | TRUE | TRUE | TRUE | TRUE | 0 |
| 2139 | Geter | | Geter | Geter | Geter | FALSE | TRUE | TRUE | TRUE | 1 |
| 1031 | Brown | Brown | Brown | Brown | Brown | TRUE | TRUE | FALSE | TRUE | 1 |
| 7651 | Hackerson | Hackerson | Hackerson | Hackerson | Hackerson | TRUE | TRUE | TRUE | TRUE | 0 |
| 1107 | Garcia | Guajardo | Garcia | Garcia | Garcia | FALSE | TRUE | TRUE | TRUE | 1 |
| 7730 | Earl | Earl | Earl | Earl | Earl | TRUE | TRUE | TRUE | TRUE | 0 |
| 1277 | Gasuad | Gasuad | Gasuad | Gasuad | Gasuad | TRUE | TRUE | TRUE | TRUE | 0 |
| 2356 | Schloss | Schloss | Schloss | Schloss | Schloss | TRUE | TRUE | FALSE | TRUE | 1 |
| 8143 | Ford | | Ford | Ford | Ford | FALSE | TRUE | TRUE | TRUE | 1 |
| 9363 | Douglas | Douglas | Douglas | Douglas | Douglas | TRUE | TRUE | TRUE | TRUE | 0 |
| 8160 | Lewis | Lewis | Lewis | Lewis | Lewis | TRUE | TRUE | TRUE | TRUE | 0 |
| 0563 | Johnson | Johnson | Johnson | Johnson | Johnson | TRUE | TRUE | TRUE | TRUE | 0 |
| 9907 | Fuentes | Fuentes | Fuentes | Fuentes | Fuentes | TRUE | TRUE | TRUE | TRUE | 0 |
| 4757 | Evans | Evans | Evans | Evans | Evans | TRUE | TRUE | TRUE | TRUE | 0 |
| 2722 | Hanson | | Hanson | Hanson | Hanson | FALSE | TRUE | TRUE | TRUE | 1 |
| 6841 | Mclendon | McLendon | Mclendon | Mclendon | Mclendon | TRUE | TRUE | TRUE | TRUE | 0 |
| 1696 | Cameron | Cameron | Cameron | Cameron | Cameron | TRUE | TRUE | TRUE | TRUE | 0 |
| 5660 | Lucas | Sanders | Lucas | Sanders | Lucas | FALSE | TRUE | FALSE | TRUE | 2 |
| 5741 | Mitz | Mitz | Mitz | Mitz | Mitz | TRUE | TRUE | TRUE | TRUE | 0 |
| 9207 | Williams | Williams | Williams | Williams | Christian | TRUE | TRUE | TRUE | FALSE | 1 |
| 6822 | Diberardo | Diberardo | Diberardo | Diberardo | Diberardo | TRUE | TRUE | TRUE | TRUE | 0 |
| 7194 | Ogbonna | | Ogbonna | Ogbonna | Ogbonna | FALSE | TRUE | TRUE | TRUE | 1 |
| 7458 | Cook | | Cook | Cook | Cook | FALSE | TRUE | TRUE | TRUE | 1 |
| 4558 | Rodgers | Rodgers | Rodgers | Rodgers | Rodgers | TRUE | TRUE | TRUE | TRUE | 0 |
| 4453 | Grazes | Graves | Grazes | Grazes | Graves | BRG OK | TRUE | TRUE | BRG OK | 0 |
| 7899 | Fuentes | Fuentes | Fuentes | Fuentes | Fuentes | TRUE | TRUE | TRUE | TRUE | 0 |
| 2775 | Foster | Foster | Foster | Foster | Foster | TRUE | TRUE | TRUE | TRUE | 0 |
| 5189 | Riehl | Riehl | Riehl | Riehl | Riehl | TRUE | TRUE | TRUE | TRUE | 0 |
| 1165 | Arey | Arey | Arey | Arey | Arey | TRUE | TRUE | TRUE | TRUE | 0 |
| 8547 | Nana | Nana | Nana | Nana | Nana | TRUE | TRUE | TRUE | TRUE | 0 |
| 8659 | Patel | Patel | Patel | Patel | Patel | TRUE | TRUE | TRUE | TRUE | 0 |

Berkeley Research Group

| | |
|---|---|
| **Exhibit E3** | |
| **Lead List Phone Numbers: Last Name Matches to Search Engine Results** | |

| *DETAIL SUMMARY* |
|---|

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1424 | Davidson | Davidson | Davidson | Davidson | Davidson | TRUE | TRUE | TRUE | TRUE | 0 |
| 0955 | Hawks | Hawks | Hawks | Hawk | Hawks | TRUE | TRUE | BRG OK | TRUE | 0 |
| 7868 | Womack | Womack | Womack | Womack | Womack | TRUE | TRUE | TRUE | TRUE | 0 |
| 0760 | Stephens | Stephens | Stephens | Stephens | Stephens | TRUE | TRUE | TRUE | TRUE | 0 |
| 8789 | Thomsen | | Thomsen | Thomsen | Thomsen | | FALSE | TRUE | TRUE | FALSE | 2 |
| 5251 | Flint | Austin | Austin | Austin | Austin | FALSE | FALSE | FALSE | FALSE | 4 |
| 2198 | Siragusa | Siragusa | Siragusa | Siragusa | Siragusa | TRUE | TRUE | TRUE | TRUE | 0 |
| 2526 | Alanis | Alanis | Alanis | Alanis | Alanis | TRUE | TRUE | TRUE | TRUE | 0 |
| 8457 | Harris | | Harris | Harris | Harris | FALSE | TRUE | TRUE | TRUE | 1 |
| 9689 | Anderson | Anderson | Anderson | Anderson | Anderson | TRUE | TRUE | TRUE | TRUE | 0 |
| 4192 | Dumetz | Dumetz | Dumetz | Dumetz | Barnett | TRUE | TRUE | TRUE | FALSE | 1 |
| 7906 | Sanders | | Sanders | Sanders | Sanders | FALSE | TRUE | TRUE | TRUE | 1 |
| 2428 | Craig | Craig | Craig | Craig | Craig | TRUE | TRUE | TRUE | TRUE | 0 |
| 5918 | Nielsen | | Nielsen | Nielsen | Nielsen | FALSE | TRUE | TRUE | TRUE | 1 |
| 0962 | Bennett | Bennett | Bennett | Bennett | Bennett | TRUE | TRUE | TRUE | TRUE | 0 |
| 8211 | Jones | Jones | Jones | Jones | Jones | TRUE | TRUE | TRUE | TRUE | 0 |
| 0979 | William | William | William | William | William | TRUE | TRUE | TRUE | TRUE | 0 |
| 8015 | Sims | | Sims | Jimenez | Sims | FALSE | TRUE | FALSE | TRUE | 2 |
| 2836 | Harris | Harris | Harris | Harris | Harris | TRUE | TRUE | TRUE | TRUE | 0 |
| 0659 | Hoefer | Hoefer | Hoefer | Hoefer | Hoefer | TRUE | TRUE | TRUE | TRUE | 0 |
| 2485 | Hercules | | Hercules | Hercules | Hercules | FALSE | TRUE | TRUE | TRUE | 1 |
| 2444 | Ewing | Ewing | Ewing | Ewing | Ewing | TRUE | TRUE | TRUE | TRUE | 0 |
| 1102 | Spencer | | Spencer | Insaard | | FALSE | TRUE | FALSE | FALSE | 3 |
| 4441 | Ziegler | Ziegler | Ziegler | Ziegler | Ziegler | TRUE | TRUE | TRUE | TRUE | 0 |
| 4105 | Stewart | Stewart | Stewart | Stewart | Stewart | TRUE | TRUE | TRUE | TRUE | 0 |
| 1630 | Ogawa | Nowak | Ogawa | Ogawa | Nowak | FALSE | TRUE | TRUE | FALSE | 2 |
| 5843 | Izzard | Izzard | Izzard | Izzard | Izzard | TRUE | TRUE | TRUE | TRUE | 0 |
| 2482 | Richardson | Richardson | Richardson | Richardson | Richardson | TRUE | TRUE | TRUE | TRUE | 0 |
| 2796 | Woodward | Woodward | Woodward | Woodward | Bird | TRUE | TRUE | TRUE | FALSE | 1 |
| 1262 | Hagman | | Hagman | Hagman | Hagman | FALSE | TRUE | TRUE | TRUE | 1 |
| 2997 | Washington | Washington | Washington | | Washington | TRUE | TRUE | FALSE | TRUE | 1 |
| 1393 | Council | Council | Council | Council | Council | TRUE | TRUE | TRUE | TRUE | 0 |
| 4379 | Hopkins | Hopkins | Hopkins | Hopkins | Hopkins | TRUE | TRUE | TRUE | TRUE | 0 |
| 8141 | Frank | Frank | Frank | Frank | Frank | TRUE | TRUE | TRUE | TRUE | 0 |

| | |
|---|---|
| **Exhibit E3** | |
| **Lead List Phone Numbers: Last Name Matches to Search Engine Results** | |

| *DETAIL SUMMARY* |
|---|

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2026 | Baker | Baker | Baker | Baker | Baker | TRUE | TRUE | TRUE | TRUE | 0 |
| 7946 | Contreras | Contreras | Contreras | Contreras | Contreras | TRUE | TRUE | TRUE | TRUE | 0 |
| 8905 | Bomer | | Bomer | Bomer | | FALSE | TRUE | TRUE | FALSE | 2 |
| 8294 | Garcia | Garcia | Garcia | Garcia | Garcia | TRUE | TRUE | TRUE | TRUE | 0 |
| 6574 | Shaughnessy | Shaughnessy | Shaughnessy | Shaughnessy | Shaughnessy | TRUE | TRUE | TRUE | TRUE | 0 |
| 5168 | Chruma | Chruma | Chruma | Chruma | Chruma | TRUE | TRUE | TRUE | TRUE | 0 |
| 0230 | Thomas | Thomas | Thomas | Thomas | Thomas | TRUE | TRUE | TRUE | TRUE | 0 |
| 2050 | Jean | Robinson | Jean | Duckens | Ghee | FALSE | TRUE | FALSE | FALSE | 3 |
| 1167 | Moore | Moore | Moore | Moore | Idom | TRUE | TRUE | TRUE | FALSE | 1 |
| 9022 | Oldham | Oldham | Oldham | Oldham | Oldham | TRUE | TRUE | TRUE | TRUE | 0 |
| 5552 | Potuto | Potuto | Potuto | Potuto | Potuto | TRUE | TRUE | TRUE | TRUE | 0 |
| 3174 | Keller | Keller | Keller | Keller | Keller | TRUE | TRUE | TRUE | TRUE | 0 |
| 4664 | Lang | | Lang | Cobarris | Mills | FALSE | TRUE | FALSE | FALSE | 3 |
| 5295 | Williams | Williams | Williams | Williams | Williams | TRUE | TRUE | TRUE | TRUE | 0 |
| 2083 | Aguinaldo | Aguinaldo | Aguinaldo | Aguinaldo | Aguinaldo | TRUE | TRUE | TRUE | TRUE | 0 |
| 6899 | Thompson | Thompson | Thompson | Thompson | Thompson | TRUE | TRUE | TRUE | TRUE | 0 |
| 6970 | Williams | Lawton | Williams | Lawton | Lawton | FALSE | TRUE | FALSE | FALSE | 3 |
| 5230 | Fiori | Fiori | Fiori | Fiori | Fiori | TRUE | TRUE | TRUE | TRUE | 0 |
| 0322 | Newman | Newman | Newman | Newman | Palma | TRUE | TRUE | TRUE | FALSE | 1 |
| 1918 | Haag | Haag | Haag | Haag | Haag | TRUE | TRUE | TRUE | TRUE | 0 |
| 1862 | Hulen | Hulen | Hulen | Hulen | Hulen | TRUE | TRUE | TRUE | TRUE | 0 |
| 1088 | Francis | Ray | Francis | Francis | Francis | FALSE | TRUE | TRUE | TRUE | 1 |
| 9129 | Patel | Patel | Patel | Patel | Patel | TRUE | TRUE | TRUE | TRUE | 0 |
| 9628 | Mascarenas | | Mascarenas | Mascarenas | | FALSE | TRUE | TRUE | FALSE | 2 |
| 6686 | Waske | Waske | Waske | | Waske | TRUE | TRUE | FALSE | TRUE | 1 |
| 2379 | Fitch | Fitch | Fitch | Fitch | Fitch | TRUE | TRUE | TRUE | TRUE | 0 |
| 6972 | Gonzales | Gonzales | Gonzles | Gonzales | Gonzales | TRUE | BRG OK | TRUE | TRUE | 0 |
| 6260 | Krynski | Krynski | Krynski | Krynski | Krynski | TRUE | TRUE | TRUE | TRUE | 0 |
| 8700 | Mcdonald | Mcdonald | McDonald | Mcdonald | Mcdonald | FALSE | TRUE | TRUE | TRUE | 1 |
| 6589 | Justice | Justice | Justice | Justice | Justice | TRUE | TRUE | TRUE | TRUE | 0 |
| 6188 | Jackson | Jackson | Jackson | Jackson | Jackson | TRUE | TRUE | TRUE | TRUE | 0 |
| 8400 | Bowman | Bowman | Bowman | Bowman | Bowman | TRUE | TRUE | TRUE | TRUE | 0 |
| 2671 | Crabtree | Crabtree | Crabtree | Crabtree | Crabtree | TRUE | TRUE | TRUE | TRUE | 0 |
| 5545 | Pozdol | Pozdol | Pozdol | Pozdol | Pozdol | TRUE | TRUE | TRUE | TRUE | 0 |

Berkeley Research Group

| Exhibit E3 |
| --- |
| **Lead List Phone Numbers: Last Name Matches to Search Engine Results** |

| DETAIL SUMMARY |
| --- |

| Description | Total Count |
| --- | --- |
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 8320 | Swanson | Swanson | Swanson | Swanson | Swanson | TRUE | TRUE | TRUE | TRUE | 0 |
| 7050 | Shupe | Schupe | Shupe | Shupe | Shupe | BRG OK | TRUE | TRUE | TRUE | 0 |
| 4443 | Lyon | Lyon | Lyon | Lyon | Lyon | TRUE | TRUE | TRUE | TRUE | 0 |
| 1473 | Makros | Session | Session | Session | Session | FALSE | FALSE | FALSE | FALSE | 4 |
| 7777 | Burns | Burns | Burns | Burns | Burns | TRUE | TRUE | TRUE | TRUE | 0 |
| 0164 | Pitts | Pitts | Pitts | Pitts | Pitts | TRUE | TRUE | TRUE | TRUE | 0 |
| 1540 | Merrill | Merrill | Merrill | Merrill | Merrill | TRUE | TRUE | TRUE | TRUE | 0 |
| 4139 | Jelsone | | Jelsone | Jelsone | Jelsone | FALSE | TRUE | TRUE | TRUE | 1 |
| 7202 | Williamson | Williamson | Williamson | Williamson | Williamson | TRUE | TRUE | TRUE | TRUE | 0 |
| 0645 | Musgrove | Musgrove | Musgrove | Musgrove | Musgrove | TRUE | TRUE | TRUE | TRUE | 0 |
| 2481 | Libera | Libra | Libera | Libera | Libera | BRG OK | TRUE | BRG OK | TRUE | 0 |
| 8450 | Wines | Wines | Wines | Wines | Wines | TRUE | TRUE | TRUE | TRUE | 0 |
| 0166 | Volk | Volk | Volk | Volk | Volk | TRUE | TRUE | TRUE | TRUE | 0 |
| 3097 | Garbo | Garbo | Garbo | Garbo | Garbo | TRUE | TRUE | TRUE | TRUE | 0 |
| 2971 | Dominguez | Dominguez | Dominguez | Dominguez | Dominguez | TRUE | TRUE | TRUE | TRUE | 0 |
| 0556 | Bourne | Bourne | Bourne | Bourne | Bourne | TRUE | TRUE | TRUE | TRUE | 0 |
| 3197 | Ailsworth | Ailsworth | Ailsworth | Ailsworth | Ailsworth | TRUE | TRUE | TRUE | TRUE | 0 |
| 7664 | Stewart | Stewart | Stewart | Stewart | Stewart | TRUE | TRUE | TRUE | TRUE | 0 |
| 7160 | Kamen | Kamen | Kamen | | Kamen | TRUE | TRUE | FALSE | TRUE | 1 |
| 5756 | Lavanh | Lavanh | Lavanh | Lavanh | Lavanh | TRUE | TRUE | TRUE | TRUE | 0 |
| 3512 | Holmes | Holmes | Holmes | Holmes | | TRUE | TRUE | TRUE | FALSE | 1 |
| 5252 | Terrell | Terrell | Terrell | Terrell | Terrell | TRUE | TRUE | TRUE | TRUE | 0 |
| 6343 | Howard | Williams | Howard | Williams | Howard | FALSE | TRUE | FALSE | TRUE | 2 |
| 2983 | White | White | White | White | White | TRUE | TRUE | TRUE | TRUE | 0 |
| 3344 | Kneff | | Kneff | Kneff | Kneff | FALSE | TRUE | TRUE | TRUE | 1 |
| 3090 | Finch | Finch | Finch | Finch | Finch | TRUE | TRUE | TRUE | TRUE | 0 |
| 2377 | Vanderwal | | Vanderwal | Vanderwal | | FALSE | TRUE | TRUE | FALSE | 2 |
| 0447 | Maddox | | Maddox | Maddox | Maddox | FALSE | TRUE | TRUE | TRUE | 1 |
| 1371 | Locklear | Locklear | Locklear | Locklear | Locklear | TRUE | TRUE | TRUE | TRUE | 0 |
| 0351 | Fuerte | | Fuerte | Fuerte | Fuerte | FALSE | TRUE | TRUE | TRUE | 1 |
| 3121 | Stone | Bond | Stone | Stone | Stone | FALSE | TRUE | TRUE | TRUE | 1 |
| 4225 | Hayden | Hayden | Hayden | Hayden | Hayden | TRUE | TRUE | TRUE | TRUE | 0 |
| 3650 | Parker | Parker | Parker | Parker | Parker | TRUE | TRUE | TRUE | TRUE | 0 |
| 8670 | Magyar | | | | | FALSE | FALSE | FALSE | FALSE | 4 |

| Exhibit E3 |
| Lead List Phone Numbers: Last Name Matches to Search Engine Results |

**DETAIL SUMMARY**

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7232 | Olson | Olson | Olson | Olson | Olson | TRUE | TRUE | TRUE | TRUE | 0 |
| 9234 | Gass | Gass | Gass | Gass | Gass | TRUE | TRUE | TRUE | TRUE | 0 |
| 9545 | Hicks | Hicks | Hicks | Hicks | Hicks | TRUE | TRUE | TRUE | TRUE | 0 |
| 2671 | Benzie | Benzie | Benzie | Benzie | Lyn | TRUE | TRUE | TRUE | FALSE | 1 |
| 9957 | Jackson | Ter | Jackson | Jackson | Jackson | FALSE | TRUE | TRUE | TRUE | 1 |
| 3556 | Maxey | | Maxey | Maxey | Maxey | FALSE | TRUE | TRUE | TRUE | 1 |
| 7391 | Hoey | Hoey | Hoey | Hoey | Hoey | TRUE | TRUE | TRUE | TRUE | 0 |
| 4630 | Aleksoski | Aleksoski | Aleksoski | Aleksoski | Aleksoski | TRUE | TRUE | TRUE | TRUE | 0 |
| 1147 | Bryant | Bryant | Bryant | Bryant | Banks | TRUE | TRUE | TRUE | FALSE | 1 |
| 2414 | Stewart | Stewart | Stewart | Stewart | Stewart | TRUE | TRUE | TRUE | TRUE | 0 |
| 5862 | Miller | Miller | Miller | | Miller | TRUE | TRUE | FALSE | TRUE | 1 |
| 5417 | Isenhart | Isenhart | Isenhart | Isenhart | Isenhart | TRUE | TRUE | TRUE | TRUE | 0 |
| 9852 | Gingrich | Gingerich | Gingrich | Gingrich | Gingrich | BRG OK | TRUE | TRUE | TRUE | 0 |
| 2455 | Boulden | | Boulden | Boulden | Boulden | FALSE | TRUE | TRUE | TRUE | 1 |
| 5065 | Battiste | Battiste | Battiste | Battiste | Battiste | TRUE | TRUE | TRUE | TRUE | 0 |
| 4430 | Wingo | | Wingo | Wingo | Wingo | FALSE | TRUE | TRUE | TRUE | 1 |
| 5249 | Guy | Guy | Guy | Guy | Guy | TRUE | TRUE | TRUE | TRUE | 0 |
| 5175 | Hargrave | Hargrave | Hargrave | Hargrave | Hargrave | TRUE | TRUE | TRUE | TRUE | 0 |
| 3447 | May | May | May | May | May | TRUE | TRUE | TRUE | TRUE | 0 |
| 1952 | Marmino | Gerst | Marmino | Marmino | Marmino | FALSE | TRUE | TRUE | TRUE | 1 |
| 7125 | Garcia | Garcia | Garcia | Garcia | Garcia | TRUE | TRUE | TRUE | TRUE | 0 |
| 4611 | Calhoun | Calhoun | Calhoun | Calhoun | Calhoun | TRUE | TRUE | TRUE | TRUE | 0 |
| 0805 | Holst | Holst | Holst | Holst | Holst | TRUE | TRUE | TRUE | TRUE | 0 |
| 1455 | Walsh | Walsh | Walsh | Walsh | Walsh | TRUE | TRUE | TRUE | TRUE | 0 |
| 5593 | Pennell | Pennell | Pennell | Pennell | Pennell | TRUE | TRUE | TRUE | TRUE | 0 |
| 0680 | Jarvis | Jarvis | Jarvis | McElroy | Jarvis | TRUE | TRUE | FALSE | TRUE | 1 |
| 7348 | Beard | Beard | Beard | Beard | Beard | TRUE | TRUE | TRUE | TRUE | 0 |
| 8028 | Phetdara | Phetdara | Phetdara | Phetdara | Phetdara | TRUE | TRUE | TRUE | TRUE | 0 |
| 2484 | Chen | Chen | Chen | Chen | Chen | TRUE | TRUE | TRUE | TRUE | 0 |
| 0780 | Mcelveen | Ramkisson | McElveen | McElveen | Ramkisson | FALSE | TRUE | TRUE | FALSE | 2 |
| 9427 | Siongco | Siongco | Siongco | Siongco | Siongco | TRUE | TRUE | TRUE | TRUE | 0 |
| 1401 | Heath | Heath | Heath | Heath | Heath | TRUE | TRUE | TRUE | TRUE | 0 |
| 9904 | Harris | Stone | Harris | | | FALSE | TRUE | FALSE | FALSE | 3 |
| 8126 | Hankins | Hankins | Hankins | Hankins | Hankins | TRUE | TRUE | TRUE | TRUE | 0 |

| | Exhibit E3 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Lead List Phone Numbers: Last Name Matches to Search Engine Results** | | | | | | | | |

| *DETAIL SUMMARY* | |
|---|---|
| **Description** | **Total Count** |
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1577 | Higginbotham | Higginbotham | Higginbotham | Higginbotham | Higginbotham | TRUE | TRUE | TRUE | TRUE | 0 |
| 1857 | Shelton | Shelton | Shelton | Shelton | Shelton | TRUE | TRUE | TRUE | TRUE | 0 |
| 2505 | Gebre | Gebre | Gebre | Gebre | Gebre | TRUE | TRUE | TRUE | TRUE | 0 |
| 1283 | Davis | Davis | Davis | Davis | Davis | TRUE | TRUE | TRUE | TRUE | 0 |
| 2234 | Taylor | Taylor | Taylor | Taylor | Taylor | TRUE | TRUE | TRUE | TRUE | 0 |
| 1721 | Bjorkman | Hein | Bjorkman | Bjorkman | Bjorkman | FALSE | TRUE | TRUE | TRUE | 1 |
| 5752 | Abney | Abney | Abney | Abney | Abney | TRUE | TRUE | TRUE | TRUE | 0 |
| 6001 | Farmer | Farmer | Farmer | Farmer | Farmer | TRUE | TRUE | TRUE | TRUE | 0 |
| 9195 | Mills | Mills | Mills | Mills | Mills | TRUE | TRUE | TRUE | TRUE | 0 |
| 0192 | Solomon | Solomon | Solomon | Solomon | Soloman | TRUE | TRUE | TRUE | BRG OK | 0 |
| 2362 | Locklear | Locklear | Locklear | Locklear | Locklear | TRUE | TRUE | TRUE | TRUE | 0 |
| 1285 | Castillo | Castillo | Castillo | Castillo | Castillo | TRUE | TRUE | TRUE | TRUE | 0 |
| 5678 | Cragle | English | Cragle | Cragle | Cragle | FALSE | TRUE | TRUE | TRUE | 1 |
| 9261 | Perrin | Perrin | Perrin | Perrin | Perrin | TRUE | TRUE | TRUE | TRUE | 0 |
| 0276 | Edwards | Edwards | Edwards | Edwards | Edwards | TRUE | TRUE | TRUE | TRUE | 0 |
| 8355 | Goodson | Goodson | Goodson | Goodson | Goodson | TRUE | TRUE | TRUE | TRUE | 0 |
| 8336 | Isreal | Isreal | Isreal | Isreal | Israel | TRUE | TRUE | TRUE | BRG OK | 0 |
| 4841 | Jacobs | Jacobs | Jacobs | Jacobs | Jacobs | TRUE | TRUE | TRUE | TRUE | 0 |
| 2462 | Wiley | Wiley | Wiley | Willey | Wiley | TRUE | TRUE | BRG OK | TRUE | 0 |
| 4096 | Almanza | Almanza | Almanza | Almanza | Almanza | TRUE | TRUE | TRUE | TRUE | 0 |
| 8798 | Sikora | Sikora | Sikora | Sikora | Sikora | TRUE | TRUE | TRUE | TRUE | 0 |
| 4598 | Boster | Rupright | Boster | Boster | Boster | FALSE | TRUE | TRUE | TRUE | 1 |
| 3464 | Amaya | Amaya | Amaya | Decandia | Amaya | TRUE | TRUE | FALSE | TRUE | 1 |
| 4013 | Dixon | Dorn | Dixon | Dixon | Dixon | FALSE | TRUE | TRUE | TRUE | 1 |
| 5704 | Turner | Turner | Turner | Turner | Turner | TRUE | TRUE | TRUE | TRUE | 0 |
| 4091 | Sykes | Sykes | Sykes | Sykes | Sykes | TRUE | TRUE | TRUE | TRUE | 0 |
| 9717 | Dilport | Dilport | Dilport | Dilport | Dilport | TRUE | TRUE | TRUE | TRUE | 0 |
| 2702 | Freeman | Freeman | Freeman | Freeman | Freeman | TRUE | TRUE | TRUE | TRUE | 0 |
| 0923 | Morris | Morris | Morris | Morris | Morris | TRUE | TRUE | TRUE | TRUE | 0 |
| 5737 | Brown | Whitfield | Brown | Brown | Brown | FALSE | TRUE | TRUE | TRUE | 1 |
| 3487 | Kime | Rosario | Kime | Kime | Kime | FALSE | TRUE | TRUE | TRUE | 1 |
| 9576 | Clanton | Clanton | Clanton | Clanton | Clanton | TRUE | TRUE | TRUE | TRUE | 0 |
| 8131 | Hasan | Hasan | Hasan | Hasan | Hansan | TRUE | TRUE | TRUE | FALSE | 1 |
| 9966 | Hamm | Hamm | Hamm | Hamm | Hamm | TRUE | TRUE | TRUE | TRUE | 0 |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
|  | **Exhibit E3**<br>**Lead List Phone Numbers: Last Name Matches to Search Engine Results** |

| | | |
|---|---|---|
|  | *DETAIL SUMMARY* |

| Description | Total Count |
|---|---|
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 2881 | Reifschneider | Reifschneider | Reifschneider | Reifschneider | Reifschneider | TRUE | TRUE | TRUE | TRUE | 0 |
| 1871 | Monroe | Monroe | Monroe | Monroe | Monroe | TRUE | TRUE | TRUE | TRUE | 0 |
| 4590 | Lajaunesse | Hoffman | Hoffman | Lajaunesse | Hoffman | FALSE | FALSE | TRUE | FALSE | 3 |
| 9290 | Gonzalez | Gonzalez | Gonzalez | Gonzalez | Gonzalez | TRUE | TRUE | TRUE | TRUE | 0 |
| 0346 | Mansfield | Mansfield | Mansfield | Mansfield | Mansfield | TRUE | TRUE | TRUE | TRUE | 0 |
| 8628 | Francescon | Francescon | Francesco | Francescon | Francescon | TRUE | BRG OK | TRUE | TRUE | 0 |
| 8279 | Mathis | Mathis | Mathis | Mathis | Mathis | TRUE | TRUE | TRUE | TRUE | 0 |
| 0451 | Frank | Frank | Frank | Lemaster | | TRUE | TRUE | FALSE | FALSE | 2 |
| 3301 | Ramsey | Ramsey | Ramsey | Ramsey | Ramsey | TRUE | TRUE | TRUE | TRUE | 0 |
| 1562 | Duval | Duval | Duval | Duval | Duval | TRUE | TRUE | TRUE | TRUE | 0 |
| 8219 | Summitt | | Summitt | Summitt | Summitt | FALSE | TRUE | TRUE | TRUE | 1 |
| 5964 | Martinez | Martinez | Martinez | Martinez | Martinez | TRUE | TRUE | TRUE | TRUE | 0 |
| 6825 | Hallberg | Hallberg | Hallberg | Hallberg | | TRUE | TRUE | TRUE | FALSE | 1 |
| 2654 | Townsend | Townsend | Townsend | Hammitt | Townsend | TRUE | TRUE | FALSE | TRUE | 1 |
| 2963 | Kaval | | Kaval | Kaval | Kaval | FALSE | TRUE | TRUE | TRUE | 1 |
| 2344 | Hoffman | | Hoffman | Hoffman | Hoffman | FALSE | TRUE | TRUE | TRUE | 1 |
| 4841 | Sloan | Schneekloth | Sloan | Sloan | Sloan | FALSE | TRUE | TRUE | TRUE | 1 |
| 4725 | Scott | Scott | Scott | Scott | Scott | TRUE | TRUE | TRUE | TRUE | 0 |
| 8607 | Summers | Summers | Summers | Summers | Summers | TRUE | TRUE | TRUE | TRUE | 0 |
| 9222 | Schoot | Schoot | Schoot | Schoot | | TRUE | TRUE | TRUE | FALSE | 1 |
| 2253 | Ramey | Ramey | Ramey | Ramey | Ramey | TRUE | TRUE | TRUE | TRUE | 0 |
| 5432 | Tremble | Martin | Tremble | Martinez | Martin | FALSE | TRUE | FALSE | FALSE | 3 |
| 5220 | Wood | | Wood | Wood | Wood | FALSE | TRUE | TRUE | TRUE | 1 |
| 3815 | Pertree | Pertree | Pertree | Pertree | Pertree | TRUE | TRUE | TRUE | TRUE | 0 |
| 5525 | Contreras | Contreras | Contreras | Contreras | Contreras | TRUE | TRUE | TRUE | TRUE | 0 |
| 5837 | Wahl | Wahl | Wahl | Wahl | Wahl | TRUE | TRUE | TRUE | TRUE | 0 |
| 1067 | Bradley | Bradley | Bradley | Bradley | Bradley | TRUE | TRUE | TRUE | TRUE | 0 |
| 2147 | Labouve | Labouve | Labouve | Labouve | Labouve | TRUE | TRUE | TRUE | TRUE | 0 |
| 4684 | Conde | Conde | Conde | Conde | | TRUE | TRUE | TRUE | FALSE | 1 |
| 6139 | Richardson | Richardson | Richardson | Richardson | Richardson | TRUE | TRUE | TRUE | TRUE | 0 |
| 0743 | White | White | White | White | White | TRUE | TRUE | TRUE | TRUE | 0 |
| 0884 | Wenzl | Wenzl | Wenzl | Wenzl | Wenzl | TRUE | TRUE | TRUE | TRUE | 0 |
| 7675 | Rowder | Rowden | Rowden | Rowder | Rowden | BRG OK | BRG OK | TRUE | BRG OK | 0 |
| 8621 | Kelly | Kelly | Kelly | Kelly | Kelly | TRUE | TRUE | TRUE | TRUE | 0 |

Berkeley Research Group

| Exhibit E3 |
| Lead List Phone Numbers: Last Name Matches to Search Engine Results |

| DETAIL SUMMARY |

| Description | Total Count |
| --- | --- |
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1496 | Sheridan | Tate | Tate | Sheridan | Tate | FALSE | FALSE | TRUE | FALSE | 3 |
| 9612 | Lehman | Lehman | Lehman | Lehman | Lehman | TRUE | TRUE | TRUE | TRUE | 0 |
| 5331 | Jutton | Jutton | Jutton | Jutton | Jutton | TRUE | TRUE | TRUE | TRUE | 0 |
| 3040 | Novy | Novy | Novy | Novy | Novy | TRUE | TRUE | TRUE | TRUE | 0 |
| 6257 | Hester | Hester | Hester | Hester | Hester | TRUE | TRUE | TRUE | TRUE | 0 |
| 9648 | Bailey | | Bailey | Bailey | Bailey | FALSE | TRUE | TRUE | TRUE | 1 |
| 5105 | Close | Close | Close | Close | Close | TRUE | TRUE | TRUE | TRUE | 0 |
| 9570 | Quezada | Quezada | Quezada | Quezada | Quezada | TRUE | TRUE | TRUE | TRUE | 0 |
| 1204 | Inserra | Inserra | Inserra | Inserra | | TRUE | TRUE | TRUE | FALSE | 1 |
| 2112 | Musiala | | Musiala | Musiala | Musiala | FALSE | TRUE | TRUE | TRUE | 1 |
| 2716 | Davis | Davis | Davis | Davis | Davis | TRUE | TRUE | TRUE | TRUE | 0 |
| 4441 | Bell | Bell | Bell | Bell | Bell | TRUE | TRUE | TRUE | TRUE | 0 |
| 3288 | Main | | Campbell | | | FALSE | FALSE | FALSE | FALSE | 4 |
| 4813 | Becker | Norblom | Becker | Becker | Norblom | FALSE | TRUE | TRUE | FALSE | 2 |
| 9669 | Minor | Minor | Minor | Minor | Minor | TRUE | TRUE | TRUE | TRUE | 0 |
| 1080 | Lemons | Lemons | Lemons | Lemons | Lemons | TRUE | TRUE | TRUE | TRUE | 0 |
| 0873 | Glisson | Glisson | Glisson | Glisson | Glisson | TRUE | TRUE | TRUE | TRUE | 0 |
| 0837 | Burton | Burton | Burton | Burton | Burton | TRUE | TRUE | TRUE | TRUE | 0 |
| 1893 | Avant | Avant | Avant | Avant | Avant | TRUE | TRUE | TRUE | TRUE | 0 |
| 6369 | Cook | Cook | Cook | Cook | Cook | TRUE | TRUE | TRUE | TRUE | 0 |
| 1494 | Clayton | Cla | Clayton | Clayton | Clayton | FALSE | TRUE | TRUE | TRUE | 1 |
| 7604 | Dietrick | Dirtrick | Dietrick | Dietrick | Dietrick | BRG OK | TRUE | TRUE | TRUE | 0 |
| 0121 | Hinneburg | Hinneburg | Hinneburg | Hinneburg | Dickinson | TRUE | TRUE | TRUE | FALSE | 1 |
| 4130 | Kral | Kral | Kral | Kral | Kral | TRUE | TRUE | TRUE | TRUE | 0 |
| 5507 | Stransky | Stransky | Stransky | Stransky | Stransky | TRUE | TRUE | TRUE | TRUE | 0 |
| 0489 | Harrell | | Harrell | Harrell | Harrell | FALSE | TRUE | TRUE | TRUE | 1 |
| 9280 | Odonnell | | ODonnell | | Odonnell | FALSE | TRUE | FALSE | TRUE | 2 |
| 8985 | Bess | Bess | Bess | Bess | Bess | TRUE | TRUE | TRUE | TRUE | 0 |
| 0437 | Barnes | Barnes | Barnes | Barnes | Barnes | TRUE | TRUE | TRUE | TRUE | 0 |
| 5563 | Cheatham | Cheatham | Cheatham | Cheatham | Cheatham | TRUE | TRUE | TRUE | TRUE | 0 |
| 1605 | Neil | | Neil | | Gray | FALSE | TRUE | FALSE | FALSE | 3 |
| 7886 | Keck | Keck | Keck | Keck | Keck | TRUE | TRUE | TRUE | TRUE | 0 |
| 0275 | Dozier | Dozier | Dozier | Dozier | Dozier | TRUE | TRUE | TRUE | TRUE | 0 |
| 0587 | Proctor | Proctor | Proctor | Proctor | Proctor | TRUE | TRUE | TRUE | TRUE | 0 |

Berkeley Research Group

| Exhibit E3 |
| :---: |
| Lead List Phone Numbers: Last Name Matches to Search Engine Results |

| DETAIL SUMMARY | |
| :---: | :---: |

| Description | Total Count |
| :--- | :---: |
| Lead List Phone Numbers with more | 36 |
| | 348 |
| | **384** |

| | | | | | | | | | | |
| :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- | :--- |
| 4616 | Mills | Mills | Mills | Mills | Mills | TRUE | TRUE | TRUE | TRUE | 0 |
| 5502 | Shaw | Shaw | Shaw | Shaw | Shaw | TRUE | TRUE | TRUE | TRUE | 0 |
| 8854 | Brown | Brown | Brown | Brown | Brown | TRUE | TRUE | TRUE | TRUE | 0 |
| 5501 | Vaiden | Vaiden | Vaiden | Vaiden | Vaiden | TRUE | TRUE | TRUE | TRUE | 0 |
| 6052 | Fink | Fink | Fink | | Fink | TRUE | TRUE | FALSE | TRUE | 1 |
| 6069 | Williams | Williams | Williams | Williams | Williams | TRUE | TRUE | TRUE | TRUE | 0 |
| 7840 | Olson | | Olson | Olson | Olson | FALSE | TRUE | TRUE | TRUE | 1 |
| 6716 | Kenney | Kenney | Kenney | Kenney | Kenney | TRUE | TRUE | TRUE | TRUE | 0 |
| 4831 | Brooks | Brooks | Brooks | Brooks | Brooks | TRUE | TRUE | TRUE | TRUE | 0 |
| 0193 | Muehlenbeck | | Muehlenbeck | Blumer | Muehlenbeck | FALSE | TRUE | FALSE | TRUE | 2 |
| 2076 | Peterson | Peterson | Peterson | Peterson | Peterson | TRUE | TRUE | TRUE | TRUE | 0 |
| 3322 | Pepper | | | | | FALSE | FALSE | FALSE | FALSE | 4 |
| 3386 | Day | Day | Day | Day | Day | TRUE | TRUE | TRUE | TRUE | 0 |
| 2794 | Dunn | Dunn | Dunn | Dunn | Dunn | TRUE | TRUE | TRUE | TRUE | 0 |
| 384 | | | | | | 90 | 14 | 47 | 52 | |

# EXHIBIT F

Berkeley Research Group

| **Exhibit F**<br>**Lead List Phone Numbers Registered with at least One Business** |
|:---:|

Total recordings reveiwed                                357

Recordings in which Caller is identified is NOT Caller on Call List            108


Percentage of recordings in which Caller is identified is NOT Caller on Call List    **30%**


*Notes*
[1] Supporting data can be found in Exhibit F2.

