# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1.  ROBERT H. BRAVER, for himself and all individuals similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 5:17-cv-00383-F ) |
| 1.  NORTHSTAR ALARM SERVICES, LLC, a Utah Limited Liability Company,<br>2.  YODEL TECHNOLOGIES, and<br>3.  DOES 2-10, UNKNOWN INDIVIDUALS, | ) ) ) ) ) |
| Defendants. | ) ) |

## PLAINTIFF ROBERT H. BRAVER'S MOTION FOR SUMMARY JUDGMENT

## AND BRIEF IN SUPPORT

**HUMPHREYS WALLACE HUMPHREYS, P.C.**
David Humphreys, OBA #12346
Luke Wallace, OBA #16070
Paul Catalano, OBA #22097
9202 S. Toledo Avenue
Tulsa, OK  74137
(918) 747-5300 / (918) 747-5311 (Fax)
david@hwh-law.com
luke@hwh-law.com
paul@hwh-law.com

**KEOGH LAW LTD**
Keith J. Keogh, IL #6257811,
Appearing *Pro Hac Vice*
Timothy J. Sostrin, IL #6290807,
Appearing *Pro Hac Vice*
55 W Monroe St, Ste 3390
Chicago, IL  60603
(312) 726-1092 / (312) 726-1093 –fax
keith@keoghlaw.com
tsostrin@keoghlaw.com

**ATTORNEYS FOR PLAINTIFF ROBERT H. BRAVER**

## TABLE OF CONTENTS

I.      Introduction ......................................................................................1

II.     Material Facts to Which There Is No Genuine Dispute .........................................1

III.    Argument and Authorities .......................................................................14

        A.  Standard on MSJ ...........................................................................14

        B.  The Telemarketing Calls to Robert Braver and the Class Violate the TCPA .......14

            1.  Yodel Initiated the Calls ...........................................................15

            2.  The Calls were Placed to Residential Phone Lines..................................16

            3.  The Calls Used Prerecorded Voices to Deliver Messages......................16

            4.  The Calls Contain an Advertisement and Constitute Telemarketing.......17

            5.  There is no evidence supporting the affirmative defense of prior express
                written consent ..........................................................................19

        C.  Northstar as Seller is Vicariously Liable for Its Telemarketer's TCPA
            Violations.  ...................................................................................20

            1. Yodel Was Northstar's Agent  ................................................22

            2. Yodel Had Actual Authority from Northstar to Make the Calls On
               Northstar's Behalf........................................................................24

            3. Yodel had Apparent Authority to Make the Calls On Northstar's
               Behalf .........................................................................................25

            4. Northstar Ratified Yodel's Conduct by Accepting the Benefits of the
               Telemarketing Campaign ............................................................27

CERTIFICATE OF SERVICE  .................................................................................31

# TABLE OF AUTHORITIES

**Federal Cases**

*1-800 Contacts, Inc., v. Lens.Com, Inc.*,
    722 F.3d 1229 (10th Cir. 2013) ....................................................................... 23, 27

*Aranda v. Caribbean Cruise Line, Inc.*,
    179 F.Supp.3d 817 (N.D.Ill., 2016) ........................................................................ 28

*Bradbury v. Phillips Petroleum Co.*,
    815 F.2d 1356 (10th Cir. 1987) ............................................................................... 23

*Braver v. Northstar Alarm Servs., LLC*,
    329 F.R.D. 320 (W.D. Okla. 2018) ................................................................. 25, 28

*Campbell-Ewald Co. v. Gomez*,
    136 S.Ct. 663 (U.S. 2016) ....................................................................................... 20

*GDG Acquisitions LLC v. Government of Belize*,
    849 F.3d 1299, 1309 (11th Cir. 2017) .................................................................... 27

*Golan v. Veritas Entertainment, LLC*,
    788 F.3d 814, 820 (8th Cir. 2015) ................................................................... 15, 18

*Golan v. Veritas Entm't, LLC*,
    2016 WL 880402, *4 (E.D. Mo. 2016) .................................................................. 27

*Henderson v. United Student Aid Funds, Inc.*,
    918 F.3d 1068, 1074 (9th Cir. 2019) ...................................................................... 27

*Holzman v. Turza*,
    728 F.3d 682, 686 (7th Cir. 2013) .......................................................................... 17

*Keim v. ADF Midatlantic, LLC*,
    2015 WL 11713593, at 8 (S.D. Fl. 2015) ............................................................... 28

*Klein v. Commerce Energy, Inc.*,
    2017 WL 2672290, at *14 (W.D.Pa., 2017) .......................................................... 28

*Krakauer v. Dish Network L.L.C.*,
    311 F.R.D. 384, 395 (M.D. N.C. 2015) .................................................................. 24

*Lucas v. Jolin,*
    2016 WL 4995040, at *4 (S.D.Ohio, 2016). ........................................................ 25

*Mey v. Venture Data, LLC,*
    2017 WL 1193072, at *14 (N.D.W.Va., 2017) ..................................................... 28

*Physicians Healthsource, Inc. v. Alma Lasers, Inc.,*
    2012 WL 4120506, at *2 (N.D. Ill. Sept. 18, 2012).............................................. 17

*Retail Liquor Ass'n of Okla. v. Okla. A.B.L.E. Comm.,*
    276 F.Supp.3d 1230, 1234 (W.D.Okla.  2017) ..................................................... 14

*Smith v. State Farm Mutual Automobile Insurance Company,*
    30 F.Supp.3d 765, 774 (N.D.Ill., 2014)........................................................... 21, 22

*Thompson v. Sutherland Global Servs.,*
    2019 WL 1470238,  *6 (N.D. Ill. 2019)................................................................ 23

*Van Patten v. Vertical Fitness Group, LLC,*
    847 F.3d 1037, 1044 (9th Cir. 2017) ...................................................................... 19

*Williams v. National Healthcare Review,*
    2017 WL 4819097, at *5 (D.Nev. 2017)................................................................ 20

**<u>Statutes</u>**

47 U.S.C. § 227 ............................................................................................. *passim*

**<u>Other</u>**

47 CFR § 64.1200 .......................................................................................... *passim*

21 F.C.C.R. 3787, 3814 (Apr. 6, 2006) ............................................................. 17

*In the Matter of the Joint Petition filed by Dish Network, LLC,*
    28 F.C.C. Rcd 6574, (F.C.C. May 9, 2013) ...................... 15, 21, 22, 23, 25, 26, 27

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act,* 30
    FCC Rcd. 7961, (June 18, 2015) ................................................................... 19, 20

*In Re Rules & Regulations,* 18 F.C.C. Rcd. 14014 (2003)............................... 20.

