**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA**

ROBERT H. BRAVER, for himself )
and all individuals similarly situated, )
                            )
         Plaintiff, )
                            )     Case No. CIV-17-0383-F
-vs- )
                            )
NORTHSTAR ALARM SERVICES, )
LLC, et al., )
                            )
        Defendants. )

## <u>ORDER</u>

### I. <u>Introduction</u>

In this action, Robert H. Braver alleges, for himself and on behalf of the class the court has certified under Rule 23, that Yodel Technologies, LLC, initiated telemarketing calls on behalf of NorthStar Alarm Services, LLC, in a manner which violated the Telephone Consumer Protection Act (TCPA) and regulations implemented thereunder.

Braver appears on his own behalf and on behalf of the class with respect to count one, and appears on his own behalf with respect to count three.[1] Yodel is a company which allegedly provides telemarketing services to its clients. Defendants

---

[1] After the parties filed a joint stipulation dismissing count two, the First Amended Complaint (doc. no. 7) was deemed amended to delete count two. Doc. no. 54. No motion to certify was filed as to count three, and the deadline for such a motion has passed. Doc. no. 32. Accordingly, the class action allegations in count three are moot.

describe Yodel's business as "qualifying leads" (prospects) for its clients.[2] NorthStar is (or was) one of Yodel's clients. NorthStar provides residential security and home automation systems to consumers.

Cross-motions for summary judgment are before the court.

Braver moves for summary judgment on his own behalf and on behalf of the class.[3] He seeks summary judgment against both defendants "for their violations of the TCPA."[4] Braver's motion, however, presents no developed argument with respect to count three. NorthStar filed a response brief.[5] Braver filed a reply brief.[6]

NorthStar moves for summary judgment on counts one and three.[7] Braver has responded[8] and NorthStar has replied.[9]

Yodel moves to join NorthStar's motion for summary judgment. Doc. no. 123. No party responded to Yodel's motion, which is broadly construed as a motion seeking leave to join in all of NorthStar's motion papers currently before the court, specifically, NorthStar's motion for summary judgment, NorthStar's reply brief, and NorthStar's brief in response to Braver's motion for summary judgment. The court construes Yodel's motion in this manner because the arguments made by NorthStar in all of these papers overlap and because it appears this was Yodel's intent. The

---

[2] Doc. no. 124, p. 9. Except for depositions, this order cites documents by their ecf page numbers at the top of each as-filed page. Depositions are cited by their original page numbers.

[3] Doc. no. 117.

[4] Doc. no. 117, p. 6.

[5] Doc. no. 124.

[6] Doc. no. 130.

[7] Doc. no. 120.

[8] Doc. no. 127.

[9] Doc. no. 132.

court is confident, for example, that Yodel did not intend to confess Braver's motion for summary judgment by failing to respond to it.

For the reasons stated in this order, Braver's motion for summary judgment will be granted on count one and otherwise denied. NorthStar's motion for summary judgment, joined in by Yodel, will be granted on count three and otherwise denied.

## II. The Claims

The court previously dismissed any direct liability claims alleged against NorthStar, ruling that any potential liability on NorthStar's part must be based on its alleged vicarious liability for Yodel's acts.[10] At this stage, Braver argues that Yodel has direct liability on both of the remaining counts and that NorthStar has vicarious liability on those counts.

Count One.

Count one alleges that defendants violated the TCPA, specifically 47 U.S.C. § 227(b)(1)(B), and the Federal Communications Commission's implementing regulation at 47 C.F.R. § 64.1200(a)(3).

Section 227(b)(1)(B) provides that it shall be unlawful for any person within the United States:

> to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party….[11]

Regulation 47 C.F.R. § 64.1200(a)(3) limits the application of §227(b)(1)(B) to telemarketing calls and requires prior express written consent of the called party, providing as follows.

---

[10] Doc. no. 27, p. 7.

[11] Exceptions apply but are not material.

> No person or entity may…[i]nitiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call…is not made for a commercial purpose; [or] [i]s made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing….

47 C.F.R. § 64.1200(a)(3)(ii),(iii).

Braver contends that defendants violated these provisions by making telemarketing calls on the residential phone lines of Braver and the class, using soundboard technology to deliver prerecorded messages to persons with whom defendants had no prior relationship and from whom prior consent had not been obtained.

<u>Count Three.</u>

Count three alleges that defendants violated 47 C.F.R. § 64.1200(d), which provides as follows.

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list. …
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The

> telephone number provided may not be a 900 number or
> any other number for which charges exceed local or long
> distance transmission charges.

Braver contends that defendants violated this regulation in two ways: by initiating calls without first having implemented an effective written policy meeting the regulatory standards, and by failing to provide the called party (Braver) with the required identifying information.

### III. Standards

Under Rule 56, Fed. R. Civ. P., summary judgment shall be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the non-moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). All reasonable inferences to be drawn from the undisputed facts are to be determined in a light most favorable to the non-movant. United States v. Agri Services, Inc., 81 F.3d 1002, 1005 (10th Cir. 1996). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials, demonstrating that there is a genuine issue for trial. Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983). A scintilla of evidence is not sufficient to defeat a motion for summary judgment; there must be sufficient evidence on which a jury could reasonably find for the non-moving party. Manders v. State of Oklahoma ex rel. Dept. of Mental Health, 875 F.2d 263, 265 (10th Cir. 1989), superseded by statute on different issue, quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986).

Facts set forth in the statement of the material facts of the movant may be deemed admitted for the purpose of summary judgment unless specifically controverted by the nonmovant using the procedures set forth in the court's local rules. LCvR56.1(e). Those procedures require the nonmovant to cite evidentiary material in support of its position. *Id.* Accordingly, this order sometimes characterizes a fact as undisputed although the nonmovant purports to dispute it. The court only does so if it has found, based on its review of the record, that the nonmovant did not carry its burden to raise a genuine dispute.

## IV. Background Facts

There is no dispute about the following matters. (Additional facts are stated elsewhere in this order.)