Berkeley Research Group

| Exhibit F2 |
| :---: |
| Callers Identified in Sample Recordings |

| DETAIL SUMMARY |
| :---: |

| Description | Total Count | |
| --- | --- | --- |
| Recordings in which Caller is *NOT* Properly Identified | 108 | See Exhibit F |
| Recordings in which Caller is Properly Identified | 249 | |
| Total Recordings Reveiwed | **357** | See Exhibit F |

| AUDIO_URL | FIRSTNAME | LASTNAME | Alternate Name Identified in Recording (1 = Yes) | Alternate Name Identified (if Applicable) |
| --- | --- | --- | --- | --- |
| http://audio.yodelvoice.com 8080/audio/2016/05/25 | Thomas | | 1 | Maureen C. McDaniel |
| http://audio.yodelvoice.com 8080/audio/2016/05/30 | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/05/30 | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/05/31 | Sadie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/01 | Mattie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/01 | Gloria | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/02 | Richard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/03 | Dorothy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/06 | Jackie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/06 | Ernest | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/08 | Jerry | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/09 | Linda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/13 | Corinne | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Daryl | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | James | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Gloria | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Rolland | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Elaine | | 1 | Naomi Waden |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Elaine | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Nola | | 1 | David Clark |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Jo | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Richard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Richard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/14 | Eva | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/15 | Dale | | 1 | Roy Garrett |
| http://audio.yodelvoice.com 8080/audio/2016/06/16 | Deborah | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/16 | Shirley | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/16 | Gerardo | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/16 | Shah | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/17 | Mildred | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/17 | Bobbie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/17 | James | | 1 | Dave Kimball |
| http://audio.yodelvoice.com 8080/audio/2016/06/17 | Irene | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/20 | Christina | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/21 | Paul | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/21 | Sandra | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/21 | Vickie | | 1 | Peter Foster |
| http://audio.yodelvoice.com 8080/audio/2016/06/21 | Merlean | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/21 | Sara | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/21 | Allen | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/22 | Virginia | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/22 | Earnesteen | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/23 | Jerry | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/23 | Steven | | 1 | Anna King |
| http://audio.yodelvoice.com 8080/audio/2016/06/23 | George | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/24 | Linda | | 1 | Willie Stevenson |
| http://audio.yodelvoice.com 8080/audio/2016/06/24 | Angelo | | 1 | Maria Ibarra |
| http://audio.yodelvoice.com 8080/audio/2016/06/24 | Madeline | | 1 | Donald Bragman |
| http://audio.yodelvoice.com 8080/audio/2016/06/24 | richard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/27 | Robert | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/27 | Era | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/27 | Zenon | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/27 | Charles | | 1 | Joy Goddell |
| http://audio.yodelvoice.com 8080/audio/2016/06/27 | Barbara | | 1 | Mike Rice |
| http://audio.yodelvoice.com 8080/audio/2016/06/28 | Donna | | 1 | Dan Gan |
| http://audio.yodelvoice.com 8080/audio/2016/06/28 | Minnie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/28 | Mary | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/29 | Ronald | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/29 | Darrell | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/30 | Rose | | 1 | Edwin Genhart |
| http://audio.yodelvoice.com 8080/audio/2016/06/30 | Billy | | 1 | Pam Ruhl |
| http://audio.yodelvoice.com 8080/audio/2016/06/30 | Dennis | | | |
| http://audio.yodelvoice.com 8080/audio/2016/06/30 | James | | 1 | David Wilson |
| http://audio.yodelvoice.com 8080/audio/2016/06/30 | Linda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/01 | Neil | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/01 | Carolyn | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/01 | Virginia | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/01 | Zayda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/01 | Theodore | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/01 | Jean | | 1 | Albert Graham |
| http://audio.yodelvoice.com 8080/audio/2016/07/05 | Glenda | | 1 | Carey Bonner |
| http://audio.yodelvoice.com 8080/audio/2016/07/05 | freddiee | | 1 | Freddie Miller |
| http://audio.yodelvoice.com 8080/audio/2016/07/05 | Emma | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Steven | | 1 | Waltraud Analisa Place |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Curtis | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Equila | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Jocelin | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Gail | | 1 | Ann Bouie |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Paul | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/06 | Angel | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/07 | Ada | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/07 | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/07 | James | | | |

Berkeley Research Group

| Exhibit F2 |
| :---: |
| Callers Identified in Sample Recordings |

| DETAIL SUMMARY |
| :---: |

| Description | Total Count | |
| :--- | :---: | :--- |
| Recordings in which Caller is _**NOT**_ Properly Identified | 108 | See Exhibit F |
| Recordings in which Caller is Properly Identified | 249 | |
| **Total Recordings Reveiwed** | **357** | See Exhibit F |

| AUDIO_URL | FIRSTNAME | LASTNAME | Alternate Name Identified in Recording (1 = Yes) | Alternate Name Identified (if Applicable) |
| :--- | :--- | :--- | :---: | :--- |
| http://audio.yodelvoice.com 8080/audio/2016/07/08/ | Willie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/08/ | Johnny | | 1 | Beverly Gaines |
| http://audio.yodelvoice.com 8080/audio/2016/07/08/ | Shirley | | 1 | Richard Lofton |
| http://audio.yodelvoice.com 8080/audio/2016/07/11/ | Emma | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/11/ | Nancy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | Gloria | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | Anne | | 1 | Nancy McGinnis |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | AA | | 1 | Emma McDonald |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | Arlene | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | John | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | Mrs. | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/12/ | Gloria | | 1 | Jose Garcia |
| http://audio.yodelvoice.com 8080/audio/2016/07/13/ | robert | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/13/ | Charles | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/13/ | Bernard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/14/ | Skip | | 1 | Nina Kinney |
| http://audio.yodelvoice.com 8080/audio/2016/07/14/ | Joseph | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/14/ | Roosevelt | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/14/ | Barbara | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/14/ | Alice | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/14/ | Ronald | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | Robert | | 1 | Diana Sullivan |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | Terry | | 1 | Stanford Joseph |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | Arthur | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | Gary | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | Ronald | | 1 | Mary Lethco |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | Irma | | 1 | Dionicio Sifuentes |
| http://audio.yodelvoice.com 8080/audio/2016/07/15/ | G doreen | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/18/ | Amie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/18/ | Geraldine | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/18/ | Cornelius | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/18/ | Ellen | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/18/ | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/19/ | Colette | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/19/ | Bonita | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/20/ | Creole | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/20/ | Margaret | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/20/ | Lamar | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/21/ | Alda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/21/ | AAA | | 1 | Robert Forbes |
| http://audio.yodelvoice.com 8080/audio/2016/07/21/ | juice | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/21/ | James | | 1 | Bertha Gaston |
| http://audio.yodelvoice.com 8080/audio/2016/07/22/ | John | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/22/ | Charlene | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/22/ | Jeraldine | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/22/ | Anastacia | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/25/ | Lynette | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/25/ | Donald | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/25/ | Mary | | 1 | Augustine Luna |
| http://audio.yodelvoice.com 8080/audio/2016/07/25/ | Thomas | | 1 | Anne Preisinger |
| http://audio.yodelvoice.com 8080/audio/2016/07/26/ | Daisy | | 1 | Stacy Alexander |
| http://audio.yodelvoice.com 8080/audio/2016/07/26/ | Louise | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/26/ | Randy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/26/ | Randy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/27/ | Wayne | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/27/ | Chirita | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/27/ | AVI | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/27/ | Refugia | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Jessie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Helen | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | SUSAN | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Rickie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Mark | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Brenda | | 1 | Dorothy Phillips |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Daniel | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/28/ | Mary | | 1 | Mary Wood |
| http://audio.yodelvoice.com 8080/audio/2016/07/29/ | Karen | | 1 | David McGee |
| http://audio.yodelvoice.com 8080/audio/2016/07/29/ | Gladys | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/29/ | Elnora | | | |
| http://audio.yodelvoice.com 8080/audio/2016/07/29/ | Shirley | | 1 | James Garner |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Paula | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Willie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Dorothy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Jerry | | 1 | Quana Mulkey |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Fidelio | | 1 | Phyllis Crawford |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Revonda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Ronald | | 1 | Bonnie Lusilek |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | chris | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Linda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | AAA | | 1 | Anie Holder |
| http://audio.yodelvoice.com 8080/audio/2016/08/01/ | Mary | | 1 | Mary Ellis |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | Sybil | | | |

Berkeley Research Group

| Exhibit F2 |
| :---: |
| Callers Identified in Sample Recordings |

| DETAIL SUMMARY |
| :---: |

| Description | Total Count | |
| --- | :---: | --- |
| Recordings in which Caller is *NOT* Properly Identified | 108 | See Exhibit F |
| Recordings in which Caller is Properly Identified | 249 | |
| Total Recordings Reviewed | **357** | See Exhibit F |

| AUDIO_URL | FIRSTNAME | LASTNAME | Alternate Name Identified in Recording (1 = Yes) | Alternate Name Identified (if Applicable) |
| --- | --- | --- | :---: | --- |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | Carolyn | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | elizabeth | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | Terrance | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | Rudolph | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | Deborah | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/02/ | Alvin | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/03/ | Louis | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/03/ | Wilma | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/03/ | Sharron | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/08/ | Doris | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/08/ | Linda | | 1 | John McCoy |
| http://audio.yodelvoice.com 8080/audio/2016/08/08/ | Roy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/08/ | Richard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Rosa | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Ronald | | 1 | Maxine Wrase |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Marlon | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Wayne | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Stanley | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Mary | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/09/ | Mischell | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/10/ | Lora | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/10/ | Annie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/10/ | Thomas | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/11/ | Daniel | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/11/ | Lee | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/11/ | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/11/ | Sheryl | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | QQQ | | 1 | Cordy Marques |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | linda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | Virgil | | 1 | Patricia Hawkins |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | Thomas | | 1 | Judy Adamson |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | R | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | AAAA | | 1 | Kevin Smith |
| http://audio.yodelvoice.com 8080/audio/2016/08/12/ | Judy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | EDWARD | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | Barbara | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | R | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | Jean | | 1 | William Smith |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | Joyce | | 1 | John Perry |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | William | | 1 | Patricia Tyler |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | Shirley | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | Riely | | 1 | Norvis Curtis |
| http://audio.yodelvoice.com 8080/audio/2016/08/15/ | Trudy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | John | | 1 | Thomas Johanneson |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | AAA | | 1 | Linda Cameron |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Cara | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Antoinette | | 1 | Flora Richardson |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Arthur | | 1 | Sarah Campos |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Thelma | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Richard | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Arvida | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Christin | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Annette | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Peggy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/16/ | Peggy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/17/ | Carol | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/17/ | arlene | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/17/ | Michelle | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/17/ | Ernest | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/18/ | Beverly | | 1 | Robert Tyler |
| http://audio.yodelvoice.com 8080/audio/2016/08/18/ | dixid | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/18/ | Jean | | 1 | Theodis Rivers |
| http://audio.yodelvoice.com 8080/audio/2016/08/18/ | Patricia | | 1 | Joe McCraw |
| http://audio.yodelvoice.com 8080/audio/2016/08/18/ | LARREN | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/19/ | Mildred | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/19/ | Riched | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/19/ | Edith | | 1 | Mr.Ward |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | Vicenta | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | AA | | 1 | Mabel Gallaway |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | bbbbb | | 1 | Steve |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | Dennis | | 1 | Darryl Rudolph |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | Maria | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | Gurcharan | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | Max | | 1 | Mitchell Clement |
| http://audio.yodelvoice.com 8080/audio/2016/08/22/ | Mildred | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/23/ | Deanne | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/23/ | James | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/23/ | kareena | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/23/ | Sarah | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/23/ | Shirley | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Patricia | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Dennis | | 1 | Shannon Robertson |

Berkeley Research Group

| Exhibit F2 |
|---|
| Callers Identified in Sample Recordings |

| DETAIL SUMMARY | | |
|---|---|---|
| **Description** | **Total Count** | |
| Recordings in which Caller is _**NOT**_ Properly Identified | 108 | See Exhibit F |
| Recordings in which Caller is Properly Identified | 249 | |
| Total Recordings Reveiwed | **357** | See Exhibit F |

| AUDIO_URL | FIRSTNAME | LASTNAME | Alternate Name Identified in Recording (1 = Yes) | Alternate Name Identified (if Applicable) |
|---|---|---|---|---|
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Sandy | | 1 | John Smith |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Roberta | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Roberta | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Angelica | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Mary | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | gayle | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/24/ | Phyllis | | 1 | James Taylor |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Mary | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Mark | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Meade | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Misako | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Michael | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Sandra | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Wayne | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Sandra | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/25/ | Louise | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | George | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | George | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | Raymond | | 1 | Juanita Bertot |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | Tanya | | 1 | Tanya Pierce |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | Russell | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | Linda | | 1 | Shaila Davis |
| http://audio.yodelvoice.com 8080/audio/2016/08/26/ | Chris | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/29/ | aaa | | 1 | Paul Bellin |
| http://audio.yodelvoice.com 8080/audio/2016/08/29/ | Sharry | | 1 | Diana Terry |
| http://audio.yodelvoice.com 8080/audio/2016/08/29/ | AA | | 1 | James McGregor |
| http://audio.yodelvoice.com 8080/audio/2016/08/30/ | Robert | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/30/ | Bobbie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/30/ | Sylvia | | 1 | Sally chavez |
| http://audio.yodelvoice.com 8080/audio/2016/08/30/ | AAA | | 1 | Florida Rice |
| http://audio.yodelvoice.com 8080/audio/2016/08/30/ | George | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/31/ | Perry | | 1 | Rosa J. Grayson |
| http://audio.yodelvoice.com 8080/audio/2016/08/31/ | Terrie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/31/ | Marie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/31/ | Micheal | | | |
| http://audio.yodelvoice.com 8080/audio/2016/08/31/ | Jody | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/01/ | Sharon | | 1 | Ronald Watson |
| http://audio.yodelvoice.com 8080/audio/2016/09/01/ | Bulah | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/01/ | King | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/01/ | Mike | | 1 | Betty Vailes |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | a | | 1 | Roseanne Nealis |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | a | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | Lisa | | 1 | Brent Dunn |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | Ramiro | | 1 | Sarah |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | FFF | | 1 | Mariam Socha |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | Michael | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | Nanita | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/02/ | Michelle | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/06/ | Andrew | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/06/ | Michael | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/06/ | ask | | 1 | Ida Jackson |
| http://audio.yodelvoice.com 8080/audio/2016/09/07/ | oconner | | 1 | Ryan O'Connor |
| http://audio.yodelvoice.com 8080/audio/2016/09/07/ | Perry | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/07/ | Roy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/07/ | Barbara | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/07/ | Dorothy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/07/ | Monica | | 1 | Freddie Drayer |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | Leroy | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | William | | 1 | Mrs. Horn |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | eulu | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | Carol | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | Thelma | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | Shirley | | 1 | Buel Pilger |
| http://audio.yodelvoice.com 8080/audio/2016/09/08/ | AA | | 1 | Roy Brown |
| http://audio.yodelvoice.com 8080/audio/2016/09/13/ | Lula | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/13/ | Lula | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/13/ | Quang | | 1 | Loan T. Lam |
| http://audio.yodelvoice.com 8080/audio/2016/09/13/ | Rosalind | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/14/ | Eva | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/15/ | Rosella | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/15/ | Franklin | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/15/ | Anne | | 1 | Jack Jones |
| http://audio.yodelvoice.com 8080/audio/2016/09/15/ | Stanley | | 1 | Bettie Jessie |
| http://audio.yodelvoice.com 8080/audio/2016/09/16/ | Wanda | | 1 | Willy Fluellen Sr. |
| http://audio.yodelvoice.com 8080/audio/2016/09/16/ | Susan | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/19/ | William | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/19/ | Marie | | 1 | Donald Bradley |
| http://audio.yodelvoice.com 8080/audio/2016/09/19/ | David | | 1 | Thomas Mowry |
| http://audio.yodelvoice.com 8080/audio/2016/09/19/ | Christina | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/19/ | Blondean | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/20/ | Robert | | 1 | Refused to provide name; claimed |
| http://audio.yodelvoice.com 8080/audio/2016/09/20/ | Sandy | | 1 | Keith Fields |
| http://audio.yodelvoice.com 8080/audio/2016/09/20/ | Monica | | | |

Berkeley Research Group

| Exhibit F2 |
|---|
| Callers Identified in Sample Recordings |

| DETAIL SUMMARY |
|---|

| Description | Total Count | |
|---|---|---|
| Recordings in which Caller is _**NOT**_ Properly Identified | 108 | See Exhibit F |
| Recordings in which Caller is Properly Identified | 249 | |
| Total Recordings Reveiwed | **357** | See Exhibit F |

| AUDIO_URL | FIRSTNAME | LASTNAME | Alternate Name Identified in Recording (1 = Yes) | Alternate Name Identified (if Applicable) |
|---|---|---|---|---|
| http://audio.yodelvoice.com 8080/audio/2016/09/21 | Vickie | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/21 | Lucille | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/22 | Rex | | 1 | Freda Castle |
| http://audio.yodelvoice.com 8080/audio/2016/09/22 | Donna | | 1 | Glenda Hardemann |
| http://audio.yodelvoice.com 8080/audio/2016/09/22 | Theresa | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/22 | Doris | | 1 | Latisha Foster |
| http://audio.yodelvoice.com 8080/audio/2016/09/22 | Deborah | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/23 | Anita | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/26 | Clarence | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/26 | Robert | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/28 | Earnesteen | | | |
| http://audio.yodelvoice.com 8080/audio/2016/09/29 | Bobby | | 1 | Anthony Watson |
| http://audio.yodelvoice.com 8080/audio/2016/09/30 | Greg | | 1 | Bernadette Williams |
| http://audio.yodelvoice.com 8080/audio/2016/10/03 | Luz | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/04 | Raheel | | 1 | Bushra |
| http://audio.yodelvoice.com 8080/audio/2016/10/05 | Dale | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/07 | Barbara | | 1 | Daniel Bender |
| http://audio.yodelvoice.com 8080/audio/2016/10/11 | Maurice | | 1 | Equila Montgomery |
| http://audio.yodelvoice.com 8080/audio/2016/10/12 | Walter | | 1 | Ryan Smith |
| http://audio.yodelvoice.com 8080/audio/2016/10/13 | Marty | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/13 | Shirley | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/13 | Joseph | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/17 | Esther | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/21 | Alda | | | |
| http://audio.yodelvoice.com 8080/audio/2016/10/24 | Ellen | | | |

# EXHIBIT G

# What *is* Augmentative and Alternative Communication? An Introduction

*Sally Millar and Janet Scott*

Augmentative and Alternative Communication (AAC for short) sounds very complicated – it isn't really! This chapter aims to demystify AAC.

## What exactly does AAC or Augmentative Communication mean?

Augmentative communication means any method of communicating that supplements the ordinary methods of speech and handwriting, where these are impaired.

Some people with disabilities may not be able to use speech as their main means of communication, and may have to use special techniques. The idea of augmentative communication is to use to the full whatever abilities the communication impaired person does have, in order to bypass and/or compensate for areas of impaired function. With recent technological advances and an increasing awareness of the range of communication options open to individuals with a wide range of disabilities, the potential is there to provide more and more people with an improved level of communication.

Although there are times when we all may use aspects of AAC (for example gesturing across a noisy pub to a friend for a drink, pointing to a picture or gesturing when trying to make yourself understood in a foreign language), some people rely on AAC all the time. AAC is used in all sorts of settings – wherever people need communication: family homes, in nurseries and pre-school settings, in schools, colleges, and in Higher Education, in hospitals and intensive care units, in Day Centres, in residential homes.

AAC has the potential to greatly enhance the quality of someone's life. *"The joy of being able to write again and keep in touch with old friends ... is tremendous. Having the security of knowing I will always have some way of talking to those closest to me is too wonderful to describe."* (Macdonald, 1994).

AAC can allow an individual to participate more fully in society, by providing him/her with a greater level of independence. McFadden (1995) *"... to me and others like me being able to communicate puts us into society. It lets us have a voice. ...For me having a Liberator has changed my life completely."*

AAC can enhance an individual's access to learning and educational opportunities: *"Using the BIGmack has been very beneficial. It has allowed him to participate in various classroom activities and has helped to strengthen his understanding of symbols by adding speech to them."* (teacher of children with profound and complex learning difficulties).

## Do 'AAC' and 'AAC system' mean the same thing?

*One is the overall concept (AAC), the other is a specific example of the whole (AAC system).*

The term 'AAC' includes four interlinking strands:

❍ the **communication medium** – how the meaning of the message is being transmitted. This can be unaided", for instance by using gesture, facial expression, signing, etc., or it can be 'aided', where the person communicates using some sort of device other than their body, for instance via a communication chart, or an electronic device with speech output.

❍ a **means of access** to the communication medium – this may be via a keyboard or touch screen, or by using a switch to scan from an array of letters / words / pictures.

❍ a **system of representing meaning** – when people speak, their meaning is represented by spoken words which act as 'symbols'. Where a person is unable to speak, their meaning has to be represented by a different set of symbols. These symbols may be traditional orthography (letters / words), or it may be a set of pictorial symbols (e.g. Picture Communication Symbols)

❍ **strategies for interacting** with a communication partner, for example being able to start up a conversation, or to sort things out when the other person does not understand.

*adapted from RCSLT, 1996*

An augmentative communication *system* means the 'package' of techniques and technologies that makes up 'total communication' for a specific individual. Typically, an individual might use their facial expressions, body postures and gestures, eye-pointing, vocalisations with different pitch and tone, and speech attempts; they might also use a more specialised system such as signing or symbols, and/or computer-based message storage with text-processing and synthetic voice output.

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 79 of 219

Each individual's augmentative communication system will be personally customised and thus each will be different in important respects such as the specific device chosen, method of access / operation, the settings, the type of overlay, the particular vocabulary available, and the way messages are built up etc..

### What's the best form of AAC to use?

*There's no such thing!*

That's like saying "what's the best car?" or "what's the best food?". It depends on personal tastes, and on personal needs, as well as on each individual's situation and abilities and disabilities; it will be different for different people. Specialised assessment will help to identify the most appropriate system.

Most AAC users use a number of different forms of AAC – *a mixture* of unaided and aided communication systems, and a mixture of low tech and high tech aids – depending on the situation.

### Unaided Communication

This term is used for an augmentative method of communication which does not require the use of any additional material or equipment. The biggest advantage of gestures and signing is that they are, precisely, unaided systems, and thus wonderfully quick, immediate and practical – you can't forget to take these systems with you; you can use them wherever you are; you don't need any expensive or cumbersome equipment; they can't break down.

Gesture is often used loosely to include the whole range of expressive things we can do with our bodies, such as facial expression, eye gaze, and body postures, and might include some mime-like movements and signs. At the simplest level, gesture is intuitive to everybody, and often immediately intelligible. It may be used by people with profound difficulties. More sophisticated gestural codes can also be developed. The disadvantage of gesture for transmitting information is, as Michael Williams (1994), who is himself an AAC user, says:

> "*gestures can get you a cup of coffee in the morning, but they do a poor job of telling your friend about that delicious piece of cake you had the other night. Gestures can only express things in the here and now. Also, gestures are poor candidates for expressing things like truth and beauty.*"

Signing is a much more sophisticated form of communication (and as such, is a whole specialist area in itself, which is beyond the scope of this book). There are a number of different forms of signing – some use restricted numbers of signs as a support for speech, while at the other end of the scale, others provide complex and powerful language, with enormously rich expressive capabilities. While signing is of course a primary AAC choice for people with deafness and hearing impairment who live in a 'signing world', it is not always quite as useful for people with other communication difficulties. The disadvantage of sign language is above all that not everyone in the communication impaired person's environment – in fact, sometimes hardly anyone – may sign well themselves or understand sign to any very advanced degree. Staff need continual training in sign. Furthermore, many people who need augmentative communication systems have some degree of physical and/or neurological impairment, which may make the formation of recognisable signs physically difficult.

### Aided Communication

This term refers to systems which involve some physical object or equipment such as symbol charts or books, or to computers or voice output communication aids (VOCAs). An aided communication system can be something very simple (e.g. the alphabet written on a plain post-card) or it may involve a highly sophisticated microelectronic system specially programmed with a large vocabulary.

### Advantages of Aided Communication Systems

The biggest advantages of aided communication are the flexibility and the richness of communication that can be achieved by creating and/or customising vocabulary sets; employing sophisticated methods of storage and retrieval; and providing users with special means of accessing them, if necessary. Aided communication can be used by very young children, non-readers, and individuals with severe intellectual and sensory disabilities, as many are based on simple pictures and symbols. Systems based on alphabetic symbols, for those who can use them, give access to a limitless range of communication. Low tech systems can be very quick and simple to use. High tech aids can be designed for operation by a very minimal movements (e.g. a single switch press), so can be accessible to individuals with severe physical disabilities. Rate enhancement techniques may be included in the design of an electronic aid, to try and help users approach a more normal speed of communication. Voice output increases users' independence. Use of high tech systems greatly increases the range of types of communication available (e.g.. group discussions, phone use, use in employment, connection with other computers, email, 'chatting' on electronic Bulletin Boards, etc.) above

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 80 of 219
Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

and beyond personal face to face communication .

## Disadvantages of Aided Communication Systems

The biggest disadvantage of aided communication is the equipment itself. Having to remember and carry objects around with you, inevitably means something can get forgotten / left behind / lost / broken. Sometimes equipment can be bulky, or heavy, and often it may be very expensive. If the communication equipment is electronic, there may be a need to keep track of wheelchair mountings, battery rechargers or spare batteries, on top of the basic equipment – and there is always the spectre of technical failure. (For this reason, it is vital to have a) a non electronic back-up, and b) insurance.) Another disadvantage, to the user, of high tech aids is that acquisition of a sophisticated piece of technology may set up unhelpfully unrealistic expectations of 'instant success'.



## The Technological Continuum

### What's 'Low tech'?

*Anything you could use in a tent, with no power points or spare batteries anywhere – i.e. anything that doesn't involve electricity or electronics.*

'Low tech' communication systems may take many forms, and are discussed in more detail later in this book, in Chapter 2. 'Low Tech' systems might include, for example:

- ❍ tangible symbols (e.g. real objects, miniature objects or parts of objects, on an activity calendar)
- ❍ picture / photo boards or books
- ❍ symbol communication charts or books, topic boards
- ❍ letter, word or phrase boards
- ❍ communication cards (e.g. clipped on a keyring on a belt)
- ❍ eye-blink, or eye-pointing pointing codes
- ❍ ETRAN frames (fix pictures, symbols or letters, or a code to a frame in front of the user, who eye-points to the item they want to communicate.)

Features of a low tech system to look out for are the choice of *representational system,* (i.e. what kind of pictures, symbols or codes suit the user best) and the *method of selection* of items (e.g. direct pointing, saying 'yes' or 'no' when a helper points, switch use etc.).

### What's 'High Tech'?

*Anything using electricity / electronics*

This category covers a wide spectrum, starting with very low 'high tech' devices (ie. which do contain some technological element, like a battery or a switch, but which are very simple). For example:



*If it doesn't use batteries or electronics, it's low tech.*

- ❍ pointer boards (hit a switch to stop the pointer going round, when it's at the object / picture / symbol required
- ❍ switches connected to battery-operated toys or simple environmental control devices such as attention-getting bleepers, cassette recorders, single message tape-loops or other simple message players
- ❍ switches connected to a 'Mains Switcher' to allow a user to control things like a television, or lamp
- ❍ toys or books that speak when certain areas are pressed.
- ❍ simple, single message devices such as the *Big Mack*

Specific high tech systems will be discussed in detail in another part of this book. Features to look out for in high 'high tech' communication systems would include:

- ❍ portability and robustness
- ❍ range and type of possible input methods (keyboard? overlay keyboard? switch input? a range of scan options?)

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 81 of 219

❏ type of screen display (none; static, displaying only text; dynamic, displaying symbols)

❏ techniques used to store and retrieve messages

❏ output (transient or permanent? (what type of screen, if any? digitised voice? synthetic voice? text? hard copy printout? storage on disk?)

'High tech' communication aids vary also in the degree to which they demand of the user more or less sophisticated techniques of visual perception, memory, sequencing skills, language processing, meaning associations, grammar or encoding.

### Who can benefit from AAC?

Numerically, small numbers of people – probably less than 1% of the population. But although that percentage sounds small, that's still hundreds of thousands of people in the UK. Worldwide, it adds up to millions.

There are no reliable figures on the number of people currently using AAC in the UK. The total figure might be dramatically increased if we included people who *might* benefit from AAC (but who have not been assessed or provided with AAC), and people with severe hearing and visual impairments.

However many or few, communication is a really important issue for each individual. The less speaking ability a person has, the greater their need for augmentative communication. Some people will need AAC as their main means of expressive communication, lifelong, because of congenital physical or language disability. Some will come to use AAC later on because of acquired disability, through accident or illness. Others may require AAC techniques only occasionally, to clarify or expand upon spoken messages or in particular situations. For some, AAC may be only a transitional stage in the development, ultimately, of speech. Some people can speak adequately, and need AAC only for writing tasks.

There is no single medical condition that indicates (or, for that matter, contra-indicates) the use of augmentative communication; AAC is a functional, not a clinical definition of a set of helping strategies that can be learned by people of all ages, with a wide variety of conditions. For example, users of AAC can be found amongst people with cerebral palsy, complex cognitive disabilities, specific speech / language disorder, stroke, head injury, motor neurone disease, multiple sclerosis, profound and multiple learning difficulties, Freidreich's ataxia, autism, spinal cord injury, and more.

The narrowest definition of AAC refers only to speech aids for people who can't speak clearly. The wider definition, which we use here, includes writing aids for people who can't physically write as a form of AAC. Many individuals can neither speak nor write so an ideal AAC system would include speech and writing aids integrated within the same system. Other individuals may speak adequately in the 'here and now', but will need to use AAC for writing tasks e.g. to access the curriculum in education, to record their work in class, or to enter or keep employment.

A special group is people who use a full-scale sign language. People with deafness or hearing impairment who sign are said to be using sign language as an ***alternative*** method of ***communication*** in that sign is usually their first or main language and often totally *replaces* speech. (Whereas most other communication impaired people are *supplementing* their existing speech attempts, sometimes with sign along with other systems, and are said to use augmentative communication.)

Blind or visually impaired people who use Braille or Moon and/or technology based on these systems may also be thought of as using a specialised form of augmentative and alternative communication, although this does not usually fall to AAC specialists to teach, but more often to specialists in visual impairment.

### What level of ability does someone have to have, before AAC is a possibility?

*None. There are no prerequisites to the use of AAC. AAC should be introduced as early as possible.*

No one is too disabled to be able to benefit in some way(s) from augmentative communication techniques and technologies. The whole point about AAC is that it offers a *new* way of doing something. Rather than waiting until someone has failed with other approaches, AAC should be introduced as early as possible. The fact that a young child cannot apparently recognise and reliably pick out pictures does not mean they cannot use a voice output communication aid. It may mean that they need the aid to help them learn to associate the pictures with the words, through the supportive and consistent feedback of hearing the name of the picture spoken out each time they press it. People learn to communicate *by communicating* in meaningful situations – not by working up high test scores on apparently unrelated tasks such as picture matching.

> **No one is too disabled to be able to benefit in some way(s) from augmentative communication techniques and technologies.**

Naturally, different people use different types of systems, and at different levels, depending on their age and stage and upon the pattern of their strengths and needs. For example, some individuals with complex multiple

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 82 of 219

disabilities may benefit most from use of technology to enhance their attention-getting, mobility and play – and thus interaction – before a 'formal' communication system as such is introduced. (They may have learned a lot of transferable skills useful for communication, such as switch use, cause and effect, and selection from an array of choices, from the earlier activities.)

## How easy is it to integrate use of AAC into Education and Everyday Life?

*This is the really 'key' question!*

In fact, identifying the most appropriate augmentative communication system and even finding the funding to purchase it, for a user, is often the easy bit. Implementing effective use of the and integrating use of the system into daily life at home, school, or work can prove to be a difficult and a long term task. Recent work underlines the fact that

> "Mastery of a particular code ....does not ensure that the individual user will function as a competent communicator. Provision of an expensive communication aid will not ensure that it is used in a versatile and truly interactive way"

**(MacDonald & Rendle, 1994)**

## Whose Responsibility is AAC?

*Everybody's. It's not just the job of the speech and language therapist. A co-ordinated approach is vital.*

For someone to learn and use AAC effectively, it needs to be part of everyday life, not a 'task' done occasionally. Communication doesn't happen in isolation. Each person using AAC will have a network of people around them – some with a formal remit to 'work' on communication and others who have communication links with that person on a more personal, social, work related or educational level. Murphy et al (1994) found that most of the people in their study could identify a group of individuals who had some communication remit in their work with the AAC user – however within each group there was confusion as to who the other members were, and the role of each.

> **For someone to learn and use AAC effectively, it needs to be part of everyday life, not a 'task' done occasionally.**

### AAC Team

For AAC to be maximised there needs to be more co-ordination (Murphy et al, 1996), with someone with a clearly identified lead role (possibly, but not inevitably, a Speech and Language Therapist) acting as coordinator. The following people have a very important role to play, in helping the AAC system to function most efficiently, and to help the user learn to communicate effectively with AAC:

- ❍ Parents, families, spouses, friends
- ❍ Home and day placement carers
- ❍ Speech and language therapists
- ❍ Teachers and classroom assistants
- ❍ Occupational therapists
- ❍ Physiotherapists
- ❍ Rehabilitation engineers (or bio-engineers, electronic engineers)
- ❍ Computer programmers
- ❍ Volunteers
- ❍ AAC users!

## What are the Key Features of a Successful AAC Programme?

*There are many interlinking factors.*

### Assessment

Identifying the most appropriate communication medium, method of access and system of representing meaning can be a difficult task. The potential AAC user and their family, as well as other key people, need to be actively involved in the decision making process, rather than just having an 'expert' prescribe. It is important that the needs of the individual are met rather than the concerns of a third party, and so it is important to seek out assessment advice that is as professional and independent as possible. Obviously people's needs and abilities change over time and AAC assessment should not be seen as a 'one off' event. Many people who have had communication difficulties all their lives will not be able to reveal their true potential until they have had access to a means of communication; they may need to work through a progression of AAC techniques as they develop their dormant skills.

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 83 of 219

## Training

At least three different groups of people need training: *the person using AAC; the person co-ordinating the input to the AAC user; those other people with whom he/she communicates*

*The person using AAC* – It is all too easy to miss the obvious – the person using AAC needs to be *taught*. Learning to communicate by some augmentative means is at least as difficult as learning to speak a foreign language (Murphy et al, 1996) – that fact is rarely acknowledged. Obviously the actual amount required will vary from person to person – but everybody using AAC as their means of communication will at least have to learn the following skills:

- ❍ how to operate their particular 'communication medium'
- ❍ how to use this in an interactive, *communicative* manner – and how to integrate this with their other ways of communicating, e.g. gesture, vocalisation etc.

Some people will also have to be taught:

- ❍ what communication actually is about
- ❍ a symbolic language system
- ❍ how to access their communication system, e.g. switch scanning skills

*The person co-ordinating the input to the AAC user* – There must be ongoing training and support so that they can keep up to date with changes in philosophy and teaching approaches as well as in technology. They also need to be able to train and support all the *other* people in the communication network. Staff move on, and children change teachers each year, so training needs are continual.

*The other people with whom the AAC user communicates* – They need to be involved and trained. Communicating with a person using AAC is different from communication between two naturally speaking people. Conversations are usually slower so more time is needed; conversations can easily become dominated as the he/she is able to speak at a faster rate than the AAC user, and has had more experience of communicating; conversations tend to have more frequent misunderstandings when the natural speaker has not been able to understand what the AAC user is saying and vice versa. The use of basic social interaction skills (e.g. eye contact, gesture and timing) can be different in an AAC conversation. People need to be aware of these differences and of the skills required for successful communication.

## Vocabulary

Some people who use AAC are able to spell out exactly what they want to say. For them vocabulary selection is not a problem. But, for the many people using AAC who have only limited reading and/or spelling, choosing the appropriate vocabulary for their communication aids / charts can be a challenge. It needs to be appropriate, and to change according to changes in interests, to new events happening, etc. It needs to reflect those messages and concepts that the person is unable to convey by other (perhaps more spontaneous) means. No one person will have all the knowledge required to select the vocabulary for a person using AAC. This task should be carried out by a number of people. The people who spend the most time in a variety of situations with the person using AAC are in a good position to have ideas about suitable vocabulary. Irrelevant vocabulary is one of the main reasons why an AAC system may be underused.