Restatement 3d of Agency, § 1.01...................................................................... 23

Restatement (Third) of Agency, § 4.01 .............................................................. 28

Restatement (Third) Of Agency § 4.03 ............................................................ 27

Rules and Regulations Implementing the TCPA,
    70 FR 19330, 19331 (2005) .................................................................. 16

Comes now the Plaintiff, for himself and on behalf of the class, and moves this Court pursuant to FRCP 56 for summary judgment against Defendants for their violations of the TCPA.  In support of said Motion, Plaintiff states the following:

## I.  Introduction

This case concerns an illegal telemarketing scheme.  Between February 2016 and October 2016, Defendants used the same prerecorded soundboard technology to place telemarketing calls to over six million people across the country, including Plaintiff, who had no relationship whatsoever with the Defendants.  On October 15, 2018, this Court certified a class of 239,630 persons who received, in total, 252,765 of these calls. Doc. 72 at p. 7.  Each one of these calls to the class violated the Telephone Consumer Protection Act (TCPA) and the FCC's implementing regulations. *See* 47 U.S.C. § 227(b)(1)(B); 47 C.F.R. § 64.1200(a)(3).

Further, although the calls were physically placed by defendant Yodel Technologies, Inc. ("Yodel"), they were placed on behalf of defendant Northstar Alarm Services, LLC ("Northstar"), who is also liable for the calls under several theories of vicarious liability.

As shown below, there are no genuine disputes as to any material fact and the class is entitled to judgment as a matter of law.

## II.    Material Facts to Which There Is No Genuine Dispute

### Background

1.    Northstar sells home security systems. Ex. 1 at 23:7-11.

2.      Yodel's business is to place telemarketing calls on behalf of its commercial clients using its prerecorded soundboard system. Ex. 2  at 16:6-17, 55:13-17, See also Ex. 5 & Ex. 6.

3.      Although Northstar operates its own call center in the United States, where it pays its call center employees $8 to $12 per hour (Ex. 1 at 80:20 – 81:20), Northstar decided in January 2016 to hire Yodel to place prerecorded telemarketing calls on its behalf, rather than having its own call center employees make live telephone calls. Ex. 1 at 26:16-27:1, 27:13-18.

4.      Northstar hired Yodel to obtain the landline telephone numbers and other contact information for "homeowners specifically" in the areas where Northstar did business and to then call those residential numbers on its behalf. Ex. 2 at 19:7-24; 24:24 – 25:6.

5.      Further, Northstar hired Yodel to call those individuals using Yodel's prerecorded soundboard system so that those persons could be "qualified" to purchase Northstar's home security products, and then refer those individuals to Northstar after completing the soundboard process. Ex. 2 at 53:20-23, 55:6-17.

6.      The calls' purpose was to sell Northstar's alarm systems with monitoring contracts for either 42 or 60 months of service at a rate between $45 and $75 per month. Ex. 2 at 53:2-7; Ex. 1 at 129:8-132:1.

<u>Yodel's System Delivered Prerecorded Messages Advertising Northstar's Products</u>

7.      All of the calls Yodel made on behalf of NorthStar were made using the same soundboard system. Ex. 2  at 32:11-15, 54:17-24, 55:13-17.

8.      Yodel contracted with "voice talent" who recorded various spoken messages and saved those recorded messages as ".wav files" on a computer for later use by the soundboard agents. Ex. 3 at 103:1-10.

9.      Northstar approved these recordings prior to their use in the telemarketing campaign.  Ex. 1 41:18-42:13.

10.     NorthStar knew beforehand that the soundboard system utilized these prerecorded messages and approved the prerecorded script that Yodel would use. Ex. 1at 30:10-31:10, 52:9-14, 67:2-24.

11.     The script that Northstar approved proceeded as follows, with each numbered paragraph reflecting a separate prerecorded .wav file to be played by the soundboard agent:

1.   Intro: Hello this is Amy, I am security advisor, can you hear me okay?
2.   Purpose: Okay, good, I am with the security help center and the reason why I am calling today is that there have been issues with false alarms, with home security systems in your neighborhood, have you been informed about that?
3.   Security Concern: With crime rates and mass shooting on the rise in the US and national security with our borders, you can see having false alarms with home security systems in your area can be a big concern right?
4.   My job: So it's my job to make sure that all the homes in your neighborhood are aware of the technologies and security programs available in your area, I just have a couple of questions to see what your home will qualify for. Are you the homeowner? …
9.  . . . . the system you prequalify for is full color, touch screen, and has the ability to use home automation products like wireless door locks,…..cameras, and thermostats that you can control from your cell phone.
Ex. 9; Ex. 1 40:18-23, 41:11-17, 67:2-68:2; Ex. 3 103:13-21.

12.     The system advertised is the system that Northstar would sell to any willing recipients of these calls. Ex. 1 at 77:18 – 78:6.

3

13.     The soundboard agents were employed by a call center in India and were not required to speak the English language. Ex. 3 ( at 93:16-25.

14.     Northstar knew that agents in India would be used to operate the soundboard recordings during the calls; indeed, the low hourly rate was a significant factor in Northstar's decision to implement the telemarketing campaign. Ex. 3 at 195:17-24; 240:25 – 241:6.

15.     Yodel's automated predictive dialer initiated each of the calls at issue in this case.   Ex. 2  at 37:16-39: 4, 41:19-24.

16.     A computer dialed the telephone number, detected whether or not it was answered by a potential customer, and if so, transferred the connected call to a soundboard agent trained to play the prerecorded audio file by pressing the appropriate buttons in order. Ex. 2 at 37:16-39: 4, 41:19-24.  Ex. 3 at 97:14 – 98:1, 101:25-102:4 ; *see also* Ex. 9.

17.     Thus, after answering a call connected by Yodel's predictive dialer, the first thing a lead prospect heard was a prerecorded message stating:  "Hello this is Amy[1], I am security advisor, can you hear me okay?"  Ex. 9.

18.     During the course of the telemarketing campaigns, there were some variations in how a lead was provided to Northstar, but every call began with the soundboard agents playing the first recording.  See Ex. 9; Ex. 3 at 120:2-24, 122:11-123:3, 125:25-126:12, 127:1-13, 129:13-22,  Ex. 11 and 12.

---

[1] At different points, this script was recorded by "Amy," "Joe," and "Billy" with no meaningful changes to the script. Ex. 3  at 102:11-103:7, 108:19-109:18.