### Yodel's Soundboard Technology.

Yodel's automated predictive dialer initiated the calls in question in this action.[12] A computer dialed the telephone number, detected whether it was answered by a potential customer and, if so, transferred[13] the connected call to a soundboard agent who was trained to play prerecorded wav files (audio files) to deliver messages to the called party by pressing buttons.[14]

The soundboard software (referred to by Yodel as "the Yodel Dialer")[15] required Yodel's soundboard agents, located in a call center in India,[16] to follow a

---

[12] Doc. no. 117, p.9, ¶16.

[13] Some leads were transferred to NorthStar and some were called back by NorthStar.

[14] *Id.* at ¶16.

[15] Doc. no. 117-3, p. 97.

[16] There is no dispute that Yodel is responsible for the material acts of the soundboard agents who worked at the call center.

script which instructed them to press buttons in a certain order thereby delivering prerecorded audio clips to the called party.[17]

After answering the initial call, the first thing a called person (*i.e.* a lead or a prospect) heard was a prerecorded voice stating: "Hello this is [Amy],[18] I am security advisor, can you hear me okay?"[19]  During the course of the telemarketing campaign, there was some variation in how a lead was provided to NorthStar (some leads were handed off as a "warm transfer," meaning with the called person still on the line, and some leads were called back by NorthStar), but every initial call began with the soundboard agent (Yodel's agent) playing the first recording.[20]

<u>The Class</u>.

On October 15, 2018, the court certified the following class and subclass.[21]

<u>Class</u>:  All persons in the Red Dot Data marketing list for whom Yodel's records reflect a telephone call regarding Northstar's home security systems that lasted more than 30 seconds, that was handled by an agent who applied status code 20 or 50 to the call, and that resulted in the normal clearing disposition.

---

[17] *Id.* at p. 9, ¶¶13, 16.

[18] The name varied.  "Amy," "Joe" and "Billy" were also used.  Doc. no. 117, p. 9, ¶17, n.1.

[19] *Id.* at p. 9, ¶17.

[20] *Id.* at p. 9, ¶ 18.  Defendants do not dispute the assertions by Braver as set out in ¶ 18 of doc. no. 117, p. 9.  *See*, defendants' response to ¶ 18 at doc. no. 124, p. 13.  Thus, defendants do not dispute that "every call began with the soundboard agents playing the first recording." Nevertheless, the court notes that elsewhere in the briefing papers, defendants point to testimony by Yodel's Rule 30(b)(6) witness that he had heard that new soundboard agents sometimes made an error and transferred a call without playing a script. Doc. no. 121-4, pp. 57-59. It is not clear whether the witness was speaking of instances specific to the NorthStar campaign. Moreover, this testimony is vaguely sourced (to "reports," "things of that nature," what "we've heard from quality control agents" at pp. 57-58) and is hearsay.

[21] Doc. no. 72, pp. 26-27.

<u>Subclass</u>:
All persons in the Red Dot Data marketing list for whom Yodel's records reflect a telephone call regarding Northstar's home security systems that lasted more than 30 seconds, that was handled by an agent who applied status code 50 to the call, and that resulted in the normal clearing disposition.

<u>Excluded from the class are</u>:
Any persons whose contact information is associated with either an IP address or website URL in the Red Dot Data marketing list.

Braver's expert analyzed call records and identified 239,630 persons who meet the class definition and 47,398 persons who meet the subclass definition. In doing so, he removed any call records where there was any possibility that no prerecorded message played. As a result of this approach, the total set of 78 million call records was narrowed to 252,765 calls at issue for the class.[22]

<u>Calls to Braver</u>.[23]

On August 26, 2016, Braver received a telephone call on his residential phone number. The call used the soundboard system. In that call, the soundboard agent pressed buttons which delivered prerecorded voice messages and thus could not answer Mr. Braver's basic questions about who was calling or why Braver's telephone number had been dialed. Prior to receiving the call, Braver had no relationship with NorthStar. Like the other class members, Braver is in the Red Dot Data marketing list which Red Dot Data sold to Yodel.

<u>Matters Expressly Conceded by Defendants</u>.[24]

Defendants concede Yodel initiated the calls to plaintiff and to the class.

---

[22] Doc. no. 117, p. 17, ¶¶ 65-67; doc. no. 124, p. 23, ¶¶ 65-67.

[23] For all of the facts stated in this paragraph, *see* doc. no. 117, pp. 17-18, ¶¶ 68-71; doc. no. 124, pp. 23-24, ¶¶ 68-71. Recordings of two calls to Braver are in the record. Doc. nos. 117-11, -12 (audio recordings), doc. no. 119 (notice of conventional filing).

[24] For all of these concessions, *see* doc. no. 124, p. 26.

Defendants concede Yodel did not obtain consent from the called parties prior to initiating calls to plaintiff and the class.

Defendants concede that the calls constituted telemarketing under the TCPA.

Defendants concede that at least some of the telephone numbers called were residential numbers.

## V.  Count One

Given these concessions, defendants raise just two issues with respect to count one.  Defendants argue that the calls initiated by Yodel to generate leads as part of the NorthStar telemarketing campaign are not calls which "deliver a message" within the meaning of §227(b)(1)(B). This issue is addressed in Part A, below. Defendants also argue that NorthStar is not vicariously liable for Yodel's material acts.  This issue is addressed in Part B, below.

### A.  Calls Delivered "a Message" Within the Meaning of §227(b)(1)(B).

As previously stated, §227(b)(1)(B) provides that it shall be unlawful:

> to initiate any [telemarketing] telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party.

Defendants contend that §227(b)(1)(B)'s use of the singular in the phrase "to deliver a message," shows the statute does not regulate, and was not intended to regulate, interactive exchanges of information which defendants contend do not deliver "a message" but instead deliver messages - plural.  Defendants argue:  "Put simply:  while soundboard technology may use audio clips containing 'artificial or prerecorded voices,' those clips do not 'deliver a message.'  Thus, these calls do not contravene the TCPA's prohibition on using prerecorded voices to deliver a message."[25]

_____

[25] Doc. no. 120, p. 11.