## Access to AAC and Communication Opportunities

It may seem very obvious, but if the people using AAC do not have their communication aids available and accessible to them, they will not be used. We are all familiar with communication charts and high-tech devices being kept in cupboards – perhaps to keep them safe, perhaps because they've been forgotten about, perhaps because they take up too much space, perhaps because they're broken, perhaps ..... Perhaps the person using AAC will *choose not to* use it all of the time, but if it is not there, if the person cannot see it or reach out for it then he/she can never *choose to* use it.

People with physical impairments may find it difficult to start up a conversation with their AAC aid independently and may need practical help – for example, someone to ensure that a battery operated device is charged up regularly, to help get a communication aid out of their bag, or switch it on, or to position / fix down their switch, turn pages in a communication book and so on.



*... if the people using AAC do not have their communication aids available and accessible to them, they will not be used.*

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Sometimes the environment needs to be 'engineered' somewhat, to offer *communication opportunities* to an AAC user, so that they can practise and get positive communication experiences. The use of 'non-questions' or closed 'question and answer' interactions ("I'm sure Henry wants a drink, don't you Henry?") needs to be reduced, if possible, and replaced by more exciting and open-ended prompts, and opportunities to make choices ("OK Henry, what time is it? What should we do now? a song? a bath? a drink? a peanut down the back of your tee shirt?") – with plenty of time given to *expectant waiting* – i.e. assuming that the user can and will take up their communication turn, not that they can't or won't.

There needs to be new people to talk to and new things to talk about – a user may need trips to shops or cafes where s/he can ask for things independently; 'buddy' or group activities where they can meet and interact with non-disabled people of the same age; changes and continual new challenges in the daily routine so that the user *has to* use their system actively to stick up for themself, ask questions or to demand things – as opposed to a dull routine where all needs are anticipated and there is no real need for communication.

## Technical support

AAC technology is becoming ever more sophisticated. It is providing opportunities which could not have been imagined even a few years ago. People with severe disabilities are able to communicate globally on an equal basis via the Internet. Their disability is hidden unless they choose to reveal it; for once in their lives, the wheelchair or speech difficulty is not the only thing people notice about them. However this increasingly complex technology also brings its own problems. Even not-very-sophisticated technology also brings difficulties – for instance, switches break or fall off their mountings. Few of us working in the AAC field (at least therapists and teachers) have skills in soldering, wiring up switches, computer programming, etc.. It is very important to identify sources of ongoing technical help locally, as well as contacting the supplier of the high-tech aid. From the perspective of a person using very sophisticated AAC equipment (who also has a need for Velcro!) *"Don't underestimate the importance of such help ..."* (Macdonald, 1994).

## Time

One of the most important resources for the support of effective use of AAC is *time*. Not only do conversations with a person using AAC usually take longer than with a naturally speaking person, considerable time has to be found to learn about the AAC aid / technique; to teach the person using AAC; to coordinate / train / support the network of communication partners; for technical repairs / maintenance; and finally to sit back and reflect on progress and plan for the next step. Murphy et al (1996) argue that more time is needed for Speech and Language Therapists to work directly with people using AAC (and not just in the clinical setting – therapy needs to be taken out into the real world), and to train and support those other people in the communication partner network. For children in school, there can be a real conflict if the time available for delivery of the 5-14 / National Curriculum' is *also* required for teaching them to communicate using AAC. Reid et al (1996) stress the importance of having time allocated officially for joint planning between teachers and therapists. Priorities have to be set and reviewed on a regular basis. Perhaps for some children learning how to use their communication aid will be the priority for a period of time, as this will give access to other aspects of the curriculum, which can then come to the fore at a later date.

## Changing Attitudes

Blackstone (1991) argues that the quality of the interaction that takes place with a person using AAC is generally dependent to some extent on the kind of beliefs and attitudes the speaking partner has about people who have a disability. Attitudes toward people with disabilities are generally rather negative. Attitudes towards people using AAC (or who may be able to use AAC) need to be positive. If people seem to give out the message that AAC use is "too difficult" or "takes too much time" then it will not be surprising if the user appears unmotivated to use their system. The user needs to feel they are working in a positive environment where their AAC use is encouraged and valued.

There needs to be a realisation that the speaking partner has an important role to play in the process of AAC. For AAC to be successful, the person using AAC needs to be included actively in the selection and development of the appropriate form of AAC. They need to be asked what they want! Murphy (1996) quotes a Speech and Language Therapist who has found it essential to consult her clients when selecting the vocabulary for their AAC devices: *"I've found that my selection of vocabulary, what I thought was going to be most interesting, hasn't actually been that accurate...with client led selection looking at the vocabulary that's available ... I've found that I had a better response."* Blackstone (1993) quotes a lovely example of the need to include the potential AAC user in the creation of their communication aid: a colour-coded communication overlay full of symbols had been made up for an adolescent boy. Much time and care had been taken over the task. One of the colours used was pink. The boy took one look at it and said *"You don't expect me to touch pink, do you?"*

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

### How can I get Advice and Information on AAC, or an AAC Assessment ?

*Because AAC is quite new and specialist, not all teachers, therapists and Day Centre officers have acquired training in its use. If this is the case, and you think you or your family member or client could benefit from AAC, you could ask for a special assessment for AAC.*

Anyone who already has speech and language therapy is half-way towards a referral for specialist help with AAC: all speech and language therapists have a 'duty of care' and professional standards which include the requirement that a non-specialist local therapist *"might seek to establish a joint assessment process with colleagues with special competence in augmentative / alternative communication. In certain circumstances the assessment process may result in onward referral to a specialist centre for augmentative / alternative communication."* (Royal College of Speech and Language Therapists, 1996, p.90)

In Scotland, each NHS Trust has a nominated 'Link Speech & Language Therapist' who takes special responsibility for AAC and is supported by regular contact from SCTCI. SCTCI will provide a list of the names and addresses of existing Link Therapists, who may be contacted directly. Your Link Therapist will be able to organise a specialist assessment for AAC

If there is no Link Therapist, or you are not sure of the procedure in your area, ask the local speech & language therapist about this. If there is no contact with a local speech & language therapist, try contacting the Headquarters of the Health Board for the area for advice. With the help of their Speech & Language Therapy Adviser, the Health Board will be able to clarify which NHS Trust covers the case of the communication impaired individual, and what is the appropriate point of contact for Speech & Language Therapy and/or specialist AAC help in that Trust.

A number of regions in Scotland now have centres or services specialising in AAC and/or technology for education. Even if the remit of these agencies does not allow them to 'take on' a particular child or adult client directly, they are likely to be able to suggest other possible sources of help or guide enquirers towards the appropriate procedures in their own area.

If there appears to be no-one locally who can help, a national agency such as SCTCI (all ages) or CALL (mainly for educational settings) can help to provide information and advice and sometimes assessment support. These specialist agencies will accept requests for help directly, and do not necessarily require speech & language therapy referral.

If you live outside Scotland, you may wish to contact one of the Communication Aids Centres or one of the ACE Centres (mainly for educational settings).

### Who pays for 'High-tech' Communication Aids?

*Yes, well, a good question.....*

In spite of considerable efforts from the AAC field (National Paramedical Advisory Committee, 1997), policies on the funding of AAC equipment and services are still far from being established. It seems, unfairly, that the situation may depend to some extent upon where one lives and the age of the person needing the communication aid (and the time of year – budgets run out or have to be spent quickly).

If the person needing the communication aid is a child with a Record of Needs, and the communication system along with necessary support is specified in Part 4 of the Record (Statement of Special Educational Needs), the Education Authority will take responsibility either for itself funding the purchase of the necessary aid, or for arranging for funding jointly with other appropriate sources, (depending on the procedures that apply in different regions / Health Board areas). This alone is a worthwhile reason for persuading the authorities to open a Record on a child. It will then be very important to ensure that the AAC requirements are detailed very clearly and precisely in Part 4 of the Record (*not* in Part 5, which is where it is currently often placed, under 'Other Needs') (Scottish Consumer Council, 1989). The situation is similar with Statements, in England and Wales.

The terms in which the AAC system needed is recorded should be balanced somewhere in between an over-vague reference like "an AAC system" (which cannot be interpreted reliably and thus may never be implemented) and an over-precise reference (which ties the child for ever to some specific system that might quickly become unsuitable). The best format to use is something like *"a system of graphic symbols, implemented on a portable electronic voice output device with acceptable voice quality, storage capacities and a range of access methods similar to those currently available (1998) on the 'DeltaTalker'"*. It will be important too that the necessary speech and language therapy and other services to introduce and support use of the AAC system is also included in the Record under 'Educational Needs' rather than under 'other needs'. *And* that the Record includes provision for regular reassessment of AAC needs, and upgrading of AAC system as necessary.

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 86 of 219

For non-recorded children (especially pre-schoolers) or adults, there may be arguments as to whether their need for an AAC system should be paid for by Health, Education or Social Work. Again, in many cases, an ideal solution is to try and arrange joint funding, and some authorities are starting to put in place joint agencies for this – but in other places it can take up a good deal of time and effort finding out who to write to and how to make sure everyone is in touch with everyone else. If the needs of an adult are being formally assessed under Care in the Community procedures it is important to ensure that their AAC needs (which may be highly relevant to other issues such as independent living) are assessed, recorded and specified clearly, so that Social Work Departments are obliged to make provision for these.

Students in Higher Education may be eligible for a Disabled Student's Allowance as part of a mandatory award or grant from the Scottish Office or from the Local Education Authority in England and Wales. From the academic year 1998-9, the Disabled Student's Allowance will no longer be means-tested. There are three types of allowance and students may be eligible for any or all of them:

(a) Specialist equipment allowance (maximum payable for the whole course £3,955 for 1998-9) for purchase or lease of major items such as a computer.

(b) Non-medical helpers maximum per year (£10,000 for 1998-9) for special helpers such as note-takers or sign language interpreters.

(c) Miscellaneous Allowance – maximum per year (£1,315 for 1998-9) for expenditure not covered by the first two.

More information can be obtained from the Scottish Office or local education authority's Student Awards Section (Disabled Students Allowance) or by discussing the matter with the university Adviser on Disability.

Students on other courses in Further Education may qualify for discretionary 'bursaries' from their local education authorities or from the College to which they are applying, or even, in some cases, funding from their local Social Work Dept. In all cases, arrangements for applications through these sources should be set in motion as early as possible in the process of applying to college.

The fact of the matter is that currently many people still have to wait for many months, if not years, for the statutory services to provide funding for an AAC system – if they ever do – and many end up relying on friends, families and charitable donations and awards to fund purchase of their communication systems.

### Conclusion

In summary, there has been, in recent years, exciting progress in the field of augmentative communication – in people's awareness and understanding; in the development of powerful and user-friendly technology; and above all in the development of the skills, confidence and increasing independence and assertiveness of people who use AAC. An excellent example of this is the person we know who has never been able to speak with their own voice, yet who is confident enough (and skilled enough) using their voice output communication aid to 'page' an unknown Speech and Language Therapist in a hospital at the other end of the country (having negotiated at least three levels of 'telephone receptionist'). As further evidence, you need look no further than some of the later chapters of this book where Scottish AAC users speak for themselves.

For users, AAC may be their means of accessing the rest of their lives. For those of us who are involved in helping people to use AAC, although it can sometimes feel as if it is taking up our whole lives, it is a privilege to work in this area,. We have learned so much from the people we have been involved with and their families. As one carer out it, *"It's like being paid to go and spend time with my pals!"* We hope that this book will be a friendly and useful introduction for newcomers to the world of augmentative communication and its users.

*Sally Millar*　　　　　　　　　　　　　　　*Janet Scott*
*CALL Centre*　　　　　　　　　　　　　　　*SCTCI*
*University of Edinburgh*　　　　　　　　　　*WESTMARC*
*4 Buccleuch Place*　　　　　　　　　*Southern General Hospital*
*Edinburgh EH8 9LW*　　　　　　　　　　*1345 Govan Road*
　　　　　　　　　　　　　　　　　　　　*Glasgow G51 4TF*

### References:

Blackstone, S. (1991) **Augmentative Communication News, 4:2.**

Blackstone, S. (1993) **Augmentative Communication News, 6:3.**

Glennen and DeCoste (1997) *Handbook of Augmentative and Alternative Communication*, Singular Publishing Group, San Diego.

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 87 of 219

MacDonald, A. & Rendle, C. (1994) *Developing the Foundations of Communicative Competence in Children with Severe Physical Disability* in **Working with Communication Difficulties** (Ed. Judith Watson) p 70-87 Moray House Publications

Macdonald, T. (1994) *An Augmented Lifestyle* in **Augmentative Communication in Practice: An Introduction** (Eds. Millar, S. and Wilson, A.), CALL Centre, University of Edinburgh.

McFadden, D. (1995) *AAC in the Community – A Personal Viewpoint*, in **Widening the Perspective** (Eds. Millar, S. and Wilson, A.), CALL Centre, University of Edinburgh.

Murphy, J. (1993) The Advantages and Disadvantages of AAC Systems in **Augmentative Communication in Practice: Scotland, Collected Papers 1993** (Eds. Millar, S & Wilson, A), CALL Centre, University of Edinburgh.

Murphy, J., Scott, J., Moodie, E. and McCall, F. (1994) *The Role of Communication Support Networks in the Training and Use of AAC Systems by People with Cerebral Palsy*, **Communication Matters,** 8:3, 25 – 26.

Murphy, J. (1996) *Direct AAC Work in Practice*, **Communication Matters, 10:1, 5 – 9.**

Murphy, J., Markova, I., Collins, S., and Moodie, E. (1996) *AAC systems: obstacles to effective use*, **European Journal of Disorders of Communication, 31:1, 31 – 44**

National Paramedical Advisory Committee, (1997) *The Provision of and Support for Augmentative and Alternative Communication(AAC) in Scotland: Equipment and Services*, Scottish Office Home and Health Department , St, Andrew's House, Edinburgh

Reid, J., Millar, S., Tait, L., Donaldson, M.L., Dean, E.C., Thomson, G.O.B., and Grieve, R. (1996) *The Role of Speech & Language Therapists in the Education of Pupils with Special Educational Needs*. Edinburgh: Edinburgh Centre for Research in Child Development, Department of Psychology, University of Edinburgh

Royal College of Speech and Language Therapists (1996) *Communicating Quality 2: Professional Standards for Speech and Language Therapists* ,RCSLT

Robertson, Anthony (1993) *The Public's Perspectives of Communication Aid Users* in **Communication Matters** 7:2, p17-19

Scottish Consumer Council (1989 ) *In Special Need: a Handbook for Parents and Young People in Scotland with Special Educational Needs* HMSO

Student Awards Agency for Scotland (1998/9) *Student Grants in Scotland: a Guide to Undergraduate Allowances* (AB2) and *A Guide to Postgraduate Allowances* (AB2(PG)) from Room 107, Gyleview House, 3 Redheughs Rigg, Edinburgh EH12 9HH.

Williams, Michael (1994) **Alternatively Speaking** Vol. 1 No. 1 April 1994 ISSN 1075 3982

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

# EXHIBIT H

Case 5:17-cv-00383-F    Document 66-1    Filed 06/11/18    Page 89 of 219



**David Mahmarian**  Follow

IxD focused on accessibility and inclusive design.

Feb 2, 2016 · 8 min read

# A History of Autism and AAC

Currently the rates of autism diagnosis in the United States are 1 in 68 children. With rates this high, most people have a relative or know someone who is affected by it. In 1990 the rate of autism was 1 in 5000 and it was considered a rare disorder. Because of that there was minimal research into the causes of autism and little was known about how to effectively teach children with the disorder. One of the core deficits in autism is the ability to communicate. The difficulties can range from idiosyncratic or repetitive use of language to having no verbal language at all. The use of augmentative communication for individuals with autism continues to be an emerging field. As technology continues to develop; the possibilities for innovative forms of communication devices and methods also increase. Historically, many of the employed techniques came from other fields and were designed for people with various disabilities. It is important to understand this history to see how we arrived at where we are today.

The use of alternative methods of communication can be traced back to classical Rome and ancient Greece when Plato was writing about sign language used by deaf Athenians around 385 B.C. There are also manual languages documented for the deaf in European cultures between the sixteenth and eighteenth centuries. These manual languages were also used by Native Americans who had a system of gestures to interact with other tribes, which led to the creation of a complex method of communicating between speakers of multiple languages. These were the foundations of a field we know today as Augmentative and Alternative Communication (AAC).

There are many types of AAC including sign language, gestures, picture symbols and speech generating devices. These methods have proven to be useful for people with any type of disability that impairs communication such as cerebral palsy and autism and have also helped those with degenerative diseases such as ALS and Parkinson's disease. Difficulty with communication impacts quality of life in many ways and creates barriers to the access of education and community services. An individual's ability to express their needs, wants, thoughts and feelings is vital to being human and connecting with others. Many behavioral challenges result from the frustration of not being able to communicate and the utilization of AAC can minimize or even eliminate dysfunctional behavior in disabled individuals.

The use of AAC began in the 1920's when professionals started using communication boards to treat individuals with severe disabilities. The first board that was generally available was the F. Hall Roe Communication Board. It was created for F. Hall Roe who had cerebral palsy, then replicated and printed with notches which allowed for the board to be printed and mounted on wheelchairs. Jumping to the

earliest electronic communication devices; the Patient Operated Selector Mechanism (POSM), was a sip-and-puff typewriter controller created by Reg Maling in 1960. He was inspired to conceive the POSM when he realized that paralyzed people in a hospital he visited only had a bell to communicate with. Other notable devices were created around this time including the Patient Initiated Lightspot Operated Typewriter (PILOT), which was operated by pointing light beams at photoelectric cells. Keith Copeland documented many of these devices in his "Aids for the Severely Handicapped" book from 1974.



F. Hall Roe Communication Board



Patient Operated Selector Mechanism (POSM)

Case 5:17-cv-00383-F    Document 66-1    Filed 06/11/18    Page 91 of 219



The Talking Brooch

Autism came to the forefront in 1943 as a result of the work of Dr. Leo Kanner at John Hopkins Hospital. Dr. Kanner authored a paper titled "Autistic Disturbances of Affective Contact" where he described 11 socially isolated children who shared high intelligence, a strong preference for being alone and an "obsessive insistence on the preservation of sameness". Kanner was also responsible for decades of misconception about autism as he believed it was a form of "childhood schizophrenia" and theorized that autism was a result of emotionally distant mothering. In a 1960 interview he described parents of autistic children as "just happening to defrost enough to produce a child" but it was Bruno Bettleheim who gave the term "refrigerator mothers" its widespread popularity.



Leo Kanner

It is important to note that Kanner's point of view on autism was not the only one that existed at the time. An Austrian pediatrician named Hans Asperger was also conducting a lot of research on the topic. He published the first definition of what we know today as Asperger's Syndrome in 1944. Asperger identified a pattern in four boys that included "a lack of empathy, little ability to form friendships, one-sided conversation, intense absorption in a special interest and clumsy movements". It is apparent from his writings that Asperger had more of a positive view on the condition. He noted their ability to speak about their favorite subjects in great detail and predicted that they would go on to use their special talents as adults. It is likely that Asperger was working with higher functioning autistics on the spectrum.



Therapists began applying the principles of behavioral psychology in the 1960's to help individuals with autism and related disabilities communicate. The foundation of this work was using positive reinforcement by rewarding a desired behavior so that it would likely be repeated. This was the beginning of what we know today as Applied Behavior Analysis (ABA) therapy. Much of this was done through the use of communication boards, similar to the one used by F. Hall Roe in the 1920's, which predated its time. These boards were never really designed specifically to treat autism, but were adapted by the community.

A speech language pathologist from the University of Iowa State Hospital-School named Beverly Vicker, documented her efforts to create communication boards for people with varied disabilities in her book "Nonoral communication system project 1964–1973". The communication boards themselves were quite varied: while some had pictures, letters, words or symbols, others were a combination. Some communication boards were very simplified with just a few words or icons, while others were documented as having up to 800 words. There was a wide range of ways people interacted with these boards including fingers, pointers, head sticks and other devices.

A major advance in the field came in 1971 when Shirley McNaughton of the Ontario Crippled Children's Centre started working with

Blissymbolics. The symbol system was originally created by Charles K Bliss for the purpose of international communication. Shirley led an interdisciplinary team to apply the system to the communication of children with physical disabilities. The symbols were used to communicate general concepts and were combined together to form words. The system was flexible and allowed for individuals who were more advanced to communicate faster.



Blissymbolics



Symbols combined to form sentences

In the 1980's, autism was classified as a developmental disorder in the third edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM-III), a manual published by the American Psychiatric Association. This was a major breakthrough, as autism was now officially and medically differentiated from schizophrenia. The rates of diagnosis at this time were about 2–5 per 10,000 people. In 1987, O. Ivar Lovaas, a psychologist from the University of California published a scholarly article titled "Behavioral Treatment and Normal Educational and Intellectual Functioning in Young Autistic Children". In his article, Dr. Lovaas described that after intensive training, some autistic people had been able to catch up to their peers and function in conventional classrooms.



Early interview of Dr. Ivar Lovaas

Public awareness of autism rapidly grew in the 1990's and over seven major research centers were founded. The rates of diagnosis also increased to approximately 5 in 10,000 people. As the need for services became more apparent many new government programs were created. There was still a big misconception about the factors that caused autism and many mothers were being falsely blamed for causing autism in their child. It was also a very difficult time for parents as they had to advocate to get the proper programs for their children in school systems. ABA therapy and communication devices were not widely accepted or used in schools at the time; some schools even prohibited them completely.

Research advanced dramatically in the early 2000's when the Children's Health Act was signed into law. The act provided funding for a long-term autism research study and also established a research coordinating committee. In 2005, Bob and Suzanne Wright, grandparents of an autistic child, founded Autism Speaks. The organization was launched with the help of Bernie Marcus, a family friend who donated $25 million dollars to get it running. Autism Speaks has become "the world's leading autism science and advocacy organization, dedicated to funding research into the causes, prevention, treatments and a cure for autism; increasing awareness of autism spectrum disorders; and advocating for the needs of individuals with autism and their families."

Today, society's attitude toward autism seems to be shifting away from autism awareness, to autism acceptance. The rates of diagnosis keep increasing, as just a few years ago it was 1 in 86 children, compared to the previously mentioned rate at 1 in 68 today; 25 percent of whom are completely nonverbal. Through AAC combined with individualized therapy, many individuals with severe autism now have a much higher chance of learning some form of communication. The work of Dr. Lovaas is still widely practiced through intensive ABA therapy, sometimes consisting of 40 hours a week for up to 5 years. This has led to many communication breakthroughs for individuals who were completely nonverbal and are now fully communicative. Just as the

research and therapy becomes more sophisticated, so will the devices that are used to enable communication.

Most of the current devices, applications and other "solutions" seem to be created with a goal of helping the autistic person learn to use language the way we do. In 2007, a severely autistic, nonverbal woman named Amanda Baggs published a video on YouTube describing the experience of living as a person with autism. In the video she types: "We are even viewed as non-communicative if we don't speak the standard language, but other people are not considered non-communicative if they are so oblivious to our own languages as to believe they don't exist." This implies that the needs and wishes of autistic people are being left out of the design process and it is my belief that the next phase will consist of people on the autism spectrum designing solutions for other autistics.



In My Language

References posted here: http://bit.ly/20u7lJQ

Case 5:17-cv-00383-F      Document 66-1      Filed 06/11/18      Page 96 of 219

# EXHIBIT I

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

# High Technology Aids to Communication

## Deborah Jans and Sue Clark

Within our modern society, the general public is utilising high technology equipment more and more within daily life. For people with disabilities also there are many applications for the use of high technology equipment in communication, learning, employment, and leisure / recreation activities.

This chapter focuses on high technology equipment designed for people with communication impairments. In discussing electronic communication aids, we will consider the common features of the communication aids currently on the market and being implemented in this country. Additionally, we will review different input methods and issues surrounding implementation of a device for an individual user.

Most of the equipment discussed here was originally designed for individuals with a physical impairment, but there are many different client groups which can benefit from communication aids, as listed in Chapter 1. Assessment procedures, for the selection of a suitable AAC system for a particular user have been discussed in Chapter 5, however it is important to emphasise that any potential user of a communication aid will require a detailed assessment. This is best performed by a multi-disciplinary team with the appropriate expertise.

High Technology aids to communication are here defined as equipment which is electronic in nature and requires a power supply – either battery or mains powered. High technology communication equipment can be divided into two main categories:

- ❍ dedicated communication aids
- ❍ computer based communication equipment.

### Dedicated Communication Aids

Dedicated communication aids were designed solely for the means of providing an alternative to oral speech or to augment an individual's oral speech. Although some aids do provide access to additional activities such as writing and environmental control, their main purpose is to provide a means to communicate in conversation. Appendix 1 provides a summary of the most widely used dedicated communication aids available in the United Kingdom.

As shown in Appendix 1, there are many communication aids available on the market today. To better discuss and evaluate each communication aid, four factors in particular need to be considered: access; the selection set; the output mode and portability.

### Accessing the Communication Aid

There are two main avenues that an individual can use to access a communication aid: *direct selection* or *indirect selection via scanning*. The physical positioning of the individual user and his/her physical abilities will form the basis for deciding which access method is to be preferred.

#### Direct selection

Direct selection is defined as the ability of the user to select by physically touching the equipment. This may be a keyboard, touch window, or a membrane keypad. This definition can also be extended to include the use of a head pointer (either a head or chin stick, head mounted optical pointer or infrared head control unit) or a mouth stick. Direct selection can be done with any part of the body e.g. foot, hand, nose etc. The most common is accessing directly with the hand, either by fist pointing or finger pointing or in combination.

Communication aids can have varying types of keyboards with variable sensitivity and feedback to the user, usually in the form of a click or a beep. In addition, as indicated in Appendix 1, some aids allow the user and facilitator to choose different sizes for the individual keys on the keyboard. This allows for more flexibility for an individual user, or across a range of users.

#### Indirect selection

The second type of access method is indirect selection via scanning. This requires the user to activate a switch or number of switches connected to the communication aid. The communication aid must be able to accept a switch and have some type of scanning array available to the user.

When discussing indirect selection, it is important to have an idea of the different types of switches available to an individual user. Switches come in an almost infinite variety and can be customised to suit each individual. For example, they can be activated by movement or pressure with different parts of the body, by heat, breaking a light beam, or sound, or by pneumatic control (suck/puff). Switches may come in single, double, four-way or multiple configurations. Commonly used switches include:

Case 5:17-cv-00383-F Document 66-1 Filed 06/11/18 Page 99 of 219

❍ Simple lever switches, operated by pressing on the hinged 'lid' of a lightweight box.

❍ Platform switches, requiring the user to press a large 'lid' or button resting on a few switches; light pressure on any part of the 'lid' activates one or other of the switches.

❍ Bead switches mounted on a necklace and activated by the chin or cheek.

❍ Head switches, mounted into a wheelchair / headrest.

❍ Push switches and joysticks – operated by pushing a handle or plate.

❍ Wobble switches and spring sticks -the user can hit the switch in any direction.

❍ Suck and puff switches (which require a user with good breath control).

❍ Tongue switches.

❍ Sound operated switches (difficult to set correct sensitivity in noisy environments).

Switch access is discussed in greater detail in the next chapter.

Some communication aids are designed specifically *either* for direct selection *or* indirect selection via scanning. Over recent years, manufacturers have often combined these two different types of access methods into one single aid. This can be seen in communication aids such as the *ORAC*, *MessageMate*, *Liberator*, *AlphaTalker*, *DeltaTalker* and *Macaw*, to name a few. This allows for more flexibility for an individual user as it allows the user to choose different access methods during the time they are using the communication aid. This may be important as the user either develops more consistent physical abilities over time, or, in the case of users with progressive conditions, as their physical capabilities become more limited over time.

## Selection Set

Dedicated communication aids may be used with different types of representational system. The system chosen for use may be known as the *selection set*. The most commonly used selection sets are either symbol / icon based or text-based.

### Text-based Systems

Text-based systems usually use a standard form of alphabetic letters and numbers. The display of these letters may be the QWERTY layout as seen on computer keyboards, or an alphabetical layout, or a special display based on the statistical frequency of occurrence of letters in the language. In the case of some special codes, e.g. with Morse Code, the user does not really have a display of letters as such at all; the system provides an access technique whereby the dots and dashes are transmitted as switch presses through an emulator that translates these codes into letters and numbers.

### Symbol / Icon-Based Systems

The different symbol / icon systems available have been described in Chapter 3. It is important to note when considering a particular communication aid, whether that aid utilises symbols or icons as an interface, or alphabetic letters and/or numbers. Communication aid designers often combine both types of interfaces into one aid to extend the choice available to the user. This can be seen in the *Canon Communicator*, for example, which can be transformed from a text-based communication aid to a symbol based aid by utilising the Canon Memory Mates provided with the communicator. Dynamic screen devices, such as the *DynaVox 2,* the *Cameleon* and the *Vanguard* can be set up for use with symbols / icons, text, or a mixture of both.

## Output

Another major factor to consider when looking at individual communication aids is the output that is available.

### Visual Output

Visual output refers both to a visual display unit such as a small screen, and to printed copy of the messages through a printer. Screens and printers may be internally built ('on-board'), or connected externally to the communication aid.

It is important to evaluate the clarity of the visual display (especially in differing light conditions); the size of the display; how many lines / characters the display will show at any one time. If the display is small and only shows a limited number of characters there is usually a buffer built in to save the data as it scrolls off the screen. A cursor can then move to retrieve it later as needed.

### Auditory Output

An important form of auditory output is the type of speech output the communication aid supports. There are two different types of speech output: *digitised* and *synthetic*.

*Digitised speech* is a real voice recorded into a communication aid. The advantages of digitised

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

speech are that different languages, regional accents, or dialects, and age / gender of voice can be used. Digitised speech may sound more 'natural' and acceptable, for some listeners. Digitised recording also allows the user or his facilitator to use environmental sounds such as a doorbell ringing. The main disadvantage of digitised speech is that the user has to work with a fixed vocabulary at any given time, as he or she cannot create and store new messages by him/herself but is dependent on others for this. Digitised speech also takes up a lot of memory, in a device.

*Synthetic speech* is speech generated by a computer. There are many different types of synthetic speech available commercially. Some are used in a whole variety of different communication aids (such as *DECtalk / Multivoice*) while others are specific to a particular aid (such as *EuroTalk* in *Lightwriters*, or *Oratalk* in the *ORAC*). One of the advantages of synthetic speech is that it uses less memory than digitised. Also, synthetic speech is open-ended and allows spelling in of an unlimited range of new messages. This can be done by users themselves, if they are able and wish to do so. The disadvantages are that it may be more complicated and time-consuming to program a device with synthetic speech, than one with digitised, and that sometimes the pronunciation is not 100% accurate (although most systems now have a 'pronunciation adjustment' facility).

It is becoming more popular to have a combination of different types of speech outputs available in the same communication aid. (This facility is available on the *ORAC, DeltaTalker* and *Vanguard*, for example.) This offers the user more choice, for example in placing emphasis on different messages or types of message, and in taking decisions about the most efficient use of the device.

When evaluating different communication aids, it is important to note the clarity of the speech output, ability to represent different voices, gender, pitch variations etc. Choice of voice is a very personal decision made by individual users as to which voice they feel most comfortable with, and can best understand or be understood.

## Feedback

Communication aids may also supply a special type of output, whose function is to support and give information to the user, rather than to the listener. This is known as *feedback*.

*Auditory feedback* options mainly consist of a choice of click or beep when a key is pressed on the keyboard (or selected some other way). Some communication aids give users an auditory prompt as they scan along each message, before they make their selection; such auditory scanning methods may be particularly useful for people with visual impairments.

*Tactile feedback* (where users feel the length of a keypress, or a definite click as a key is activated) may also be helpful to tell users when they have been successful in their selection and may move on to the next (Some keyboards, e.g. membrane, lack this).

*Visual feedback* would include the lights on a scanning system. A useful form of visual feedback is the 'icon-prediction' feature seen in devices such as the *DeltaTalker* and the *Vanguard*. As the user builds up a message, the keys that are 'possible' as the next keypress ( i.e. those keys that have messages attached to them), light up to guide the user to them. This places less strain on the user's memory, and speeds up selection for scan-switch users.

## Portability

The issue of portability has important practical implications for the user. As technology advances, it is becoming much easier to find equipment in a range of different shapes, sizes and weights. It is important to keep in mind whether a communication aid is indeed truly portable or just transportable. If our goal is to provide equipment to help an individual become independent in their daily life, then we need to make sure that the user can carry or transport the aid to different locations if necessary. This has different implications for people who are ambulant as opposed to people who use a wheelchair.

A number of communication aid manufacturers / suppliers also sell specialised mounting systems, for use with wheelchair users to allow the communication aid to be portable.

Designers have taken up this challenge of portability with respect to ambulant users. Some suppliers now have carry bags available in varying shapes and sizes, including bags you can wear around your waist. It is sometimes a major deterrent to successful use of a communication aid if the user cannot carry the aid around while shopping or perhaps switching classes in school or college. Other communication aids have been designed specifically for the ambulant user, for example, the *Cameleon CV* and the *DynaMyte* have been designed as "small" versions of the *Cameleon* and *DynaVox 2*, respectively.

Copyright (c) The individual authors, CALL Centre & Scottish Executive Education Dept

# EXHIBIT J

6

# Augmentative and Alternative Communication and Voice Products and Technologies

The ease and simplicity of use of typical natural speech mask the complexity of a speech production process that involves precise control and coordination of respiration, voice, articulation, and language comprehension and expression (van der Merwe, 2009). For many, speech is the external expression of language, and the motor skills involved are performed with accuracy and speed, without conscious control (Netsell, 1982). With impairment, alterations in speech subsystems become apparent and the complexity revealed. The primary rationale for individuals' electing to use augmentative and alternative communication (AAC) is the inability of their natural speech to meet all of their daily communication needs. Although the severity of impairment plays a role in determining AAC needs and appropriate interventions, other factors include level of communication complexity, skills of communication partners, communication environments and environmental factors, rate of communication, and proficiency at strategic communication, among others. The delicate balance that yields automaticity of natural speech planning, programming, and execution is not replaced by AAC systems, nor does AAC fully mitigate impairments in natural speech production.

Although the primary focus of this chapter is AAC systems, the discussion also briefly addresses voice restoration technologies that support communication associated with head and neck cancer treatments. AAC refers to all types of communication other than oral speech (e.g., pictures, symbols, writing, hand gestures) (ASHA, 2016a). AAC systems may be *unaided* (e.g., signing, gestures) or *aided* (Beukelman and Mirenda, 2013). Aided AAC systems include nontechnology assistive products (e.g., communication

boards, books) and technology-based products (e.g., speech-generating devices [SGDs], mobile technologies). This chapter begins with an overview of the conditions benefiting from the use of AAC technologies, which is followed by a detailed taxonomy of AAC and voice products and technologies. Next is a review of the clinical considerations entailed in comparing natural speech and technology-based voice output systems. Evaluation and monitoring, training and adaptation, and access and availability are then addressed in turn. The chapter next considers voice restoration following head and neck surgery. The final section presents findings and conclusions. Before proceeding, it is important to note that the research in this field often has focused on specific areas and populations, making generalizations across studies problematic and highlighting the need for AAC-specific research across adult populations (Bourgeois, 2013).

## OVERVIEW OF CONDITIONS BENEFITING FROM AAC TECHNOLOGIES

### Prevalence of AAC Need

An estimated 1.3 percent of Americans (about 4 million people) cannot reliably meet their daily communication needs using natural speech (Beukelman and Mirenda, 2013), and the prevalence and complexity of communication disorders increase with age (Yorkston et al., 2010a). Additionally, many individuals with other disabilities (e.g., developmental, physical) have co-occurring communication disabilities (Lawthers et al., 2003; Perry et al., 2004). Although datasets on the prevalence of AAC use are limited, increases in the number of individuals requiring AAC have been observed (Light and McNaughton, 2012). Factors contributing to this increase include the rising incidence of autism spectrum disorders (CDC, 2011, 2014); advances in medical intervention that have resulted in improved survival, albeit with lifelong disability (Durkin et al., 2016; Hustad and Miles, 2010; Vincer et al., 2006); increased life spans of individuals with communication disability (Balandin and Morgan, 2001); and increased overall life expectancy (Gaskin et al., 2016; Segalman, 2011). Improvements in AAC technology that better account for the unique cognitive and linguistic skills of persons with physical and cognitive disabilities have resulted in new opportunities for the appropriate provision of AAC services (Beukelman and Mirenda, 2013; Light and McNaughton, 2012).

### Medical Conditions Benefiting from AAC

Prevalent conditions leading to a need for AAC include Alzheimer's disease, Parkinson's disease, autism spectrum disorder, learning difficulties, stroke, cerebral palsy, head/brain injury, profound and multiple learning

disabilities, and motor neuron disease/amyotrophic lateral sclerosis (ALS) (Perry et al., 2004; Wodka et al., 2013). Other conditions include, but are not limited to, head and neck cancers (Sullivan et al., 2007b), aphonia/voice impairment (Rousseau et al., 2015), progressive illnesses (e.g., multiple sclerosis, Huntington's disease) (Beukelman et al., 2007c), dementia (Bourgeois, 1992; Bourgeois et al., 2001), primary progressive aphasia (King et al., 2007), brainstem impairment/locked-in syndrome (Culp et al., 2007), genetic associations/syndromes (e.g., Prader-Willi, William's, Rett, Angelman, Fragile X, Down, 22q.11 deletion) (Brady et al., 2006; McDuffie et al., 2016), and other neuromuscular diseases (e.g., muscular dystrophy, spinal muscular atrophy) (Ball et al., 2012, 2016a; Fried-Oken et al., 2015). In an Australian sample, the age range of the largest number of people with complex communication needs was 19 to 40 years. Most individuals with such needs as a result of congenital conditions were in the same age range, with cerebral palsy (46 percent), genetic/congenital syndromes (37 percent), and autism spectrum disorder (48 percent) predominating. The same study found that some conditions associated with complex communication needs increase with age (e.g., stroke, dementia, laryngectomy, Parkinson's disease, Huntington's disease) (Perry et al., 2004).