<u>Defendants Attempted to Conceal Their Identities Throughout the Campaign</u>

19.    Defendants actively concealed their identity from the recipients of their telemarketing calls.  In order to mislead consumers into thinking that a local number was calling, the soundboard system was designed to display a bogus telephone number on the recipient's caller id, using the same area code as the telephone number as the recipient 99.51% of the time. Ex. 3  at 87:9-19; Ex. 13 91:24-97:12, see also Ex. 8  at p. 11 ¶¶ 36-44, 48.

20.    Defendants used the alias "Security Help Center" in the approved, prerecorded sales script, despite knowing there was no such entity. Ex. 9; Ex. 1 at 69:8-23; Ex. 3 at 104:12-24.

21.    Northstar itself referred to Yodel as the "Security Help Center" in its communications with the persons previously called by Yodel. Ex. 1 at 112:1 – 113:1.

22.    Despite receiving numerous complaints about the robocalls, NorthStar's call center employees denied any knowledge about use of a robocall system when confronted with irate consumers. Ex. 1 at 117:5-118:11, 121:15-123:1; Ex. 14; Ex. 3 152:13-23, Ex. 15.  Northstar states it simply rolls right through complaints that Amy is a robot.  Ex. 15 at NS 1627

23.    After one such complaint, NorthStar's telemarketing director asked Yodel: "How would they know leads are being sent to NorthStar if they are receiving a call from the Security Help Center? I am feeling exposed, please advise." Ex. 16; Ex. 17; Ex. 3  at 181:20-183:3.

24.     Yodel investigated Northstar's concern, discovered how Northstar's information was being provided and eliminated the source of Northstar's concern by not giving any call back information going forward.  Ex. 17; Ex. 3 at 184:23-185:16, 186:4-17.

25.     Northstar testified that it did not want Yodel to inform consumers that Northstar was involved in the calls and did not even want Yodel to provide Northstar's phone number to the consumers called. Ex. 1 at 153:17-25, 155:11-156:4, 157:8-9.

<u>Defendants Knew They Had No Consent to Place the Calls</u>

26.     With Northstar's approval, Yodel obtained the contact information for the telemarketing campaign from two sources:  Flex Marketing and Red Dot Data.  Ex. 2 at 18:8-19:6.

27.     Red Dot Data provided contact information for residential landline telephone subscribers, without any representation that the subscribers had ever consented to receive telemarketing calls. Ex. 2 at 18:8-19:6, 24:24-25:12.

28.     Thus, both Northstar and Yodel  understood that records from Red Dot Data was not "consent data"; they both simply decided that they did not need consent to call landline telephone numbers, and therefore did not care that the persons in the Red Dot Data marketing list had not consented to receive telemarketing calls. Ex. 2 at 25:20-26:12.

29.     Yodel President Kyle Wood testified, Defendants determined they did not need and therefore did not seek *any* consent to call landline telephone numbers.  Ex. 2 at 25:20-26:12; 172:6-21.

30.     Northstar testified it never received or saw a written authorization for the calls at issue. Ex. 1 at 171:12-172:1.

### Northstar Controlled The Telemarketing Campaign

31.     Yodel built its campaign pursuant to Northstar's specifications.  As Yodel's Operations Manager, Ryan Dana, testified, when Yodel obtains a new client, in this case Northstar, "we build the campaign as direct by the client."  Ex. 24 at at 7:19-25.

32.     Northstar controlled the manner in which Yodel would conduct its soundboard calls.  For instance, in March of 2016, Northstar demanded that Yodel do a live transfer of the call to Northstar after completing the soundboard process, rather than ending the call and having Northstar call back later.  Ex. 1 at 56:14-23.

33.     Northstar demanded this change because it was not finding the prior system to be profitable.  Ex. 1 at 56:24- 57:5; 59:25 – 60:23.  Yodel acquiesced and implemented the transfer process. Id.

34.     Northstar also controlled the volume of calls that Yodel made on its behalf. Ex. 25 at 527-528.  For instance, on March 11, 2016, Northstar demanded that Yodel place the calls at a rate such that Northstar would receive two transfers per hour, and Yodel acquiesced to this demand. Ex. 26.

35.     Similarly, on August 26, 2016, Yodel asked Northstar for permission to adjust the volume of its calls and Northstar refused, telling Yodel that it needed to keep the volume "at 60." Ex. 27.

36.     Similarly, on March 31, 2016, Northstar demanded that Yodel pause the calling campaign and Yodel acquiesced. Ex. 28 2.

7

37.     Similarly, on June 2, 2016, Northstar demanded that Yodel "ramp up" its call volume. Ex. 29.

38.     Northstar also controlled which numbers Yodel called on its behalf.  To begin, Northstar demanded that Yodel call residences only in certain zip codes and Yodel acquiesced to that request. Ex. 1 at 73:1-5, 82:6-17.

39.     Northstar also frequently instructed Yodel to stop calling certain numbers and to add those numbers to Yodel's internal do-not-call list, and Yodel followed those instructions. See Ex. 24 at 12:1-22); Ex. 30;  Ex. 31; Ex. 32; Ex. 33; Ex. 34.

40.     Similarly, Northstar repeatedly instructed Yodel to stop placing repeat calls to certain numbers and Yodel acquiesced in those instructions.  Ex. 35;, Ex. 36.

41.     Northstar also controlled the telemarketing script that Yodel used in the calls.  Not only did Northstar give ultimate approval for the script (See *supra* ¶¶ 9-11), it made changes to the script during the campaign and demanded that Yodel adhere to those changes. Ex. 37.

<u>Northstar Shared Internal Systems and Sensitive Information With Yodel</u>

42.     In order to implement the campaign, Northstar allowed Yodel to integrate with, access, and post data directly into Northstar's customer management software (Salesforce), which kept track of Northstar's customers and sales. Ex. 38; Ex. 1 at 165:25 – 167:17, 107:17 – 108:3; 129:6-10.

43.      Northstar also allowed Yodel to integrate with, access, and post data directly into Northstar's telemarketing software (Five9) which stored all of the data Northstar used for telemarketing.  Ex. 39; Ex. 40; Ex. 25; Ex. 1 at 52:9 -53:4, 85:2 –

86:11

44.     Northstar also provided regular reports to Yodel about the sales it was making as a result of Yodel's calls. Ex. 41; Ex. 1 at. 103:19 – 105:4; 182:11-22.

<u>Northstar Knowingly Accepted the Benefits of the Prerecorded Calls</u>

45.     Northstar admits in its response to Plaintiff's motion for class certification that it accepted the benefits of the unlawful telemarketing campaign stating "Yodel's leads led to roughly 150 new NorthStar customers."  Dkt 57 at p. 13; Ex. 1 26:16-21, 105:6-9.