Title 1 U.S.C. § 1 provides that "In determining the meaning of any Act of Congress, unless the context indicates otherwise…words importing the singular include and apply to several persons, parties, or things…."[26] Nothing about the context of §227(b)(1)(B) suggests a different result here.[27]

Defendants argue that if Congress had intended § 227(b)(1)(B) to apply to calls which delivered multiple messages, Congress knew how to so provide. Defendants cite restrictions against making "any call…using any automatic telephone dialing system or an artificial or prerecorded voice" (to a patient room of a hospital) per 47 U.S.C. §227(b)(1)(A)(ii). Defendants also cite the TCPA's creation of a private right of action under §227(c)(5) for persons who receive "more than one telephone call within any 12-month period by or on behalf of the same entity" in violation of regulations prescribed under that subsection. These arguments are unpersuasive given the plain language and meaning of § 227(b)(1)(B), together with the principle of statutory construction embodied in 1 U.S.C. § 1.

The court also rejects defendants' argument that the statute's use of the singular shows it was not intended to regulate a soundboard system that involves human interaction. Defendants argue that phrases in the statute such as "initiate any telephone call" and "deliver a message" imply no human interaction in the message-

---

[26] Title 1 U.S.C. § 1 also provides that "unless the context indicates otherwise…words importing the plural include the singular." United States v. Foote, 413 F.3d 1240, 1246 (10th Cir. 2005), held that nothing in the plain language of the Counterfeit Trademark Act, which prohibits traffic in "goods," required a defendant to traffic in more than one counterfeit good, citing 1 U.S.C. § 1. And see, Schott v. C.I.R., 319 F.3d 1203, 1206 (9th Cir. 2003) ("singulars normally include plurals, just as 'he' normally includes 'she,' " citing 1 U.S.C. § 1).

[27] The meaning of § 227(b)(1)(B) would be clear even without 1 U.S.C. § 1 based on the common understanding of the English language. For example, if someone asks, "Was there a thunderstorm yesterday?", the answer will be "yes" whether there was one thunderstorm or two. Similarly, if someone asks, "Did that telephone call deliver a prerecorded message?", the answer will be "yes" whether the call delivered one prerecorded message or several.

delivery system.  As further support, defendants' response brief cites[28] <u>In re TCPA of 1991</u>, 7 FCC Red 2736 (June 25, 1992), which states: "The legislative history of the TCPA also reflects the premise that auto dialer generated calls are more intrusive to the privacy concerns of the called party than live solicitations."[29]  Defendants also cite legislative history in their own moving brief.[30]

The court notes the statements of congressional purpose relied on by defendants.  This legislative history, however, does not limit the plain language of

---

[28] Doc. no. 124, p. 20.

[29] *Id*. at 2740, ¶ 25.

[30] Doc. no. 120, p. 34, cites S. Rep. 102-178 at 4-5 (1991), *reprinted in* 1991 U.S.C.C.A.N. 1968, 1972 (1991), as follows.

> These automated calls cannot interact with the customer except in preprogrammed ways, do not allow the caller to feel the frustration of the called party, fill an answering machine tape or voice recording service, and do not disconnect the line even after the customer hangs up the telephone.

Defendants argue that soundboard calls do not offend these congressional concerns.  But the undisputed audio recording of the initial Braver call shows that soundboard calls "cannot interact with the customer except in preprogrammed [not to mention meaningless] ways," which is one of the congressional concerns cited above. The following excerpts from the Braver call illustrate the point.

> BRAVER: Okay, and what company did you say you were with?
> PRERECORDED VOICE: Are you a US citizen?
> BRAVER: Uh yes, what company did you say you were with?
> PRERECORDED VOICE: Does your home have at least two bedrooms?
> …
> BRAVER: Well I guess I'm still not understanding the issue with false alarms in my neighborhood. What is it about my neighborhood? I'm still not understanding. What is it about my neighborhood that's causing false alarms? I don't have any problems with that. That's why I am all confused here.
> PRERECORDED VOICE: That's fine. Oh, and I almost forgot one last question. Now do you currently have a home security system?

Doc. no. 117-11, notice of conventional filing at doc. no. 119.

§227(b)(1)(B), which says nothing about any requirement that there be no human interaction for §227(b)(1)(B) to apply. Even more fundamentally, the language of §227(b)(1)(B) is clear, and there is no reason to resort to legislative history to determine its meaning. *See*, Edwards v. Valdez, 789 F.2d 1477, 1481 (10th Cir. 1986) ("When the meaning of a statute is clear, it is both unnecessary and improper to resort to legislative history to divine congressional intent").

Defendants argue that their interpretation of § 227(b)(1)(B) avoids conflict with other provisions of the TCPA. For example, they note that 47 U.S.C. §227(d)(3)(A) requires callers to include certain identifying information at the beginning of all prerecorded messages.[31] They argue that if soundboard technology is considered to be the delivery of a prerecorded message, then under § 227(d)(3)(A), call recipients would be required to listen to the same identification information before each and every audio clip played during a call, an obviously absurd result. The court rejects this argument as a basis for construing § 227(b)(1)(B). Congress is entitled to some flexibility of language so long at its meaning is clear.

Defendants' other arguments are also unpersuasive. Defendants argue that their interpretation of §227(b)(1)(B) avoids a conflict with the Federal Trade Commission's Telemarketing Sales Rule's call-abandonment provisions. Braver responds by arguing that defendants misstate the rule. Regardless, this court is not required to ignore the plain meaning of §227(b)(1)(B) to avoid bumping up against an FTC rule not in dispute in this action. Defendants argue that if §277(b)(1)(B) is construed to apply to calls that involve human interaction and prerecorded messages, then the statute will apply whenever a prerecorded message is used in an otherwise

---

[31] Section 227(d)(3)(A) provides: "[A]ll artificial or prerecorded telephone messages (i) shall, at the beginning of the message, state clearly the identity of the business, individual, or other entity initiating the call, and (ii) shall, during or after the message, state clearly the telephone number or address of such business, other entity, or individual…."

live call so that common prerecorded messages (such as "this call may be monitored," hold music or hold messages) will violate § 227(b)(1)(B) when played during these otherwise live calls. Section 227(b)(1)(B), however, applies only to telemarketing calls, a fact which largely answers this argument. Similarly, defendants argue that if §227(b)(1)(B) is construed as Braver contends, the statute will preclude telemarketing calls placed by a disabled person who uses a voice generator as an "artificial voice." This action involves a "prerecorded voice," not an "artificial voice." Moreover, the bigger point with respect to all of these types of arguments is that they are too remote from the facts of this case to be persuasive.