Data on 2014 Medicare services (see Appendix C) indicate that the majority (168/227, or 73 percent) of SGDs funded were in the E2510 category (SGD, synthesized speech output, multiple message formulation methods). Although the reason for the predominance of this category is unknown, funding, professional training, availability of AAC assessment teams, and public awareness likely contribute. Many individuals use this type of AAC device to produce complex language, while others use the sophisticated features of the device to support beginning communication skills (Brock et al., 2017; Ganz et al., 2015).

A potential misalignment exists between clinician perceptions of the need for AAC and actual need (Hustad and Miles, 2010). This misalignment may produce underestimated numbers of individuals who would benefit from AAC based on clinician (e.g., speech-language pathologist [SLP], physician) identification alone. There is no evidence to support the idea that persons with complex communication needs who undergo AAC evaluation receive no recommendation for AAC technology. The greater challenge is that there are few SLPs to provide AAC evaluation and treatment services, as is discussed later in this chapter.

## TAXONOMY

AAC systems are used to establish functional communication when natural speech methods are insufficient to achieve daily communication goals and meet communication needs (Beukelman and Mirenda, 2013). Aided AAC systems can be categorized into nontechnology and technology-based

products. Nontechnology products are nonelectronic boards or books that contain images that the individual selects to convey messages (e.g., picture symbols, alphabet boards, photograph books). Technology-based systems employ hardware and software to produce visual output, that is, digitally displayed messages (i.e., dynamic or static displays) or voice output (verbal messages [SGDs and mobile AAC technologies]). For the purposes of this report, the term "AAC technology" refers generally to technology-based communication systems with voice output, and it includes both SGDs and mobile AAC technologies. Voice output may be digitized, synthesized, or a combination of the two. Box 6-1 summarizes the definitions relevant to the AAC taxonomy used in this chapter (see also Table 6-1 and Annex Table 6-1 at the end of this chapter).

Technology-based AAC systems include a number of features that need to be considered when these systems are selected for particular individuals (see Table 6-1). Table 6-2 summarizes the ways in which vocabulary and messages are represented and generated for communication using technology-based AAC systems. To optimize a particular individual's communication performance, any number of features may need to be personalized or customized by an SLP or other qualified team member. While careful selection of these features may partially mitigate a communication impairment, training in use of the selected AAC technology alone cannot eliminate environmental and personal barriers that may impact use.

### AAC Software

Important features of AAC software include (1) language/message representation methods, (2) vocabulary selection and organization based on communication needs and personal preferences, and (3) language/message generation options (Hill and Corsi, 2012). The features shown in Table 6-2 are not mutually exclusive, and multiple methods are often integrated into communication (e.g., a combination of direct selection for typical use and scanning for selection when fatigued; word-by-word message formulation strategies for novel utterances combined with preformulated messages for rapid access to frequently used utterances). One consideration in the selection of software features is the additional cognitive tasks associated with each option or combination of options; successful communication in the context of the cognitive, visual, and learning demands of complex AAC systems is influenced by an individual's language and cognitive status (Light and McNaughton, 2013; Rowland et al., 2003). While extensive evidence supports the benefits of some software and apps for language and access methods, little evidence exists for others as yet (Caron and Light, 2016) (see also Annex Table 6-2 at the end of this chapter).

---

**BOX 6-1**
**Augmentative and Alternative Communication (AAC) Systems**

**Unaided Communication Systems:** Systems that enable communication that relies on the user's body (language) to deliver messages. Examples include gestures, eye gaze, vocalizations, sign language, and facial expressions (adapted from ASHA [2016a]).

**Aided AAC Systems:** Systems that "require the use of tools or equipment in addition to the user's body. Aided communication methods can range from paper and pencil to communication books or boards to devices that produce voice output (speech generating devices or [AAC technologies, mobile technologies]) and/or written output. Electronic communication aids allow the user to use picture symbols, letters, and/or words and phrases to create messages. Some devices can be programmed to produce different spoken languages" (ASHA, 2016a).

- *Nontechnology Products:* Communication aids that do not need batteries or an electric power source to meet users' needs. Most are simple aids such as communication boards or books.
- *Technology-Based Products*
  - **Visual output:** Used primarily to support messages when natural, digitized, or synthesized speech is not understood or available. Examples include aided symbols and text viewed on a display.
  - **AAC technologies:** Technology-based communication systems that may include speech-generating devices and mobile AAC technologies.
  - **SGDs:** Essential durable medical equipment that provides speech output using digitized, synthesized, or combined digitized and synthesized speech (adapted from Drager et al. [2010]).
  - **Mobile AAC technologies:** Mainstream technology (e.g., iOS, Android, Windows) with software or applications that provide speech output using digitized, synthesized, or combined digitized and synthesized speech output.
    - o **Digitized voice output:** Generated by communication devices that reproduce messages consisting of a recording of natural speech that is converted to digital format. The voice output on the device is recorded by another person, as opposed to the computer (adapted from Beukelman and Mirenda [2013]).
    - o **Synthesized voice output:** Generated by communication devices that convert typed text to digital speech.

---

*Software Message Management Features*

To communicate with AAC, individuals employ formulation, storage, and retrieval (words, codes, messages) strategies (Beukelman and Mirenda, 2013). A variety of software options are used to manage and generate messages, including but not limited to spelling letter-by-letter, using symbols

*214*

**TABLE 6-1**
Communication-Related Features of Aided AAC Systems

| Feature | No Technology AAC | Digitized SGD | | | | Synthesized SGD | | Mobile AAC Technology |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Minutes of recording time | | ≤8 | 9–20 | 21–40 | >40 | >40 | >40 | >40 |
| Digitized voice output | | X | X | X | X | | | X |
| Synthesized voice output | | | | | | X | X | X |
| Message banking | | X | X | X | X | X | X | X |
| Voice banking | | | | | X | X | X | X |
| Visual output | X | | X | X | X | X | X | X |
| Preprogrammed messages | X | X | X | X | X | X | X | X |
| Message formulation | X | | | | X | X | X | X |
| Battery operated | | X | X | X | X | X | X | X |
| Rechargeable | | | X | X | X | X | X | X |
| Fixed display | X | X | X | X | X | | | |
| Dynamic display | | | | | | X | X | X |
| Physical contact/direct selection | X | X | X | X | X | X | X | X |
| Scanning | X | | X | X | X | X | X | X |
| Multiple access options | X | X | | | X | X | X | X |
| Eye gaze access | X | | | | | X | X | X |
| Graphic/symbol representation | X | X | X | X | X | X | X | X |
| Text representation | X | | | | X | X | X | X |
| Photo/visual scene representation | X | X | X | X | X | X | X | X |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Rate acceleration: encoding | X | X | | X | X | X | X |
| Rate acceleration: prediction | | | | X | X | X | X |
| Visual adjustments (spacing, font, brightness) | X | | X | X | X | X | X |
| Auditory adjustments (volume) | | X | X | X | X | X | X |
| Funding (Medicare/Medicaid, insurers, VA) | | X | X | X | X | X | X |
| Assessment and Training | X | X | X | X | X | X | X |

NOTE: AAC = augmentative and alternative communication; SGD = speech-generating device; VA = U.S. Department of Veterans Affairs.

**TABLE 6-2**
Components of AAC Technology

| LANGUAGE COMPONENTS | | |
| --- | --- | --- |
| **Language Representation** | **Vocabulary** | **Method of Utterance Generation** |
| • Alphabet or text<br>• Single-meaning pictures/ symbols<br>• Multimeaning icons | • Core—high frequency words<br>• Extended—low frequency or topic specific words | • Novel utterance generation<br>• Prestored utterances |
| **HARDWARE AND SOFTWARE COMPONENTS** | | |
| **Display Features** | **Control and Selection Methods** | **Outputs** |
| • Symbol type<br>• Display type and size<br>• Number of grid locations<br>• Number of pages<br>• Encoding, color | • Direct selection: keyboard, head pointing, eye gaze, Morse code, brain–computer interfaces<br>• Scanning: one or two switches, scanning pattern | • Speech: synthesized, digitized, individually created digital voices<br>• Other: display, electronic/ infrared/radio frequency, Bluetooth, data logging |
| **OTHER COMPONENTS AND SERVICES** | | |
| **System Options** | **Manufacturer Options** | **Other Supports** |
| • External computer access<br>• Internet, Wi-Fi<br>• Phone access<br>• Switches<br>• Mounting systems<br>• Carrying cases | • Technical support<br>• Repairs<br>• Equipment loans<br>• Warranties<br>• Funding support<br>• Device training | • Equipment loan closets<br>• Funding requests, appeals<br>• System training<br>• Communication programming<br>• Communication participation training (speech-language pathologist) |

SOURCES: Adapted from Hill, 2010; Hill and Corsi, 2012.

to represent words and messages, sequencing icons to represent words and messages, selecting individual words from a display to generate word-by-word messages, and selecting partial and full messages that have been programmed and stored for retrieval. Each variation is appropriate for some individuals, and given the complex cognitive demands of these systems, careful consideration is required across a wide range of technologies to match individuals with the most appropriate systems (Higginbotham et al., 2007; Light and McNaughton, 2013; Mizuko et al., 1994; Ratcliff, 1994; Rowland et al., 2003; Thistle and Wilkinson, 2013; Wagner and Jackson, 2006).

Aided symbol representation includes the visual, auditory, or tactile presentation of communicative messages, symbols, and codes from which the

individual selects (Beukelman and Mirenda, 2013). Aided symbols include two-dimensional symbols that can represent other items, and may include tangible objects (e.g., miniatures, partial objects), textures (e.g., a piece of spandex to represent swimming/a swimming suit), picture symbols (e.g., photographs, drawings, codes), and orthographic symbols (e.g., alphabet, Braille) (Beukelman and Mirenda, 2013). Most AAC technologies use aided symbols with visual displays of pictures, alphabet, pictorial symbols, or codes. For individuals with visual or other impairments, AAC technologies may present spoken messages or offer tactile representation of items (e.g., objects, textures, shapes). Although a wide array of strategies is used with communication software, methods for representing language or messages can be identified as (1) alphabet- or text-based methods, (2) single-meaning picture symbols, (3) visuals scenes, or (4) multimeaning icons or semantic compaction (Beukelman et al., 2015; Ganz et al., 2015; Gevarter et al., 2014; Light and McNaughton, 2012; Therrien and Light, 2016).

*Keystroke and Rate Manipulation*

People who rely on AAC often select components of messages one at a time from the display. A number of strategies have been developed to reduce the time and effort this process requires (Beukelman and Mirenda, 2013; Hoag et al., 2009).

**Encoding**  Considered sequential building of sounds in words (Hartsuiker et al., 2005), encoding in the case of AAC technologies involves converting electronic data into a standard format that can be sent within the device and later decoded as communication output (Barrett and King, 2005). Encoding strategies typically found in AAC technologies involve word and message features in the communication software.

*Stored words*  Alphabet- or text-based methods, including alpha, alphanumeric, letter-category, and numeric codes, may be used to represent words. Alpha codes typically employ truncation (e.g., use the first few letters of a word, such as *sched = schedule*) or contraction (e.g., use the most salient letters, such as *schdl = schedule*). Alphanumeric codes use letter–number combinations (e.g., *sched1 = work schedule*, *sched2 = travel schedule*, *sched3 = home schedule*). Letter-category codes involve indicating a category with the first letter and then the word with the second letter (e.g., *S = my schedules*, *SW = work schedule*, *ST = travel schedule*). Numeric codes have limited use but are helpful when display space is limited (e.g., assignment of an arbitrary number, such as *15 = work schedule*). Morse code is another encoding system available in some AAC technologies; dot and dash combinations are used to access the alphabet, punctuation, numbers, and computer functions (King, 2000).

*Symbols* Symbols and icons may be used to represent words. In the case of single-meaning symbols, one symbol represents one word. Symbol representation of words may result in keystroke savings over the course of a conversation. Since an individual's vocabulary typically includes several thousand words, however, this method requires the availability of an equal number of symbols. Sequencing two or three icons to access a word is another keystroke-saving approach that offers rate enhancement value for some individuals with severe physical disabilities, such as cerebral palsy (McNaughton et al., 2002). Use of multimeaning icons or semantic compaction (Baker, 1986; Chang et al., 1992) entails combining teachable icon sequences based on semantic relationships to represent a word. This representation method involves sequencing a small set (single display) of icons to reduce navigation among symbols/text.

*Messages* Alpha, alphanumeric, letter-category, and numeric codes and single- and multimeaning symbols/icons also may be used to represent phrases and messages. Some individuals use salient letter codes to indicate the relevant message content (e.g., *OD = please open the door for me*). Color encoding also may represent contextual (e.g., red = body parts, blue = work supplies) or linguistic (e.g., green = nouns, orange = verbs) categories (Thistle and Wilkinson, 2009). Communication software programs using symbols and icon sequences may contain prestored messages. Thus, one picture symbol or icon sequence may produce a greeting, provide the individual's name/address, or access a prestored presentation for a workplace meeting or conference.

**Prediction** Letter, word, and message prediction involves active retrieval in which options change according to the portion of the word/message already formulated. As with the now commonplace texting keyboard on many smartphones and tablets, algorithms predict content based on the probability of letter occurrence, letter combinations, and linguistic context to provide a set of options for the target message. Types of prediction include word completion, next-word prediction, linguistic prediction, message prediction, and icon prediction (Dowden, 2016).

### Hardware Components

AAC technologies offer myriad hardware options for the message display, selection method, and output and input.

### Display

Those AAC system components used to present the language components to the person with communication needs are commonly referred to as

the display. AAC displays generally are of one of four types: fixed, dynamic, visual scenes, or hybrid (Beukelman and Mirenda, 2013).

**Fixed display** In fixed, or static, displays, graphic symbols are displayed in fixed locations, typically in a grid layout with symbols shown in cells that have fixed locations (Drager et al., 2003). The number of symbols or messages that a fixed display can present to the individual is limited (fewer than 150 in the largest displays) because each available item is visible at all times; as a result, some AAC systems utilize multiple, often hierarchical displays to accommodate various communication needs, environments, and listeners (Bruno and Trembath, 2006; Hochstein et al., 2003). Nonelectronic-aided AAC systems and most digitized AAC technologies employ fixed displays.

**Dynamic display** AAC technologies typically employ computer-based dynamic displays that change to a new set of symbols (pages) automatically when activated. Multiple levels of displays accommodate myriad individual vocabulary and linguistic needs (Drager et al., 2003). As with fixed displays, the majority of dynamic displays are presented in a grid or matrix, with items arranged in rows and columns. In contrast with fixed displays, however, the number of symbols or messages that a dynamic display can present to the individual is not limited by what is visible; such displays offer symbols that are not visible but can be accessed through page linking (Drager et al., 2003). Dynamic displays provide a range of organizational strategies that make complex language constructions possible (Bruno and Trembath, 2006; Drager et al., 2003). Some digitized AAC technologies and most synthesized devices employ dynamic displays (Beukelman and Mirenda, 2013).

**Visual scene display** In contrast with the grid format of many dynamic displays, visual scene displays provide context for the user by integrating a picture, photograph, or virtual environment within a visual image (e.g., showing people, objects, and events against the background in which they occur) (Beukelman et al., 2015; Dietz et al., 2006; Thistle and Wilkinson, 2015). Visual scene displays may be used across a wide range of AAC technologies (e.g., photographic images placed on a digitized device, digital images placed on devices that support programming "hot spots"). Visual scene displays support interactive communication across a variety of ages and disability groups (Beukelman et al., 2015; Brock et al., 2017; Ganz et al., 2015; Gevarter et al., 2014; Therrien and Light, 2016; Ulmer et al., 2016).

**Hybrid display** Hybrid displays typically consist of a fixed display with a dynamic component (e.g., indicator lights that highlight items, word prediction on alphabetic displays) (Beukelman and Mirenda, 2013). In other

cases, a visual scene display may be embedded with dynamic hotspots that move the display away from the visual scene to a text or grid display (Gevarter et al., 2016). Hybrid displays may be used across the full range of AAC technology types.

### Selection Method

AAC systems typically provide two methods for selecting elements on the display and producing messages: direct selection and scanning.

**Direct selection** Direct selection, available as an option on most AAC systems, allows the user to select a desired item without intervening supports. The most common form of direct selection involves a finger point or pressure (i.e., physical contact); however, direct selection may also involve pointing with another body part or activating an item without physical contact (e.g., head/mouth stick, eye gaze, head mouse, eye-safe laser) (Ball et al., 2010b; Fager et al., 2012; Hanson et al., 2016). Brain–computer interfaces show promise but are still under study; they are currently available only in selected clinics primarily as components of research programs (Akcakaya et al., 2014; Barreto et al., 2000; Fried-Oken et al., 2015; Hill et al., 2014; Wolpaw et al., 2000).

**Scanning** Scanning is an alternative selection method commonly used by individuals who are unable to choose items directly, most commonly because of impaired motor control (Beukelman and Mirenda, 2013). Scanning involves presenting items on the display by moving progressively through a predetermined pattern (e.g., row-column, circular, linear, group-item). Scanning requires that the user wait while the system sequentially presents undesired items before reaching the item of choice; a switch is used to activate the scanning movement and select the item/message (Beukelman and Mirenda, 2013).

### Output Capabilities

Aided AAC systems provide a variety of message output modes, including digitized and synthetized speech, nonelectronic-aided symbols, and print (Beukelman and Mirenda, 2013). Visual output (e.g., aided symbols or text viewed on a display) is used primarily to support messages when natural, digitized, or synthesized speech is not understood or available. Individuals with impaired natural speech may use synthesized or digitized speech to gain listeners' attention, produce utterances at a distance, communicate in group conversations, and talk on the telephone, among many other activities (Alamsaputra et al., 2006; Hanson et al., 2016; Hill, 2010).

AAC technologies provide speech output using digitized, synthesized, or combined digitized and synthesized speech (Drager et al., 2010). Digitized and synthesized speech incorporated into electronic communication devices has resulted in significant advances in AAC (Alamsaputra et al., 2006).

**Digitized speech**  Digitized speech refers to human voice stored as segments of sound waves (Schlosser, 2003). It consists of natural speech that has been recorded with a microphone, converted to a digital signal, and stored and retrieved in word or message form (Beukelman and Mirenda, 2013). Message banking, a strategy that involves storing digitized speech, is used primarily by individuals who, retaining intelligible speech but anticipating its loss (e.g., because of degenerative disease or head/neck cancer), want to record their own voice for use in future communication systems (Costello, 2011, 2014). Message banking strategies are not effective for individuals who are referred late for AAC evaluation, already presenting with moderate to severe speech impairment (Nordness et al., 2010). Although most technology-based AAC systems provide a feature for digitally recording a message, many provide a limited amount of storage space for such recordings (see Table 6-1). Prerecorded stored messages cannot be modified for spontaneous or real-time communication.

**Synthesized speech**  Synthesized speech is computer-generated according to a set of rules in a mathematical algorithm (Drager et al., 2010). Text-to-speech synthesis, a common method for generating synthetic speech for AAC technologies, involves extracting speech sound components from words and then combining them to form natural-sounding synthetic voices (Beukelman and Mirenda, 2013; Drager et al., 2010). In contrast with the stored messages from digitized speech, synthesized speech systems allow the user to generate speech for each utterance and therefore provide greater novel message flexibility.

New options for creating a personalized synthetic voice that combine components of digitized and synthesized output have emerged and appear promising. However, the intelligibility and effectiveness of these options currently remain under study (Bunnell et al., 2015; Jreige et al., 2009; Patel et al., 2015; Yamagishi et al., 2012).

## CLINICAL CONSIDERATIONS

Overall, people who rely on AAC for daily interactions value situational flexibility, reliability, learning ease, and intelligibility of output in their communication devices, as reflected in characteristics described by individuals who use AAC and their facilitators as research priorities (O'Keefe et al., 2007). In the study by O'Keefe and colleagues (2007),

*THE PROMISE OF ASSISTIVE TECHNOLOGY*

AAC consumers with cerebral palsy and spinal cord injury indicated as priority needs (1) preparing people who use AAC to participate and have success in social relationships (e.g., friendships, dating) and employment; (2) improving AAC technologies and optimal, rapid service delivery; and (3) improving literacy among people who use AAC (O'Keefe et al., 2007). SLPs typically measure the function of speech subsystems, including intelligibility, comprehensibility, and efficiency, in conducting evaluations (ASHA, 2004c). One method for evaluating AAC systems and factors impacting their use involves comparing the effectiveness of natural speech with AAC options. Evidence from pediatric populations suggests that the extent of AAC use is directly related to the extent of communication need that is managed effectively with natural speech (Oommen and McCarthy, 2014). Although research is lacking for the full range of populations that may benefit from AAC (Light and Drager, 2007), considerations for comparing natural speech and technology-based voice output are summarized below for message and overall communication intelligibility, comprehensibility and listener comprehension, efficiency, and effectiveness.

### Intelligibility

Broadly considered the measured understandability of speech, intelligibility is defined as the degree to which a person's natural speech is understood by a communication partner (Yorkston et al., 1992). Intelligibility is a key criterion for determining the severity of speech-production disorders (Yorkston et al., 2010b), as reduced intelligibility may critically limit vocational, educational, and social participation (Hustad, 2008). It follows that intelligibility is a key criterion for AAC output, as reductions result in increases in communication breakdowns (Ball et al., 2001, 2002). Many AAC speakers retain some functional natural speech with limited degrees of intelligibility; as a result, they may use AAC technology in some speaking situations and natural speech in others.

Standard procedures for intelligibility assessment commonly involve transcription (identification) of individual sounds, words, or sentences from decontextualized utterances (Yorkston et al., 1992). Each intelligibility assessment type yields task-specific information: phoneme intelligibility measures the understandability of discrete sound productions; word intelligibility measures the understandability of single-word utterances; and sentence intelligibility measures speech production in longer utterances characteristic of typical occupational interactions (Kent et al., 1989; Yorkston and Beukelman, 1981; Yorkston et al., 1992). Research has identified factors contributing to the intelligibility of synthesized speech, including quality of synthesis (Greene et al., 1986; McNaughton et al., 1994), message length (Mirenda and Beukelman, 1987, 1997), and rate

(Higginbotham et al., 1994). Continued advances in the quality of synthesized speech are expected to result in output that is increasingly comparable to natural speech.

## Comprehensibility and Listener Comprehension

In contrast with intelligibility, in which the speech signal is extracted from context, comprehensibility is the degree to which speech is understood when combined with available relevant information (e.g., linguistic context, physical environment, gestures, and conversational topic) (Duffy, 2013; Yorkston et al., 1996). Assessment of comprehensibility, like that of intelligibility, involves transcribing verbal productions, except for the supplementation of verbal productions with contextual information (Hustad, 2008). When speech impairment is present, the addition of this contextual information usually results in comprehensibility scores superior to those for intelligibility (Hustad, 2008). Research has identified factors contributing to the comprehensibility of synthesized speech, including environment (noise, quiet) (Nelson et al., 2005), native language (Alamsaputra et al., 2006; Reynolds et al., 1996), message predictability and meaningfulness (Hoover et al., 1987; Oshrin and Siders, 1987; Slowiaczek and Nusbaum, 1985), and linguistic context (Beukelman and Mirenda, 2013; Drager and Reichle, 2001; Marics and Williges, 1988). Quantifying the comprehensibility of AAC output involves providing structured opportunities for transcription of messages in specific, functional contexts that are relevant to the individual (e.g., employment environments, topics, messages).

Separately, comprehension measures the ability of listeners to interpret the meaning of messages produced, which is evaluated by examining a listener's ability to answer questions about the message or utterance content (Hustad, 2008). Unlike scores on intelligibility and comprehensibility, comprehension scores do not reflect the severity of speech impairment; indeed, these scores tend to be higher than intelligibility scores, particularly for individuals with moderate to severe speech disability (Hustad, 2008).

## Efficiency

Communication efficiency, often quantified by measures of speaking rate (i.e., intelligible words per minute [wpm], comprehensible wpm), refers to the rate at which understandable information is conveyed (Duffy, 2013). Measures of communication efficiency are key indicators of perceived normalcy of communication in social contexts because intelligibility efficiency reflects functional limitations, while comprehensibility efficiency reflects the ability to participate effectively in daily interactions (Duffy, 2013). Little

research has addressed efficiency of comprehension for natural, digitized, or synthesized speech, although it likely influences such participation.

Typical speaking rates for people unaffected by speech-language disability (i.e., unimpaired intelligibility and comprehensibility) vary by task: paragraph reading rates range from 160 to 170 wpm (Fairbanks, 1960); sentence reading rates are approximately 190 wpm (Yorkston and Beukelman, 1981); and a much wider range of 150 to 250 wpm is noted for conversational utterances (Goldman-Eisler, 1986) because these utterances are influenced by the cognitive load of the task at hand (Yorkston et al., 2010b). Speakers with dysarthria tend to speak at slower rates, reflected in mean syllable durations of 246-249 milliseconds, relative to unimpaired speakers, with a typical rate of 198 milliseconds (Darley et al., 1975; Yorkston et al., 2010b).

Efficiency of AAC output also is impacted by measures of rate, which are influenced by the same factors associated with spoken messages but also by the interaction with AAC technology and by physical (e.g., motor, sensory, perceptual) ability and access methods (Higginbotham et al., 2007). AAC communication rates reflect such factors as message formulation and message delivery time. Communication rates 15-25 times slower than those of spoken speech are common for AAC (Beukelman and Mirenda, 2013), with a speaking rate of 10 wpm having been reported when alphabet-based rate acceleration strategies are combined (Newell et al., 1998). A significant objective in selecting an individual's optimal AAC system is to heighten message communication rates to those typical of natural speech and permit more efficient communication (Wisenburn and Higginbotham, 2009). The ideal balance of rate and content for AAC selection remains under study (Haidet et al., 2012; Lesher et al., 1998; Trnka et al., 2008; Wisenburn and Higginbotham, 2009).

### Effectiveness

Considered a component of participation in daily interactions, self-perceived communication effectiveness also may reflect efficiency (McAuliffe et al., 2010). Ratings of communication effectiveness have demonstrated a positive correlation with intelligibility (Ball et al., 2004). However, efficiency and intelligibility factors are not the sole contributors to effectiveness (Donovan et al., 2008; Dykstra et al., 2015; McAuliffe et al., 2010). In some research, speakers with ALS and their listeners have expressed similar perceptions of communication effectiveness (Ball et al., 2004), whereas speakers with Parkinson's disease and traumatic brain injury have perceived their communication effectiveness as higher relative to listeners and expressed the view that intelligibility is not significantly related to effectiveness (Donovan et al., 2008; McAuliffe et al., 2010). Additionally, speakers with ALS have

rated their communication effectiveness as poor even though the intelligibility of their utterances remained above 90 percent, potentially a reflection of the influence of effort and fatigue on perceptions of communication effectiveness (Ball et al., 2004). A research focus on the effectiveness of AAC communication is emerging (Beukelman et al., 2015; Fried-Oken et al., 2012; Higginbotham et al., 2007). Focus group participants in a study by O'Keefe and colleagues (2007, p. 95) highlighted the need for emphasis on aspects of participation, stating, "Don't make the use of technology an end goal; instead show me how to communicate satisfactorily to get and keep a job." and "Don't make the design and use of [AAC] our center of attention; concentrate on how I use communication to find a wife."

## EVALUATION AND MONITORING

The ultimate goal of an AAC assessment is to recommend an AAC system and design treatment that will assist the individual in achieving "the most effective interactive communication possible" (ASHA, 2016b). Successfully matching an individual to the appropriate communication technology is a complex process. The following subsections describe required elements of comprehensive evaluation and monitoring of the achievement of functional communication goals.

### Team Approach

The dynamic and multidimensional nature of disability results in complexities that are best addressed by interdisciplinary assessment teams (Fried-Oken and Granlund, 2012; Raghavendra et al., 2007; WHO, 2002). The members of the AAC team vary depending on individual user abilities, expectations, and communication needs and the availability of services. At a minimum, AAC team members include the individual with a communication disability; key communication partners (e.g., caregivers, partner, adult children); an SLP; and the individual's physician (Beukelman et al., 2008; Binger et al., 2012; Dietz et al., 2012). The SLP typically is the lead professional in the AAC team evaluation process and is likely to provide the intervention with AAC technology. The roles of the team members in AAC may be filled by many different people and may overlap. Importantly, the team approach makes the individual and family central contributors, interacting with the rest of the team to ensure their full participation and information sharing (Binger et al., 2012; Hill et al., 1998). Table 6-3 illustrates the roles of personnel involved in AAC assessment and treatment beyond the individual with communication needs, who is involved in every aspect listed in the table (Beukelman et al., 2008; Binger et al., 2012).

*THE PROMISE OF ASSISTIVE TECHNOLOGY*

**TABLE 6-3**
Personnel Involved in AAC Assessment and Treatment

| Personnel | Assessment and Treatment Involvement |
|---|---|
| AAC Finder | Identify and refer<br>Report case history |
| General-practice speech-language pathologist | Identify and refer<br>Acquire and evaluate case history<br>Evaluate speech-language capacity and related domains<br>Identify and recommend AAC options<br>Acquire funding<br>Establish and provide treatment |
| AAC clinical specialist | Evaluate case history<br>Determine diagnostic questions[a]<br>Identify and recommend AAC options<br>Acquire funding<br>Establish and provide treatment<br>Provide AAC technical support |
| AAC facilitator (communication partner) | Identify and refer<br>Report case history<br>Contribute to diagnostic questions<br>Participate in evaluation and treatment<br>Advocate for individual<br>Provide support across transitions<br>Provide AAC technical support |
| Collaborating professional (e.g., occupational therapist; physical therapist; vision, hearing, rehabilitation medicine specialists) | Identify and refer<br>Report/evaluate case history<br>Contribute to diagnostic questions<br>Participate in evaluation and treatment<br>Access troubleshooting |
| AAC manufacturer/vendor | Identify AAC options<br>Assist in evaluation process<br>Provide equipment loans/trials<br>Facilitate funding of selected AAC<br>Provide AAC devices and accessories<br>Provide AAC technical support |
| AAC technology training agency | Facilitate AAC evaluation and intervention<br>Identify and recommend AAC options<br>Establish and provide treatment<br>Provide equipment loans/trials<br>Provide AAC training<br>Provide AAC technical support |

[a]AAC clinical specialists may perform testing associated with a collaborating professional (e.g., vision, hearing, physical skills, cognition) as related specifically to communication and access.

### Assessment

An AAC assessment requires integration of a broad scope of information to determine an appropriate recommendation and its implementation (Beukelman and Mirenda, 2005). The complexity of the assessment is influenced by such factors as the user's characteristics (e.g., skills, communication needs, environments), AAC team dynamics, rapidly occurring changes in technology, limited preprofessional training, and limited research on AAC clinical decision making (Dietz et al., 2012).

AAC assessment identifies daily communication needs, details functional communication goals, outlines individual/family supports, and generates treatment recommendations (Beukelman and Mirenda, 2013; Light and McNaughton, 2013; Williams et al., 2008). To enable comprehensive participation, evidence supporting communication needs for educational endeavors, vocational training, transition activities, and employment is integrated into the assessment. In addition, many funding sources require a medical necessity for communication; therefore, interactions needed for medical/health interactions are often identified. A sequential process of AAC assessment includes: (1) identifying communication needs and completing subsequent referral, (2) collecting information relevant to communication status and needs, (3) determining diagnostic questions and communication goals, (4) developing and completing evaluation procedures, (5) ascertaining and recommending AAC interventions, (6) securing funding, and (7) repeating steps 2-6 as additional needs arise (Binger et al., 2012). Assessments typically involve dynamic procedures designed to identify individual skills and strengths that can be used to support functional communication, gauge the impact of modifications on performance, and determine effort required for successful interactions (King et al., 2015). Although various models, frameworks, and guidelines are used in AAC assessments, feature matching (i.e., matching the user to AAC technology) and system trials are standard components (Beukelman and Mirenda, 2013; Cook and Polgar, 2008; Hill, 2004; Scherer and Craddock, 2002; Zabala et al., 2005). A brief description of typical assessment processes used to determine communication abilities, needs, and AAC options follows. Medical and communication diagnosis, prognosis, communicative needs, and functional abilities provide the basis for matching individuals with appropriate AAC systems by creating a customized system that supports communication based on the individual's skills. There are no prerequisite skills (e.g., cognitive, motor, language/literacy) for using AAC technologies (Light and McNaughton, 2012; Snell et al., 2010).

*Demographics, Background, and Communication Needs*

In addition to demographic and diagnostic information, the individual's educational, vocational, and previous clinical experiences are noted; this history informs assessment procedures and the AAC options presented. For example, an individual with long-standing developmental disabilities (e.g., cerebral palsy, cognitive impairment) may have previous experience with AAC systems that will reveal prior successes/failures with specific devices, while other individuals may have no prior AAC experience. For some individuals (e.g., those with ALS), a delay in referral for an AAC assessment creates an urgency to identify an immediate means for communicating (Nordness et al., 2010). Interviews and questionnaires provide information about the individual's (and his or her primary communication partners') values, beliefs, motivations, and expectations regarding AAC; current communication status and communication necessary to support daily communication activities; and environmental factors that may influence successful AAC implementation (Binger et al., 2012; Romski and Sevcik, 2005).

*Speech/Oral Motor Skills*

Individuals are candidates for AAC intervention if their natural speech is not sufficiently functional to meet all of their daily communication needs (Beukelman and Mirenda, 2013). A person may find that his or her dysarthric natural speech is functional for interactions with a spouse at home in a quiet or context-rich environment, but that this same speech will not support vocational interactions; therefore, natural speech fails to meet all of the person's communication needs. Unintelligible speech or significantly reduced rate of speech influences functionality, thus supporting a person's need for AAC technology.

*Cognitive–Linguistic Considerations*

Beyond current language ability, conversational needs, and communication contexts, AAC techniques and symbols and/or strategies are evaluated to identify optimal communication performance (Hill and Corsi, 2012; Hill et al., 2010; Romich et al., 2005). Frequently, linguistic evaluations are conducted prior to the AAC assessment as part of a standard speech-language evaluation. Important considerations include the individual's

- receptive (comprehension), expressive (speaking and writing), and pragmatic (social) language skills, which influence the selection of an optimal language representation and messaging system; and

- cognitive and executive functioning skills (e.g., attention, focus, orientation, organization, and sequencing), which influence the selection of an optimal AAC system and the individual's functional and strategic implementation of that system.

### Fine/Gross Motor Skills and Mobility

Assessment of physical skills in the context of an AAC system includes identifying input selection techniques, transporting the device, and ensuring proper seating and positioning (Cooper et al., 2009; Costigan and Light, 2010). The identification of appropriate input selection techniques is influenced by body or extremity (e.g., finger, hand, knee, toe, head) range of motion, accuracy and consistency of movement, degree of force required to activate the device or a switch, the speed at which the individual can activate and release the device or switch, and the length of time and frequency with which the individual can repeat the movement before becoming fatigued. Assessment of input selection may entail evaluating the person's access to the device using available movements (e.g., digit of the hand, foot, eye gaze, stylus, mouse or head mouse, joystick, head stick or mouth stick). Many device features may be modified to improve selection accuracy and efficiency (e.g., accept or release time, display size or orientation, touch guides, key guards). Likewise, assessment includes identifying impacts of such modifications on communication performance, device transport (e.g., weight, size), and effective interactions. When direct selection is ineffective as an access technique, the individual's ability to scan using one or multiple switches is assessed, which entails evaluating access to AAC technologies indirectly by means of switch activation. Options include activation using body part movement or function (e.g., hand or arm, foot or leg, head, blink, motion, voice). Device features may be modified to improve selection accuracy and efficiency (e.g., scan method, scan rate, highlighting, repeat scans), and the assessment includes comparing positive and negative impacts of the various options.

Although many individuals who communicate with AAC ambulate independently, many have complex disability that requires the use of rollators, wheelchairs, or alternative seating and positioning. Many changes in AAC technologies that have occurred in recent years influence how they are both used and transported (McNaughton and Light, 2013). Alternative seating may require a means of mounting the AAC system to enable access as the person is positioned throughout the day and during transport; the AAC team makes such decisions about enhanced access as part of the assessment process (Beukelman et al., 2008; Binger et al., 2012). Mounting systems can be fitted to a wheelchair, and commercial mounting products offer a variety of features (e.g., swing-away, folding, rolling). The assessment includes

making comparisons to identify features that will benefit an individual or are needed to maximize use of the AAC.

### Vision and Hearing

Assessment of functional vision and hearing influences the selection and use of an AAC system: visual skills inform decisions regarding the size, type, and placement of symbols, while hearing informs decisions regarding voice output system needs (Beukelman and Mirenda, 2013; Hill, 2010; Hill and Corsi, 2012). Assessment includes identifying the appropriate number of locations on a display to accommodate vision abilities and needs and controls for auditory output (e.g., volume, voice output, speech rate, or pitch).

### Choice of an Appropriate AAC Technology for the Individual

AAC assessment and prescription entails a systematic approach to matching an individual's abilities, communication needs, and expectations to specific AAC features. The assessment team identifies the user's current communication needs and then attempts to anticipate the future by considering potential changing needs and skills (e.g., transitions, skill development, degeneration). The intent is to optimize functional interactions in all communication situations (ASHA, 2004b; Glennen and DeCoste, 1997; Scherer, 2002, 2005; Scherer and Craddock, 2002).