46.     Yodel made 77,912,856 calls using its soundboard system to consumers during the Northstar telemarketing campaign.  Ex. 7.

47.      From its nearly 78 million calls, Yodel winnowed out disinterested parties and provided Northstar with 7874 distinct leads and between 5309 and 9196 live call transfers.  Ex. 22; Ex. 23 at INT 4.  .  Northstar was "very impressed with the quality of verified leads" and remarked that "connect rates are REALLY GOOD."  Ex. 15, at 1627.

<u>The Marketing List</u>

48.     Yodel stored and maintained the marketing list in a Northstar specific database and used the list exclusively for calls on behalf of Northstar. Ex. 2 at 32:6-10; Ex. 3 at 225:25-226:5.

49.     Yodel produced the complete marketing list in a file named "northstar_outbound_leads." Ex. 2 at 27:2-18.

50.     As can be seen in the excerpt attached hereto as Exhibit 10, that data file contains the name, address, and telephone number of the persons in the marketing list and

identified the source of the contact information in the "outbound_lead_group_id" column, i.e. either Flex Marketing (code 632) or Red Dot Data (code 597). Ex. 2 at 28:24-29:8.

## The Call Records

51.     Yodel's automated dialing system generated records of all of its soundboard calls on behalf of Northstar into a database and produced a copy of the database records in a file named "northstar_outbound_lead_logs." Ex. 2 at 57:3-58:6.

52.     Each call was logged and assigned a unique id for each person called (Column B – outbound_lead_id), corresponding to a unique id in the Telemarketing List identifying the person called for each call. Ex. 10; see also Ex. 2 at 59:1–19.

53.     In addition, the call records reflect the date and time that the call was dialed (column M – dial_time), the date and time that the call was answered (column N – answer time), and the date and time that call disconnected. (Column P – hangup_time).Ex. 10; Ex. 2 at 66:22-67:16, 69:17-70:9.[2]

54.     These call records show that between February 15, 2016 and October 24, 2016, Yodel made millions of telemarketing calls on behalf of Northstar to the people in the marketing list. Ex. 3 at 212:22 – 213:13; Ex. 7; Ex. 8.

55.     As one example, on August 26, 2016, the same day that Plaintiff received a call, Yodel placed 1,106,572 soundboard calls for the Northstar campaign. Ex. 7.

---

[2] These time stamps are in Unix format, and reflect time, in microseconds, from midnight on January 1, 1970, to the time of the event.  See Ex. 8 at fn 1; see also Ex. 2 at 67:9-16.

56.     Additionally, the call records contain data points explaining what occurred during each call.  For instance, the hangup_cause (column T) conveys the automated response from the telephone carrier as to whether or not the call connected to the called party. Ex. 2 at 62:15-20.

57.     The value "normal clearing" proves successful call completion to the called party. Ex. 2 at 63:10-19; Ex. 8 at p. 9 ¶ 17.

58.     Further, the cc_agent column (column L), is populated whenever the call is handled by a soundboard agent. Ex. 2 at 68:15 – 69:7.

*59.*     Thus, if that column is populated by a value, rather than blank, it means that a soundboard agent handled the call. Ex. 2 at 68:15-69:7

60.     Finally, the status_final column (column E) reflects the soundboard agent's treatment of the call. Ex. 2 at 61:8-9.

61.     The status codes 20 (DNCL) and 50 (sale) in this column are only entered by the soundboard agents if they handled a call.    Ex. 4 at 26:10-27:19, Ex. 4.

62.     Status code 20 (DNCL) means that the called party responded to the prerecorded prompts by stating that they did not want to be called again. Ex. 4 at 32:25-33:2.

63.     Status code 50 (sale) means the soundboard agent played at least six prerecorded messages during the call. i.e. up to "are you a U.S. Citizen?" Ex. 4 *Y*at 34:2-35:15.

## The Class

64.     On October 15, 2018, the Court certified the following class and subclass:

11

Class:
All persons in the Red Dot Data marketing list for whom Yodel's
records reflect a telephone call regarding Northstar's home security systems
that lasted more than 30 seconds, that was handled by an agent who applied
status code 20 or 50 to the call, and that resulted in the normal clearing
disposition.

Subclass:
All persons in the Red Dot Data marketing list for whom Yodel's
records reflect a telephone call regarding Northstar's home security systems
that lasted more than 30 seconds, that was handled by an agent who applied
status code 50 to the call, and that resulted in the normal clearing disposition.

Excluded from the class are:
Any persons whose contact information is associated with either an IP
address or website URL in the Red Dot Data marketing list.

Doc. 72 at pp. 26-27

65.    Plaintiff's expert analyzed Defendants records and identified 239,630

persons who meet the class definition, and 47,398 persons who meet the subclass

definition.  Ex. 8 at p. 6 ¶ 15, pp. 10-11 ¶¶ 32-33.

66.    In doing so, he removed any call records where it was even remotely

possible that no prerecorded message played. *See* Ex. 13  at 84:14 – 91:2; See also, Ex. 8

at p. 6 ¶ 14-p. 10 ¶ 33.

67.    As a result of this highly selective and conservative approach, Biggerstaff

narrowed the total set of 78 million call records to only 252,765 calls at issue for the

class. Ex. 13 at 90:10-12; Ex. 8 at p. 12 ¶¶ 46-47.

<u>Plaintiff's Complaint and Defendants' Response</u>

68.    On August 26, 2016, Plaintiff received a telephone call from the

soundboard system on his residential phone number.  Ex. 18; Ex. 11; Ex. 13 7:3-7, 18-24,

11:20-12:9, 13:20-14:12, 91:3-22.

69.     In that call, the soundboard agent pressed the prerecorded functions as trained, and thus could not answer even the most basic questions about who was calling and why Plaintiff's number had been dialed. Ex. 11; Ex. 13  11:20-12:9, 14:13-15:23, 22:23-23:13.

70.     Just like every other class member, Plaintiff is in the Red Dot Data marketing list, and was called with a prerecorded voice attempting to sell Northstar's home security systems simply because Red Dot Data had sold Plaintiffs information to the defendants. See Ex. 10; Ex. 13 91:3-22; Ex. 8 p. 10 ¶¶ 34-35.