After careful consideration, the court rejects defendants' argument that the calls initiated by Yodel did not deliver a message within the meaning of §227(b)(1)(B).[32] This conclusion -- together with the matters which have been expressly conceded by the defendants (Yodel initiated the calls to plaintiff and the class, consent was not obtained, the calls constituted telemarketing calls, and at least some of the telephone numbers called were residential numbers) -- means that liability has been established on the part of Yodel with respect to count one. There is no genuine issue with respect to the fact that Yodel initiated telephone calls to residential telephone lines using a prerecorded voice to deliver a message without the prior express consent of the called party. With respect to the claims alleged against Yodel in count one, Braver and the class are entitled to summary judgment in their favor.

NorthStar's potential liability on count one depends on vicarious liability, addressed next.

---

[32] Courts which have ruled in favor of plaintiffs in TCPA cases that involve technology similar to the soundboard technology involved in this case include: Margulis v. Eagle Health Advisors, LLC, 2016 WL 1258640, *3 (E.D. Mo. March 31, 2016) (claim stated under TCPA); Bakov v. Consolidated World Travel, 2019 WL 1294659, **3, 22 (N.D. Ill. March 21, 2019) (class certified for Illinois residents).

B. NorthStar Is Vicariously Liable on Count One.

As recognized by the United States Supreme Court, the Federal Communications Commission has ruled that under federal common-law principles of agency, there may be vicarious liability for TCPA violations. Campbell-Ewald Co. v. Gomez, 84 USLW 4051, 136 S. Ct. 663, 674 (2016), referencing In re Joint Petition Filed by Dish Network, LLC, et al. for Declaratory Ruling Concerning the Tel. Consumer Prot. Act (TCPA) Rules, 28 F.C.C. Rcd. 6574 (2013), hereafter "May 2013 FCC Ruling."[33] The May 2013 FCC Ruling states: "we clarify that a seller is not directly liable for a violation of the TCPA unless it initiates a call, but may be held vicariously liable under federal common law agency principles for a TCPA violation by a third-party telemarketer." May 2013 FCC Ruling at 6582, ¶24. The May 2013 FCC Ruling then sets out three potential agency theories under which a non-caller (such as NorthStar) may be vicariously liable for the TCPA violations of a direct caller (such as Yodel): actual agency, also referred to as classical agency; apparent authority; and ratification.

The classical definition of agency contemplates the fiduciary relationship which arises[34] when one person (principal) manifests assent to another person (agent) that the agent shall act on the principal's behalf and subject to the principal's control.[35] Plaintiff must show that the principal controlled or had the right to control

---

[33] The FCC has agreed that guidance in the May 2013 FCC Ruling regarding how common law agency principles may apply to these types of TCPA cases is not binding on courts, is not entitled to Chevron deference, and is guidance which depends on its power to persuade. Dish Network, LLC v. Federal Communications Com'n, 552 Fed. Appx. 1 (D.C. Cir. 2014).

[34] It is not necessary to show a fiduciary relationship to establish that an agency exists; rather, fiduciary duties arise as a result of circumstances establishing the agency relationship. 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1250 (10th Cir. 2013).

[35] May 2013 FCC Ruling at 6586, ¶ 34.

the purported agent. Restatement (Third) of Agency §1.01 cmt. f (1) (2006) ("essential element of agency is the principal's right to control the agent's actions");[36] <u>Mey v. Venture Data, LLC</u>, 245 F.Supp.3d 771, 787 (N.D. W. Va. 2017). The principal's right of control presupposes that the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority. Restatement (Third) of Agency § 1.01 cmt. f (1). In the TCPA context, some courts have characterized the control necessary to establish agency as control over the manner and means of the agent's calling activities. <u>Mey</u> at 787. Citing <u>Mey</u>,[37] defendants argue that a "manner and means" test applies. Defendants also argue that agency requires more than mere passive permission, as it involves request, instruction or command.[38] The court will presume for purposes of argument that all of these requirements apply.

With this understanding of classical agency in mind, the court finds the following facts based on undisputed evidence.

*1. In or around February of 2016, NorthStar hired Yodel to generate qualified leads for NorthStar. This relationship lasted until October 2016.[39]*

---

[36] Federal courts have looked to the Restatement (Third) of Agency (2006) as the source of federal agency principles. <u>Hodgin v. UTC Fire & Security Americas Corp., Inc.</u>, 885 F.3d 243, 252 (4th Cir. 2018). The Tenth Circuit cites the Restatement in <u>1-800 Contacts Inc. v. Lens.com, Inc.</u>, 722 F.3d 1229, 1250-51 (10th Cir. 2013). Whenever this order cites the Restatement, it cites the 2006 edition.

[37] Doc. no. 124, p. 17, ¶ 32.

[38] Doc. no. 120, p. 22.

[39] Doc. no. 120, p. 12, ¶¶ 4-5; doc. no. 127, p. 8, ¶¶ 4-5.

*2. NorthStar was involved in determining the script for the prerecorded messages used by Yodel in the calls which Yodel made in order to provide NorthStar with qualified leads.*

--Before calls were placed by Yodel as part of the NorthStar telemarketing campaign, NorthStar listened to prerecorded audio clips and reviewed a sample soundboard script, all of which were provided by Yodel (which had used them for another security company).[40]  When NorthStar's witness was asked if Bates No. 107 was the script "that Yodel provided to NorthStar to show what the prerecorded Avatar would be saying," the witness answered "Yes."[41]

--When NorthStar's witness was asked whether NorthStar ultimately approved the script to be used in telephone calls, the witness testified: "We didn't object to them using it, but it wasn't understood that we would have to approve it as far as I know."[42]  The questioner then asked, whether, at some point, NorthStar told Yodel to begin making calls, and whether, at that point, "approval was made with the understanding that they [Yodel] would be using this script shown at Bates No. 107," to which the witness answered "correct."[43]  Thus, NorthStar told Yodel to begin making calls with the

---

[40] Doc. no. 117, p. 8, ¶¶ 9-11; doc. no. 124, pp. 10-11, ¶¶ 9-11 (not disputing text of script).