### Previous AAC Experience

Identification of previous AAC interventions is helpful in determining categories and features of AAC devices that may meet the individual's abilities, needs, and expectations. The effectiveness of previously implemented features also can be evaluated. In some cases, updates to AAC technologies may impact performance.

### Selection of AAC Device Features

Informing the individual and family of various AAC technology options is a critical step in feature matching, helping to remove bias from the selection process. The taxonomy of AAC devices presented earlier and in Annex Tables 6-1, 6-2, and 6-3 at the end of this chapter reveals the complexity of AAC features and their combinations. The AAC team seeks to identify AAC device features that support identified communication goals, which may involve medical, social, educational, and/or vocational interactions. Device features identified as important to effective AAC implementation by SLPs and individuals who use AAC include ease of use (e.g., efficiency,

reliability, suitability, adjustability), design (e.g., comfort, size, portability, durability), performance (e.g., battery life, rapid use, simple maintenance, rechargeable during use), integrated software and layout (e.g., ability to find words and messages easily and produce spontaneous messages), and voice output (e.g., rapid speech production, having an alternative output method) (Judge and Townend, 2013; O'Keefe et al., 2007).

The rise in the use of mobile technologies (e.g., smartphones, tablets) in the United States and the vast array of applications available for download have opened the door to the use of such technologies by individuals with complex communication needs (McNaughton and Light, 2013). Mobile AAC technologies may be a good match for some individuals and can offer certain benefits over traditional AAC systems such as SGDs. Often the mobile technologies are smaller and less expensive than traditional AAC systems, and they offer the myriad features typical of such devices that go well beyond the AAC function (McNaughton and Light, 2013). In addition, because they are mainstream technologies, their use as AAC devices promotes social acceptance. As one AAC user noted, "Using an iPad, Blackberry, or iPhone . . . is not another thing that makes me different. It wasn't using a strange, unfamiliar device to communicate with this group" (Hyatt, 2001, p. 25; McNaughton and Light, 2013). Yet, while ease of access to and social acceptance of AAC mobile technologies are benefits attending such devices, they come with a downside. Focusing on the technologies themselves ignores the most important element of any communication device for someone with complex communication needs—its ability "to facilitate effective communication and fuller participation in society" for that individual (McNaughton and Light, 2013, p. 110). Regardless of the category of devices being considered, whether a variety of SGDs or different mobile AAC technologies, it is important that consumers and providers be aware of all of the available options and engage in a process of evaluation and decision making that will result in matching the individual with the most appropriate device to meet his or her communication needs (McNaughton and Light, 2013).

### AAC Technology Trials

Practice with an assortment of AAC technologies that have been matched to the user's needs optimizes assessment outcomes for both the individual and the AAC team and illustrates the strengths and weaknesses of various options or combinations thereof. The format and methods used for practice, known as trials, are at the discretion of the SLP, the individual and family, and the other AAC team members. Upon completion of system trials, team members reach informed consensus on the optimal system.

*Trial Decisions*

As the lead professional on the AAC team, the SLP typically selects an array of AAC technologies to be used during trials. Individuals may have suggestions about products they have heard about, seen, and hope to try, which are integrated into the evaluation process to the extent possible (e.g., based on availability, individual access options, and/or appropriate representation). Trials may reflect professional experience and preferences with respect to AAC technology; therefore they tend to be idiosyncratic across SLPs (Glennen, 2000). Selecting AAC technologies for trial includes ensuring that the individual is aware of various options and the personal abilities and communication needs they address. Summarizing trial results may serve to highlight evidence of individual communication performance with the different technologies and features, thus adding support for device selection by providing a personalized performance profile.

*Rationale for AAC Technology Selection*

Integrating information on clinical implementation, personal performance, and external participation (e.g., in the community, home, and workplace) gleaned from AAC technology trials guides decision making and optimizes the selection of an AAC system. Clinical and personal evidence are based on comprehensive assessment of communication ability and the domains influencing communication, daily communication needs, functional communication goals, and personal preferences. The trial process allows the AAC team to identify specific components, features, and tools necessary to meet the individual's communication needs.

## Monitoring

AAC clinical services are intended to support the myriad communication needs of the augmented communicator (Higginbotham and Engelke, 2013). To enable the user to accomplish the most effective communication, quantitative and qualitative performance measures are gathered intermittently. Performance measurement typically includes examining clinical evidence and communication performance in a clinical setting. Participation and outcome measures also are used to monitor progress toward achieving optimal use of the recommended AAC system (ASHA, 2004b).

AAC outcome measurement involves evaluating AAC technology-based interactions during specific communication activities, then comparing achieved outcomes with the intended results or desired goals. Measuring the effectiveness of AAC communication requires having appropriate measurement instruments and methodologies available (Anderson et al., 2016;

Smith, 1996). Measures of real-time communication functioning and research investigating the impact of AAC technologies on communicative participation are sparse. Various instruments collect measures of satisfaction and self-reported outcomes for various assistive products and technologies; some include AAC, while others can be modified for evaluating AAC results (Anderson et al., 2016; Demers et al., 2002; Jutai et al., 1996; Scherer and Craddock, 2002). Similarly, some AAC devices have a data logging feature that automatically records the communicator's utterances (Higginbotham et al., 2002; Hill, 2004) and provides a file for analysis and tracking of communication trends (Hill, 2010).

Monitoring also includes tracking acceptance and abandonment of AAC devices. High levels of acceptance of AAC technologies have been documented for a variety of individuals across disability groups. Among individuals with communication impairment resulting from traumatic brain injury using devices based on assessment recommendations, acceptance of synthesized high-tech devices was more than 94 percent, and acceptance of digitized low-tech devices was 100 percent (Fager et al., 2006). Likewise, individuals with ALS have been found to have an acceptance rate of synthesized high-tech devices of approximately 96 percent (Ball et al., 2004, 2007). Other individuals with progressive disease also have demonstrated acceptance of AAC technologies (Beukelman et al., 2007a), including those with primary progressive aphasia (Fried-Oken et al., 2015), spinal muscular atrophy (Ball et al., 2012), and dementia (Bourgeois, 1991; Fried-Oken et al., 2015). Among individuals with aphasia, communication partner strategies have been shown to improve acceptance of AAC technologies (Ball and Lasker, 2013).

Prominent factors in acceptance of AAC include intervention timing (e.g., early referral, regular reevaluations, and continual treatment); involvement of communication partners from the onset (e.g., to establish AAC acceptance and use); and ongoing monitoring and adjustment over time (e.g., integration of new strategies, accommodation of changes in technology or personal ability, integration of multiple modalities to capitalize on strengths) (Fried-Oken et al., 2015). Factors potentially influencing acceptance of AAC mobile technologies include functionality and interconnectivity, consumer empowerment in accessing AAC options, social acceptance of AAC in the mainstream, ease of acquisition, and affordability (McNaughton and Light, 2013).

Data are lacking on abandonment, or the inappropriate discontinuation of AAC technology determined appropriate by the AAC team. Factors influencing abandonment have been reported to include communication partners' belief that they can understand natural speech; insufficient opportunities to engage in conversation; lack of communication partners' motivation; individual preference for other communication methods; and

insufficient or inadequate education/preparation for use or maintenance of the device (e.g., programming, generation of timely and appropriate messages, system upkeep) (Johnson et al., 2006). Lack of support from a communication facilitator or partner has been cited as influential in the abandonment of AAC interventions for people with traumatic brain injury (Fager et al., 2006). Factors influencing potential abandonment of AAC mobile technologies include a possible shift in the essential focus on communication to a focus on the technology; the lack of a structured assessment process to identify optimal features for communication and support for a wide variety of communication functions and contexts; and access restricted to mainstream options (Kagohara, et al., 2013; McNaughton and Light, 2013).

## TRAINING AND ADAPTATION

Based on the complexity of the AAC system, a wide range of training and adaptation requirements exist, from those in which the individual "turns on and uses" to those requiring multiple learning sessions and ongoing system programming to support interactions with new communicative partners, topics, and/or situations. Little information is available regarding specific training needs and adaptation times across AAC systems.

The need to rely on AAC may result from a wide range of developmental, physical, cognitive, and/or social impairments (Ball et al., 2010a). For many individuals, these impairments are chronic, requiring AAC across the life span and through numerous life transitions (Lilienfeld and Alant, 2009; Mirenda, 2003). During transitions, AAC strategies and system features that have been effective in one communication environment may become less effective in new ones (Hamm and Mirenda, 2006; Lund and Light, 2006). Likewise, depending on the type of disability, individuals who rely on AAC to communicate may find that existing AAC strategies become less effective, generally as a result of the natural course of the medical condition that has resulted in limited spoken communication (either degenerative or gradually improving and eventually stabilizing) (Beukelman et al., 2007b). Degenerative conditions include ALS, primary progressive aphasia, and dementia, among others. For individuals with degenerative conditions, AAC systems are managed so as to maintain effective communication through speech, language, cognitive, or motor control decline. Improving and stabilizing conditions include stroke/aphasia, traumatic brain injury, cerebral palsy, cognitive impairment, and locked-in syndrome, among others. As with degenerative conditions, AAC supports interactions across multiple settings in the context of improving speech, language, cognitive, or motor control (Beukelman et al., 2007b).

AAC system adaptations occur after the original evaluation for four

primary reasons: (1) physical changes that result in a need for a new access method, (2) cognitive changes that result in a need for new/updated message representations, (3) changes to other equipment that result in a need for new/updated mounting of the AAC system, and (4) living or vocational setting changes that result in the need to interact in new communication contexts with different partners. Individuals with degenerative, improving, and relapsing-remitting conditions require frequent adjustments to AAC access, commonly to accommodate physical changes. Some adjustments to the AAC software presentation may be necessary based on increasing/decreasing vocabulary and linguistic complexity (e.g., someone with Alzheimer's disease wants to maintain a key skill at work, or someone with cognitive impairment is promoted and wishes to train for new interactions).

## AAC Use and Prognosis for Occupational Success

Speech and language disorders encompass a wide range of impairments (e.g., congenital, acquired, degenerative) that affect an individual's ability to communicate functionally using natural speech (ASHA, 2016a; Perry et al., 2004; Wodka et al., 2013). Communication competence with AAC is complicated not simply by the need to have knowledge of and skills in a native language but also by the need to learn the language software of the AAC system (Drager et al., 2003).

Although data on the subject are sparse, successful employment among individuals who require AAC tends to be dependent on the discrete job requirements and flexibility of employers; successful employment outcomes have been reported for professional jobs with text-centered interactions (i.e., written or text-generated speech) (Fried-Oken, 1993; McNaughton et al., 2001). Individuals have reported as benefits of employment personal expectations (e.g., desire for success, serving as a model for others with disability), finances (e.g., gaining independence), and positive workplace experiences (e.g., enjoying work activities and workplace interactions) (McNaughton and Richardson, 2013; McNaughton et al., 2002). Telework has been shown to have benefits for some individuals who communicate with AAC (e.g., work efficiency, flexible schedule, coworker interactions), although some problems exist (e.g., slow home Internet speeds, need to purchase one's own office equipment, easy access to distractions) (McNaughton et al., 2014). A growing number of individuals who communicate with AAC (e.g., those with autism spectrum disorder or complex communication needs) expect to participate fully in community and workplace activities but require supports (e.g., training and experience valued by employers, academic and vocational training, identification of jobs that are a good match) (Bryen et al., 2007; Howlin et al., 2005; Light and McNaughton, 2012; McNaughton and Arnold, 2013; Wehman et al.,

2012). AAC technologies have been shown to increase employability ratings compared with natural dysarthric speech based on perceived credibility, strength and knowledgeability involving highly skilled positions, verbal ability, and interactivity (Stern et al., 2017).

Individuals who communicate with AAC can obtain and maintain employment (Hourcade et al., 2004; Light et al., 1996; McNaughton and Bryen, 2007), but this is the case for only a small percentage of these individuals because of a number of barriers to their employment (Feinstein et al., 2013; Light et al., 1996). Successful employment has been documented primarily with government agencies and advocacy organizations (McNaughton et al., 2002). Because AAC technologies are subject to breakdown, they require technical support and repair that results in loss of access to communication, and a loss of effective communication, however temporary, will impact an individual's ability to fulfill work responsibilities.

Language, literacy, and education are critical factors for the employment of individuals with physical disabilities, and communication competence for basic workplace interactions is essential for employment of individuals with developmental disabilities (Collier et al., 2012; McNaughton et al., 2002). Development of these skills must begin at an early age if academic, social, and communication skills are to be integrated successfully into the workplace (McNaughton et al., 2002).

Interpersonal communication (e.g., responding to others, participating in conversations, putting others at ease) is an important work-related social-relational skill (Light and McNaughton, 2014). One model of communication competence cites linguistic, operational, social, and strategic abilities, as well as motivation, attitude, confidence, and resilience, as influencing success with AAC technology (Light, 2003; Light and McNaughton, 2014; Thistle and Wilkinson, 2013). Training in social-relational interactions can have a positive impact on communication competence (Kent-Walsh and McNaughton, 2009; Light et al., 1999). Skill in such interactions is important for the communication partners of AAC speakers as well, yet most individuals in a community are unlikely to have had a conversation with such an individual. The lack of partner skill may limit communication effectiveness as much as, if not more than, the AAC technology. Indeed, as noted above, issues related to partner training and AAC technology supports are associated with abandonment of the technology (Johnson et al., 2006).

Integration of AAC software into mainstream technologies can enable easy and rapid interactions that are required for employment, particularly telework (AAC-RERC, 2011), while also providing access to a wide variety of other information (e.g., online services, entertainment, education, health care, public services, employment, health and safety, tools) (Shane et al., 2012). Barriers to control of mainstream technologies may be encountered by individuals with physical limitations who are unable to perform certain

movements (e.g., swipe, pinch, use a keyboard or touch screen) without integration of the alternative access available through the AAC technology or implementation of the adapted access options that are increasingly available (e.g., accelerometers, eye gaze, pattern recognition) (Shane et al., 2012).

Reduced communication rates associated with AAC likely interfere significantly with communication interactions, particularly in educational and employment contexts with speakers accustomed to exchanging information at a rapid pace (Higginbotham et al., 2007; McNaughton and Bryen, 2007). Even if an individual is matched with an appropriate device, receives extensive training, and becomes competent in using an AAC system, he or she may not engage adequately in a real-time discussion in a board room because of limitations imposed by the interrelationship among the method of communication; the AAC technology features; and the individual's physical disability, cognitive/linguistic skills, and skills in interacting with a communication partner (Higginbotham et al., 2007). Similarly, various service industry positions require certain (as yet unestablished) interaction pacing to sustain engagement. Communication inefficiencies (reduced comprehensibility) and message timing limitations (time required to formulate a message) interfere with effective communication on the part of many individuals who rely on AAC to communicate (Hanson et al., 2016; Rodriguez et al., 2016; Trnka et al., 2008). Communication applications with various features and strategies may not enhance the rate of communication sufficiently to support individual participation by generating rapid utterances (Newell et al., 1998), and little research published to date supports the notion that word prediction enhances rate (Yang et al., 2009). Other human factors, moreover, such as increased visual monitoring and motor control, influence communication rates when rate enhancement strategies are employed (Beukelman and Mirenda, 2013).

With few exceptions, digitized speech in AAC is associated with greater intelligibility relative to synthesized speech (Drager et al., 2006). Research has demonstrated that low-quality synthesized speech is sufficiently inferior to human speech to have significantly compromised value for functional AAC; however, the quality of synthesized speech has shown dramatic improvements in recent years (Drager and Reichle, 2001; Fucci et al., 1995; Venkatagiri, 2003). Still, multiple investigations have demonstrated that digitized and synthesized systems are not sufficiently intelligible for all listeners in all environments (Alamsaputra et al., 2006).

### Communication with Natural Speech: Effects on Prognosis

Effective speakers produce appropriate messages and are active and efficient in relaying them to control, influence, and direct the environment (Yorkston et al., 2010b). People use speech in their daily environments and

have individually unique speaking demands that vary based on such factors as employment, life situation, recreational and community involvement, and particular communication preferences (Anderson et al., 2016). And evidence suggests that communication impairments often result in loss of independence and reduced quality of life (Müller et al., 2001).

The impact of employment cannot be overstated. Employment plays a key role in socioeconomic status, personal self-image, and quality of life (Blackstone, 1993; McCarthy, 1986; McNaughton et al., 2001). Emerging evidence indicates that perceived hireability may be limited when individuals communicate with even mild dysarthric natural speech instead of using AAC technologies for communication (Stern et al., 2017). Evidence indicates further that individuals who work for pay tend to report higher speech usage than those who are nonworking; indeed, a large percentage (74 percent) of those working for pay rank speech usage as the most important activity for work and describe it as either "extremely" or "very" important to their work (Anderson et al., 2016). It is difficult, however, to identify the need for communication associated with various jobs. Positions labeled as requiring no verbal communication may nonetheless have a speaking requirement that was not identified by the employer (e.g., a surveillance system operator may watch monitors to prevent shoplifting in a business, but in some way he or she must report incidents when observed).

## Social Security Administration Disability Evaluation: Natural Speech and AAC

Based on regulations, the U.S. Social Security Administration (SSA) considers both natural speech and speech supported by AAC in disability determinations. SSA disability evaluation considers "the use of speech by any means and includes the use of mechanical or electronic devices" in determining whether an individual's speech disorder is "severe enough to prevent an individual from doing any gainful activity" (SSA, n.d., 2.00 Special Senses and Speech). The category of impairment defined as "loss of speech due to any cause, with inability to produce by any means speech that can be heard, understood, or sustained" relates to persistent ineffective speech or communication (e.g., SSA, n.d., 2.09 loss of speech, 11.04A aphasia), significant interference with communication (e.g., SSA, n.d., 11.07 cerebral palsy), or unintelligible speech (e.g., SSA, n.d., 11.11 post-polio syndrome).[1]

The Program Operations Manual System Policy for Evaluation of Speech Impairments (SSA, 2017) identifies three attributes pertinent to

---

[1]This sentence has been revised to reflect the updated Listing of Impairments for Neurological Disorders.

evaluation of speech proficiency: (1) audibility, (2) intelligibility, and (3) functional efficiency. Audibility encompasses loudness or intensity of speech in such contexts as quiet, noise, and riding in automobiles, as well as voice that becomes inaudible with use (as might be experienced with some conditions impacted by fatigue or respiratory insufficiency). Intelligibility, or the ability to articulate accurately, encompasses frequency of articulation errors, the extent to which the person is asked to repeat utterances, and how well the person is understood by strangers (the policy refers specifically to esophageal speech understood by people unfamiliar with this type of speech production). Finally, functional efficiency encompasses the ability to sustain consecutive speech, the number of words spoken without interruption/hesitancy, and the time lapse prior to speaking fatigue. Although specific measures are not indicated, the policy notes that if at least one of these attributes is missing, overall speech is not considered effective.

## ACCESS AND AVAILABILITY

### AAC Clinician Expertise

The *Scope of Practice in Speech-Language Pathology* of the American Speech-Language-Hearing Association (ASHA) (ASHA, 2016e) provides the conceptual framework within which SLPs provide clinical services. Although SLP graduate training programs meet multimodal communication standards, many universities do not offer a dedicated course in AAC, many AAC courses are not required components of the curriculum, few programs offer more than one such course, and students often graduate without having a supervised AAC clinical experience.

ASHA's *Knowledge and Skills* document outlines the responsibilities, knowledge, and general skills for SLPs in the area of AAC (ASHA, 2016c). Proficiencies required of an SLP for providing AAC services include the following:

- Knowledge of the broad array of . . . [current] devices that are designed specifically for AAC purposes and their respective features.
- Knowledge of the performance differences of the broad array of [AAC technologies] (e.g., different forms of computer hardware and software, as well as adaptations such as touch screens and expanded keyboards that are intended for purposes that include but are not limited to communication) and their respective features.
- Knowledge of how language is generated on AAC systems during communication.
- Matching features of AAC systems to capabilities of individuals being considered for those same systems.
- Customizing AAC systems to meet individuals' needs and skills.

- Modifying AAC systems as individuals' communication abilities and needs change and new technologies arise. (ASHA, 2016c)

Individuals who communicate with AAC experience significant barriers to obtaining and learning to use AAC technology. As discussed below, funding is a concern for these individuals, but the greater barrier at present appears to be the lack of trained SLPs to provide assessment and intervention services. Persons who provide daily support to these individuals often do not receive needed training (Beukelman et al., 2009; McNaughton et al., 2001; Ratcliff and Beukelman, 1995), and as noted above, many graduates of SLP programs fail to receive sufficient training in AAC (Collier and Blackstein-Adler, 1998; Costigan and Light, 2007; Crema and Moran, 2012; Koul and Lloyd, 1994; Matthews, 2001; Robinson and Sadao, 2005). ASHA's 2015 end-of-year membership report cites 156,254 certified SLP members (ASHA, 2015a), whereas the AAC Special Interest Group had 3,239 members, reflecting approximately 2 percent of the association's total membership.

Few, if any, structured programs offer AAC training to SLPs beyond entry-level (Certificate of Clinical Competence) education (Koul and Lloyd, 1994). As a result, SLPs must obtain such training by attending numerous AAC-specific conferences and workshops, completing training with a variety of AAC technologies, reading AAC journals and periodicals, and participating in professional organizations with a focus on AAC (e.g., the ASHA AAC Special Interest Group, the International Society for Augmentative and Alternative Communication) (Beukelman et al., 2009).

### AAC Funding Factors

Chapter 7 addresses major sources of coverage and funding for assistive products and technologies, including AAC. This section highlights a few funding considerations that are specific to AAC technology. Funding policies and practices can affect the adequacy of AAC evaluation, as well as funding approval for prescribed AAC technologies. Funding obstacles also may impact receipt of AAC training to maximize employment potential.

Current Procedural Terminology (CPT) codes for speech-language services are both time- and procedure-based (ASHA, 2016d). The time-based codes relevant to AAC include the first hour of an AAC evaluation, each additional 30 minutes of the evaluation, standardized cognitive performance testing per hour, and aphasia evaluation per hour. All other codes are procedure-based; the CPT code is reported once for the procedure and is based on a typical session regardless of the appointment length. Codes include evaluation of speech sound production; evaluation of language comprehension and expression; behavioral and qualitative analysis of voice and

resonance; therapeutic services for the use of non-speech-generating AAC; therapeutic services for the use of AAC technology, including programming and modification; and repair/modification of AAC devices. Although modification, repair, or replacement of unrepairable systems often is fundable, no provision is made for interim communication support while these processes are taking place. As a result, it is important to highlight the fact that as technologies or computer-based equipment, AAC systems are subject to breakdown, thus requiring technical support and repair; as noted earlier, loss of access to communication, albeit temporary, will likely impact an individual's ability to fulfill work responsibilities.

Funding mechanisms for the purchase of prescribed AAC technology may influence the prescription of a particular system. Typical funding sources for adults who would benefit from AAC technology include private insurance companies, the Veterans Health Administration, and Medicare or Medicaid. Additional funding mechanisms available to some individuals include state telephone equipment distribution programs, vocational rehabilitation programs, private pay, and charitable programs. Medicare Advantage plans are implemented under contract with private insurers through policies that provide Medicare (Parts A and B) benefits (CMS, 2017a), and individual policies may differ regarding coverage of SGDs. Medicare Supplemental Insurance (Medigap) policies are designed to cover some health care costs associated with Medicare (e.g., coinsurance, deductibles, copayments); these policies may be purchased from private insurers (CMS, 2017b). For funding of SGDs, Medigap policies cover supplemental costs associated with obtaining items covered by Medicare (Medicare typically covers 80 percent of approved SGD costs, and a Medigap policy will cover the 20 percent copayment). Medigap policies do not cover items not approved by Medicare (e.g., mobile AAC technologies, hearing aids) (CMS, 2017b).

Not all AAC technology solutions have been assigned a Healthcare Common Procedure Coding System (HCPCS) code. Delays in assigning codes may occur when technology innovations are added quickly to the market, as is common for rapidly changing technology. If uncoded technology is identified as the best match for and preferred by the individual, funding for that technology may or may not be available. Moreover, ongoing costs associated with mobile technologies (e.g., data rates, access to the Internet, cellphone fees) reduce the use of these AAC technologies for some individuals who could benefit from them (AAC-RERC, 2011), while others may opt for an SGD because it is covered by insurance even though it provides fewer features and is a poorer match for their communication needs (McNaughton and Light, 2013). Conversely, some individuals may purchase a mobile AAC technology thinking it will save them money, only to discover that it is not a good match for their AAC needs. Regardless of

the funding source, a range of appropriate AAC technology solutions are presented as part of the evaluation, with the ultimate goal of achieving the best communication match and meeting personal preferences. It remains the case, however, that funding options, cost, and affordability often influence which device is prescribed.

One benefit of Centers for Medicare & Medicaid Services (CMS) funding programs is the establishment of an assessment procedure and specific requirements (CMS, 2001). Some alternative funding options (e.g., equipment lending libraries, private purchase of mobile AAC technologies) do not link appropriate evaluations with AAC selection, trained providers, communication specialists, or indeed any criteria (AAC-RERC, 2011). At times, obtaining equipment in such a way results in a substantial cost savings and an appropriate communication solution; however, chance often determines whether the individual makes an inappropriate purchase that may ultimately prove more costly in terms of money, motivation, and effort.

One concern associated with CMS funding programs with respect to multimodal communication and employment is the requirement that the individual abandon all other forms of communication before selecting an SGD. The requirement is that all other forms of treatment be "considered and ruled out" prior to selection of an AAC option (CMS, 2001).

Individuals with disabilities also face challenges with funding for AAC technologies as they go through transitions. Youth transitioning from education-based services may face questions regarding ownership of AAC products and technologies; if a school system made the purchase, the AAC technology currently used by the individual may be retained by the school. In such situations, an AAC reevaluation and funding approval are required for the individual to have access to an AAC system that meets his or her communication goals and supports the person's continued education, vocational training, and employment.

Although many individuals in need of communication systems have funding available for the purchase of AAC technology, most clinical providers do not. Notably, many clinical facilities do not provide AAC evaluations because of the high cost of purchasing and maintaining AAC technologies, software, and access options. Anecdotal evidence from providers nationwide indicates that assessment sites maintaining updated equipment most commonly are those affiliated with university educational/research programs. Few hospitals maintain evaluation centers with current equipment. Many individual clinicians will arrange to borrow equipment from other evaluation centers (e.g., state offices for assistive technology, disability-specific loan closets) and manufacturers to gain access to appropriate equipment. These funding factors impact access to appropriate evaluations and equipment needed to implement trials.

## VOICE RESTORATION FOLLOWING HEAD AND NECK SURGERY

### Prevalence of Need

The American Cancer Society estimated 59,000 cases of head and neck cancer in the United States in 2015 (American Cancer Society, 2015). Individuals with head and neck cancer acquire communication needs as a result of various cancer treatments, including surgical resection, radiation, and chemotherapy. Surgical treatments may involve resection of head/neck structures and tissue that may result in partial or complete removal of the larynx, vocal cords, and articulatory structures, in turn resulting in loss of voice and/or speech.

### Voice Restoration Taxonomy

Some individuals with head and neck cancer may benefit from various categories of AAC technology, including mobile technologies, SGDs (HCPCS: E2500-E2510), and communication software and apps (HCPCS: E2511) (Ball et al., 2016b; Beukelman and Mirenda, 2013; Happ et al., 2004; Sullivan et al., 2007a,b):

- **Mobile technologies—**Communication applications are available for use on both iOS and Android platforms, although the number of options is currently greater on the former (Ball et al., 2016b). Such mobile technologies are now intrinsic to daily life for people from many cultures, languages, and traditions, and as such may provide a readily accessible means of supporting communication without adding to visible disability (McNaughton and Light, 2013). These technologies are summarized in Annex Tables 6-1 and 6-3.
- **Speech-generating devices—**Designed specifically for communication, SGDs may provide the most effective means of meeting communication needs through highly customizable and variable features (Beukelman and Mirenda, 2013; McNaughton and Light, 2013). Other SGD features that may be of particular importance for individuals with communication needs relate to available language options and options for connectivity to other computer technologies (Ball et al., 2016b). These technologies are described in detail in Tables 6-1 and 6-2 and Annex Tables 6-1 and 6-3.
- **Communication software and apps—**Communication software programs and apps provide options for individuals with head and neck cancer to communicate using direct access. They also may be used to design and print low-tech communication displays that can often be practical for communicating basic messages in acute

care or other temporary settings. Software may represent language using symbols other than traditional text (e.g., pictures, drawings) and therefore may be helpful to individuals with literacy and/or cognitive limitations (Ball et al., 2016b). The framework for these technologies is described in Table 6-2, while details are provided in Annex Table 6-2.

Although some individuals benefit from the specified AAC technologies, individuals typically are supported with voice restoration after undergoing head/neck cancer interventions (Tang and Sinclair, 2015). Similarly, those having undergone a tracheostomy, who retain the body structures and functions necessary to produce speech but whose respiratory flow is redirected away from the vocal cords, are supported with speech restoration (Lichtman et al., 1995). For some, speech becomes functional when diminished speech intensity is supported by amplification (Andreetta et al., 2016). The various options are described below and summarized in Table 6-4.[2]

### Functional Speech Following Head/Neck Cancer Surgery and Radiation

For individuals postsurgery, "speech outcomes are the strongest predictor of health-related quality of life, inhibiting a person's ability to return to work, establish or maintain relationships, or participate in everyday activities" (Bolt et al., 2016, p. E1). Psychosocial quality of life decreases as a result of loss of voice after head and neck cancer treatments. Individuals may experience feelings of solitude, limitations in social relationships that result in social withdrawal, and reduced sexual enjoyment (Babin et al., 2009; Singer et al., 2008; Tang and Sinclair, 2015). Key factors in participation in communication include severity of speech loss, cognitive function (perhaps associated with cancer-related cognitive impairment), and extent of surgical resection (Bolt et al., 2016).

One study found that at 3 months following head/neck cancer treatment, 63 percent of individuals postsurgery (55 percent postsurgery with radiation) described broadly functional speech (i.e., perceived as possibly distorted but 100 percent intelligible) with natural speech or when accessing a tracheoesophageal voice prosthesis (TEP), an artificial/electrolarynx (AL/EL), and/or esophageal speech (ESS) (Perry and Shaw, 2000). Another 22 percent of individuals postsurgery (26 percent postsurgery with radiation) reported at least moderate speech disabilities (i.e., perceived as intelligible only when communication partners knew the message context) using the same assistive methods of communication (i.e., TEP, AL/EL, ESS), citing

---

[2]The images in Table 6-4 serve as examples of device categories only and should not be considered an endorsement of specific products or manufacturers.

a frequent need to repeat spoken messages and use writing to supplement speech to convey intended meaning (Perry and Shaw, 2000). Finally, 12 percent of individuals postsurgery (19 percent postsurgery with radiation) reported poor speech (occasional to no functional communication and/or at least 50 percent unintelligible) with the same assistive communication methods (i.e., TEP, AL/EL, ESS) (Perry and Shaw, 2000). These reports thus indicate a range of 34-45 percent of individuals undergoing head and neck cancer treatments who, although receiving benefit from voice restoration strategies, will likely require AAC technology to achieve fully functional communication.

### Functional Speech Following Laryngectomy

For individuals who produce functional speech following a laryngectomy, four primary voice restoration methods are used: (1) esophageal speech, (2) tracheoesophageal voice prosthesis, (3) artificial or electrolarynx (Perry and Shaw, 2000), and (4) voice amplification (see p. 252).

*Esophageal Speech*

In ESS (see Figure 6-1), air from the mouth is transferred into the upper esophagus, where the released air causes the pharyngo-esophageal tissue to vibrate and produce a low-pitched voice (Enderby et al., 2009). This voice restoration strategy does not involve assistive technology; instead, ESS is produced by the individual's injecting (essentially swallowing) air into the esophagus and then releasing it in a controlled manner to cause the soft tissue to vibrate and produce voicing (Tang and Sinclair, 2015).

*Tracheoesophageal Voice Prosthesis*

At present, the most common voice restoration strategy for individuals with a complete laryngectomy is the placement of a one-way valve in the tracheoesophageal wall that allows respiratory air to flow from the lungs to the esophagus, where soft tissue vibrates and produces substitute voicing. This voice restoration method involves fitting a prosthesis through a surgically created puncture (e.g., stoma) between the trachea and the esophagus (Enderby et al., 2009). Voice is created by closing the stoma using one's fingers or a hands-free valve (see Figure 6-2).

*Artificial/Electrolarynx*

This voice restoration strategy involves an electrolarynx, an external device that produces vibrations in the oral cavity or pharyngeal mucosa

*246*

**TABLE 6-4**
Voice and Speech Restoration and Amplification Taxonomy

| Feature | AL/EL (L8500) A | TSV (L8501) B | TEP$_{pt}$ (L8507) C | TEP$_{pr}$ (L8509) D | AMP (L8510) E | ESS |
|---|---|---|---|---|---|---|
| Total laryngectomy | X | | X | X | X | X |
| Partial laryngectomy | | | | | X | |
| Tracheostomy, intact larynx | | X | | | | |
| Professional insertion | | | | X | | |
| Patient insertion | | | X | | | |
| Hands free use | | X | X | X | X | X |
| Hand held use | X | | | | X | X |
| Shunt air into esophagus | | | X | X | | X |
| Vibrate head/neck tissue | X | | X | X | | X |
| Surgical placement | | | X | X | | |
| Voice amplification | | | | | X | |
| Battery, rechargeable | X | | | | X | |

*247*

NOTE: AL/EL = artificial/electrolarynx; AMP = voice amplifier; ESS = esophageal speech; TEP = tracheoesophageal voice prosthesis; TEP$_{pr}$ = TEP, provider inserted; TEP$_{pt}$ = TEP, patient inserted; TSV = tracheostomy speaking valve.

SOURCES: A. Servox Digital electrolarynx, Bruce Medical; B. PMV 2001 (purple®), Passy Muir, Inc.; Image courtesy of Passy Muir, Inc. Irvine, CA. C. Blom-Singer® Duckbill-Patient Changeable Voice Prosthesis, InHealth Technologies. Image courtesy of InHealth Technologies, www.inhealth.com; D. Blom-Singer® Classic™ Voice Prosthesis-Clinician Placed (non-sterile), InHealth Technologies. Image courtesy of InHealth Technologies, www.inhealth.com; E. UltraDisk DVA 10W Portable Voice Amplifier, UltraDisk, www.ultradisk.co.uk.



**FIGURE 6-1** Illustration of esophageal speech.
SOURCE: THANC Foundation, 2017. Copyright © 2017 Jill Gregory & Kellie Holoski, *Head & Neck Cancer Guide*. All rights reserved. Available at: www.headandneckcancerguide.org.



**FIGURE 6-2** Tracheoesophageal puncture with prosthesis.
SOURCE: THANC Foundation, 2017. Copyright © 2017 Jill Gregory & Kellie Holoski, *Head & Neck Cancer Guide*. All rights reserved. Available at: www.headandneckcancerguide.org.

(Tang and Sinclair, 2015). An electrolarynx is a small handheld, battery-operated device that, when activated by pressing buttons on the device, vibrates air in the oral cavity to approximate the sound of voicing (Enderby et al., 2009). The device may be positioned on the neck, under the chin (see Figure 6-3), or on the cheek; it also may be used with an oral adapter to vibrate air in the oral cavity.

*AUGMENTATIVE AND ALTERNATIVE COMMUNICATION AND VOICE*    *249*



**FIGURE 6-3** Chin placement of artificial/electrolarynx. SOURCE: THANC Foundation, 2017. Copyright © 2017 Jill Gregory & Kellie Holoski, *Head & Neck Cancer Guide*. All rights reserved. Available at: www.headandneckcancerguide.org.

### Functional Speech Following Tracheostomy

In tracheostomy, the vocal mechanism typically remains fully functional; however, respiratory air is directed through the tracheostomy tube instead of upward through the vocal cords. As a result, voicing is difficult to impossible without use of a tracheostomy speaking valve (TSV) (Hoffman et al., 2008). A TSV, a small one-way valve prosthesis that is placed on the end of a tracheostomy tube, is designed to redirect exhaled air upward through the vocal cords in the larynx (Hoffman et al., 2008). All TSVs have similar components, but their engineering/design varies. In all TSVs, a diaphragm either (1) remains open and closes on expiration or (2) remains closed and opens when inspiratory effort is applied. All valves close during expiration, and all attach to the hub of a tracheostomy tube (Leder, 1994). Individuals having undergone tracheostomy often benefit from a speaking-valve prosthesis (see Figure 6-4) that uses a one-way valve to redirect exhaled air from the trachea upward through intact vocal cords to produce natural voicing.



**FIGURE 6-4** Tracheostomy speaking valve.
SOURCE: Illustration courtesy of Passy Muir, Inc., Irvine, CA.

### Functional Speech with Diminished Vocal Intensity

*Voice Amplification*

Individuals who retain function of the vocal cords may benefit from voice amplification to address dysphonia or hypophonia (Andreetta et al., 2016). Typically a speaker-type voice amplifier fitted with a head-mounted or lavaliere microphone, this device is designed to amplify the fundamental frequency of voice. It has been shown to increase the intelligibility of speech in noisy situations and when the individual produces insufficiently loud speech (Andreetta et al., 2016). Similarly, those having undergone total laryngectomy who communicate with TEP or ESS often benefit from amplification (Happ et al., 2004; Hilgers et al., 1990).

### Functionality of Voice Restoration Technologies

Considered the gold standard, TEPs are deemed effective for many individuals postlaryngectomy and are associated with low occurrence of medical complications (Calkovsky and Hajtman, 2015; Tang and Sinclair, 2015). Still, the resulting voice is sometimes considered monotonous and unpleasant.