71.     Just like every other class member, Braver had no prior relationship with Northstar and was the recipient of a cold sales call reflecting the same data points in Yodel's call records as the calls to the rest of the class; i.e., the telephone network gave the "normal_clearing" disposition to the call, indicating that it connected; the call lasted at least 30 seconds; and the call connected to a soundboard agent who notated the call with code 20 or 50.  Ex. 8 at ¶¶ 19-33; Ex. 10; Ex. 13 H 84:14-85:17, 86:8-87:11, 87:25-89:25, 91:3-22.

72.     On August 28, 2016, Plaintiff sent Northstar a letter explaining that the robocalls were illegal and asking for additional information for his investigation.  Ex. 19; Ex. 13 at 13:16-14:3, 15:17-20.

73.     As a result of Plaintiff's letter, NorthStar debated whether to cease the calls and expressly stated in writing the decision would depend on how much money it was making. Ex. 1 at 178:7-180:25; Ex. 20.

74.     Apparently Northstar believed that its profits made the illegality worth the risk. After this discussion, Northstar entered into a new contract with Yodel for prerecorded soundboard calls on its behalf, for which Northstar would pay $5.25 per soundboard agent hour.  Ex. 21.

## III.    Argument and Authorities.

### A.    Standard on MSJ

The standard for summary judgment is well established. Summary judgment may only be granted if the evidence of record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The movant bears the initial burden of demonstrating the absence of material fact requiring judgment as a matter of law. A fact is material if it is essential to the proper disposition of the claim. If the movant carries this initial burden, the nonmovant must then set forth specific facts outside the pleadings and admissible into evidence which would convince a rational trier of fact to find for the nonmovant. All facts and reasonable inferences therefrom are construed in the light most favorable to the nonmoving party.

*Retail Liquor Ass'n of Okla. v. Okla. A.B.L.E. Comm.*, 276 F.Supp.3d 1230, 1234

(W.D.Okla.  2017)(internal citations omitted).

### B.    The Telemarketing Calls to Robert Braver and the Class Violate the TCPA.

The relevant portion of the TCPA states:

It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
 (b) Restrictions on use of automated telephone equipment
        (1) Prohibitions
             (B) to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call . . . is exempted by rule or order by the [FCC] . . ."

47 USC § 227(b)(1)(B).  The corresponded FCC regulation provides:

14

No person or entity may:

> Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call;
> (i) Is made for emergency purposes;
> (ii) Is not made for a commercial purpose;
> (iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing;
> (iv) Is made by or on behalf of a tax-exempt nonprofit organization; or
> (v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

47 C.F.R. § 64.1200(a)(3). Defendants are liable for violations of this section of the TCPA by initiating telemarketing calls to the class members' residential phone lines using a prerecorded voice to deliver a message without the prior express written consent of the called party.

### 1.      Yodel Initiated the Calls

Yodel initiated calls to the residential phone lines of Robert Braver and the members of the class as part of a telemarketing campaign to sell Northstar's goods and services. See, § II. *supra* at ¶¶ 1-6, 48-71.

"A 'person or entity 'initiates' a telephone call when it takes the steps necessary to physically place [the] call.'" *Golan v. Veritas Entertainment, LLC*, 788 F.3d 814, 820 (8th Cir. 2015)(citing, *In the Matter of the Joint Petition filed by Dish Network, LLC,* 28 F.C.C. Rcd 6574, 6583 ¶ 26, 2013 WL 1934349, at *8 (F.C.C. May 9, 2013)). Yodel took the steps necessary to initiate the call by programming its automated dialer system to

place calls to the class members' residential telephones.  See, § II. *supra* at ¶¶ 7, 15-17, 48-71.

### 2.      The Calls were Placed to Residential Phone Lines

The class members were all part of the same data group purchased from Red Dot Data, which consisted solely of residential phone numbers.  See, § II. *supra* at ¶¶ 4, 26-28.  As Yodel testified, it purchased that data because Northstar was specifically seeking the landline telephone numbers of homeowners across the country in order to sell them home security services.  *Id*. at ¶ 4.  There is no evidence that any class members' telephone number was assigned to a commercial, rather than residential, property.

Defendants have argued that some of those phone numbers should lose their "residential" status if they were ever "held out and used" for business purposes in a home-based business. *See e.g.* Rule 23(f) Petition at pp. 29-30 (pointing to a class member who "runs his law office *out of his home*.") (emphasis added). This is unsupported and irrelevant. As this court held, "the TCPA does not make an exception to its prohibition for calling telephone lines if the residential line is used for a home-based business or for another business purpose." Doc. 72 at pp. 12-13, citing Rules and Regulations Implementing the TCPA, 70 FR 19330, 19331 (2005) ("We also decline to exempt from the do-not-call rules those calls made to 'home-based businesses . . .'").

### 3.      The Calls Used Prerecorded Voices to Deliver a Message

It is undisputed that each call to Mr. Braver and the class was initiated using Yodel's soundboard equipment and automatic dialing system using multiple, prerecorded wav files to deliver numerous messages for the purpose of selling Northstar's goods and

services. See, § II. *supra* at ¶¶ 1-8, 11-12, 15-17, 48-71. The first thing each class

member heard was a prerecorded voice stating "Hello this is [Amy/Joe/Billy], I am

security advisor, can you hear me okay?" *Id*. at ¶¶ 11-17. Yodel's own records as

summarized by Mr. Biggerstaff and testimony of its CEO indicate that the class members

each heard one or more prerecorded messages. *Id*. at ¶¶ 7-8, 11-17, 48-71.

Absent application of an exemption or affirmative defense of consent, these calls

violated the TCPA, 47 USC § 227(b)(1)(B).

### 4.     The Calls Contains an Advertisement and Constitute Telemarketing

"The term advertisement means any material advertising the commercial

availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1).

The calls at issue in this expressly advertise the quality of Northstar's home security

system. See, § II. *supra* at ¶¶ 11-12. They are therefore advertisements. *See, Holzman v.

Turza*, 728 F.3d 682, 686 (7th Cir. 2013); *Physicians Healthsource, Inc. v. Alma Lasers,

Inc*., 2012 WL 4120506, at *2 (N.D. Ill. Sept. 18, 2012) ("Faxes promoting a free

seminar may constitute an 'unsolicited advertisement' since free seminars are often a

pretext to market products or services") (citing 21 F.C.C.R. 3787, 3814 (Apr. 6, 2006)).

Even if not advertisements, the calls are "telemarketing" because they were made

for the express purpose of marketing Northstar's goods (alarm systems) and services

(alarm monitoring). See, § II. *supra* at ¶¶ 1-6, 12. "Telemarketing" is defined as the

"initiation of a telephone call or message for the purpose of encouraging the purchase or

rental of, or investment in, property, goods, or services, which is transmitted to any

17

person." 47 C.F.R. § 64.1200(f)(12).   The undisputed evidence demonstrates that the purpose of the calls is telemarketing.