[41] Doc. no. 117-1, p. 67 (deposition cited by all parties).

[42] *Id*. at p. 67.

[43] *Id.*

understanding that the script to be used in those calls was a script substantially similar[44] to the script NorthStar had reviewed.

--The script reviewed by NorthStar and ultimately used in the NorthStar campaign was substantially as set out below.[45] Each numbered paragraph reflects a separate, prerecorded wav file to be played by the soundboard agent.[46]

1. Intro: Hello this is [Amy],[47] I am security advisor, can you hear me okay?

2. Purpose: Okay, good, I am with the security help center and the reason why I am calling today is that there have been issues with false alarms, with home security systems in your neighborhood, have you been informed about that?

3. Security Concern: With crime rates and mass shooting on the rise in the US and national security with our borders, you can see having false alarms with home security systems in your area can be a big concern right?

4. My job: So it's my job to make sure that all the homes in your neighborhood are aware of the technologies and security programs available in your area, I just have a couple of questions to see what your home will qualify for. Are you the homeowner? …

---

[44] Doc. no. 127-3, p. 114 ("substantially similar").

[45] The fact that "Amy's" prerecorded pitch is plainly deceptive in some respects (to the point of being predatory when heard by credulous or otherwise vulnerable listeners) is eye-catching, but ultimately immaterial to the court's analysis of the issues addressed in this order.

[46] Doc. no. 117, p. 8, ¶ 11; doc. no. 124, p. 11, ¶ 11 (not disputing text of script). The court presumes there were other audio clips but makes no finding as to whether NorthStar reviewed other clips.

[47] As previously stated, the fictional name varied.

9. . . . [T]he system you prequalify for is full color, touch screen, and has the ability to use home automation products like wireless door locks, … cameras, and thermostats that you can control from your cell phone.

--The script's description of the security system which the called person prequalified for -- a "full color, touch screen" system, with "the ability to use home automation products like wireless door locks," "cameras," "and thermostats that you can control from your cell phone" -- is an accurate description of a system NorthStar provides,[48] further confirming that NorthStar was involved in determining the script.

--On at least one occasion Yodel made a change in the script (a correction or fix), in response to an inquiry from NorthStar. Yodel took out a reference to an incorrect area code after NorthStar stated as follows in an email: "We need to follow the script outlined [by Yodel], and I thought we took out the 214 area code scripting. We [NorthStar] use a local touch dialer and it will most likely not be a 214 area code."[49]

3. *NorthStar was aware that Yodel intended to use, and did use, soundboard technology to deliver prerecorded voices in audio clips which were played to the person receiving the call.*[50]

---

[48] Doc. no. 117, p. 8, ¶ 12; doc. no. 124, p. 11, ¶ 12.

[49] Doc. no. 117, p. 13, ¶ 41, citing doc. no. 117-37; doc. no. 124, pp. 19-20, ¶ 41.

[50] Doc. no. 117, p. 8, ¶ 10; doc. no. 124, p. 11, ¶ 10.

--When the questioner asked Yodel's witness, "So they [NorthStar] understood that a prerecorded voice would be used during calls?" the witness answered (over an objection as to form), "They understood how the sound board technology worked, yes."[51]

*4.  Yodel and NorthStar understood that the qualified leads Yodel generated using the prerecorded soundboard system would be provided to NorthStar by one of two means.*

--Called parties were either transferred by Yodel to NorthStar as "warm transfers" which NorthStar accepted to solicit customers for its security systems, or the parties called by Yodel were called back by NorthStar for that purpose.[52]

*5.  In their communications with the persons called, both Yodel and NorthStar made statements which identified the initial call as being from the "Security Help Center" (a fictional alias for Yodel and its soundboard agents).*

--NorthStar knew the persons placing the calls for Yodel had identified themselves to the called persons as being with the "Security Help Center." NorthStar, in its follow-up conversations with the persons called, also referred to Yodel as the "Security Help Center."[53]  This demonstrates coordination between Yodel and NorthStar.  It also shows that NorthStar made statements

---

[51] Defendants cite this testimony in their own motion for summary judgment, doc. no. 120, p. 15, ¶ 25, citing doc. no. 121-3, p. 52.

[52] Doc. no. 124, p. 10, ¶6.

[53] Doc. no. 117, p. 10, ¶¶ 20-21; doc. no. 124, p. 13, ¶¶ 20-21.

to the persons called, linking the different stages of the calls in the mind of the called persons.

*6. NorthStar received a few complaints from consumers, which stemmed from calls placed by Yodel.[54]   NorthStar had a policy for what was supposed to be said when someone complained about the "robocall."[55]*

*7. At times, NorthStar caused Yodel to change its procedures.*

--After one complaint received by NorthStar, Yodel investigated, at NorthStar's request, how the complaining person had known that leads were being sent to NorthStar if the complaining person knew only that he or she was receiving a call from the "Security Help Center."  A NorthStar email to Yodel stated, "I am feeling exposed, please advise."[56]  Yodel responded, "I will look into it.  We do not use the term NorthStar to anyone so I will see what happened."  Yodel reported back that "our inbound has been giving your [NorthStar's] 877 number as a call back number" but that it was a rare situation, and it "won't happen again."[57]  Thus, Yodel corrected its procedure

---

[54] Defendants contend some of the complaints may have been associated with Yodel's calls for other companies, which the court accepts.

[55] Doc. no. 124, pp. 13-14, ¶ 22.

[56] NorthStar argues that this comment did not mean NorthStar felt exposed based on Yodel's use of soundboard technology.  NorthStar contends that the author of the email felt exposed because the complaining customer was threatening to post negative information about NorthStar which would be damaging to NorthStar's reputation.  The court accepts NorthStar's interpretation.

[57] Doc. no. 117, p. 11, ¶ 24 citing doc. no. 117-17; doc. no. 124, p. 15, ¶ 24.

in response to an inquiry from NorthStar about a complaint NorthStar had received from a person called by Yodel.