Studies have shown that voice restoration with tracheoesophageal puncture is superior to that with an electrolarynx and ESS (Clements et al.,

1999; Eadie et al., 2016; Finzia and Bergman, 2001; Ward et al., 2003). In addition to surgery and radiation, factors associated with head and neck cancer influence speech intelligibility. Decreases in intelligibility are associated with (1) increases in tumor size; (2) increases in the volume of tissue resected; (3) the need for reconstructive surgery; and (4) tumor site, with poorer intelligibility in cases involving the floor of the mouth or lower alveolar crest (Blyth et al., 2014; Borggreven et al., 2007). One recent study found lowest stress and perceived handicap with ESS, followed by an electrolarynx and then tracheoesophageal puncture (Saltürk et al., 2016). One critical consideration is that all voice restoration methods (TEP, ESS, and electrolarynx) rely on the articulatory musculature to produce speech. Thus, loss of articulatory musculature during surgical resection has significant consequences for the production of intelligible speech (Tang and Sinclair, 2015).

## Voice Restoration and AAC

Given developments in communication systems for people with unmet communication needs, ESS and electrolarynges are not the sole options available, and in many cases, they may no longer be acceptable to some individuals. The increase in availability and acceptability of these technologies and communication applications for mobile technologies has significantly changed functional communication intervention (e.g., McNaughton and Light, 2013). These factors play an obvious role in determining functional communication interventions using AAC technologies. The situational effectiveness of communication with ESS, an electrolarynx, or both ranges from 80 to 100 percent intelligibility (Sullivan et al., 1993).

Caregivers of adults with complex communication needs have identified as highly important the need for viable modes of communication to (1) regulate the behavior of others for basic wants and needs (e.g., getting needs met, giving instructions/directions, providing clarifications); (2) stay connected with friends and family members (e.g., social closeness); and (3) discuss important issues (e.g., information transfer) (Fried-Oken et al., 2006). AAC supports are necessary given that the overwhelming majority of individuals with severe speech impairments have no access to appropriate communication modalities when hospitalized. They therefore struggle to provide medical information and to have their medical needs met, and they are at increased risk for poor health outcomes (Blackstone et al., 2015; Hemsley and Balandin, 2014).

*Factors Affecting Device Use*

Speakers have reported using multiple communication methods based on the complexity of communication in various environments, using writing, gestures, and/or interpreters to supplement spoken communication while speaking in situations with background noise or via intercoms (Sullivan et al., 1993). Although written supplementation of spoken communication may be useful in some situations, it does not produce audible output and is limited by literacy skills for some individuals. Indeed, 17.1 percent of individuals with head and neck cancer read at or below the 8th-grade level (Jesse et al., 2015). Because individuals with reduced speech intelligibility tend to experience reduced quality of life, timely identification of such individuals is an important component of their cancer treatment so that they can be provided with appropriate communication options that facilitate their overall recovery (Borggreven et al., 2007).

### Voice Restoration Evaluation and Monitoring

Rapid, effective voice and speech restoration is associated with preventing psychosocial and economic consequences of loss of speech (Blom, 2000). Optimal levels of communication support for individuals with head and neck cancer need to be identified throughout the phases of cancer treatment, with consideration of variations/transitions in medical status and personal needs over time. Targeted interventions need to be developed in the context of the cancer site (e.g., tongue, maxilla, larynx), phase of recovery (e.g., presurgical, acute postsurgical, speech restorative), preexisting communication skills and demands, and ongoing communication needs (Sullivan et al., 2007a). Each voice restoration method has specific monitoring and evaluation procedures. To ensure that individuals with head and neck cancer can successfully meet all their communication needs, AAC assessment and intervention procedures are implemented in conjunction with voice restoration strategies (Ball et al., 2016b). AAC service-delivery intervals for these individuals are established to support presurgical care, acute care (immediately postsurgery), initial outpatient care, and ongoing outpatient AAC support (e.g., treatment change or new disease states (Sullivan et al., 2007a).

The goal of *presurgical AAC assessment* is to identify communication needs, determine communication options for implementation immediately postsurgery, and evaluate the potential effectiveness of various AAC options. At this stage, a communication needs assessment is completed, individual patterns of communication are established (e.g., interest in and use of communication), and potential supports and needs following surgery are identified (Ball et al., 2016b). The goal of *acute care AAC assessment*

is to evaluate the effectiveness of short-term communication techniques that have been identified and continue to evaluate AAC options for longer-term implementation. The goal of *outpatient AAC assessment* is to identify daily communication needs that are not being met by the selected voice restoration procedures (Ball et al., 2016b). As voice restoration procedures are implemented, communication breakdowns, intelligibility and comprehensibility, and communication efficiency (intelligible words per minute) are monitored (Sullivan et al., 1993). Finally, the goal of *ongoing AAC intervention* is to evaluate new communication needs and any sources of communication breakdown as well as to identify communication options for addressing these issues. Cancer recurrence or new health conditions, for example, may require additional medical treatments that impact communication (Ball et al., 2016b).

AAC assessment for individuals with head and neck cancer often differs from a typical lengthy AAC assessment process that yields a communication system following a series of assessment sessions and trials (Ball et al., 2016b). Instead, the focus is on supporting communication in a rapid, just-in-time manner (i.e., methodically targeting communicative supports as needed). When long-term use of AAC technology is indicated, a comprehensive AAC evaluation may be required.

Individuals with head and neck cancer receiving AAC commonly require (1) lightweight portability (independent, unimpaired ambulation); (2) direct access (full use of hands, sufficiently large keyboard to provide accurate message selection); (3) high-quality display (visibility in multiple environments); (4) traditional orthography (if literacy supports message formulation, native language text); (5) message formulation (few predetermined messages with some repeated/personal messages recorded prior to surgery, formulation of new messages with text-to-speech); (6) rate acceleration (features that speed rate of communication); and (7) ease of use (brief period of time required to learn how to use the device) (Beukelman and Mirenda, 2013). Desired features of mobile communication systems include those mentioned above (e.g., portability, high-quality display). Other desired features include options to obtain extended battery life (e.g., communication during an 8-hour work shift), durability and protection (e.g., a case that increases the durability of the system without compromising access) with screen protection, and voice output amplification. If the user places a high premium on small devices but cannot isolate individual items on the display because of hand/finger size or mobility, it is also important to identify a stylus that will provide access to the keyboard and a means of ensuring its location without loss (i.e., storage slot).

### Voice Restoration Training and Adaptation

Individuals report that ESS is more difficult to learn than other communication methods, and success depends on individual motivation and length of time practicing. Other factors include training method, timing of training postsurgery, and type of training (group versus individual) (Kresic et al., 2015; Staffieri et al., 2006).

Individuals with communication problems following head/neck cancer interventions but without other speech/language problems have an undamaged language system (Enderby et al., 2009). These individuals can participate in an AAC assessment to choose a system that best addresses their needs (Fox and Rau, 2001). The goals of AAC for individuals with head and neck cancer are to augment intelligibility, decrease communication breakdowns or miscommunications, enable repair when communication breakdowns occur, and provide alternative means of communication when the voice restoration methods employed result in ongoing unmet communication needs (Ball et al., 2016b).

Often, recommended communication strategies involve simple methods, and clinicians may not see a need for direct instruction; however, not all individuals adapt to their lack of communication and the implementation of new communication methods without instruction (Sullivan et al., 2007b). Moreover, most medical professionals (e.g., nurses, physicians) receive no instruction in interacting with individuals who are unable to communicate effectively via natural speech (Hemsley and Balandin, 2014). Therefore, some form of instruction and therapeutic support for both individuals and providers is likely to yield improved patient–provider communication, which in turn can influence satisfaction with and outcomes of treatment (Downey and Happ, 2013; Hemsley and Balandin, 2014).

### Voice Restoration Access and Availability

Caregivers of individuals with head and neck cancer have reported that they primarily taught themselves communication strategies for identifying problems and meeting individual needs, which required intensive effort and creativity on their part. These reports indicate that, postsurgically, these individuals and their caregivers are in critical need of assistance in meeting communication needs (McGrory, 2011). Similarly, nurses have attributed nurse–patient communication breakdowns to the lack of readily manageable and interpretable communication systems (Happ et al., 2004).

The complexity of funding policies impacts access to voice restoration in many cases. Some insurers will not pay for an electrolarynx or voice prosthesis, the latter of which often must be replaced on a routine basis (as often as monthly, although commonly every 2-3 months). As a result, clinicians or treating facilities must provide voice prostheses at their own expense, or the patient must bear the cost. Also, non-indwelling voice prostheses are considered durable medical equipment by CMS, whereas indwelling prostheses are not. The result can be problems with respect to training of SLPs in how to manage non-indwelling prostheses and how to instruct individuals in their insertion and long-term use. Medicare administrative contractors require that a TEP not be distributed directly to an individual but instead directly to a professional, one device at a time, and that a provider visit occur at the time the TEP is distributed and billed (Satterfield, 2015). A separate funding issue is that, at present, Medicare payment for a TEP covers approximately one-half the cost of actually obtaining the device; as a result, many clinical practices no longer provide TEPs (Satterfield, 2015).

Access to voice restoration methods depends on the availability of appropriately trained professionals, which varies by region. ASHA certification (Certificate of Clinical Competence-SLP) is necessary; however, meeting certification requirements is not sufficient to qualify an SLP to perform TEP care as outlined by preferred practice standards (ASHA, 2004a). SLPs require extensive additional training to manage voice restoration options (e.g., anatomy and physiology, instrumentation, TEP and related materials, instruction of individuals in the use of ESS, identification of appropriate TEP candidates, TEP sizing/removal/reinsertion, safety issues) (ASHA, 2004a). Limited numbers of these experts are available, and there have been anecdotal reports of situations in which local surgeons have provided laryngectomy and primary TEP care when no trained SLP was available in the region to provide the necessary pre-/postoperative assessment and interventions, potentially leaving the individual with no voice restoration options. Limited numbers of SLPs specialize in voice assessment and interventions. A survey of providers indicated that 5 percent of SLPs' adult service delivery time was spent in the area of voice (including but not limited to voice restoration), with SLPs in outpatient clinics spending significantly more time, although still negligible (12 percent; $p = .000$), than those in other medical facilities (e.g., skilled nursing facility, U.S. Department of Veterans Affairs facility, hospital, long-term acute care facility) (ASHA, 2015b).

*THE PROMISE OF ASSISTIVE TECHNOLOGY*

## FINDINGS AND CONCLUSIONS

### Findings

*Need for Augmentative and Alternative Communication*

6-1.   Severe impairments of natural speech result in complex communication needs that interfere with daily interactions and employment outcomes.

6-2.   Research in the field of augmentative and alternative communication (AAC) often focuses on specific areas and populations, making generalizations across studies problematic.

6-3.   Individuals with amyotrophic lateral sclerosis (ALS) may be referred for AAC assessment and treatment beyond the time when they could remain at or return to work; this and other factors may increase the urgency of the need for AAC and/or limit AAC acceptance.

6-4.   Individuals receiving voice restoration head and neck cancer treatments may also require AAC to achieve fully functional communication.

6-5.   The complexity of AAC systems is demonstrated by the multiple features and components that must be identified, evaluated, and manipulated to address the specific abilities, needs, and expectations of each individual.

6-6.   Individualized, contextual needs are variable and cannot be generalized within a specific disability group (i.e., individuals have communication skills and needs that are not based on a diagnosis such as cerebral palsy, ALS, or head and neck cancer).

6-7.   Individuals who require AAC have complex communication needs, which often change over the course of their impairment (e.g., improving or degenerating communication capabilities) so that individuals require ongoing monitoring and/or intervention to maintain or improve their communication performance.

6-8.   Different considerations are entailed in communicating with an electrolarynx or tracheoesophageal voice prosthesis, which requires operational competence, versus AAC, which requires language representation, cognitive and device-based message formulation, and social and operational competencies.

*Prognosis for Occupational Success*

6-9.    Individuals who communicate with AAC can obtain and maintain employment if they are provided early educational preparation; attain high levels of language competence, literacy, and education; and achieve competency in workplace communication interactions.

6-10.   Established measures of real-world communicative functioning are sparse, and research investigating the impact of AAC products and technologies on real-world communicative functioning is extremely limited.

6-11.   Direct instruction in communication techniques improves clinical outcomes for persons with AAC needs.

6-12.   As technologies or computer-based equipment, AAC systems are subject to breakdown, thus requiring technical support and repair; loss of access to communication in the interim will likely impact an individual's ability to fulfill work responsibilities.

6-13.   Occupational title listings may indicate no need for speaking, but an occupation often has a speaking requirement nonetheless.

*Access and Availability*

6-14.   Original Medicare benefits are based on medical necessity and cover 80 percent of an approved device's fee schedule, and some individuals may not have the 20 percent copay. The result is that the cost of a speech-generating device (SGD) may remain prohibitive for many people (e.g., a $20,000 AAC system would require a $4,000 out-of-pocket expense). If the SGD is not approved based on the fee schedule, the entire cost falls to the individual.

6-15.   Medicaid funding varies by state, with some states having specific criteria for assessments; limiting access to treatment; and/or providing insufficient funding, especially for higher-cost AAC technologies.

6-16.   Private health insurance may exclude coverage of AAC systems, even when other types of durable medical equipment are covered.

6-17.   Some funding options (e.g., equipment lending libraries, private purchase of mobile technologies) do not link appropriate evaluations with AAC selection, resulting at times in inappropriate recommendations and purchases.

6-18.   Some coverage requires that an individual abandon attempts to improve natural speech before qualifying for AAC support.

6-19.   School districts that have provided AAC systems for children often retain the devices; as a result, children transitioning from school into postsecondary/vocational settings must navigate the transition while completing the AAC assessment, funding, and new learning processes. Some children may even have to learn entirely new language representation, messaging, and access methods before they can engage in essential communication.

6-20.   Required education for preprofessional speech-language pathologists (SLPs) is limited, as a number of university programs still do not have a required AAC course.

6-21.   The 2015 American Speech-Language-Hearing Association end-of-year membership report showed that there were 156,254 certified SLP members, although the AAC Special Interest Group comprised only 3,239 members, approximately 2 percent of the total membership. These numbers are indicative of the relatively small number of SLPs with AAC expertise.

6-22.   High equipment costs and continual technology developments result in limited availability of AAC systems for use in the assessment, equipment trial, and intervention processes in clinical settings.

### Conclusions

*Prognosis for Occupational Success*

6-1.   Data on the prevalence and use of AAC systems by adults are fragmented and limited, resulting in incomplete knowledge of employability, vocational effectiveness, and overall employment outcomes. [Findings 6-2, 6-9]

6-2.   Establishing objective measures of real-world communicative functioning will promote improved understanding of the effects of AAC products and technologies on actual practical and interactive communicative function. [Finding 6-10]

6-3.   Although great progress has been achieved in AAC systems, use of an SGD does not fully mitigate the impact of a severe communication impairment. In addition, even when provided with optimal assessment, funding resources, AAC systems, interventions, and supports, individuals may not achieve their potential because of any number of environmental and personal factors that influence communication performance in employment contexts. [Findings 6-5, 6-6, 6-11, 6-12]

*Access and Availability*

6-4.   Access to SLPs and other professional members of an AAC team with relevant knowledge, skills, and expertise is necessary and currently limited. [Findings 6-4, 6-5, 6-6, 6-7, 6-10, 6-19, 6-20, 6-21]

6-5.   Limited availability of AAC systems in the clinical setting impedes proper assessment, equipment trial, and intervention processes to the detriment of the individual's participation in educational and vocational settings. [Finding 6-22]

6-6.   Differences in funding policies among various programs significantly limit access to AAC technology and clinical services. [Findings 6-14, 6-15, 6-16, 6-17, 6-18, 6-20]

# REFERENCES

AAC-RERC (Augmentative and Alternative Communication-Rehabilitation Engineering Research Center). 2011. *Mobile devices and communication apps: An AAC-RERC white paper*. http://aac-rerc.psu.edu/index.php/pages/show/id/46 (accessed February 22, 2017).

Akcakaya, M., B. Peters, M. Moghadamfalahi, A. R. Mooney, U. Orhan, B. Oken, D. Erdogmus, and M. Fried-Oken. 2014. Noninvasive brain-computer interfaces for augmentative and alternative communication. *IEEE Reviews in Biomedical Engineering* 7:31-49.

Alamsaputra, D. M., K. J. Kohnert, B. Munson, and J. Reichle. 2006. Synthesized speech intelligibility among native speakers and non-native speakers of English. *Augmentative and Alternative Communication* 22(4):258-268.

American Cancer Society. 2015. *Cancer facts & figures 2015*. Atlanta, GA: American Cancer Society. http://www.cancer.org/content/dam/cancer-org/research/cancer-facts-and-statistics/annual-cancer-facts-and-figures/2015/cancer-facts-and-figures-2015.pdf (accessed January 22, 2017).

Anderson, L., C. R. Baylor, T. L. Eadie, and K. M. Yorkston. 2016. Describing speech usage in daily activities in typical adults. *Journal of Voice* 30(1):42-52.

Andreetta, M. D., S. G. Adams, A. D. Dykstra, and M. Jog. 2016. Evaluation of speech amplification devices in Parkinson's disease. *American Journal of Speech-Language Pathology* 25(1):29-45.

ASHA (American Speech-Language-Hearing Association). 2004a. *Knowledge and skills for speech-language pathologists with respect to evaluation and treatment for tracheoesophageal puncture and prosthesis: Knowledge and skills*. http://www.asha.org/policy (accessed February 13, 2017).

ASHA. 2004b. *Preferred practice patterns for the profession of speech-language pathology [preferred practice patterns]*. http://www.asha.org/policy/PP2004-00191 (accessed November 16, 2016).

ASHA. 2004c. *Roles and responsibilities of speech-language pathologists with respect to augmentative and alternative communication: Technical report*. http://www.asha.org/policy/TR2004-00262 (accessed January 22, 2017).

ASHA. 2015a. *Highlights and trends: Member and affiliate counts, year-end 2015*. http://www.asha.org/uploadedFiles/2015-Member-Counts.pdf (accessed January 18, 2017).

ASHA. 2015b. *SLP Health Care Survey 2015 caseload characteristics*. http://www.asha.org/uploadedFiles/2015-SLP-Health-Care-Survey-Caseload.pdf (accessed February 13, 2017).

ASHA. 2016a. *Augmentative and alternative communication (AAC)*. http://www.asha.org/public/speech/disorders/AAC (accessed October 25, 2016).

ASHA. 2016b. *Augmentative and alternative communication decisions*. http://www.asha.org/public/speech/disorders/CommunicationDecisions (accessed October 25, 2016).

ASHA. 2016c. *Augmentative and alternative communication: Knowledge and skills for service delivery [knowledge and skills]*. http://www.asha.org/policy/KS2002-00067.htm (accessed November 16, 2016).

ASHA. 2016d. *Current procedural terminology (CPT) codes: Speech language pathology*. http://www.asha.org/Practice/reimbursement/coding/SLPCPT (accessed December 31, 2016).

ASHA. 2016e. *Scope of practice in speech-language pathology [scope of practice]*. http://www.asha.org/policy/SP2016-00343 (accessed November 16, 2016).

Babin, E., D. Beynier, D. Le Gall, and M. Hitier. 2009. Psychosocial quality of life in patients after total laryngectomy. *Revue de Laryngologie—Otologie—Rhinologie* 130(1):29-34.

Baker, B. 1986. Using images to generate speech. *Byte* 11(9):160-168.

Balandin, S., and J. Morgan. 2001. Preparing for the future: Aging and alternative and aug-mentative communication. *Augmentative and Alternative Communication* 17(2):99-108.

Ball, L. J., and J. Lasker. 2013. Teaching partners to support communication for adults with acquired communication impairment. *Perspectives on Augmentative and Alternative Communication* 22(1):4-15.

Ball, L. J., A. Willis, D. R. Beukelman, and G. L. Pattee. 2001. A protocol for identification of early bulbar signs in amytrophic lateral sclerosis. *Journal of the Neurological Sciences* 191(1-2):43-53.

Ball, L. J., D. R. Beukelman, and G. L. Pattee. 2002. Timing of speech degeneration in peo-ple with amyotrophic lateral sclerosis. *Journal of Medical Speech-Language Pathology* 10(4):231-235.

Ball, L. J., D. R. Beukelman, and G. L. Pattee. 2004. Communication effectiveness of indi-viduals with amyotrophic lateral sclerosis. *Journal of Communication Disorders* 37(3): 197-215.

Ball, L. J., D. R. Beukelman, and L. Bardach. 2007. Amyotrophic lateral sclerosis. In *Augmentative communication strategies for adults with acute or chronic medical condi-tions*, edited by D. R. Beukelman, K. L. Garrett, and K.M. Yorkston. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 287-316.

Ball, L. J., K. Stading, and D. Hazelrigg. 2010a. AAC considerations during the transition to adult life. In *Transition strategies for adolescents & young adults who use AAC*, edited by D. McNaughton and D. R. Beukelman. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 201-218.

Ball, L., A. Nordness, S. Fager, K. Kersch, B. Mohr, G. L. Pattee, and D. R. Beukelman. 2010b. Eye-gaze access of AAC technology for persons with amyotrophic lateral sclerosis. *Journal of Medical Speech-Language Pathology* 18(3):11-23.

Ball, L. J., S. Fager, and M. Fried-Oken. 2012. AAC in progressive neuromuscular disease. *Physical Medicine and Rehabilitation Clinics of North America* 23(3):689-699.

Ball, L. J., S. Evans, S. Chavez, M. Leach, and K. Smart. 2016a (unpublished). Communication of children diagnosed with spinal muscular atrophy type 1: A parent survey.

Ball, L. J., J. Kent-Walsh, and N. A. Harrington. 2016b. Consideration of communication op-tions in head and neck cancer: Augmentative and alternative. In *Cases in head and neck cancer: A multidisciplinary approach*, edited by B. H. Ruddy, H. Ho, C. Sapienza, and J. J. Lehman. San Diego, CA: Plural Publishing, Inc. Pp. 207-218.

Barreto, A. B., S. D. Scargle, and M. Adjouadi. 2000. A practical EMG-based human-computer interface for users with motor disabilities. *Journal of Rehabilitation Research & Development* 37(1):53-63.

Barrett, D., and T. King. 2005. *Computer networking illuminated*. Sudbury, MA: Jones and Bartlett Publishers.

Beukelman, D. R., and P. Mirenda. 2005. *Augmentative and alternative communication: Supporting children and adults with complex communication needs*. 3rd ed. Baltimore, MD: Paul H. Brookes Publishing Co.

Beukelman, D. R., and P. Mirenda. 2013. *Augmentative and alternative communication: Supporting children and adults with complex communication needs*. 4th ed. Baltimore, MD: Paul H. Brookes Publishing Co.

Beukelman, D. R., S. Fager, L. J. Ball, and A. Dietz. 2007a. AAC for adults with acquired neurological conditions: A review. *Augmentative and Alternative Communication* 23(3): 230-242.

Beukelman, D. R., K. M. Yorkston, and K. L. Garrett. 2007b. An introduction to AAC services for adults with chronic medical conditions: Who, what, when, where, and why. In *Augmentative communication strategies for adults with acute or chronic medical conditions*, edited by D. R. Beukelman, K. L. Garrett, and K. M. Yorkston. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 1-16.

Beukelman, D. R., K. L. Garrett, and K. M. Yorkston. 2007c. *Augmentative communication strategies for adults with acute or chronic medical conditions*. Baltimore, MD: Paul H. Brookes Publishing Co.

Beukelman, D. R., L. J. Ball, and S. Fager. 2008. An AAC personnel framework: Adults with acquired complex communication needs. *Augmentative and Alternative Communication* 24(3):255-267.

Beukelman, D. R., E. K. Hanson, E. Hiatt, S. Fager, and D. Bilyeu. 2009. AAC technology learning part 3: Regular AAC team members. *Augmentative and Alternative Communication* 21(3):187-194.

Beukelman, D. R., K. Hux, A. Dietz, M. McKelvey, and K. Weissling. 2015. Using visual scene displays as communication support options for people with chronic, severe aphasia: A summary of AAC research and future research directions. *Augmentative and Alternative Communication* 31(3):234-245.

Binger, C., L. J. Ball, A. Dietz, J. Kent-Walsh, S. Lasker, S. Lund, M. McKelvey, and W. Quach. 2012. Personnel roles in the AAC assessment process. *Augmentative and Alternative Communication* 28(4):278-288.

Blackstone, S. W. 1993. Employment in the AAC community: A problem for some . . . but not for everyone. In *Proceedings of the Pittsburgh Employment Conference for Augmented Communicators*, edited by R. V. Conti and C. Jenkins-Odorisio. Pittsburgh, PA: SHOUT Press. Pp. 3-6.

Blackstone, S. W., D. R. Beukelman, and K. M. Yorkston. 2015. *Patient-provider communication: Roles for speech-language pathologists and other health care professionals*. San Diego, CA: Plural Publishing, Inc.

Blom, E. D. 2000. Current status of voice restoration following total laryngectomy. *Oncology* 14(6):915-922.

Blyth, K. M., P. McCabe, R. Heard, J. Clark, C. Madill, and K. J. Ballard. 2014. Cancers of the tongue and floor of mouth: Five-year file audit within the acute phase. *American Journal of Speech-Language Pathology* 23(4):668-678.

Bolt, S., T. Eadie, K. Yorkston, C. Baylor, and D. Amtmann. 2016. Variables associated with communicative participation after head and neck cancer. *JAMA Otolaryngology—Head & Neck Surgery* 142(12):1145-1151.

Borggreven, P. A., I. M. Verdonck-de Leeuw, M. J. Muller, M. L. C. H. Heiligers, R. de Bree, N. K. Aaronson, and C. R. Leemans. 2007. Quality of life and functional status in patients with cancer of the oral cavity and oropharynx: Pretreatment values of a prospective study. *European Archives of Oto-Rhino-Laryngology* 264(6):651-657.

Bourgeois, M. S. 1991. Communication treatment for adults with dementia. *Journal of Speech, Language, and Hearing Research* 34(4):831-844.

Bourgeois, M. S. 1992. Evaluating memory wallets in conversation with persons with dementia. *Journal of Speech, Language, and Hearing Research* 35(6):1344-1357.

Bourgeois, M. S. 2013. Restricted literature base limits interpretation of meta-analysis of the effectiveness of communication-enhancing interventions in dementia. *Evidence-based Communication Assessment and Intervention* 7(1):1-3.

Bourgeois, M. S., K. Dijkstra, L. Burgio, and R. Allen-Burge. 2001. Memory aids as an augmentative and alternative communication strategy for nursing home residents with dementia. *Augmentative and Alternative Communication* 17(3):196-210.

Brady, N., D. Skinner, J. Roberts, and E. Hennon. 2006. Communication in young children with fragile X syndrome: A qualitative study of mothers' perspective. *American Journal of Speech-Language Pathology* 15(4):353-364.

Brock, K., R. Koul, M.Corwin, and R. Schlosser. 2017. A comparison of visual scene and grid displays for people with chronic aphasia: A pilot study to improve communication using AAC. *Aphasiology* 1-25.

Bruno, J., and D. Trembath. 2006. Use of aided language stimulation to improve syntactic performance during a weeklong intervention program. *Augmentative and Alternative Communication* 22(4):300-313.

Bryen, D. N., B. B. Potts, and A. C. Carey. 2007. So you want to work? What employers say about job skills, recruitment and hiring employees who rely on AAC. *Augmentative and Alternative Communication* 23(2):126-139.

Bunnell, H. T., J. Chandlee, J. Lilley, J. Gray, B. Moyers, and B. Warren. 2015. *ModelTalker*. https://www.modeltalker.org (accessed January 24, 2017).

Calkovsky, V., and A. Hajtman. 2015. Primary prosthetic voice rehabilitation in patients after laryngectomy: Applications and pitfalls. *Advances in Experimental Medicine and Biology* 852:11-16.

Caron, J. G., and J. Light. 2016. Social media experiences of adolescents and young adults with cerebral palsy who use augmentative and alternative communication. *International Journal of Speech Language Pathology* 1-13.

CDC (U.S. Centers for Disease Control and Prevention). 2011. *Autism and Developmental Disabilities Monitoring (ADDM) Network*. Atlanta, GA: CDC.

CDC. 2014. Prevalence of autism spectrum disorder among children aged 8 years: Autism and Developmental Disabilities Monitoring Network, 11 sites, United States, 2010. *Morbidity and Mortality Weekly Report* 63(2).

Chang, S. K., G. Costagliola, S. Orefice, G. Polese, and B. R. Baker. 1992. *A methodology for iconic language design with application to augmentative communication*. Proceedings of the 1992 IEEE Workshop on Visual Languages, Seattle, WA, September 15-18.

Clements, K., C. Rassekh, H. Seikaly, J. A. Hokanson, and K. H. Calhoun. 1999. Communication after laryngectomy: An assessment of patient satisfaction. *Archives of Otolaryngology—Head & Neck Surgery* 123(5):493-496.

CMS (Centers for Medicare & Medicaid Services). 2001. *CMS Pub. 100-3, Medicare National Coverage Determinations Manual, Chapter 1, Section 50.1. LCD Title Speech Generating Devices, ID number L108*. Baltimore, MD: CMS.

CMS. 2017a. *Medicare Advantage Plans cover all Medicare services*. https://www.medicare.gov/what-medicare-covers/medicare-health-plans/medicare-advantage-plans-cover-all-medicare-services.html (accessed April 6, 2017).

CMS. 2017b. *What's Medicare supplemental insurance (Medigap)?* https://www.medicare.gov/supplement-other-insurance/medigap/whats-medigap.html (accessed April 6, 2017).

Collier, B., and S. Blackstein-Adler. 1998. Building competencies in augmentative and alternative communication among professionals. *Augmentative and Alternative Communication* 14(4):250-260.

Collier, B., S. W. Blackstone, and A. Taylor. 2012. Communication access to businesses and organizations for people with complex communication needs. *Augmentative and Alternative Communication* 28(4):205-218.

Cook, A. M., and J. M. Polgar. 2008. *Cook & Hussey's assistive technologies: Principles and practice*. St. Louis, MO: Mosby Elsevier.

Cooper, L., S. Balandin, and D. Trembath. 2009. The loneliness experiences of young adults with cerebral palsy who use alternative and augmentative communication. *Augmentative and Alternative Communication* 25(3):154-164.

Costello, J. M. 2011. Last words, last connections how augmentative communication can support children facing end of life. *The ASHA Leader* 1-6.

Costello, J. M. 2014. *Message banking, voice banking and legacy messages*. Boston, MA: Boston Children's Hospital.

Costigan, F. A., and J. Light. 2007. *A research review of preservice training in augmentative and alternative communication for speech-language pathologists, special education teachers, and occupational therapists.* Poster presented at the Annual Convention of the American Speech-Language-Hearing Association, Boston, MA.

Costigan, F. A., and J. Light. 2010. A review of preservice training in augmentative and alternative communication of speech-language pathologists, special education teachers, and occupational therapists. *Assistive Technology* 22(4):200-212.

Crema, C., and N. Moran. 2012. Training speech-language pathologists of adult clients on the implementation of AAC into everyday practice. *Perspectives on Augmentative and Alternative Communication* 21(2):37-42.

Culp, D., D. R. Beukelman, and S. Fager. 2007. Brainstem impairment. In *Augmentative communication strategies for adults with acute or chronic medical conditions,* edited by D. R. Beukelman, K. L. Garrett, and K. M. Yorkston. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 59-90.

Darley, F., A. Aronson, and J. Brown. 1975. *Motor speech disorders*. Philadelphia, PA: Saunders.

Demers, L., R. Weiss-Lambrou, and B. Ska. 2002. The Quebec User Evaluation of Satisfaction with Assistive Technology (QUEST 2.0): An overview and recent progress. *Technology and Disability* 14(3):101-105.

Dietz, A., M. McKelvey, and D. R. Beukelman. 2006. Visual scene displays (VSD): New AAC interfaces for persons with aphasia. *Perspectives on Augmentative and Alternative Communication* 15(1):13-17.

Dietz, A., W. Quach, S. K. Lund, and M. McKelvey. 2012. AAC assessment and clinical-decision making: The impact of experience. *Augmentative and Alternative Communication* 28(3):148-159.

Donovan, N. J., D. L. Kendall, M. E. Young, and J. C. Rosenbek. 2008. The communicative effectiveness survey: Preliminary evidence of construct validity. *American Journal of Speech-Language Pathology* 17(4):335-347.

Dowden, P. A. 2016. *UW augmentative and alternative communication*. http://depts.washington.edu/augcomm (accessed November 5, 2016).

Downey, D., and M. B. Happ. 2013. The need for nurse training to promote improved patient-provider communication for patients with complex communication needs. *Perspectives on Augmentative and Alternative Communication* 22(2):112.

Drager, K. D., and J. E. Reichle. 2001. Effects of age and divided attention on listeners' comprehension of synthesized speech. *Augmentative and Alternative Communication* 17(2):109-119.

Drager, K. D., J. C. Light, J. C. Speltz, K. A. Fallon, and L. Z. Jeffries. 2003. The performance of typically developing 2 1/2-year-olds on dynamic display AAC technologies with different system layouts and language organizations. *Journal of Speech, Language, and Hearing Research* 46(2):298-312.

Drager, K. D., E. A. Clark-Serpentine, K. E. Johnson, and J. L. Roeser. 2006. Accuracy of repetition of digitized and synthesized speech for young children in background noise. *American Journal of Speech-Language Pathology* 15(2):155-164.

Drager, K. D. R., J. Reichle, and C. Pinkoski. 2010. Synthesized speech output and children: A scoping review. *American Journal of Speech-Language Pathology* 19(3):259-273.

Duffy, J. R. 2013. *Motor speech disorders: Substrates, differential diagnosis, and management*. 3rd ed. St. Louis, MO: Elsevier Mosby.

Durkin, M. S., R. E. Benedict, D. Christensen, L. A. Dubois, R. T. Fitzgerald, R. S. Kirby, M. J. Maenner, K. Van Naardent Braun, M. S. Wingate, and M. Yeargin-Allsopp. 2016. Prevalence of cerebral palsy among 8-year-old children in 2010 and preliminary evidence trends in its relationship to low birthweight. *Paediatric Perinatal Epidemiology* 30(5):496-510.

Dykstra, A. D., S. G. Adams, and M. Jog. 2015. Examining the relationship between speech intensity and self-rated communicative effectiveness in individuals with Parkinson's disease and hypophonia. *Journal of Communication Disorders* 56(2015):103-112.

Eadie, T. L., D. Otero, S. Cox, J. Johnson, C. R. Baylor, K. M. Yorkston, and P. C. Doyle. 2016. The relationship between communicative participation and postlaryngectomy speech outcomes. *Head & Neck* 38(Suppl. 1):E1955-E1961.

Enderby, P., C. Pickstone, A. John, K. Fryer, A. Cantrell, and D. Papaioannou. 2009. *Resource manual for commissioning and planning services for SLCN*. London, UK: Royal College of Speech & Language Therapists. https://www.rcslt.org/speech_and_language_therapy/commissioning/aphasia_plus_intro (accessed January 22, 2017).

Fager, S., K. Hux, D. R. Beukelman, and R. Karantounis. 2006. Augmentative and alternative communication use and acceptance by adults with traumatic brain injury. *Augmentative and Alternative Communication* 22(1):37-47.

Fager, S., L. Bardach, S. Russell, and J. Higginbotham. 2012. Access to augmentative and alternative communication: New technologies and clinical decision-making. *Journal of Pediatric Rehabilitation Medicine* 5(1):53-61.

Fairbanks, G. 1960. *Voice and articulation drillbook*. 2nd ed. New York: Harper & Row.

Feinstein, C. S., J. Lemanowicz, M. Cunningham, R. Whiting, and The Institute on Disabilities. 2013. *Independent monitoring for quality (IM4Q): A statewide summary for the Pennsylvania Office of Developmental Programs Statewide Steering Committee on Independent Monitoring*. Philadelphia, PA: Institute on Disabilities, Temple University.

Finzia, C., and B. Bergman. 2001. Health-related quality of life in patients with laryngeal cancer: A post-treatment comparison of different modes of communication. *The Laryngoscope* 111(5):918-923.

Fox, L. E., and M. T. Rau. 2001. Augmentative and alternative communication for adults following glossectomy and laryngectomy surgery. *Augmentative and Alternative Communication* 17(3):161-166.

Fried-Oken, M. 1993. Do AAC users with degenerative neurological disease remain or return to the work force? In *The First Annual Pittsburgh Employment Conference for Augmented Communicators*, edited by R.V. Conti and C. Jenkins-Odorisio. Pittsburgh, PA: SHOUT Press. Pp. 73-78.

Fried-Oken, M., and M. Granlund. 2012. AAC and ICF: A good fit to emphasize outcomes. *Augmentative and Alternative Communication* 28(1):1-2.

Fried-Oken, M., L. Fox, M. T. Rau, J. Tullman, G. Baker, M. Hindal, N. Wile, and J.-S. Lou. 2006. Purposes of AAC device use for persons with ALS as reported by caregivers. *Augmentative and Alternative Communication* 22(3):209-221.

Fried-Oken, M., D. R. Beukelman, and K. Hux. 2012. Current and future AAC research considerations for adults with acquired cognitive and communication impairments. *Assistive Technology* 24(1):56-66.

Fried-Oken, M., A. Mooney, and B. Peters. 2015. Supporting communication for patients with neurodegenerative disease. *Neurorehabilitation* 37(1):69-87.

Fucci, D., M. Reynolds, R. Bettagere, and M. D. Gonzales. 1995. Synthetic speech intelligibility under several experimental conditions. *Augmentative and Alternative Communication* 11(2):113-117.

Ganz, J. B., E. R. Hong, W. Gilliland, K. Morin, and N. Svenkerud. 2015. Comparison between visual scene displays and exchange-based communication in augmentative and alternative communication for children with ASD. *Research in Autism Spectrum Disorders* 11:27-41.

Gaskin, J., J. Gomes, S. Darshan, and D. Krewski. 2016. Burden of neurological conditions in Canada. *Neurotoxicology* [E-pub ahead of print].