The prerecorded messages and script do not specifically mention Northstar (it specifically instructed that its name not be used) or its alarm systems but it is the purpose of the call not its content that makes a call "telemarketing." *Golan*, 788 F.3d at 820 ("While the content of the calls controlled whether they were 'advertisements,' their purpose controlled whether they were 'telemarketing.'")  The *Golan* Court then discussed purpose versus content at length stating:

> Neither the TCPA nor its implementing regulations "require an explicit mention of a good, product, or service" where the implication of an improper purpose is "clear from the context." Congressional findings indicate that consumers consider "prerecorded calls, regardless of the content [of the] message, to be a nuisance and an invasion of privacy." Even when the intended content of a message is not conveyed, the intrusion into the home and the "seizure" of the phone line is the same.
> Senator Hollings, the sponsor of the TCPA, has explained that "computerized calls are the scourge of modern civilization." They wake us up in the morning, interrupt our dinner at night, force the sick out of bed, and "hound us until we want to rip the telephone right out of the wall." Given these findings and the plain language of the regulations, we conclude that content may be instructive, but it is not dispositive. "Telemarketing" occurs when the context of a call indicates that it was initiated and transmitted to a person for the purpose of promoting property, goods, or services.

*Id*. at 820-821(internal citations omitted).

The *Golan* Court ultimately held that prerecorded calls that did not mention the movie being marketed by name were, nevertheless, made for the purpose of telemarketing the movie and were not exempt from the coverage of the TCPA.  *Id*.  The calls to the class were made for the purpose of telemarketing Northstar's goods and

18

services and are telemarketing calls regardless of whether Northstar or its goods and services were mentioned expressly in the prerecorded messages.  It is undisputed that as "telemarketing" calls, none of the exceptions in the statute apply. 47 USC § 227(b)(1)(B; 47 C.F.R. § 64.1200(a)(3)(iii).

**5.      There is no evidence supporting the affirmative defense of prior express written consent**

The Defendants did not seek prior express consent, did not produce evidence of prior express consent, and determined that consent was not necessary.  See, § II. *supra* at ¶¶ 26-30.  There is no evidence of the prior express written consent required by 47 CFR § 64.1200(a)(3).

Because consent is an affirmative defense, Defendants bear the burden of proving that the proposed class members provided signed prior express written consent authorizing Northstar to initiate or cause someone else (such as Yodel) to initiate prerecorded voice messages encouraging the purchase of Northstar's goods and services. Order, 30 FCC Rcd 7961, at 8012-13, ¶ 98, see also, *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037, 1044 (9th Cir. 2017) (holding burden is on Defendant to prove affirmative defense of consent).  No evidence even plausibly suggests that this *could have* happened, let alone that it actually happened for even a single class member.

At best, some class members (including Braver) agreed to a call back at a later time or date during a call but no one provided express written consent prior to receiving the call in which they verbally agreed to a call back.  "Purporting to obtain consent

during the call . . .does not constitute the *prior* consent necessary to deliver the message

in the first place." *In Re Rules & Regulations,* 18 F.C.C. Rcd. 14014, 14099 (2003).

Since 2013, the TCPA implementing regulations have barred the initiation of

telemarketing calls that use "an artificial or prerecorded voice to deliver a message

without the ***prior express written consent*** of the called party."  47 C.F.R. §

64.1200(a)(3)(emphasis added); see also, *Williams v. National Healthcare Review*, 2017

WL 4819097, at *5 (D.Nev. 2017). The CFR defines "prior express written consent" as:

> "an agreement, **in writing,** bearing **the signature of the person called** that
> clearly authorizes the seller to deliver or cause to be delivered to the person called
> . . .telemarketing messages **using . . . an artificial or prerecorded voice**, and the
> telephone number to which the signatory authorizes such  . . .telemarketing
> messages to be delivered."

47 C.F.R. § 64.1200(f)(8)(emphasis added).  It must further contain a "clear and

conspicuous disclosure" that "tell[s] consumers the telemarketing **will be done with**

**autodialer equipment** and that **consent is not a condition of purchase**." 2015 TCPA

Order, 30 FCC Rcd 7961, at 8012-13, ¶ 98 (emphasis added).

Yodel admits it never sought such consent and Northstar admits that it has never

seen such consent related to any call made during the telemarketing campaign.  See, § II.

*supra* at ¶¶  25-29.   The affirmative defense of consent does not apply.

## C.    Northstar as Seller is Vicariously Liable for Its Telemarketer's TCPA Violations.

"The Federal Communications Commission has ruled that, under federal common-

law principles of agency, there is vicarious liability for TCPA violations." *Campbell-*

*Ewald Co. v. Gomez,* 136 S.Ct. 663, 674 (U.S. 2016) (internal citation omitted); *see also*

*Smith v. State Farm Mutual Automobile Insurance Company,* 30 F.Supp.3d 765, 774 (N.D.Ill., 2014) (regardless of whether the FCC Ruling binds the Court or is merely persuasive authority, the Court finds that the FCC's determination that an entity may be vicariously liable for violation of section 227(b) under a broad range of common-law agency principles is correct.")

"For even when a seller does not 'initiate' a call under the TCPA, we conclude that it may be held vicariously liable for certain third-party telemarketing calls. In particular, we find that the seller may be held vicariously liable under federal common law principles of agency for TCPA violations committed by third-party telemarketers. In this regard, we explain below that a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *May 2013 FCC Ruling*, 28 FCC Rcd. at 6584 (¶ 28).

The FCC reasoned that without vicarious liability a seller could "avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties [leaving] consumers in many cases without an effective remedy for telemarketing intrusions." *May 2013 FCC Ruling*, 28 FCC Rcd at 6588 (¶ 37). It also reasoned that "the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules." *Id.*

Allowing vicarious liability for sellers when its telemarketers violate the TCPA comports with its consumer protection goals and like the statute should be read broadly to continue to meet these goals.  As the *Smith* court held, "allowing sellers to avoid potential TCPA liability by outsourcing their telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions, particularly when the telemarketers are judgment proof, unidentifiable, or located outside the United States." *Smith*, 30 F.Supp.3d at 774.

"Potential liability under general agency-related principles extends beyond classical agency" *May 2013 FCC Ruling*, 28 FCC Rcd.at 6586 (internal citations omitted).   For instance, "vicarious liability for TCPA violations in the telemarketing context may be found where "the seller approved, wrote or reviewed the outside entity's telemarketing scripts" or where "the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." *Id.* at 6592.