--At some point[58] NorthStar decided on a transfer procedure rather than having NorthStar simply call back the leads which Yodel had generated with its soundboard calls.[59] NorthStar requested this change because NorthStar believed the transfer model would be more profitable. Yodel implemented the transfer process which NorthStar requested.[60]

--NorthStar gave Yodel information about NorthStar's expectations regarding the rate of transfers, and Yodel acquiesced. In an email of March 11, 2016, NorthStar requested "Lets [sic] start with 2 transfers per hour during 9-5 m-f," and Yodel acquiesced.[61] On March 31, 2016, NorthStar emailed Yodel, "would like to pause for now," and again Yodel acquiesced.[62] On June 2, 2016, NorthStar sent an email to Yodel stating "lets [sic] ramp up the transfers."[63] In an email of August 26, 2016, Yodel emailed NorthStar, "[P]lease give me a call, volume has greatly increased, want to talk to you

---

[58] Defendants contend Yodel began transferring warm calls to NorthStar in late May of 2016. Doc. no. 124, p. 17, ¶ 32. The court accepts that date.

[59] Defendants argue that procedures relating to transfers or call-backs are not material as they had nothing to do with the TCPA violations alleged in count one. If the court is incorrect and this type of evidence should not be considered, the result stated in this order (vicarious liability exists) would remain the same.

[60] Doc. no. 117, p. 12, ¶¶ 32-33; doc. no. 124, p. 17, ¶¶ 32-33.

[61] Doc. no. 117, p. 12, ¶ 34, doc. no. 117-26; doc. no. 124, pp. 17-18, ¶ 34.

[62] Doc. no. 117, p. 12, ¶ 36, doc. no. 117-28; doc. no. 124, p. 18, ¶ 36.

[63] Doc. no. 117, p. 13, ¶ 37, doc. no. 117-29; doc. no. 124, p. 19, ¶ 37.

before we start reducing, because its [sic] hard to get it back up where its [sic] at." NorthStar emailed Yodel back, "I understand, but we need to keep at 60 for time being."[64]

8. *NorthStar had some involvement in determining to which telephone numbers calls would be placed by Yodel.*

--NorthStar gave Yodel a list of the zip codes to which the calls should be made; the listed zip codes were those in which NorthStar did business.[65] Yodel's witness was asked at his deposition, "So NorthStar provided the list of zip codes, then you used that list of zip codes to obtain the marketing leads from the two marketing companies we discussed; is that right?" The witness answered, "Yes."[66]

--Five different times NorthStar requested that Yodel stop calling certain numbers and asked that Yodel add those telephone numbers to Yodel's internal do not call list, which Yodel did.[67]

--Twice, NorthStar instructed Yodel that some customers were receiving multiple calls, after which Yodel took steps to stop repeating calls.[68]

---

[64] Doc. no. 117, p. 12, ¶ 35, doc. no. 117-27; doc. no. 124, p. 18, ¶ 35.

[65] Doc. no. 117, p. 13, ¶ 38, citing doc. no. 117-1, p.73; doc. no. 124, p. 19, ¶ 38. Defendants' own motion (doc. no. 120, p. 15, ¶ 25) concedes NorthStar provided zip code and demographic information to Yodel.

[66] Doc. no. 121-3, p. 139, cited by defendants in doc. no. 120, p. 15, ¶ 25.

[67] Doc. no. 117, p. 13, ¶ 39; doc. no. 124, p. 19, ¶ 39.

[68] Doc. no. 117, p. 13, ¶ 40; doc. no. 124, p. 19, ¶ 40.

*9.  NorthStar and Yodel agreed to a change in the compensation structure, which NorthStar hoped would make the campaign financially viable.  Approximately one month later NorthStar terminated Yodel's services.*

--In late September 2016, approximately one month before NorthStar terminated Yodel, NorthStar and Yodel executed an insertion order agreement changing the structure by which Yodel would be compensated.[69]  NorthStar's Rule 30(b)(6) witness was asked, "Why was the decision made to enter into a new contract with Yodel at this point?"  NorthStar's witness answered, "By changing the compensation structure, we were hopeful that we could make the campaign financially viable."[70]

*10.  NorthStar allowed Yodel to upload consumer lead data directly into NorthStar's telemarketing software which stored all of the data NorthStar used for telemarketing.[71]*

*11.  NorthStar provided regular reports to Yodel about the sales it was making as a result of Yodel's calls.[72]*

\* \* \*

This undisputed evidence establishes that NorthStar's involvement with Yodel's material acts (acts in violation of the TCPA as alleged in count one) was

---

[69] Doc. no. 120, pp. 14-15, ¶ 20; doc. no. 127, p. 11, ¶ 20.

[70] Doc. no. 120, pp. 14-15, ¶ 20, citing deposition at doc. no. 121-2, p. 181.

[71] Doc. no. 117, p. 13, ¶ 43; doc. no. 124, p. 20, ¶ 43.

[72] Doc. no. 117, p. 14, ¶ 44; doc. no. 124, p. 20, ¶ 44.

both ongoing and significant. NorthStar was involved in determining what would be said in the prerecorded messages delivered by Yodel's soundboard technology. NorthStar was involved in determining which telephone numbers would or would not be called by Yodel. NorthStar effected changes in Yodel's calling procedures, including but not limited to procedures regarding what should or should not be said in the calls, and procedures governing how leads contacted in the calls would be delivered to NorthStar. In at least one instance, Yodel corrected its procedure in response to an inquiry from NorthStar about a complaint NorthStar had received from a consumer who had been called by Yodel. Yodel acquiesced to NorthStar's instructions and to NorthStar's expectations regarding the rate of transfers. There is no dispute that NorthStar accepted leads generated by Yodel when those leads were transferred to NorthStar, and there is no dispute that NorthStar followed up on some leads generated by Yodel with call-backs.

Evidentiary materials in the summary judgment record plainly establish that NorthStar manifested its assent to have Yodel act on NorthStar's behalf, and that NorthStar controlled or had the right to control material aspects of Yodel's performance on behalf of NorthStar. Throughout the relationship, NorthStar retained the capacity to assess Yodel's performance, to provide instructions to Yodel, and to terminate the agency relationship by revoking Yodel's authority to act on NorthStar's behalf. NorthStar had significant and continuing control over the manner and means of Yodel's calling activities. NorthStar gave Yodel more than passive permission to place the calls in question. NorthStar made requests and gave instructions regarding the manner in which the calls in question would be made.