Gevarter, C., M. F. O'Reilly, L. Fojeski, N. Sammarco, J. Sigafoos, G. E. Lancioni, and R. Lang. 2014. Comparing acquisition of AAC-based mands in three young children with autism spectrum disorder using iPad applications with different display and design elements. *Journal of Autism and Developmental Disorders* 44(10):2464-2474.

Gevarter, C., M. F. O'Reilly, M. Kuhn, L. Watkins, R. Ferguson, N. Sammarco, L. Rojeski, and J. Sigafoos. 2016. Assessing the acquisition of requesting a variety of preferred items using different speech generating device formats for children with autism spectrum disorder. *Assistive Technology* 1-8.

Glennen, S. 2000. *AAC assessment myths and realities*. Paper presented at ASHA SID 12 Leadership Conference on Augmentative and Alternative Communication, Sea Island, GA.

Glennen, S., and D. C. DeCoste. 1997. *The handbook of augmentative and alternative communication*. San Diego, CA: Singular Publishing Group, Inc.

Goldman-Eisler, F. 1986. *Cycle linguistics: Experiments in spontaneous speech*. New York: Academic Press.

Greene, B. G., J. S. Logan, and D. B. Pisoni. 1986. Perception of synthetic speech produced automatically by rule: Intelligibility of eight text-to-speech systems. *Behavior Research Methods, Instruments, & Computers* 18(2):100-107.

Haidet, P., R. E. Levine, D. X. Parmelee, S. Crow, F. Kennedy, P. A. Kelly, L. Perkowski, L. Michaelsen, and B. F. Richards. 2012. Perspective: Guidelines for reporting team-based learning activities in the medical and health sciences education literature. *Academic Medicine* 87(3):292-299.

Hamm, B., and P. Mirenda. 2006. Post-school quality of life for individuals with developmental disabilities who use AAC. *Augmentative and Alternative Communication* 22(2):134-147.

Hanson, E. K., E. Goldhammer, and T. Bethard. 2016. Telephone talk: Effects of two access methods on phone call success. *Augmentative and Alternative Communication* 32(3):219-226.

Happ, M. B., T. Roesch, and S. H. Kagan. 2004. Communication needs, methods, and perceived voice quality following head and neck surgery. *Cancer Nursing* 27(1):1-9.

Hartsuiker, R., R. Bastiaanse, A. Postma, and F. Wijnan. 2005. *Phonological encoding and monitoring in normal and pathological speech*. New York: Psychology Press.

Hemsley, B., and S. Balandin. 2014. A metasynthesis of patient-provider communication in hospital for patients with severe communication disabilities: Informing new translational research. *Augmentative and Alternative Communication* 30(4):329-343.

Higginbotham, D. J., and C. Engelke. 2013. A primer for doing talk-in-interaction research in augmentative and alternative communication. *Augmentative and Alternative Communication* 29(1):3-19.

Higginbotham, D. J., A. L. Drazek, K. Kowarsky, C. Scally, and E. Segal. 1994. Discourse comprehension of synthetic speech delivered at normal and slow presentation rates. *Augmentative and Alternative Communication* 10(3):191-202.

Higginbotham, D. J., G. W. Lesher, B. J. Moulton, and G. J. Rinkus. 2002. Automated data logging in augmentative communication. In *Emerging and accessible telecommunications, information and healthcare technologies—engineering challenges in enabling universal access*, edited by J. Winters, C. Robinson, R. Simpson, and G. Vanderheiden. Arlington, VA: Resna Press. Pp. 82-94.

Higginbotham, D. J., H. Shane, S. Russell, and K. Caves. 2007. Access to AAC: Present, past, and future. *Augmentative and Alternative Communication* 23(3):243-257.

Hilgers, F., A. Ackerstaff, N. Aaronson, P. Schouwenburg, and N. Van Zandwijk. 1990. Physical and psychosocial consequences of total laryngectomy. *Clinical Otolaryngology & Allied Sciences* 15(5):421-425.

Hill, K. 2004. Augmentative and alternative communication and language: Evidence-based practice and language activity monitoring. *Topics in Language Disorders* 24(1):18-30.

Hill, K. 2010. Advances in augmentative and alternative communication as quality-of-life technology. *Physical Medicine and Rehabilitation Clinics of North America* 21(1):43-58.

Hill, K., and V. Corsi. 2012. The role speech language pathologists in assistive technology assessments. In *Assistive technology assessment: A handbook for professionals in disability, rehabilitation and health professions*, edited by M. J. Scherer and S. Federici. London, UK: Taylor & Francis Group. Pp. 301-336.

Hill, K., R. Lytton, and S. Glennen. 1998. *The role of manufacturers' consultants in delivering AAC services [poster]*. Paper presented at 1998 International Society for Augmentative and Alternative Communication (ISAAC) Conference, Dublin, Ireland, August 24-27.

Hill, K., B. Romich, and G. Vanderheiden. 2010. Augmentative communication. In *The biomedical engineering handbook*, 4th ed., edited by J. D. Bronzino. Boca Raton, FL: CRC Press.

Hill, K., T. Kovacs, and S. Shin. 2014. Reliability of brain-computer interface language sample transcription procedures. *Journal of Rehabilitation Research & Development* 51(4):579-590.

Hoag, L., J. Bedrosian, and K. McCoy. 2009. Theory-driven AAC practices with adults who use utterance-based systems: The case of conversational rule violations. *Perspectives on Augmentative and Alternative Communication* 18(4):146-153.

Hochstein, D. D., M. A. McDaniel, S. Nettleton, and K. H. Neufeld. 2003. The fruitfulness of a nomothetic approach to investigating AAC: Comparing two speech encoding schemes across cerebral palsied and nondisabled children. *American Journal of Speech-Language Pathology* 12(1):110-120.

Hoffman, L., J. Bolton, and S. Ferry. 2008. Passy-Muir Speaking Valve use in a children's hospital: An interdisciplinary approach. *Perspective on Voice and Voice Disorders* 18:76-86.

Hoover, J., J. Reichle, D. Van Tassel, and D. Cole. 1987. The intelligibility of synthesized speech: Echo II versus votrax. *Journal of Speech, Language, and Hearing Research* 30:s425-s431.

Hourcade, J., T. E. Pilotte, E. West, and P. Parette. 2004. A history of augmentative and alternative communication for individuals with severe and profound disabilities. *Focus on Autism and Other Developmental Disabilities* 19(4):235-244.

Howlin, P., J. Alcock, and C. Burkin. 2005. An 8 year follow-up of a specialist supported employment service for high-ability adults with autism or Asperger syndrome. *Autism* 9(5):533-549.

Hustad, K. C. 2008. Comprehension and intelligibility scores for speakers with dysarthria. *Journal of Speech, Language, and Hearing Research* 51:562-573.

Hustad, K. C., and L. K. Miles. 2010. Alignment between augmentative and alternative communication needs and school-based speech-language services provided to young children with cerebral palsy. *Early Childhood Services (San Diego, California)* 4(3):129-140.

Hyatt, G. W. 2011. The iPad: A cool communicator on the go. *Perspectives on Augmentative and Alternative Communication* 20(1):24-27.

Jesse, M. T., N. Fei, E. Goldstein, I. Rakitin, L. Shama, F. Hall, and T. Ghanem. 2015. Head and neck cancer screenings and human papillomavirus knowledge across diverse suburban and urban populations. *American Journal of Otolaryngology* 36(2):223-229.

Johnson, J. M., E. Inglebret, C. Jones, and J. Ray. 2006. Perspectives of speech language pathologists regarding success versus abandonment of AAC. *Augmentative and Alternative Communication* 22(2):85-99.

Jreige, C., R. Patel, and H. T. Bunnell. 2009. *Vocalid: Personalizing text-to-speech synthesis for individuals with severe speech impairment.* ASSETS '09: Proceedings of the 11th International ACM SIGACCESS Conference on Computers and Accessibility, Pittsburgh, PA, October 25-28.

Judge, S., and G. Townend. 2013. Perceptions of the design of voice output communication aids. *International Journal of Language and Communication Disorders* 48(4):366-381.

Jutai, J., N. Ladak, R. Schuller, S. Naumann, and V. Wright. 1996. Outcomes measurement of assistive technologies: An institutional case study. *Assistive Technology* 8(2):110-120.

Kagohara, D., L. van der Meer, S. Ramdoss, M. F. O'Reilly, G. E. Lancioni, T. N. Davis, M. Rispoli, R. Lang, P. B. Marschik, D. Sutherland, V. A. Green, and J. Sigafoos. 2013. Using iPods® and iPads® in teaching programs for individuals with developmental disabilities: A systematic review. *Research in Developmental Disabilities* 34(1):147-156.

Kent, R. D., G. Weismer, J. F. Kent, and J. C. Rosenbek. 1989. Toward phonetic intelligibility testing in dysarthria. *Journal of Speech and Hearing Disorders* 54(4):482-499.

Kent-Walsh, J., and D. McNaughton. 2009. Communication partner instruction in AAC: Present practices and future directions. *Augmentative and Alternative Communication* 21(3):195-204.

King, T. 2000. *Modern morse code in rehabilitation and education.* Boston, MA: Allyn & Bacon.

King, J. M., N. Alarcon, and M. A. Rogers. 2007. Primary progressive aphasia. In *Augmentative communication strategies for adults with acute or chronic medical conditions*, edited by D. R. Beukelman, K. L. Garrett, and K. M. Yorkston. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 207-241.

King, M. R., C. Binger, and J. Kent-Walsh. 2015. Using dynamic assessment to evaluate the expressive syntax of children who use augmentative and alternative communication. *Augmentative and Alternative Communication* 31(1):1-14.

Koul, R., and L. Lloyd. 1994. Survey of professional preparation in augmentative and alternative communication (AAC) in speech-language pathology and special education programs. *American Journal of Speech-Language Pathology* 3(3):12-22.

Kresic, S., M. Veselinovic, G. Mumovic, and S. M. Mitrovic. 2015. Possible factors of success in teaching esophageal speech. *Medicinski Pregled Medical Review* 68(1-2):5-9.

Lawthers, A. G., G. S. Pransky, L. E. Peterson, and J. H. Himmelstein. 2003. Rethinking quality in the context of persons with disability. *International Journal for Quality in Health Care* 15(4):287-299.

Leder, S. B. 1994. Perceptual rankings of speech quality produced with one-way tracheostomy speaking valves. *Journal of Speech, Language, and Hearing Research* 37(6):1308-1312.

Lesher, G., B. Moulton, and D. J. Higginbotham. 1998. Techniques for augmenting scanning communication. *Augmentative and Alternative Communication* 14(2):81-101.

Lichtman, S. W., I. L. Birnbaum, M. R. Sanfilippo, J. T. Pellicone, W. J. Damon, and M. L. King. 1995. Effect of a tracheostomy speaking valve on secretions, arterial oxygenation, and olfaction: A quantitative evaluation. *Journal of Speech, Language, and Hearing Research* 38(3):549-555.

Light, J. C. 2003. Shattering the silence: Development of communicative competence by individuals who use AAC. In *Communicative competence for individuals who use AAC: From research to effective practice*, edited by J. C. Light, D. R. Beukelman, and J. Reichle. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 3-38.

Light, J. C., and K. Drager. 2007. AAC technologies for children with complex communication needs: State of the science and future research directions. *Augmentative and Alternative Communication* 23(3):204-216.

Light, J. C., and D. McNaughton. 2012. The changing face of augmentative and alternative communication: Past, present, and future challenges. *Augmentative and Alternative Communication* 28(4):197-204.

Light, J. C., and D. McNaughton. 2013. Putting people first: Re-thinking the role of technology in augmentative and alternative communication intervention. *Augmentative and Alternative Communication* 29(4):299-309.

Light, J. C., and D. McNaughton. 2014. Communicative competence for individuals who require augmentative and alternative communication: A new definition for a new era of communication? *Augmentative and Alternative Communication* 30(1):1-18.

Light, J. C., B. Stoltz, and D. McNaughton. 1996. Community-based employment: Experiences of adults who use AAC. *Augmentative and Alternative Communication* 12(4):215-229.

Light, J. C., C. Binger, T. L. Agate, and K. N. Ramsay. 1999. Teaching partner-focused questions to individuals who use augmentative and alternative communication to enhance their communicative competence. *Journal of Speech, Language, and Hearing Research* 42(1):241-255.

Lilienfeld, M., and E. Alant. 2009. The social interaction of an adolescent who uses AAC: The evaluation of a peer-training program. *Augmentative and Alternative Communication* 21(4):278-294.

Lund, S. K., and J. Light. 2006. Long-term outcomes for individuals who use augmentative and alternative communication: Part I—What is a "good" outcome? *Augmentative and Alternative Communication* 22(4):284-299.

Marics, M. A., and B. H. Williges. 1988. The intelligibility of synthesized speech in data inquiry systems. *Human Factors* 30(6):719-732.

Matthews, R. 2001. A survey to identify therapists' high-tech AAC knowledge, application, and training. *International Journal of Language and Communication Disorders* 36(Suppl.):64-69.

McAuliffe, M. J., S. Carpenter, and C. Moran. 2010. Speech intelligibility and perceptions of communication effectiveness by speakers with dysarthria following traumatic brain injury and their communication partners. *Brain Injury* 24(12):1408-1415.

McCarthy, H. 1986. Making it in able-bodied America: Career development in young adults with physical disabilities. *Journal of Applied Rehabilitation Counselling* 17(4):30-38.

McDuffie, A., A. Oakes, W. Machalicek, M. Ma, L. Bullard, S. Nelson, and L. Abbeduto. 2016. Early language intervention using distance video-teleconferencing: A pilot study of young boys with Fragile X syndrome and their mothers. *American Journal of Speech-Language Pathology* 25(1):46-66.

McGrory, A. 2011. Communicating with head and neck cancer patients. *ORL—Head and Neck Nursing* 29(3):7-11.

McNaughton, D., and A. Arnold. 2013. Supporting positive employment outcomes for individuals who use AAC. *Perspectives on Augmentative and Alternative Communication* 22(3):164-172.

McNaughton, D., and D. N. Bryen. 2007. AAC technologies to enhance participation and access to meaningful societal roles for adolescents and adults with developmental disabilities who require AAC. *Augmentative and Alternative Communication* 23(3):217-229.

McNaughton, D., and J. Light. 2013. The iPad and mobile technology revolution: Benefits and challenges for individuals who require augmentative and alternative communication. *Augmentative and Alternative Communication* 29(2):107-116.

McNaughton, D., and L. Richardson. 2013. Supporting positive employment outcomes for individuals with autism who use AAC. *Perspectives on Augmentative and Alternative Communication* 22(3):164-172.

McNaughton, D., K. Fallon, J. Tod, F. Weiner, and J. Neisworth. 1994. Effect of repeated listening experiences on the intelligibility of synthesized speech. *Augmentative and Alternative Communication* 10(3):161-168.

McNaughton, D., J. Light, and L. Groszyk. 2001. "Don't give up": Employment experiences of individuals with amyotrophic lateral sclerosis who use augmentative and alternative communication. *Augmentative and Alternative Communication* 17(3):179-195.

McNaughton, D., J. C. Light, and K. Arnold. 2002. "Getting your wheel in the door": Successful full-time employment experiences of individuals with cerebral palsy who use augmentative and alternative communication. *Augmentative and Alternative Communication* 17(2):59-76.

McNaughton, D., T. Rackensperger, D. Dorn, and N. Wilson. 2014. "Home is at work and work is at home": Telework and individuals who use augmentative and alternative communication. *Work* 48(1):117-126.

Mirenda, P. 2003. Toward functional augmentative and alternative communication for students with autism: Manual signs, graphic symbols, and voice output communication aids. *Language, Speech, and Hearing Services in Schools* 34(3):203-216.

Mirenda, P., and D. R. Beukelman. 1987. A comparison of speech synthesis intelligibility with listeners from three age groups. *Augmentative and Alternative Communication* 3(3):120-128.

Mirenda, P., and D. R. Beukelman. 1997. A comparison of intelligibility among natural speech and seven speech synthesizers and listeners from three age groups. *Augmentative and Alternative Communication* 6(1):61-68.

Mizuko, M., J. Reichle, A. Ratcliff, and J. Esser. 1994. Effects of selection techniques and array sizes on short-term visual memory. *Augmentative and Alternative Communication* 10(4):237-244.

Müller, J., G. K. Wenning, M. Verny, A. McKee, K. R. Chaudhuri, K. Jellinger, W. Poewe, and I. Litvan. 2001. Progression of dysarthria and dysphagia in postmortem-confirmed parkinsonian disorders. *Archives of Neurology* 58(2):259-264.

Nelson, P., K. Kohnert, S. Sabur, and D. Shaw. 2005. Classroom noise and children learning a second language: Double jeopardy? *Language, Speech, and Hearing Services in Schools* 36(3):219-229.

Netsell, R.. 1982. Speech motor control and selected neurologic disorders. In *Speech motor control*, edited by S. Grillner, J. Lindblom J. Lubker, and A. Persson. Oxford, UK: Pergamon Press. Pp. 247-261.

Newell, A., S. Langer, and M. Hickey. 1998. The role of natural language processing in alternative and augmentative communication. *Natural Language Engineering* 4(1):1-16.

Nordness, A. S., L. J. Ball, S. Fager, D. R. Beukelman, and G. L. Pattee. 2010. Late AAC assessment for individuals with amyotrophic lateral sclerosis. *Journal of Medical Speech-Language Pathology* 18(1):48-54.

O'Keefe, B. M., N. B. Kozak, , and R. Schuller. 2007. Research priorities in augmentative and alternative communication as identified by people who use AAC and their facilitators. *Augmentative and Alternative Communication* 23(1):89-96.

Oommen, E., and J. McCarthy. 2014. Natural speech and AAC intervention in childhood motor speech disorders: Not an either/or situation. *Perspectives on Augmentative and Alternative Communication* 23(3):117-123.

Oshrin, S. E., and J. A. Siders. 1987. The effect of word predictability on the intelligibility of computer synthesized speech. *Journal of Computer-Based Instruction* 14(3):89-90.

Patel, R., G. Meltzner, M. Suen, A. Nilsson, G. Rahhal, S. Bhandari, and R. Schweiker. 2015. *VocaliD™ human voicebank app*. Belmont, MA: VocaliD™.

Perry, A. R., and M. A. Shaw. 2000. Evaluation of functional outcomes (speech, swallowing and voice) in patients attending speech pathology after head and neck cancer treatment(s): Development of a multi-centre database. *The Journal of Laryngology & Otology* 114(8):605-615.

Perry, A., S. Reilly, S. Cotton, K. Bloomberg, and H. Johnson. 2004. A demographic survey of people who have a disability and complex communication needs in Victoria, Australia. *Asia Pacific Journal of Speech, Language, and Hearing* 9(3):259-271.

Raghavendra, P., J. Bornman, M. Granlund, and E. Björck-Åkesson. 2007. The World Health Organization's International Classification of Functioning, Disability, and Health: Implications for clinical and research practice in the field of augmentative and alternative communication. *Augmentative and Alternative Communication* 23(4):349-361.

Ratcliff, A. 1994. Comparison of relative demands implicated in direct selection and scanning: Considerations from normal children. *Augmentative and Alternative Communication* 10(2):67-74.

Ratcliff, A., and D. R. Beukelman. 1995. Pre-professional preparation in augmentative and alternative communication: State-of-the-art report. *Augmentative and Alternative Communication* 11(2):61-73.

Reynolds, M. E., Z. S. Bond, and D. Fucci. 1996. Synthetic speech intelligibility: Comparison of native and non-native speakers of English. *Augmentative and Alternative Communication* 12(1):32-36.

Robinson, N. B., and K. C. Sadao. 2005. Person-focused learning: A collaborative teaching model to prepare future AAC professionals. *Augmentative and Alternative Communication* 21(2):149-163.

Rodriguez, C. S., M. Rowe, L. Thomas, J. Shuster, B. Koeppel, and P. Cairns. 2016. Enhancing the communication of suddenly speechless critical care patients. *American Journal of Critical Care* 25(3):e40-e47.

Romich, B., G. Vanderheiden, and K. Hill. 2005. Augmentative communication. In *The biomedical engineering handbook*, 3rd ed., edited by J. D. Bronzino. Boca Raton, FL: CRC Press.

Romski, M. A., and R. A. Sevcik. 2005. Augmentative communication and early intervention: Myths and realities. *Infants and Young Children* 18(3):174-185.

Rousseau, B., M. Gutmann, I. F. T. Mau, D. Francis, J. Johnson, C. K. Novaleski, K. N. Vinson, and C. G. Garrett. 2015. Randomized controlled trial of supplemental augmentative and alternative communication versus voice rest alone after phonomicrosurgery. *Otolaryngology—Head and Neck Surgery* 152(3):494-500.

Rowland, C., P. D. Schweigert, J. C. Light, D. R. Beukelman, and J. Reichle. 2003. Cognitive skills and AAC. In *Communicative competence for individuals who use AAC: From research to effective practice*, edited by J. C. Light, D. R. Beukelman, and J. Reichle. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 241-275.

Saltürk, Z., A. Arslanoglu, E. Özdemir, G. Yildirim, I. Ayodogdu, T. L. Kumral, G. Berkiten, Y. Atar, and Y. Uyar. 2016. How do voice restoration methods affect the psychological status of patients after total laryngectomy? *HNO* 64(3):163-168.

Satterfield, L. 2015. Voice of reimbursement: Medicare coverage for vocal disorders. *Perspectives on Voice and Voice Disorders* 25(3):116-123.

Scherer, M. J. 2002. *Assistive technology: Matching device and consumer for successful rehabilitation*. Washington, DC: American Psychological Association.

Scherer, M. J. 2005. *Living in the state of stuck: How assistive technology impacts the lives of people with disabilities.* 4th ed. Brookline, MA: Brookline Books.

Scherer, M. J., and G. Craddock. 2002. Matching person and technology (MPT) assessment process. *Technology and Disability* 14(3):125-131.

Schlosser, R. W. 2003. Outcome measurement in AAC. In *Communicative competence for individuals who use AAC,* edited by J. Light, D. R. Beukelman, and J. Reichle. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 479-513.

Segalman, R. 2011. AAC, aging, and telephone relay access technology. *Disability Studies Quarterly* 31(4).

Shane, H., S. Blackstone, G. Vanderheiden, M. Williams, and F. DeRuyter. 2012. Using AAC technology to access the world. *Assistive Technology* 24(1):3-13.

Singer, S., H. Danker, A. Dietz, B. Hornemann, S. Koscielny, J. Oeken, C. Matthaus, H. J. Vogel, and O. Krauss. 2008. Screening for mental disorders in laryngeal cancer patients: A comparison of 6 methods. *Psychooncology* 17(3):280-286.

Slowiaczek, L. M., and H. C. Nusbaum. 1985. Effects of speech rate and pitch contour on the perception of synthetic speech. *Human Factors* 27(6):701-712.

Smith, R. O. 1996. Measuring the outcomes of assistive technology: Challenge and innovation. *Assistive Technology* 8(2):71-81.

Snell, M. E., N. Brady, L. Mclean, B. T. Ogletree, E. Siegel, L. Sylvester, B. Mineo, D. Paul, M. A. Romski, and R. Sevcik. 2010. Twenty years of communication intervention research with individuals who have severe intellectual and developmental disabilities. *American Journal of Intellectual and Developmental Disabilities* 115(5):364-380.

SSA (U.S. Social Security Administration). 2017. DI 24535.015 Evaluation of speech impairments. *Program Operations Manual System (POMS).* https://secure.ssa.gov/poms.nsf/lnx/0424535015 (accessed January 18, 2017).

SSA. n.d. *Disability evaluation under Social Security—listing of impairments—adult listings (Part A).* https://www.ssa.gov/disability/professionals/bluebook/AdultListings.htm (accessed January 18, 2017).

Staffieri, A., B. E. Mostafea, B. T. Varghese, E. D. Kitcher, M. Jalisi, J. J. Fagan, C. Staffieri, and G. Marioni. 2006. Cost of tracheoesophageal prostheses in developing countries. Facing the problem from an internal perspective. *Acta Oto-Laryngologica* 126(1):4-9.

Stern, S. E., C. M. Chobany, A. A. Beam, B. N. Hoover, T. T. Hull, M. Linsenbigler, C. Makdad-Light, and C. N. Rubright. 2017. Use of speech generating devices can improve perception of qualifications for skilled, verbal, and interactive jobs. *Work* [E-pub ahead of print].

Sullivan, M., D. Beukelman, and P. Mathy-Laikko. 1993. Situational communicative effectiveness of rehabilitated individuals with total laryngectomies. *Journal of Medical Speech-Language Pathology* 1(1):73-80.

Sullivan, M., C. Gaebler, and L. J. Ball. 2007a. AAC for people with head and neck cancer. In *Augmentative communication strategies for adults with acute or chronic medical conditions*, edited by D. R. Beukelman, K. L. Garrett, and K. M. Yorkston. Baltimore, MD: Paul H. Brookes Publishing Co. Pp. 347-367.

Sullivan, M., C. Gaebler, and L. J. Ball. 2007b. *Supporting persons with chronic communication limitations: Head & neck cancer.* Paper presented at American Speech-Language-Hearing Association Convention, Boston, MA.

Tang, C. G., and C. F. Sinclair. 2015. Voice restoration after total laryngectomy. *Otolaryngologic Clinics of North America* 48(4):687-702.

THANC (Thyroid Head & Neck Cancer) Foundation. 2017. *Head & neck cancer guide—Speech and swallowing rehabilitation.* http://www.headandneckcancerguide.org/adults/cancer-diagnosis-treatments/surgery-and-rehabilitation/surgeries-to-aid-breathing-and-eating/speech-and-swallowing-rehabilitation/ (accessed April 6, 2017).

Therrien, M. C., and J. C. Light. 2016. Using the iPad to facilitate interaction between preschool children who use AAC and their peers. *Augmentative and Alternative Communication* 32(3):163-174.

Thistle, J. J., and K. M. Wilkinson. 2009. The effects of color cues on typically developing preschoolers' speed of locating a target line drawing: Implications for augmentative and alternative communication display design. *American Journal of Speech-Language Pathology* 18(3):231-240.

Thistle, J. J., and K. M. Wilkinson. 2013. Working memory demands of aided augmentative and alternative communication for individuals with developmental disabilities. *Augmentative and Alternative Communication* 29(3):235-245.

Thistle, J. J., and K. M. Wilkinson. 2015. Building evidence-based practice in AAC display design for young children: Current practices and future directions. *Augmentative and Alternative Communication* 31(2):124-136.

Trnka, K., J. McCaw, C. Pennington, and K. McCoy. 2008. *Word prediction and communication rate in AAC.* Proceedings of the IASTED International Conference on Telehealth/Assistive Technologies, Baltimore, MD, April 16-18.

Ulmer, E., K. Hux, J. Brown, T. Nelms, and C. Reeder. 2016. Using self-captured photographs to support the expressive communication of people with aphasia. *Aphasiology* 1-22.

van der Merwe, A. 2009. A theoretical framework for the characterization of pathological speech sensorimotor control. In *Clinical management of sensorimotor speech disorders*, 2nd ed., edited by M. R. McNeil. New York: Thieme. Pp. 3-18.

Venkatagiri, H. S. 2003. Segmental intelligibility of four currently used text-to-speech synthesis methods. *Journal of the Acoustical Society of America* 113(4 Pt. 1):2095-2104.

Vincer, M. J., A. C. Allen, K. S. Joseph, D. A. Stinson, H. Scott, and E. Wood. 2006. Increasing prevalence of cerebral palsy among very preterm infants: A population-based study. *Pediatrics* 118(6):e1621-e1626.

Wagner, B., and H. M. Jackson. 2006. Developmental memory capacity resources of typical children retrieving picture communication symbols using direct selection and visual linear scanning with fixed communication displays. *Journal of Speech, Language, and Hearing Research* 49(1):113-126.

Ward, E. C., S. K. Koh, J. Frisby, and R. Hodge. 2003. Differential modes of alaryngeal communication and long-term voice outcomes following pharyngolaryngectomy and laryngectomy. *Folia Phoniatrica et Logopaedica* 55(1):39-49.

Wehman, P., S. Lau, A. Molinelli, V. Brooke, K. Thompson, C. Moore, and M. West. 2012. Supported employment for young adults with autism spectrum disorder: Preliminary data. *Research and Practice for Persons with Severe Disabilities* 37(3):160-169.

WHO (World Health Organization). 2002. *Towards a common language for functioning, disability and health: ICF.* http://www.who.int/classifications/icf/training/icfbeginnersguide.pdf (accessed November 16, 2016).

Williams, M. B., C. Krezman, and D. McNaughton. 2008. "Reach for the stars": Five principles for the next 25 years of AAC. *Augmentative and Alternative Communication* 24(3):194-206.

Wisenburn, B., and D. J. Higginbotham. 2009. Participant evaluations of rate and communication efficacy of an AAC application using natural language processing. *Augmentative and Alternative Communication* 25(2):78-89.

Wodka, E. L., P. Mathy, and L. Kalb. 2013. Predictors of phrase and fluent speech in children with autism and severe language delay. *Pediatrics* 131(4):e1128-e1134.

Wolpaw, J. R., N. Birbaumer, W. J. Heetderks, D. J. McFarland, P. H. Peckham, G. Schalk, E. Donchin, L. A. Quatrano, C. J. Robinson, and T. M. Vaughan. 2000. Brain-computer interface technology: A review of the first international meeting. *IEEE Transactions on Neural Systems and Rehabilitation Engineering* 8(2):164-173.

Yamagishi, J., C. Veaux, S. King, and S. Renals. 2012. Speech synthesis technologies for individuals with vocal disabilities: Voice banking and reconstruction. *Acoustical Science and Technology* 33(1):15.

Yang, C. S., C. H. Yang, L. Y. Chuang, and C. H. Yang. 2009. A wireless Internet interface for person with physical disability. *Mathematical and Computer Modelling* 50(1-2):72-80.

Yorkston, K. M., and D. R. Beukelman. 1981. Communication efficiency of dysarthric speakers as measured by sentence intelligibility and speaking rate. *Journal of Speech and Hearing Disorders* 46(3):296-301.

Yorkston, K. M., P. A. Dowden, and D. R. Beukelman. 1992. Intelligibility measurement as a tool in the clinical management of dysarthric speakers. In *Intelligibility in speech disorders: Theory, measurement and management*, edited by R. D. Kent. Philadelphia, PA: John Benjamin Publishing Company. Pp. 265-285.

Yorkston, K. M., E. A. Strand, and M. R. T. Kennedy. 1996. Comprehensibility of dysarthric speech. *American Journal of Speech-Language Pathology* 5(1):55.

Yorkston, K. M., M. S. Bourgeois, and C. R. Baylor. 2010a. Communication and Aging. *Physical Medicine and Rehabilitation Clinics of North America* 21(2):309-319.

Yorkston, K. M., D. R. Beukelman, E. A. Strand, and M. Hakel. 2010b. *Management of motor speech disorders in children and adults*. 3rd ed. Austin, TX: ProEd.

Zabala, J., G. Bowser, and J. Korsten. 2005. SETT and ReSETT: Concepts for AT implementation. *Closing the Gap* 23(5):1, 10-11.

**ANNEX TABLE 6-1***
Summary of Aided Augmentative and Alternative Communication (AAC) Products and
Technologies[a]

| | Cost Range | |
|---|---|---|
| **NO TECHNOLOGY**<br>*Healthcare Common Procedure Coding System (HCPCS)*<br>*not applicable (NA)*<br><br>Examples:<br>Alphabet board<br>Symbol sets<br>Transparent gaze board/eye transfer (ETRAN)<br>Topic boards<br><br><br>A. E-TRAN Topic Board<br><br>B.  EZ Board™ | $1–$100 | |

*The images in Annex Table 6-1 serve as examples of device categories only and should not be considered
an endorsement of specific products or manufacturers.

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Basic messaging Visual output Establish topic Spell messages Partner-supported communication | Visual impairment Requires verbal output Complex or detailed messaging needs | Lightweight Simple to create, use Replace when damaged Create for multiple contexts Digitized speech is highly intelligible Plexiglass board has increased durability | No voice output No telephone interaction Limited independence Difficult with limited literacy Fixed display Printer required; may require symbol software Limited clinical support available Limited funding available |

*continued*

**ANNEX TABLE 6-1**
Continued

| | Cost Range | |
|---|---|---|
| **LOW TECHNOLOGY**<br>*HCPCS NA*<br><br>Examples:<br>Megabee Eyegaze Communication Device<br><br><br><br>C. MegaBee Eye Gaze Communication Device | $1,260 | |
| **AAC/AAC TECHNOLOGY Type**<br>*Centers for Medicare & Medicaid Services (CMS) code* | **Cost Range** | |
| **DIGITIZED VOICE OUTPUT** | | |

*AUGMENTATIVE AND ALTERNATIVE COMMUNICATION AND VOICE*    *277*

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Eye gaze selection<br>Text output | Low literacy | Lightweight<br>Portable<br>Battery-operated<br>Dual LCD screen for both communicators to see message<br>Reduces effort of communication partner writing message by displaying on LCD screen | Partner-dependent communication<br>Limited funding available |
| | **Indications for Use** | **Relative Contraindications** | **Benefits** | **Limitations** |
| | Basic, brief messages<br>Prerecorded messages<br><br>Supports greeting, name/labeling, simple requesting, protesting | Need to formulate novel messages<br>Unimpaired adult cognitive function<br>Literate<br>Complex communication | Lightweight<br>Portable<br>Relatively inexpensive<br>Battery-operated<br>Durable design<br>Multilingual<br>Simple message recording<br>Assessment and treatment codes established for speech-language pathologist (SLP) | Require age/gender-matched communication partner to record messages (partner-dependent)<br>Limited conversations<br>No spontaneous messages |

*continued*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
|---|---|---|
| ≤8 minutes recording time *HCPCS E2500*<br><br>Examples:<br>BIGmack<br>LITTLE Step-by-Step<br>Talking Brix<br>Sequencer<br><br><br>D. LITTLE Step-by Step | $130–$3,000 | |
| 9–20 minutes recording time *HCPCS E2502*<br><br>Examples:<br>SuperTalker<br>QuickTalker23<br>VoicePal Levels<br><br><br>E. SuperTalker | $300–$500 | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Single messages<br>Limited communication needs | | Initiate interactions<br>Social comments<br>Call attention<br>Familiar communication partners | Long messages<br>Multiple messages<br>Message formulation<br>Multiple environments |
| | Limited need for multiple messages<br>Supports choice making from array | | Combine thoughts into utterances<br>Direct others | Multiple conversation partners |

*continued*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type<br>*CMS code* | Cost Range | |
|---|---|---|
| 21–40 minutes recording time<br>*HCPCS E2504*<br><br>Examples:<br>GoTalk<br>Express32<br><br><br><br>F. Express32 | $600–$1,500 | |
| >40 minutes recording time<br>*HCPCS E2506*<br><br>Examples:<br>Talara32<br>Logan ProxTalker<br>Smart/128VSD<br><br><br><br>G. Smart/128VSD | $400–$4,100 | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Multiple basic messages<br>Narrative storage and retell | | Use messages to describe known places/activities | |
| | Multiple basic and detailed messages<br>Supports introductions | | Lengthier message content | Unknown contexts, activities |

*continued*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type<br>*CMS code* | Cost Range | |
|---|---|---|
| **SYNTHESIZED VOICE OUTPUT** | | |
| **Physical Contact and Spelling**<br>*HCPCS E2508*<br><br>Examples:<br>LightWriter SL40<br>Allora2<br>TextSpeak TS04<br><br><br><br>H. LightWriter SL40 Connect | $400–$7,000 | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Provides formulation for individually unique messages<br>Supports telephone interaction, conversation, complex message formulation, personal narratives, past event messaging, clarification, self-talk<br>Benefit from full formulation for individually unique messages | Inability to formulate or comprehend complex interactions<br>Distractibility with dynamic displays | High-quality synthesized voice output<br>Text-to-speech<br>Some multilingual<br>Unlimited messages, contexts, communication partners<br>Independent message formulation<br>Formulate and interact with complex language<br>Personal choice of synthesized voice<br>Rechargeable battery and/or AC connection | Slow communication rate in time-sensitive interactions<br>Some reduction in intelligibility of synthesized speech<br>Wet, dusty conditions problematic |
| | Keyboard skills (most QWERTY)<br>Typed message formulation<br>Message formulation by (a) spelling every word, (b) device speaking word by word, or (c) person selecting "Enter" to deliver full message | Upper-extremity movement limitations<br>Limited literacy | Familiar format<br>Small, lightweight<br>Portable<br>Minimal training necessary<br>Text representation<br>Rate acceleration<br>Assessment and treatment codes established for SLP (92607, 92608, 92609) | Direct keyboard access<br>Limited accommodation to access in progressive disease<br>Communication rate limited by typing rate<br>Hands occupied for talking, unavailable for other activities |

*continued*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type<br>*CMS code* | Cost Range | |
|---|---|---|
| **Multiple Formulation and Access**<br>*HCPCS E2510*<br><br>Examples:<br>Wego<br>NovaChat<br>T7-15<br>Accent<br>ComLink<br>ProSlate<br>Enable Eyes<br><br><br><br>I. Accent 1400 | $2,000–$16,000 | |
| **Multiple Formulation and Access**<br>*HCPCS NA*<br><br>Examples:<br>Apple iPad<br>Android Tablet<br><br>J. iPad running Predictable™ | $50–$1,300 | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Touchscreen, keyboard, alternative access Display options for visual/cognitive needs Message formulation by spelling, using word prediction, selecting from a message array, device speaking word by word or upon selection to deliver full message | Limited language needs Difficulty navigating dynamic display | Unlimited content Symbol, photo, visual scene, text representation Rate acceleration strategies Dynamic display Direct and scanning access Assessment and treatment codes established for SLP | Many are large with limited portability without mounting to structure (table, wheelchair) and transport Synthesized output can be supplemented with digitized messages Communication software is integrated in speech-generating device (SGD) |
| | Touchscreen, some alternative access options Mainstream disability access options | | Unlimited content Symbol, photo, text representation Rate acceleration strategies Dynamic display Relatively inexpensive | Limited funding options Limited assessment and treatment, professional support Synthesized output can be supplemented with digitized messages Physical disability access options are limited Limited device–app integration support |

*continued*

*THE PROMISE OF ASSISTIVE TECHNOLOGY*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
|---|---|---|
| **SOFTWARE** | | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Provides language supports for communication based on language skills and needs | NA | Provides communication platform for devices Includes interface for alternative access, symbol and message management, and rate acceleration Some multilingual | Some compatibility issues, manufacturer or OS proprietary use Voice synthesizers offered as software Requires device for voice output activation Professional knowledge of communication needs essential to selecting most appropriate software/app |

*continued*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type<br>*CMS code* | Cost Range | |
|---|---|---|
| **AAC TECNOLOGY software**<br>*HCPCS E2511*<br><br>Examples:<br>Unity<br>WordPower84<br>Communicator<br>Speaking Dynamically Pro<br>GoTalk<br>Boardmaker Plus | $100–$750 | |



K. Boardmaker Plus

L. WordPower84

*AUGMENTATIVE AND ALTERNATIVE COMMUNICATION AND VOICE*     *289*

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Require message overlays for digitized devices Communication format on synthesized devices | | Provide symbol sets, framework for communication Support digitized and synthesized communication methods Often packaged with SGD | Varied levels of training necessary for use on device Some individuals will require training to understand a new representational system (i.e., using pictures to communicate) |

*continued*

*290*                              *THE PROMISE OF ASSISTIVE TECHNOLOGY*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
|---|---|---|
| **Apps** *HCPCS NA* Examples: Proloquo2Go Proloquo4Text Verbally Compass Predictable  M. Proloquo2Go® N. Proloquo4Text® | $0–$500 | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Require message overlays for tablet systems | Because of frequent changes to apps, individuals with limited acceptance of new formats or updates may have difficulty | Readily available in online marketplace<br>Relatively low cost | Some apps developed for single individual; varied quality exists in market<br>Limited access to support for use, training, and troubleshooting<br>Large number of apps available; many professionals have difficulty remaining updated on options |

*continued*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
|---|---|---|
| **ACCESSORIES** *HCPCS E2599* | | |
| **Access Switches**  O. Micro Light switch  P. Jelly Bean Twist switch | $20–$2,000 | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Provide access to messaging<br>Support for evaluating multiple access method needs (e.g., fatigue, disease progression, context) (Fager et al., 2012) | | Accommodate multiple physical disabilities to gain access to communication | Limited professional support available (e.g., SLP with AAC specialization, occupational/physical therapist [OT/PT] with switch experience) |
| | Indirect access through scanning by activating a switch when desired message is reached<br>Direct access through Morse code by activating one or two switches to formulate message<br>Direct access through head movement and dwell on desired message | May be cognitively taxing (scanning) | Relatively inexpensive | Slow message formulation, particularly with scanning<br>May need supports during transfers to remove accessories or mounts<br>Minimal repairs and maintenance available; most must be replaced when damaged |

*continued*

*294*                                    *THE PROMISE OF ASSISTIVE TECHNOLOGY*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
|---|---|---|
| **Eye Gaze Access** <br><br> Examples: <br> Eyespeak 12HD <br> I-series (12+/15+) <br> NuEye™ Tracking System <br><br>  <br> Q. Eyespeak 12HD | $2,000–$8,000 | |
| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
| **MOUNTING SYSTEMS** *HCPCS E2512* | | |

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Direct access through eye gaze selection | Blindness<br>Eye movement impairment (e.g., apraxia)<br>Consistent inability to calibrate the gaze system | Enables individuals to control an AAC device using eye gaze interaction | Extraneous movements (e.g., not under personal control, such as chorea/hyperkinetic movement) may interfere with calibration and accuracy |
| | **Indications for Use** | **Relative Contraindications** | **Benefits** | **Limitations** |
| | Provide access to device in various environments (e.g., wheelchair, desk, workstation)<br>Secure AAC technology and accessories to mobility devices, seating systems in home/workplace | Direct access to touchscreen with body<br>Portable device | Transport communication device<br>Limit fatigue associated with device transport<br>Provide optimal position for access to device | Limited professional support available (e.g., SLP with AAC specialization, OT/PT with AAC technology mounting experience)<br>Minimal repairs and maintenance available, most must be replaced when damaged<br>May require support to remove/reposition for safe transfers |

*continued*

*THE PROMISE OF ASSISTIVE TECHNOLOGY*

**ANNEX TABLE 6-1**
Continued

| AAC/AAC TECHNOLOGY Type *CMS code* | Cost Range | |
|---|---|---|
| **Device Mounts** Examples: Wheelchair mount Desk mount Rolling floor mount  R. DaeSSy Rigid Mount Tech/Talk, Speak & Scan Devices | $400–$1,500 | |
| **Switch/Accessory Mounts**  S. LIGHT-3D Table mount with two tubes and three joints with lever (14.4052)[b] | $50–$400 | |

NOTE: NA = not applicable.