Further, "a seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by knowingly accepting their benefits.  Such ratification may occur 'through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences.'"  *Id.* at 6587.

**1.  Yodel was Northstar's Agent**

"The classical definition of 'agency' contemplates "the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that

the agent shall act on the principal's behalf and subject to the principal's control.' *Id.* at

6586, citing Restatement (Third) of Agency § 1.01.

"[A]n independent contractor can be an agent. An agent need not be an

employee." *1-800 Contacts, Inc., v. Lens.Com, Inc.*, 722 F.3d 1229, 1251 (10th Cir.

2013), citing *Bradbury v. Phillips Petroleum Co.,* 815 F.2d 1356, 1360 (10th Cir. 1987).

"Control is a concept that embraces a wide spectrum of meanings, but within any

relationship of agency the principal initially states what the agent shall and shall not do,

in specific or general terms. Additionally, a principal has the right to give interim

instructions or directions to the agent once their relationship is established."  Restatement

3d of Agency, § 1.01 (Comment f(1)).  "The principal's right of control presupposes that

the principal retains the capacity throughout the relationship to assess the agent's

performance, provide instructions to the agent, and terminate the agency relationship by

revoking the agent's authority." *Id.*

In this case, Northstar assented to Yodel placing prerecorded telemarketing calls

on its behalf and subject to its control.  See, § II. *supra* at ¶¶  1-6, 31.  Northstar

controlled what was said (i.e. the scripts) during the calls (see, *id.* at ¶¶  9-12, 41), it

controlled the rate at which Yodel placed those calls (see, *id.* at ¶¶ 34-37), it controlled

which phone numbers would be called (see, *id.* at ¶¶ 38-40); and it controlled Yodel's

handling of the call, i,e, by transferring to Northstar or advising that Northstar would

follow up  (see, *id.* at ¶¶ 31-33).

These facts are similar to those found sufficient to establish control in *Thompson

v. Sutherland Global Servs.*, 2019 WL 1470238,  *6 (N.D. Ill. 2019) ("AT&T required

Defendant to use an AT&T-approved script . . . AT&T also had the right to control which customers could be called . . . AT&T even had control over the call volume and reserved the right to change the call volume as it saw fit.")

In addition, Northstar monitored Yodel's performance throughout the campaign and routinely gave instructions to Yodel, to which Yodel acquiesced (See, § II. *supra* at ¶¶ 31-41).     Northstar also exercised its ability to supervise Yodel's conduct by ensuring that its name and phone number were not provided to consumers until they spoke directly with a Northstar employee (by either transfer or call back from Northstar) and, when this directive was not followed, took immediate action by emailing Yodel that resulted in Yodel correcting its behavior and no longer providing a call back number that allowed consumers to call Northstar.   *Id.*  at ¶¶ 19-25.  Northstar used its ability to supervise to correct Yodel's temporary failure to conceal Northstar's involvement in the telemarketing campaign.

## 2. Yodel Had Actual Authority from Northstar to Make the Calls On Northstar's Behalf.

"The term seller means the person or entity on whose behalf a telephone call or message is initiated for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person."  47 CFR § 64.1200(f)(9).  It is undisputed that Northstar is the seller under this definition.    See, § II. *supra* at ¶¶ 1-6.

 "A seller can be held vicariously liable [under the TCPA] if there is actual authority, apparent authority, or ratification." *Krakauer v. Dish Network L.L.C.*, 311

F.R.D. 384, 395 (M.D. N.C. 2015) (emphasis added).  As *Krakauer* stated:

> "[T]he question of actual authority is a question common to all class members . . . as actual authority depends only on the relationship and conduct between [Northstar] and [Yodel]. If [Plaintiff] can prove to a jury's satisfaction that [Yodel] had actual authority to make the calls at issue on [Northstar]'s behalf, the class may recover from [Northstar] for any violations by [Yodel]. Thus, the issue of actual authority is a common question of fact that is central to this case."

*Id.;* see also *May 2013 FCC Ruling*, 28 FCC Rcd.6574, 6593 ("we see no reason that a seller should not be liable under [section 227(b)] for calls made by a third-party telemarketer when it has authorized that telemarketer to market its good or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.")

"The form of vicarious liability the FCC reads into the statute is that of the seller, not based on any sort of agency relationship but instead to incentivize sellers to ensure that the telemarketing companies with which they contract abide by the TCPA."  *Lucas v. Jolin,* 2016 WL 4995040, at *4 (S.D.Ohio, 2016).

It is undisputed that Northstar, as seller, authorized Yodel, as telemarketer, to engage in the telemarketing campaign using this specific script and these prerecorded messages to sell its goods and services and on its behalf.  See, § II. *supra* at ¶¶ 1-18.  This is sufficient to show actual authority under the May 2013 FCC ruling.

### 3.  Yodel had Apparent Authority to Make the Calls On Northstar's  Behalf

> "Apparent authority depends on whether a reasonable person would believe that the caller had authority to act on behalf of Northstar.  Because the inquiry is limited to how a reasonable person would perceive the calls at issue, there is no need to determine how individual class members perceived the calls."

*Braver v. Northstar Alarm Servs., LLC*, 329 F.R.D. 320, 332 (W.D. Okla. 2018).   A

reasonable person receiving Defendant's calls would believe that the Yodel had authority to call on behalf of Northstar because the calls specifically advertised Northstar's products (See, § II. *supra* at¶¶ 11-12) and Yodel endeavored to connect the caller to Northstar, either by live transfer or by having northstar place a follow up call.  *Id*. at ¶¶ 18, 31-33.

Even though Northstar instructed Yodel to conceal Northstar's identity except to those individuals called who expressed sufficient interest in alarm systems, the calls were intended to market Northstar's goods and services.  See, § II. *supra* at ¶¶ 1-6, 19-25.

At a minimum, a reasonable person would believe that the unidentified telemarketer, Yodel, had authority to make the calls on behalf of the unidentified seller, Northstar.  In addition, Northstar demonstrated the apparent authority provided to Yodel by accepting call transfers and calling back lead numbers generated by Yodel's telemarketing campaign.  If Yodel did not have actual authority, it certainly had apparent authority to engage in the telemarketing campaign.

In addition, the FCC's 2013 ruling holds that "apparent authority may be supported by evidence that:

> "the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including:  access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information.";

> "The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems";

> "It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts."

*May 2013 FCC Ruling*, 28 FCC Rcd. at 6592.  Each of these factual bases exist here.