As against this evidence, defendants make several arguments. Defendants argue that Yodel was an independent contractor rather than an agent of NorthStar. But an independent contractor may be an agent, as the terms "agents" and "independent contractor" are not necessarily mutually exclusive. 1-800 Contacts,

Inc. v. Lens.com, Inc., 722 F.3d 1229, 1251 (10th Cir. 2013).  The commercial world (not to mention the legal profession) abounds with independent contractor relationships that are also agency relationships.

Defendants also argue that Yodel did not have the power to bind NorthStar in a contractual relationship.  One may be an agent of a principal, however, without having authority to bind the principal to a contract with a third party.  *Id*.  Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf.  *Id*.  Defendants also argue that they were given assurances by Yodel that the calls NorthStar hired Yodel to make were TCPA-compliant.  The court takes it as an established fact that the assurances argued for by NorthStar were given.  That said, erroneous assurances by Yodel regarding the reach (or lack of reach) of the TCPA[73] do not eliminate NorthStar's liability for Yodel's illegal acts as an agent.

Defendants also argue that NorthStar was not involved in all aspects of Yodel's material conduct, which is a true statement as far as it goes.  For example, there is no evidence that NorthStar had anything to do with Yodel's choice of the voice talent used to prerecord the audio messages or in Yodel's selection of the call center in India to place the calls.  But undisputed evidence already reviewed in this order demonstrates that NorthStar had sufficient involvement in material aspects of Yodel's conduct to establish, as a matter of law, that Yodel acted as NorthStar's agent.

Under an actual (classical) agency theory of liability,  NorthStar has vicarious liability for Yodel's violations of the TCPA as alleged in count one.  Accordingly,

---

[73] To illustrate, one email from Yodel to NorthStar erroneously stated that "The TCPA laws cover cell phones, not land lines."  Doc. no. 127-24. (NorthStar's Rule 30(b)(6) witness testified that NorthStar understood the TCPA would apply to Yodel's calls made to the leads.  Doc. no. 127-1, p. 91.)

Braver and the class are entitled to summary judgment against NorthStar on count one. This conclusion makes it unnecessary to consider Braver's alternative theories of agency. Nevertheless, the court will briefly address those theories as alternative grounds for the same result.

Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal. May 2013 FCC Ruling, 28 FCC Rcd. 6574, 6586-87, ¶ 34. Apparent authority depends on whether a reasonable person would believe that the calling party had the authority to act on behalf of NorthStar. *See,* Kristensen v. Credit Payment Services, 12 F.Supp.3d 1292, 1306 (D. Nev. 2014) ("Apparent authority depends on whether a reasonable person would believe that the sender of the text messages, or the person that caused the text messages to be sent, had authority to act on behalf of Defendants").

Defendants argue that NorthStar's communications with the class do not evince the type of expressive conduct necessary to show that Yodel had the right to act with legal consequences for NorthStar, so that there was no apparent authority. Undisputed evidence, however, shows NorthStar accepted the calls referred to it by Yodel. In doing so, NorthStar demonstrated to the called persons, by both NorthStar's conduct[74] toward the called persons, and by NorthStar's conversations[75] with the called persons, that Yodel (a/k/a the "Security Help Center") had the apparent authority to place the initial calls, triggering follow-up by NorthStar as needed. A reasonable person in the position of a called person could only conclude

---

[74] NorthStar accepted the transferred call or NorthStar called the person back.

[75] NorthStar tried to sell a residential security system to the persons Yodel had qualified as prospects for NorthStar.

that Yodel was acting on behalf of NorthStar, within Yodel's apparent authority to do so.

The court's conclusion regarding apparent authority is based on the court's reasoning as stated above. Some additional undisputed facts may further support that conclusion but are not necessary to it. The <u>May 2013 FCC Ruling</u> states that evidence that a seller allows an outside sales entity to enter consumer information into the seller's sales or customer systems may be relevant to a determination of apparent authority. <u>May 2013 FCC Ruling</u>, *supra* at 6592, ¶ 46. It may also be relevant that the seller reviewed the outside entity's telemarketing scripts. *Id*. These facts are established on this record.

As for ratification, a seller may be liable for the acts of another under agency principles if the seller ratifies those acts by knowingly accepting their benefits.[76] <u>May 2013 FCC Ruling</u>, 28 FCC Rcd. 6574, 6586-87, ¶ 34. Such ratification may occur through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences. *Id*. at 6587, ¶ 34. Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority. Restatement (Third) of Agency §4.01. A person may ratify an act if the actor acted or purported to act as an agent on the person's behalf. *Id*. at §4.03. Knowing acceptance of the benefit of a transaction ratifies the act of entering into the transaction; this is so even though the person also manifests dissent to becoming bound by the act's legal consequences. *Id*. at § 4.01 cmt. d. A person may ratify an act by receiving or retaining benefits the act generates

---

[76] Defendants argue that a principal-agent relationship is a prerequisite before ratification could potentially occur. Restatement (Third) of Agency § 4.01 cmt. b suggests this is a minority view. It states: "In most jurisdictions, ratification may create a relationship of agency when none existed between the actor and the ratifier at the time of the act." The court need not resolve this issue but notes that if an agency relationship is required for ratification to occur, that requirement is satisfied.

if the person has knowledge of material facts and no independent claim to the benefit. *Id*. at §4.01 cmt. g.

The record establishes ratification. Undisputed evidence shows that NorthStar accepted benefits generated by Yodel's calls made in violation of the TCPA. Undisputed evidence shows that during the NorthStar telemarketing campaign, Yodel made 77,912,856 calls using its soundboard system.[77] From those nearly 78 million calls, Yodel provided NorthStar with 7874 leads and between 5309 and 9196 live call transfers.[78] Most importantly, it is undisputed that Yodel's leads resulted in roughly 150 new NorthStar customers.[79] NorthStar argues that the telemarketing campaign was a "colossal failure," which the court assumes, for present purposes, to be true. But that does not change the fact that NorthStar, with knowledge of Yodel's material acts, accepted the benefits of calls placed by Yodel in violation of the TCPA.