[a]Technologies depicted in these images were current at the time of this writing.

[b]REHAdapt Engineering does not manufacture and has no claim to the switch shown on the mount.

SOURCES: A. Low Tech Solutions 2017; B. Vidatak, LLC; C. E2L Limited; D. AbleNet, Inc. Photo courtesy of AbleNet, Inc.; E. AbleNet, Inc. Photo courtesy of AbleNet, Inc.; F. Attainment Company, Inc.; G. Advanced Multimedia Devices, Inc.; H. Tobbi Dynavox. © 2017 Tobii Dynavox. All rights reserved.; I. Prentke Romich

| | Indications for Use | Relative Contraindications | Benefits | Limitations |
|---|---|---|---|---|
| | Secure SGD to mobility devices, seating systems in home and community | Handheld portable device in use | Provide effective transport of heavy AAC devices | May require partner set-up for daily access and repositioning as body shifts location |
| | Secure switches/ eye gaze to AAC technology, mobility devices, seating systems in home and community | Flexible switch placement needed (e.g., on clothing, bedding) | Provide stable, consistent base of support for switch access | Limited switch placement flexibility when in use. May require partner set-up for daily access and with movement that removes person from switch proximity |

Company. © Copyright 2016 Prentke Romich Company. All rights reserved.; J. Predictable™. Copyright © 2017 Therapy Box Limited. All rights reserved.; K. Tobii Dynavox/Mayer-Johnson. The Picture Communication Symbols © 1981–2015 by Mayer-Johnson LLC. All rights reserved worldwide. Used with permission.; L. Prentke Romich Company. © Copyright 2016 Prentke Romich Company. All rights reserved.; M. AssistiveWare. Proloquo2Go® is an AssistiveWare® product. Image used with permission.; N. AssistiveWare. Proloquo4Text® is an AssistiveWare® product. Image used with permission.; O. AbleNet, Inc. Photo courtesy of AbleNet, Inc.; P. AbleNet, Inc. Photo courtesy of AbleNet, Inc.; Q. Talk to Me Technologies; R. Advanced Multimedia Devices, Inc.; S. REHAdapt Engineering GmbH & Co. KG.

**ANNEX TABLE 6-2**
Augmentative and Alternative Communication Software and Hardware

| | AAC Language Representation | | | | | |
| | Text, Alphabetic Symbols | | | | | |
| | Letter-by-Letter Spelling | Word Prediction | Whole Word Display | Letter Coding | Morse Code | |
|---|---|---|---|---|---|---|
| Communication Proficiency | YES | YES | YES | YES | YES | |
| Literacy Proficiency | YES | YES | YES | YES | YES | |
| Prerecorded Utterances | NO | NO | NO | NO | NO | |
| Novel Utterances | YES | YES | YES | YES | YES | |
| Vocabulary Selection | Individual Recall memory | Individual recall and recognition memory supported by software-embedded dictionaries | Individual recognition memory supported by display of high-frequency words | Individual recall memory Typically personalized for individual | Individual recall memory Often supported with visual display of the code | |
| Software and Hardware Features | | | | | | |
| Symbol Set/System | Language-specific alphabet or characters, numbers, and punctuation | Alphabetic whole-word options presented dynamically based on the letter(s) entered | Whole words integrated with alphabet, numbers, and punctuation | Letters and numbers are used to create codes representing messages (e.g., asap = as soon as possible) | Dot and dash sequences represent alphabet, numbers, punctuation, and computer functions | |

| | Single-Meaning Picture Symbols | | | | Multiple-Meaning Icons | |
| | One Display | Levels with Changeable Displays | Multiple Displays | Multiple Methods | Icon Sequencing | Multiple Methods |
|---|---|---|---|---|---|---|
| | NO | YES | YES | YES | YES | YES |
| | NO | NO | NO | NO | NO | NO |
| | YES | YES | YES | YES | YES | YES |
| | NO | NO | NO | NO | YES | YES |
| | Professional/communication partner Selection based on high-frequency vocabulary and/or customized based on personal choice, context, activity | Professional/communication partner Selection based on high-frequency vocabulary and/or customized based on personal choice, context, activity | Professional/communication partner Selection based on high-frequency vocabulary and/or customized based on personal choice, context, activity | Professional/communication partner Selection based on high-frequency vocabulary and/or customized based on personal choice, context, activity | Individual recall and recognition memory supported by high-frequency words Extended vocabulary selected based on personal choice, context, activity | Individual recall and recognition memory supported by high-frequency words Extended vocabulary selected based on personal choice, context, activity |
| | Photos, line drawings, or color graphic drawings represent words, messages | Photos, line drawings, or color graphic drawings represent words, messages | Photos, line drawings or color graphic drawings represent words, messages | Photos, line drawings, or color graphic drawings represent words, messages, paired with alphabet | Color graphic drawings that represent words and messages with more than one meaning | Color graphic drawings that represent words and messages with more than one meaning with alphabet configurations |

*continued*

*THE PROMISE OF ASSISTIVE TECHNOLOGY*

**ANNEX TABLE 6-2**
Continued

| | AAC Language Representation | | | | | |
|---|---|---|---|---|---|---|
| | Text, Alphabetic Symbols | | | | | |
| | Letter-by-Letter Spelling | Word Prediction | Whole Word Display | Letter Coding | Morse Code | |
| Number of Symbols | Language-specific letters or characters, numbers, punctuation, and other keyboard symbols | Not applicable (NA) | NA | NA | Based on language-specific symbol set | |
| Organization | Language-specific organization: QWERTY, ABCDEF, AEIOU, DVORAK, etc. | Selection options may be positioned at different display locations | Typically organized based on frequency, with the alphabet on the same or a different page | Customized letter codes, most on a separate page or section of a page | Language-specific organization | |
| Number of Display Locations | Based on individual letters or groupings Typically, 26 or more as numbers, punctuation, and control options are available | Typically in addition to the main display Groups of 6, 8, 12, or more words may be presented | Displays with 20 to 144 locations are common | Some are memorized and not displayed | Often a sheet of codes is used to support recall during learning | |

| | Single-Meaning Picture Symbols | | | | Multiple-Meaning Icons | |
|---|---|---|---|---|---|---|
| | One Display | Levels with Changeable Displays | Multiple Displays | Multiple Methods | Icon Sequencing | Multiple Methods |
| | Based on the number of display locations and individual's vocabulary needs Typically, several thousand symbols are available in communication software, and more may be added | Based on the number of display locations and individual's vocabulary needs Typically, several thousand symbols are available in communication software, and more may be added | Based on the number of display locations and individual's vocabulary needs Typically, several thousand symbols are available in communication software, and more may be added | Based on the number of display locations and individual's vocabulary needs Typically, several thousand symbols are available in communication software, and more may be added | A limited icon set is combined in sequences to represent core vocabulary Several thousand single-meaning symbols represent words | A limited icon set is combined in sequences to represent core vocabulary Several thousand single-meaning symbols represent words, including letters and numbers |
| | Based on individual communication needs: frequency, grammar, activity, topics of conversation | Based on individual communication needs: frequency, grammar, activity, topics of conversation | Based on individual communication needs: frequency, grammar, activity, topics of conversation | Based on individual communication needs: frequency, grammar, activity, topics of conversation | Does not change with selections. Icon sequences represent core vocabulary and parts of speech | Does not change with selections Icon sequences represent core vocabulary and parts of speech paired with other functions |
| | Number of locations ranges from 1 to 144 per display or page | Number of locations ranges from 2 to 144 per display or page | Number of locations ranges from 2 to 144 per display or page | Number of locations ranges from 2 to 144 per display or page | Number of locations ranges from 26 to 144 per display or page | Number of locations ranges from 26 to 144 per display or page |

*continued*

302                                THE PROMISE OF ASSISTIVE TECHNOLOGY

**ANNEX TABLE 6-2**
Continued

| | AAC Language Representation | | | | |
| | Text, Alphabetic Symbols | | | | |
| | Letter-by-Letter Spelling | Word Prediction | Whole Word Display | Letter Coding | Morse Code |
|---|---|---|---|---|---|
| Visual Scene | NA | NA | NA | NA | NA |
| Color Coding | Not typically; individual-ized color coding is possible | NA | May custom color code (parts of speech, importance, visual needs, etc.) | NA | NA |
| Navigation; Number of Pages/ Displays | Limited; typically a small number—1–6 pages/ displays | None; predictions appear on the current page/ display | Range; depending on organization of words, multiple pages may be required based on activities or topics | None; NA | None; NA |
| Rate Enhance-ment | NA | Likely; reduced keystrokes | Likely; reduced keystrokes | Yes | Yes |

*AUGMENTATIVE AND ALTERNATIVE COMMUNICATION AND VOICE*      *303*

| | Single-Meaning Picture Symbols | | | | Multiple-Meaning Icons | |
| --- | --- | --- | --- | --- | --- | --- |
| | One Display | Levels with Changeable Displays | Multiple Displays | Multiple Methods | Icon Sequencing | Multiple Methods |
| | Visual scenes may support single messages | Visual scenes may support single or multiple messages with embedded hotspots | Visual scenes may support single or multiple messages with embedded hotspots | Visual scenes may support single or multiple messages with embedded hotspots and may be paired with text or symbols | NA | Visual scenes may support single or multiple messages with embedded hotspots and may be paired with multi-meaning icons |
| | May custom color code (importance, visual needs, etc.) | May custom color code (parts of speech, importance, visual needs, etc.) | May custom color code (parts of speech, importance, visual needs, etc.) | May custom color code (parts of speech, importance, visual needs, etc.) | May custom color code (parts of speech, importance, etc.) | May custom color code (parts of speech, importance, visual needs, etc.) |
| | None; NA | Range; depending on organization of symbols, multiple pages may be required based on activities or topics | Range; depending on organization of symbols, multiple pages may be required based on activities or topics | Range; depending on organization of symbols, multiple pages may be required based on activities or topics | Range; icon sequencing minimizes navigation, but multiple pages may be required based on activities or topics | Range; icon sequencing minimizes navigation, but multiple pages may be required based on activities or topics |
| | Possible; performance data are not available | Possible; performance data are not available | Possible; performance data are not available | Word prediction evidence indicates keystroke savings, but not rate enhance-ment | Yes | Yes |

*continued*

**ANNEX TABLE 6-2**
Continued

| | AAC Language Representation | | | | | |
|---|---|---|---|---|---|---|
| | Text, Alphabetic Symbols | | | | | |
| | Letter-by-Letter Spelling | Word Prediction | Whole Word Display | Letter Coding | Morse Code | |
| The following features depend on additional needs of the individual. | | | | | | |
| Computer, Environmental Controls | Yes | Yes | Yes | Yes | No | |
| Training and Support | Varies depending on manufacturer and/or distributor, clinical professional access | | | | | |
| Peripherals | Touch guides, key guards, switches, mounting systems, external speakers, protective cases | | | | | |

| | Single-Meaning Picture Symbols | | | | Multiple-Meaning Icons | |
|---|---|---|---|---|---|---|
| | One Display | Levels with Changeable Displays | Multiple Displays | Multiple Methods | Icon Sequencing | Multiple Methods |
| | Yes | Yes | Yes | Yes | Yes | Yes |

*306*                                 *THE PROMISE OF ASSISTIVE TECHNOLOGY*

**ANNEX TABLE 6-3**
Augmentative and Alternative Communication Technology Function

| AAC Technology Category Descriptors | Common Message Characteristics | Common Message/ Language Functions | |
|---|---|---|---|
| Digitized Device ≤8 minutes recording Single display | • Single basic messages • Brief message content • Partner-dependent message formulation • Partner-dependent message recording • Multilingual | • Greet, depart • Name/label • Request (attention, help, food, break, objects, activities) • Existence/nonexistence • Cessation • Protest/reject | |
| Digitized Device 9–20 minutes recording Display modified manually by changing communication overlays | • Multiple basic, few detailed messages • Brief message content • Partner-dependent message formulation • Partner-dependent message recording • Multilingual | • Greet, depart • Name/label • Request (attention, help, food, break, objects, activities) • Comment • Protest/reject • Choices (from array) | |
| Digitized Device 21–40 minutes recording Display modified manually by changing communication overlays | • Multiple basic, detailed messages • Brief or lengthy message content • Partner-dependent message formulation • Partner-dependent message recording • Multilingual | • Greet, depart • Request (attention, help, food, break, objects, activities) • Comment • Protest/reject • Retell narratives • Choices (from array) | |
| Digitized Device >40 minutes recording Display modified manually by changing communication overlays | • Multiple basic, detailed messages • Brief or lengthy message content • Partner-dependent message formulation • Partner-dependent message recording • Multilingual • Minimal message combinations for novel interactions | • Greet, introduce • Request (attention, help, food, break, objects, activities) • Comment • Protest/reject • Retell narratives • Choices (from array) | |

| | Common Communication Contexts | Primary Communication Purposes | Communication Control | Communication Barriers Limitations |
|---|---|---|---|---|
| | Home<br>Workplace<br>Car/public<br>  transport<br>Community | Express wants<br>  and needs<br>Engage in social<br>  etiquette<br>Information<br>  transfer<br>Social closeness/<br>  relationships | Initiate<br>  communication<br>Direct action of<br>  another<br>Social comments<br>Call attention to<br>  self-achievement | No long interactions or<br>  conversational dialogue<br>Prerecorded messages<br>Poor fit for spontaneous<br>  utterances |
| | Home<br>Workplace<br>Car/public<br>  transport<br>Community | Express wants<br>  and needs<br>Engage in social<br>  etiquette<br>Information<br>  transfer<br>Social closeness/<br>  relationships | Initiate<br>  communication<br>Direct action of<br>  another<br>Social comments<br>Call attention to<br>  self-achievement<br>Combine thoughts<br>  into longer<br>  utterances | No long interactions or<br>  conversational dialogue<br>Prerecorded messages<br>Poor fit for spontaneous<br>  utterances |
| | Home<br>Workplace<br>University<br>Car/public<br>  transport<br>Community | Express wants<br>  and needs<br>Engage in social<br>  etiquette<br>Gain and share<br>  information<br>Build and sustain<br>  relationships<br>Information<br>  transfer | Initiate<br>  communication<br>Direct action of<br>  another<br>Social comments<br>Call attention to<br>  self-achievement<br>Use words to<br>  describe location<br>Ask simple questions | Few long interactions,<br>  limited conversational<br>  dialogue<br>Prerecorded messages<br>Poor fit for spontaneous<br>  utterances |
| | Home<br>Workplace<br>Car/public<br>  transport<br>Community | Express wants<br>  and needs<br>Engage in social<br>  etiquette<br>Gain and share<br>  information<br>Build and sustain<br>  relationships<br>Information<br>  transfer | Initiate<br>  communication<br>Direct action of<br>  another<br>Social comments<br>Call attention to<br>  self-achievement<br>Use words to<br>  describe location<br>Ask simple questions | Limited long interactions<br>  and conversational<br>  dialogue<br>Prerecorded messages<br>Poor fit for spontaneous<br>  utterances |

*continued*

**ANNEX TABLE 6-3**
Continued

| AAC Technology Category Descriptors | Common Message Characteristics | Common Message/ Language Functions | |
|---|---|---|---|
| Synthesized Device Physical contact, spelling Display changes dynamically when activated, based on programming | • Unlimited messages<br>• Unlimited content<br>• Independent message formulation<br>• Unlimited combinations for novel interactions<br>• Some multilingual<br>• Most QWERTY keyboards | • Greet, introduce<br>• Formulate jokes<br>• Request (attention, help, food, break, objects, activities, clarification)<br>• Comment and describe<br>• Protest/reject<br>• Hypothesize, speculate, self-talk<br>• Tell narratives, past events<br>• Manage dialogue | |
| Synthesized Device Multiple formulation and access Display changes dynamically when activated, based on programming | • Unlimited messages<br>• Unlimited content<br>• Independent message formulation<br>• Unlimited combinations for novel interactions<br>• Some multilingual<br>• Multiple display options for visual needs | • Greet, introduce<br>• Formulate jokes<br>• Request (attention, help, food, break, objects, activities, clarification)<br>• Comment and describe<br>• Protest/reject<br>• Tell narratives, past events<br>• Hypothesize, speculate, self-talk<br>• Manage dialogue | |
| Synthesized Device Multiple formulation and access Tablet (Android/Win/iOS) Display changes dynamically when activated, based on programming | • Unlimited messages<br>• Unlimited content<br>• Independent message formulation<br>• Unlimited combinations for novel interactions<br>• Some multilingual<br>• Multiple display options for visual needs | • Greet, introduce<br>• Formulate jokes<br>• Request (attention, help, food, break, objects, activities, clarification)<br>• Comment and describe<br>• Protest/reject<br>• Tell narratives, past events<br>• Hypothesize, speculate, self-talk<br>• Manage dialogue | |
| Software Communication interface | • Provides language format<br>• Provides message formulation, access options<br>• Programmed for display accommodations<br>• Varies by software/app<br>• Some multilingual<br>• Multiple options | *Described based on AAC technology categories above* | |

| | Common Communication Contexts | Primary Communication Purposes | Communication Control | Communication Barriers Limitations |
|---|---|---|---|---|
| | Home Workplace University Car/public transport Community | Express wants and needs Engage in social etiquette Gain and share information Build and sustain relationships | Initiate and maintain communication dialogue Social comments Call attention for assistance, interactions Formulate and interact with complex language | Slow message formulation, particularly for time-sensitive interactions (e.g., telephone, business meetings) Requires literacy Requires hand-contact keyboarding Some reduced intelligibility of synthesized speech |
| | Home Workplace University Car/public transport Community | Express wants and needs Engage in social etiquette Gain and share information Build and sustain relationships Information transfer | Initiate and maintain communication dialogue Social comments Call attention for assistance, interactions Formulate and interact with complex language | Slow message formulation, particularly for time-sensitive interactions (e.g., telephone, business meetings) Some reduced intelligibility of synthesized speech Many are large and heavy, require mount for transport |
| | Home Workplace University Car/public transport Community | Express wants and needs Engage in social etiquette Gain and share information Build and sustain relationships | Initiate and maintain communication dialogue Social comments Call attention for assistance, interactions Formulate and interact with complex language | Slow message formulation, particularly for time-sensitive interactions (e.g., telephone, business meetings) Some reduced intelligibility of synthesized speech Requires selection of access methods from mainstream options Not considered DME |
| | Home Workplace University Car/public transport Community | Express wants and needs Engage in social etiquette Gain and share information Build and sustain relationships Information transfer | Initiate and maintain communication dialogue Social comments Call attention for assistance, interactions Formulate and interact with complex language | Slow message formulation, particularly for time-sensitive interactions (e.g., telephone, business meetings) Some reduced intelligibility of synthesized speech Require programming of communication display and messaging Require device for voice output Varying levels of communication based on developer |

# EXHIBIT K

 (https://www.prentrom.com/)

# Our History

The History of the Prentke Romich Company (PRC) IS the History of alternative and augmentative device technology.

It all began in the early 1960's when Barry Romich, a freshman engineering student at Case Western Reserve University, met Ed Prentke, an engineer at Highland View Hospital in Cleveland, Ohio. The two men soon found they had a similar mission: to help individuals with disabilities. Prentke and Romich decided to form a partnership and, in 1966, the Prentke Romich Company was born.



## 1960s

- 1966: Ed Prentke and Barry Romich meet and form Prentke Romich Company.
- 1969: PRC produces its first communication device, a typing system based on a discarded Teletype machine.

## 1970s

- 1973: PRC moves from Barry's basement in Madisonburg to its first facility in Shreve, OH.
- 1975: The Veterans Administration orders a large quantity of Automatic Dialing Telephones, for users to make and receive telephone calls. This order gives PRC the boost it needs to grow.
- 1975: PRC welcomes the ECU-1, a 14-channel scanning environmental control device that permitted control of external devices.
- 1979: The Express 1, a microprocessor-based communication device, is developed.

## 1980s

- 1982: Prentke Romich teams with Bruce Baker of SEMANTIC COMPACTION® to incorporate the MINSPEAK® vocabulary in PRC devices.
- 1982: The Express 3, the first device with synthesized speech capabilities, is introduced.
- 1983: The MINSPEAK 1 (a repackaged Express 3 with MINSPEAK) is officially introduced at the 1st MINSPEAK Conference.
- 1984: The Touch Talker, the first portable device from PRC, debuts.
- 1984: The company moves to its present location in Wooster.
- 1985: The LightTalker begins production. The device introduces a streamlined, tethered headpointing system for users unable to use their hands for access.
- 1986: Liberator, Ltd. is formed in the UK, with PRC owning half interest.
- 1988: PRC enters the digitally recorded speech arena with IntroTalker.
- 1989: Prentke Romich Europe is formed.



## 1990s

- 1990: Prentke Romich Deutschland is formed.
- 1993: PRC receives U.S. Department of Education grant for Unity® development. This gives the company the ability to develop new language systems.

Our History | AAC & Speech Devices from PRC

- 1995: As a result of the grant, PRC launches Unity, the foundation for the vocabulary in most PRC products.
- 1996: Saltillo, a sister company to PRC, is created.
- 1997: PRC begins sponsoring the annual lecture at the American Speech-Language Hearing Association (ASHA) conference. The lecture is renamed to honor Edwin and Esther Prentke.

## 2000s



- 2000: The Pathfinder, the first product to introduce an LCD touchscreen as part of the device, launches.
- 2001: The Vantage, the first all-touchscreen device, is introduced.
- 2005: The ECO-14, with Windows accessibility, email and Internet capabilities, is released.
- 2006: In Australia, PRI Liberator Pty Ltd is created. In 2007, the company is renamed Liberator Pty Ltd.
- 2006: PRC receives ISO certification.
- 2007: PRC introduces the Language Acquisition through Motor Planning (LAMP) language system for those with autism.
- 2008: PRC acquires Saltillo.
- 2008: PRC becomes a 100% employee-owned company.
- 2009: PRC launches the AAC Language Lab® as a resource for parents, teachers and clinicians to encourage language development.
- 2009: The Center for AAC & Autism is established to promote Language Acquisition through Motor Planning (LAMP).
- 2009: The ECOPoint, the first device to utilize an eye-tracking system, is released.

## 2010s

- 2010: The Essence® family of languages, with a vocabulary designed for literate adults, is introduced.
- 2012: PRC releases its first app, LAMP Words for Life.
- 2012: The Accent® 1200 is introduced. For the first time, PRC no longer manufactures devices, instead starting with an external product.
- 2012: NuEye®, a state-of-the-art eye-tracking system, is released.
- 2014: Realize Language™, an innovative, online data-monitoring services is brought to market.
- 2015: PRC releases CoreScanner™, a progressive vocabulary program for switch users.
- 2015: NuPoint®, a head-tracking system for those with limited hand use, is introduced. The module is able to be used on all PRC devices as an additional feature.
- 2015: PRiO®, an iPad-based communication tool, featuring the iPad Air and LAMP Words for Life language system, debuts.
- 2016: PRC celebrates its 50th anniversary.

---

⌯ PRC

1022 Heyl Road

Wooster, OH 44691

📞 (330) 262-1984

📞 (800) 262-1984

📠 (330) 263-4829

📘 (http://www.facebook.com/PrentkeRomichCompany)    🐦 (http://twitter.com/PrentkeRomich)    ▶️ (http://www.youtube.com/user/PRCaccess)

## Links

About Us (https://www.prentrom.com/about-us)

Contact Us (https://www.prentrom.com/contact)

Careers (https://www.prentrom.com/careers)

International (https://www.prentrom.com/international)

Our History (https://www.prentrom.com/our-history)

Quality Commitment (https://www.prentrom.com/quality-commitment)

## Legal Stuff

Privacy (https://www.prentrom.com/privacy-policy)

HIPAA Policy (https://www.prentrom.com/hipaa-policy)

Client Bill of Rights (https://www.prentrom.com/client-bill-of-rights)

Trademarks (https://www.prentrom.com/trademarks)

## Find your Consultant

| Enter zip... | 🔍 |
| --- | --- |

 (https://www.prentrom.com/about-us/quality-commitment#achcheading)   
(https://www.prentrom.com/about-us/quality-commitment#atiaheading)

Copyright © Prentke Romich Company. All Rights Reserved.

# EXHIBIT L



*For 50 years*, PRC has given children, teens, and adults with cognitive and physical challenges the opportunity to achieve their communication potential and participate as fully as possible in life.

We helped create the assistive technology industry, and our AAC solutions have paved the way for the application of technology to speech generation. As we celebrate 50 years of empowering communication, we are grateful to everyone who has helped us reach this amazing milestone.

We have always had a single mission: the success of AAC users. It is a privilege to serve the individuals who depend on us. Our employee owners are dedicated to sustaining and building a client-centered culture that always places our clients' needs first. We will lead the AAC industry into the future by combining powerful technology, proven language systems, innovative access options, and professional teaching and therapy tools. We will continue to offer solutions that enable even the most challenged communicators, because at PRC, we believe everyone deserves a voice.



## Why PRC?

As part of our 50th Anniversary Celebration we are looking for the "50 Faces of PRC." The 50 Faces of PRC will feature 50 short video clips answering the question "Why PRC?"

These videos will encompass a diverse group of people including SLP's, device users, PRC Ambassadors, parents, teachers, vendors, and PRC employees. Each individual will be asked to create a short (1-2 min.) video or write a testimonial answering the question "Why PRC?" Depending on the individual's role, the videos may be focused on why they like working at PRC, why they recommend PRC devices, why their child is successful using a PRC device, etc.

 # Videos

PRC would like to feature YOU in one of our 50 videos! Everyone is welcome to participate!

For more information on how to submit a "Why PRC?" video, please email:

[50faces@prentrom.com (mailto:50faces@prentrom.com)](mailto:50faces@prentrom.com)

Be sure to check back often to see more of our featured "faces!"

• • • •

### Chris #19



1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16  17  18  19

# 🕐 History

Prentke Romich Company *is* the History of AAC

It all began in the early 1960's when Barry Romich, a freshman engineering student at Case Western Reserve University, met Ed Prentke, an engineer at Highland View Hospital in Cleveland, Ohio. The two men soon found they had a similar mission: to help individuals with disabilities. Prentke and Romich decided to form a partnership and, in 1966, the Prentke Romich Company was born. In 1969, the company produced its first communication device, a typing system based on a discarded Teletype machine.



In 1981, Prentke and Romich began working with Bruce Baker, the founder and president of Semantic Compaction. Baker introduced Minspeak®, a new concept for coding vocabulary in communication devices, and the first Minspeak system was introduced in 1982. The Touch Talker and LightTalker were developed in 1984 and the Liberator was introduced in 1991. All three products were retired 10 years following their introduction to the market.

In 1995, strategies for standardizing the vocabulary evolved through Mr. Baker's development of Unity®, a proprietary vocabulary program with spelling, word prediction, and single-meaning picture options. This program is now the foundation for the vocabulary in most PRC products.

In 2000, PRC introduced a new generation of augmentative and alternative communication solutions with the release of Pathfinder™, which featured a static keyboard and a color dynamic display. In 2001, PRC introduced Vantage™, a device with an enhanced operating system and portable design, making it easy to customize and support. The SpringBoard™ was launched in 2002 as the most versatile and easy to implement device, featuring the same dependable operating system as the Vantage.

Continuing our innovation in speech-generating devices, the newly redesigned Vanguard™ II was released in 2003. The Vanguard II featured synthesized and digitized speech, computer emulation, infrared environmental controls, and an integrated head-pointing system, making the device an excellent option for children new to AAC and adults with acquired disabilities.

The Pathfinder, Vanguard, Vantage and SpringBoard Plus product upgrades, announced in 2004, added integrated head-pointing and many other new features and vocabulary enhancements across the entire AAC product line.



Pathfinder
*Introduced in 2000*





Vanguard II
*Introduced in 2003*





Springboard Lite
*Introduced in 2008*

In response to the rapid changes in technology and the increased use of communcation features such as email and texting, PRC again introduced a new generation of AAC devices with the launch of the ECO™-14. which combined advanced communication and robust personal computing in a single device. With the ECO-14, AAC users could now send and receive emails and go online to surf the internet.

Also in 2007, PRC introduced the Language Acquisition through Motor Planning (LAMP) program, an approach that promotes the development of communication for individuals with Autism Spectrum Disorder.

In 2008, the company released a lighter and more portable SpringBoard, the SpringBoard™ Lite.

The ECO™2, an AAC device and Windows® XP-based computer in one, followed in 2010 and featured faster processing speed and more computing power for greater communication results. It was also the first device to offer eye-gaze compatibility, enabling users to control the device with their eyes. Essence™ PRO, Essence™ VG and Essence™ VT were also introduced in 2010 with a vocabulary designed specifically for literate adults.

In 2012, PRC moved into the app arena with the release of the LAMP Words for Life™ (WFL) app. This vocabulary program, based on Unity 84-location, was designed specifically to work with the LAMP approach. Since its introduction, the WFL app has been downloaded thousands of times and, due to its' popularity, is now being offered on Accent™ devices.

The year 2012 also brought the introduction of the Accent 1200, the first in a new family of Windows®-based products. The Accent 1200 featured a bright, sharp, 12-inch screen and a lighter frame, making it a popular choice for people with access issues.

NuEye™, a state-of-the-art eye-tracking system compatible with the Accent 1200, was also launched in 2012 and set a new standard for eye-gaze systems.

The Accent family of products continued to expand with the introduction of the Accent 1000 in 2013.

A more portable Accent device, the Accent 800, followed in 2014.



Vantage Lite
*Introduced in 2008*



Accent 1200
*Introduced in 2012*



Accent 1000
*Introduced in 2013*

The largest of the Accent products, the Accent 1400, joined the Accent family and featured advanced functionality with a large 14" screen, making access much easier for people using eye-gaze, head-pointing, and switches.

In addition to the Accent family of devices, PRC now offers a range of versatile vocabularies that are compatible with all Accent devices. The Unity family of vocabularies includes Unity, LAMP Words for Life, CoreScanner and Unidad Espanol. In addition, Essence, a spelling based program for literate adults, and WordPower, a word-based generative language system are also available.

At PRC, we have always realized the important role training and support services play in an individual's communication success. In response to a growing demand for online resources, the AAC Language Lab was launched in 2009. A valuable online resource, the Lab provides online training, lesson plans, and language stage development to empower clinicians, teachers and parents of AAC users to help AAC communicators develop expressive language.

In 2014, an innovative, online, data-monitoring service called Realize Language was introduced. This ground-breaking tool allows individuals using PRC devices and apps to upload information about the language being generated and provides automatic analysis of communication performance. This "real data" helps parents and professionals make informed decisions and develop strategies to improve an individual's language skills. CoreScanner™, a progressive vocabulary program for individuals who use switches or other methods to access communication technology, is also now part of the PRC family and is suited to the earliest learners.

NuPoint™, a head-tracking system which is an effective access solution for Accent product users with limited or no use of their hands, was introduced in 2015.

To again address a changing marketplace and the demand for tablet solutions, PRC added the PRiO, an iPad-based communication tool featuring the iPad Air and the popular LAMP Words for Life vocabulary.

PRC is proud to have been at the forefront of the AAC industry since 1966, and will continue to lead into the future with innovative products and services that enable every individual to communicate to their fullest potential.

**At PRC, we believe everyone deserves a voice.**





Accent 800
*Introduced in 2014*



Accent 1400
*Introduced in 2015*





# ❝ Testimonials

## Sean Walker

AAC Device User

> ❝ I can honestly say I would not have my college degree without PRC. Having PRC devices made it possible for me to talk to my professors, do my school work, and research topics I was studying. I chatted with classmates, asked questions inside and out of class, and made friends with new people. ❞



## Sarah Williams

Special Educator

> " It's so important for teachers to know that AAC is giving a child a voice. I think some teachers don't understand the potential that AAC devices can have. I had a student last year who used the eye-gaze tool to access the device and, oh my God, what a world that opened up for him. "



## Christine Kramlich

Parent of Kyleigh Kramlich, AAC device user

> " We've been able to discover more of Kyleigh's personality, her sense of humor, her hopes, and her dreams. This has allowed us to build a world around her that is full of things that make her happy and encourage her to push herself to her limits. "



## Stephanie Taymuree

Speech Language Pathologist and Special Educator

> "    My very best days are those when an AAC user calls my name and is then able to successfully communicate a message to me about something of which I have no previous knowledge or context," she says. "The happiness and laughter that ensues with those connections is my absolute reward! "



Marilyn Ruscoe

Parent of Grant Ruscoe, AAC Device User

> " My name is Marilyn and I am the mother of Grant, who is my 23 year old nonverbal son. You ask "Why PRC?" My answer is "why not, PRC!" The reasons are numerous. Because of PRC, Grant is able to communicate his needs and wants to us and he is also able to decrease his frustrations from not being able to verbally speak. PRC has definitely made a difference in our lives. "

Read More..





© 2016 Prentke Romich Company (PRC).    —    <u>Why PRC?</u>    <u>Videos</u>    <u>Testimonials</u>    <u>History</u>

**f** (http://www.facebook.com/PrentkeRomichCompany)    🐦 (http://twitter.com/PrentkeRomich)

▶ (http://www.youtube.com/user/PRCaccess)