Northstar allowed Yodel to access both its salesforce and five 9 systems, thereby

providing sales and customer information to Yodel See, § II. *supra* at¶¶ 42-44); it

allowed Yodel to enter information into those systems (*Id.*); and it approved the

telemarketing scripts (*Id.* ).   "At a minimum, evidence of these kinds of relationships . . .

should be sufficient to place upon the seller the burden of demonstrating that a reasonable

consumer would not sensibly assume that the telemarketer was acting as the seller's

authorized agent." *Golan v. Veritas Entm't, LLC*, 2016 WL 880402, *4 (E.D. Mo. 2016),

citing *May 2013 FCC Ruling*, 28 FCC Rcd. at 6592.

### 4.   Northstar Ratified Yodel's Conduct by Accepting the Benefits of the Telemarketing Campaign

"Ratification may create an agency relationship when none existed before[.]"

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1074 (9th Cir. 2019)

(reversing summary judgment for defendant in TCPA case because a reasonable jury

could find that defendant ratified the callers conduct).

The Restatement (Third) of Agency states "A person may ratify an act if the actor

acted or purported to act as an agent on the person's behalf."  Restatement (Third) Of

Agency § 4.03 (2006)(adopted by the 10th Circuit in *1-800 Contacts, Inc.* 722 F.3d at

1250-1252.   Assent to an agency relationship may be manifested by acceptance of the

benefits obtained unlawfully.   "Still another form of conduct that may yield consent by

ratification inheres in the **retention of benefits** generated by the agent's act." *GDG*

*Acquisitions LLC v. Government of Belize*, 849 F.3d 1299, 1309 (11th  Cir.

2017)(emphasis added). Thus, "**[r]atification** depends on Defendants' post-message behavior without concern for any conduct by the class members." *Braver*, 329 F.R.D. at 332.

The Northern District of West Virginia held that a survey company knew that its telemarketer was calling in violation of the TCPA and accepted the benefit of those calls by using the data generated. *Mey v. Venture Data, LLC*, 2017 WL 1193072, at *14 (N.D.W.Va., 2017). In its reasoning, the *Mey* Court stated "Notably, ratification does not require the existence of an agency relationship. Restatement (Third) of Agency, § 4.01 cmt. b ('Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority.'). It requires only that Ms. Mey prove that "POS was aware of Venture Data's acts and accepted their benefits." *Mey*, 2017 WL 1193072, at *14*; see also, Aranda v. Caribbean Cruise Line, Inc.,* 179 F.Supp.3d 817, 833 (N.D.Ill., 2016)(holding on summary judgment that sellers ratified telemarketers conduct by accepting the benefits of the unlawful calls even after being put on notice that the calling campaign may violate the TCPA); *Keim v. ADF Midatlantic, LLC,* 2015 WL 11713593, at 8 (S.D. Fl. 2015), (allegations were sufficient to state a claim that seller ratified conduct when it accepted the benefits of the conduct by having text messages sent on its behalf to phone numbers obtained on its behalf); *Klein v. Commerce Energy, Inc.,* 2017 WL 2672290, at *14 (W.D.Pa., 2017)(holding in denying summary judgment that the creditor ratified its debt collectors calls that violated the TCPA because it is presumed it would receive the benefit of any money collected and it

knew that its collector was calling the wrong party because it provided the number being called.).

Northstar ratified Yodel's conduct by accepting transfers, calling the leads provided, and accepting the sales generated by Yodel's telemarketing campaign.  See, § II. *supra* at ¶¶ 45-47.  It did so with knowledge that Yodel was using prerecorded voices to deliver a message to the class members' residential telephone numbers.  *Id*. at ¶¶ 3-5, 7-18, 26-30.  It did so and continued to do so despite numerous complaints, including that of Mr. Braver.  *Id*. at ¶¶ 22-254, 39, 68-70.  It did so even after Braver's written complaint put Northstar on further notice that the calls violated the TCPA by, after evaluating the profitability of the telemarketing campaign, entering into a new contract with Yodel to continue the campaign.  *Id.* at ¶¶ 68-70.

The undisputed evidence shows that Northstar, as seller, authorized the call campaign knowing how it would be conducted and provided Yodel, as telemarketer, actual authority to engage in the campaign.  In the alternative, a reasonable person would believe that Yodel had authority to market Northstar's goods and services and Northstar's conduct in accepting transfers and/or calling back leads reinforces this belief.  Therefore, Yodel had apparent authority to make the calls.

Regardless of whether the authority was actual, apparent, or Yodel lacked authority, Northstar ratified Yodel's conduct by accepting the benefits of the telemarketing campaign including call transfers, leads, and actual sales with full knowledge that the calls were initiated to the class members' residential phone lines

using prerecorded voices to deliver messages.  Northstar is vicariously liable for Yodel's conduct.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment on behalf of the class against Defendants for violating the TCPA, award statutory damages of $500.00 per call, treble said damages for willful and knowing violations, and enter an order enjoining Defendants from engaging in such conduct in the future.

Respectfully submitted,

**HUMPHREYS WALLACE HUMPHREYS, P.C.**

By:  ./s/ Paul Catalano
David Humphreys, OBA #12346
Luke Wallace, OBA #16070
Paul Catalano, OBA #22097
9202 S. Toledo Avenue
Tulsa, OK  74137
(918) 747-5300 / (918) 747-5311 (Fax)
david@hwh-law.com
luke@hwh-law.com
paul@hwh-law.com

and

Keith J. Keogh, IL #6257811, *Pro Hac Vice*
Timothy J. Sostrin, IL #6290807, *Pro Hac Vice*
KEOGH LAW LTD
55 W Monroe St, Ste 3390
Chicago, IL  60603
(312) 726-1092 / (312) 726-1093 –fax
keith@keoghlaw.com
tsostrin@keoghlaw.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of May, 2019, I caused the foregoing document to be electronically transmitted to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Brian R. Matula                                    brmatula@gpmlegal.net
GUM PUCKETT MACKECHNIE COFFIN & MATULA, LLP

Daniel S. Blynn                                    dsblynn@Venable.com
Stephen R. Freeland                                srfreeland@Venable.com
Elizabeth C. Rinehart                              lcrinehart@venable.com
VENABLE, LLP
*Attorneys for Defendant Northstar Alarm Services, LLC*

Eric S. Allen                                      eric@allenlawyer.com
ALLEN MITCHELL & ALLEN, PLLC

Anne E. Zachritz                                   anne@resolutionlegal.com
RESOLUTION LEGAL GROUP
*Attorneys for Defendant Yodel Technologies, LLC*

_/s/ Paul Catalano____