Assuming for the sake of discussion that Braver's actual agency theory is (for some reason not apparent to the court) defective, the court quite readily concludes that Braver and the class are nevertheless entitled to summary judgment against NorthStar based on apparent authority or ratification.

Finally, although not the basis of any of the court's rulings, the court states its view that it only makes sense to hold NorthStar vicariously liable for Yodel's acts where the record conclusively shows, as it does here, that NorthStar authorized Yodel to place the calls in question. *See generally,* May 2013 FCC Ruling, 28 FCC Rcd. 6574, 6593, ¶ 47 ("[W]e see no reason that a seller should not be liable under those provisions [§ 227(b) and (c)] for calls made by a third-party telemarketer when

---

[77] Doc. no. 117, p. 14, ¶ 46.

[78] Doc. no. 117, p. 14, ¶ 47.

[79] Doc. no. 117, p. 14, ¶ 45.

it has authorized that telemarketer to market its goods or services. In that circumstance, the seller has the ability, through its authorization, to oversee the conduct of its telemarketers, even if that power to supervise is unexercised.")

In summary, although the court recognizes that issues concerning the existence and scope of an agency are typically for a jury, this record supports but one conclusion: an agency existed which encompassed Yodel's acts taken in violation of §227(b)(1)(B) and 47 C.F.R. §64.1200(a)(3). Accordingly, with respect to count one, Braver's motion, brought on his own behalf and on behalf of the class, will be granted against NorthStar, based on NorthStar's vicarious liability for the acts of its agent, Yodel.

As this order has already found Yodel directly liable on count one, Braver and the class are entitled to summary judgment against both defendants on count one.

## VI. Count Three

Defendants move for summary judgment on count three, which alleges that defendants violated 47 C.F.R. §64.1200(d) by failing to provide identifying information during telemarketing calls, and by initiating calls without having first implemented an effective written policy meeting required minimum standards. Defendants argue that although the complaint alleges 47 C.F.R. §64.1200(d) was promulgated under 42 U.S.C. §227(c) (a subsection of the TCPA which provides a private cause of action), §64.1200(d) was actually promulgated under § 227(d), a subsection of the TCPA which does not provide a private cause of action.

Burdge v. Association Health Care Management, Inc., 2011 WL 379159 (S.D. Ohio Feb. 2, 2011), found that § 64.1200(d)(4) is technical and procedural in nature and was promulgated pursuant to § 227(d) of the TCPA, as NorthStar and Yodel contend. *Id*. at *4. Like the claims involved in the current action, Burdge included claims that the caller had not given the required identifying information. Burdge noted that § 227(d) provides: "The Commission shall prescribe technical and

procedural standards for systems that are used to transmit any artificial or prerecorded voice message via telephone," and "[s]uch standards shall require that…all artificial or prerecorded telephone messages shall" include certain identifying information about the identity of the business or entity initiating the call. *Id*. at *3. <u>Burdge</u> concluded that § 64.1200(d)(4), which addresses these same matters, was promulgated under § 227(d), a section which does not provide a private cause of action; accordingly, <u>Burdge</u> dismissed certain claims. *Id*. at *4. *And see,* <u>Worsham v. Travel Options, Inc.</u>, 2016 WL 4592373, *7 (D. Md. Sept. 1, 2016) (finding <u>Burdge</u> "persuasive").

Braver relies on <u>Charvat v. NMP, LLC</u>, 656 F.3d 440, 448 (6th Cir. 2011), for his contention that § 64.1200(d) was promulgated under §227(c) rather than §227(d). While <u>Charvat</u> states as much, it does so without analysis. Furthermore, § 227(c) pertains to the protection of subscriber privacy rights and only provides a cause of action to a person aggrieved "under this subsection." 47 U.S.C. §227(c)(5).

The court declines to rely on <u>Charvat</u>'s statement that §64.1200(d) was promulgated pursuant to §227(c) and agrees, instead, with <u>Burdge</u>, <u>Worsham</u> and other decisions that have concluded § 64.1200(d) was promulgated under §227(d). There is no private right of action for alleged violations of §64.1200(d), and defendants are therefore entitled to summary judgment in their favor on count three.

VII. <u>Conclusion</u>

Yodel's motion (doc. no. 123) to join NorthStar's motion for summary judgment is construed as a motion seeking leave to join in all of NorthStar's moving papers currently before the court, including NorthStar's motion for summary judgment, NorthStar's reply brief, and NorthStar's brief filed in response to plaintiff's motion for summary judgment. So construed, the motion is **GRANTED**.

Each of the cross-motions for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, as follows.

Braver's motion for summary judgment (doc. no. 117), brought on Braver's behalf and on behalf of the class, is **GRANTED** on count one. Yodel has direct liability for its actions in violation of 47 U.S.C. §227(b)(1)(B) and 47 C.F.R. §64.1200(a)(3), and NorthStar has vicarious liability for Yodel's actions in violation of that statute and regulation. Braver and the class are therefore granted summary judgment in their favor, against NorthStar and Yodel, on count one. In all other respects Braver's motion for summary judgment is **DENIED**.

NorthStar's motion for summary judgment (doc. no. 120), joined in by Yodel, is **GRANTED** on count three. There is no private right of action for violations of 47 C.F.R. § 64.1200(d). Accordingly, NorthStar and Yodel are entitled to summary judgment in their favor, against Braver, on the claim alleged by Braver in count three. *See*, n. 1, *supra*. In all other respects defendants' motion for summary judgment is **DENIED**.

The court desires to bring this case to a conclusion without undue delay. This case is **SET** for a status conference in chambers (to be attended by lead counsel for all parties) on August 13, 2019 at 8:30 a.m. The purposes of the status conference will include planning for a standardized claims process. To that end, the parties are **DIRECTED** to promptly confer with a view to agreeing on a claims process (at least in broad outline). A notice describing any such agreement shall be filed not later than noon on August 12, 2019. If the parties are unable to agree on a claims process, they shall file their respective proposals not later than noon on August 12, 2019.

IT IS SO ORDERED this 16th day of July, 2019.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE